UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD,

                    Plaintiff,


        v.                                                    CIVIL ACTION NO. 05-11005 GAO

CISCO SYSTEMS, INC., BRUCE
BASTIAN, KATE DCAMP, LYNN
FRASER, CELIA HARPER-GUERRA, and
RICK JUSTICE,

                    Defendants.


## AFFIDAVIT OF BRUCE E. FALBY

I, Bruce E. Falby, declare as follows:

1.      My name is Bruce E. Falby.  I am a partner at the law firm DLA Piper Rudnick

Gray Cary US LLP.  I represent the defendants in the captioned matter.  I also represent the

defendants in Bayad v. Chambers, et al., Civil Action No. 04-10468-GAO (D. Mass).

2.      Attached hereto as Exhibit A is a true and accurate copy of the Voluntary

Severance Agreement and General Release signed by Anthony Bayad and produced by

defendants in Bayad v. Chambers, et al., Civil Action No. 04-10468-GAO (D. Mass).

3.      Attached hereto as Exhibit B is a true and accurate copy of the Court's

Memorandum and Order in Bayad v. Chambers, et al., Civil Action No. 04-10468-GAO

(D. Mass), dated October 25, 2004.

4.      Attached hereto as Exhibit C is a true and accurate copy of Magistrate Bowler's

Report and Recommendation Re:  Defendants' Motion for Summary Judgment (Docket Entry

# 65); Plaintiff's Cross Motion for Summary Judgment (Docket Entry # 73) in <u>Bayad v.</u>

<u>Chambers, et al.</u>, Civil Action No. 04-10468-GAO (D. Mass), dated May 25, 2005.

Signed under the pains and penalties of perjury this 7th day of June 2005.

Respectfully submitted,

/s/ Bruce E. Falby

_____

Bruce E. Falby, BBO #544143
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated:  June 7, 2005

2

# EXHIBIT A



**VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE**

Notification Date: **25-APR-2001**

Anthony Bayad
278 Main Street Unit 1H
Melrose, MA 02176

Dear Anthony:

This Voluntary Severance Agreement and General Release ("Agreement") confirms our agreement regarding your separation from employment with Cisco Systems, Inc. ("Cisco" or "Cisco Systems"). Cisco Systems has conducted a reorganization of its business. As a result of that reorganization, your employment with Cisco shall end sixty (60) calendar days from your formal notice of this Agreement. This date is referred as the "Scheduled" final date of employment and is provided at the end of this Agreement for your reference. The sixty (60) calendar-day period from this notification to your "Scheduled" final date of employment is referred to as the "Transition Period."

You may voluntarily end your employment with Cisco early by signing this Agreement prior to your "Scheduled" final date of employment. Your employment will then end on the day this Agreement is executed. This date is referred to as the "Self-Selected" final date of employment. The severance benefits provided by this Agreement shall become available on or about fourteen (14) days following the execution of this Agreement as provided below.

    1.    **What You Will Receive:** You will receive your regular base pay through your "Scheduled" or "Self-Selected" final date of employment plus the value of your unused PTO earned through that date. You will also continue to be eligible for benefits coverage and stock vesting until this date. **In exchange for entering into this Agreement, including your agreed-upon ending of employment, Cisco agrees to provide you with the below-described additional consideration following your final date of employment:**

- **Severance Pay:** Severance pay equal to four (4) months of base pay less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **Pay In Lieu of Notice:** If you voluntarily sign this Agreement ending your employment prior to the expiration of the sixty (60) calendar-day Transition Period, you will still receive payment in lieu of notice for the remaining days in the Transition Period. This amount will be equal to the regular base pay you would have been entitled to for the period between your "Self-Selected" final date of employment and your "Scheduled" final date of employment, if any, less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **COBRA Premium Payments:** If you elect to continue group health coverage under COBRA, Cisco will pay the COBRA premiums for up to the first four (4) months of continuing coverage. (This does not apply to flexible health spending accounts.) Upon completion of the first four (4) months of COBRA coverage, Cisco will cease paying COBRA premiums and you will be responsible for all further COBRA payments.

- **Limited Option Exercise Period Extension:** All vested and available Cisco non-qualified stock option shares as of your final day of employment with Cisco, to the extent that the exercise price of such shares is more than the NASDAQ final market stock share price as of your final day of employment, will remain exercisable for twelve (12) months after your final day of employment with Cisco pursuant to the terms of Cisco's stock option plan, and subject to your executing any required implementation documents.

- **Outplacement Services:** On-line outplacement services as determined by Cisco and provided through Drake, Beam and Morin (DBM) (or an equivalent firm) for a period up to two (2) months from your final date of employment. (This is separate and in addition to the DBM Placement Services provide prior to your final date of employment.)

- **Relocation Loan Repayment Extension:** To the extent that you have a relocation loan secured by real property that will in part or in full become due within twelve (12) months of your final date of employment, Cisco will extend the time for repayment until twelve (12) months after your final date of employment. Interest will accrue during the repayment period at the rate specified in your loan documents, however if no rate of interest is specified, interest shall accrue at the minimum per annum rate if required to avoid the imputation of compensation income to you under the federal tax laws.

**II.    What You Are Agreeing To Release:** In consideration for the additional outplacement services, extended stock exercise period, COBRA premium payments, and four-month (4-month) severance lump sum payment, you release Cisco Systems, any affiliated companies, and their current and former officers, directors, agents, and employees and assigns from any and all claims up through the date of the execution of this Agreement, and you agree that your final date of employment shall be either the "Scheduled" date below or the earlier "Self-Selected" date. The claims subject to this release include, but are not limited to, those related to your employment with Cisco. All such claims (including related attorneys' fees and costs) are barred without regard to whether those claims are based on any alleged breach of a duty arising in statute, contract, or tort. This expressly includes waiver and release of any rights and claims arising under any and all laws, rules, regulations, or ordinances, including but not limited to the Age Discrimination in Employment Act (ADEA); the Workers Adjustment and Retraining Notification Act (WARN); Title VII of the Civil Rights Act of 1964, as amended; the Americans with Disabilities Act; the Equal Pay Act of 1963; the California Fair Employment and Housing Act (if applicable); and any similar law of any other state or governmental entity. The parties agree to apply California law in interpreting this Agreement. Accordingly, you further waive any rights under Section 1542 of the Civil Code of the State of California or any similar state statute. Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known to him, must have materially affected his settlement with the debtor."

**III.    Timeline For Considering and Signing the Agreement:** You understand and agree that you have been provided a period of sixty (60) days within which to consider whether you will execute this Agreement, no one hurried you into executing this Agreement during that sixty-day (60-day) period, and no one coerced you into executing this Agreement. The offer of this Agreement shall expire on the sixty-first (61st) day after you have received it. If this day is a Saturday, Sunday or holiday recognized by the U.S. Postal Service, the expiration date is extended to the next business day. Nonetheless, in limited circumstances such as a medical

emergency, Cisco reserves the right at its sole discretion to accept an Agreement signed after the expiration date.

Completed releases must be delivered or mailed to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050, on or before the end of the sixty-first (61st) day after receiving this Agreement. Unless you personally deliver the signed Agreement on or before this date, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before this date (the end of the sixty-first (61st) day after receiving this Agreement). The expiration which occurs on the sixty-first (61st) day of the Agreement will be extended to the next business day should it fall on a Saturday, Sunday or a holiday recognized by the U.S. Postal Service.

You understand that unless more time is allowed by applicable law, you have a limited period of seven (7) calendar days after signing to revoke your acceptance of this Agreement. You must deliver or mail written notification of revocation to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050. Unless you personally deliver the signed revocation within this seven (7) calendar-day period, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before the end of the seven (7) calendar day period after signing this Agreement. This deadline will be extended to the next business day should it fall on a Saturday, Sunday or holiday recognized by the U.S. Postal Service.

Because of this revocation period, you understand that the payment requirements of this Agreement shall not become effective or enforceable until the eighth (8th) calendar day after the date you sign this Agreement. Therefore, your severance payment will be made available to you on or about the fourteenth (14th) calendar day after you sign this Agreement.

Your employment will terminate on the day you execute this Agreement, but not later than the "Scheduled" final date of employment (which provides you with sixty (60) days' advance notification). Should you execute this Agreement prior to your "Scheduled" final day of employment, your employment will end on that "Self-Selected" day and you will become eligible for the severance benefits listed above. This specifically includes, if any, pay in lieu of notice from the "Self-Selected" until the "Scheduled" final day of employment.

**IV.    Protecting Your Rights:** You understand that rights or claims that may arise after the date this Agreement is executed are not waived. In understanding the terms of this Agreement and your rights, you are advised to consult with an attorney of your choice prior to executing this Agreement. Also, nothing in this Agreement shall prohibit you from exercising legal rights that are, as a matter of law, not subject to waiver such as: (1) your rights under applicable workers' compensation laws; (2) your right, if any, to seek unemployment benefits; and (3) your right to file a charge with appropriate administrative agencies such as the Equal Employment Opportunity Commission (EEOC). Additionally, Attachment A is incorporated into this Agreement. It contains important information about the age composition of those impacted by this business reorganization.

You understand that if you execute this Agreement before the sixty-day (60-day) notice period expires you will forgo benefits that would otherwise continue for the full sixty (60) days. (Cisco health insurance benefits terminate on the last day of the month during which your employment ends, unless coverage is continued through payment of the COBRA premium.) Nonetheless, you will receive a payment equal to your base pay for this period as described above. The option of an early "Self-Selected" final day of employment allows you to resign and immediately commence the seven-day revocation period and the waiting period for the receipt of severance benefits. This option is strictly voluntary. It may be appropriate for someone who wishes immediately

to commence other employment and will be covered under the new employer's benefit program, but again, this is your choice.

**WARNING: You are cautioned that important exercise rights regarding certain stock options commence running as of your final day of employment. You may be required to exercise your vested options as early as the final date of your employment, meanwhile thirty (30), sixty (60) and ninety (90) calendar day exercise periods from your final date of employment may also exist. Cisco will send you a courtesy notice regarding the exercise of these options usually within fifteen (15) days of your final date of employment, but it is your responsibility independently to determine your rights and take appropriate action. Failure to receive such a notice from Cisco following your final day of employment will not justify your failure to exercise vested options within the appropriate post-termination exercise period as set forth in your individual stock option grant agreements. Cisco disclaims any verbal or written representations or advice on the exercise of stock options other than what is contained in your written stock option grant agreements. You are encouraged to seek independent professional financial advice.**

**V:    Protecting Cisco's Rights:** In executing this Agreement, you acknowledge that you have not relied upon any statement made by Cisco, or any of its representatives or employees, with regard to this Agreement unless the representation is specifically included in this written Agreement. Furthermore, this Agreement contains our entire understanding regarding eligibility for and the payment of severance benefits and supersedes any or all prior representations and agreements regarding the subject matter of this Agreement. However, this Agreement does not modify, amend or supersede written Cisco agreements that are consistent with enforceable provisions of this Agreement such as Cisco's "Property Information and Invention Agreement" and Cisco's Arbitration Agreement and Policy. Once effective and enforceable, this Agreement can only be changed by another written agreement signed by you and each of the persons (or their designees) who sign below.

**VI:    Enforceability Of This Agreement:** Any controversy or any claim arising out of or relating to the interpretation, enforceability or breach of this Agreement shall be settled by arbitration in accordance with Cisco's Arbitration Agreement and Policy that you acknowledge receiving with your Notification Letter. If for any reason this Arbitration Agreement is not enforceable, you agree to arbitration under the employment arbitration rules of the American Arbitration Association or any successor hereto. The parties further agree that the arbitrator shall not be empowered to add to, subtract from, or modify, alter or amend the terms of this Agreement. Any applicable arbitration rules or policy shall be interpreted in a manner so as to ensure their enforceability under applicable state or federal law.
Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

We trust that the severance payment, placement services, and other considerations will assist you in your transition of employment. We wish you the best in your future endeavors.

**Notice: Your "Scheduled" Final Day of Employment is 25-JUN-2001**

I understand and accept the above terms and acknowledge receiving Appendix A, including the separately provided data on the job titles and ages of all individuals covered by the Program and on the job titles and ages of all individuals not covered by the Program. This data has been offered for a full forty-five (45) days prior to the expiration of the offer of this Agreement.

_____
Signature of Employee

**5 - 1 - 01**
_____
Date Actually Signed
(If signed and dated before Scheduled final date of employment shown below, this "Self-Selected" date is your final date of employment.)

**Anthony Bayad**
Printed Name of Employee

**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**
Cisco Employee # or Social Security Number

**7 3719**

**LEXINGTON, MA**
_____
Location Signed at (e.g., San Jose, CA, USA)

Thank you to all
of you and Good Luck

---

**FOR CISCO USE ONLY**

Received by:                                  Approved by

_Amy Hueger 5/3/01_              _Kathryn D Kathryn DCamp_
Name/Date                                    Name/Date*

*Approval to be binding on Cisco must be signed by Kate Dcamp, Vice President, Human Resources, or Authorized Designee.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that on 25-APR-2001 , I received the following documents:

- **US EMPLOYEE NOTIFICATION LETTER ;**

- **VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE**

- **ARBITRATION AGREEMENT AND POLICY,**

and that I have been advised that I must promptly and carefully read each document, as important rights will be affected

_____                    4/25/01
Signature of Employee                      Date

---

**FOR CISCO USE ONLY**

Anthony Bayad
Printed Name of Employee                   73799
Who Signed Above                           Cisco Employee #

Manager(s) or HR Representative(s) Present:

Lyn Fraser
Print Name                                 Print Name

**Immediately Return to: Brian O'Connor, MC SJC05/3/3 by interoffice mail or Brian O'Connor, 170 West Tasman Drive MC SJC05/3/3, San Jose, CA 95134 by post**

---

ERTS                        **FOR CISCO USE ONLY**

---

**Employee's mailing address and phone number for reception of additional documentation:**
Street: 222 Main Street Suite 1H
City: Melrose       State: MA ZIP: 02176
Phone: (781) 662-4750

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10468-GAO

ANTHONY BAYAD,
Plaintiff,

v.

JOHN CHAMBERS, PATRICIA RUSSO,
ANTHONY SAVASTANO, and CARL WIESE,
Defendants.

MEMORANDUM and ORDER
October 25, 2004

O'TOOLE, D.J.

Pro se plaintiff, Anthony Bayad, brings this employment discrimination action against individual defendants John Chambers, Patricia Russo, Anthony Savastano, and Carl Wiese, seeking monetary damages and declaratory and injunctive relief. The defendants have filed two motions to dismiss: one on behalf of Chambers, Savastano, and Wiese (Docket No. 17) and one on behalf of Russo (Docket No. 31). After careful consideration of the complaint and the briefs in support of and in opposition to the motions,[1] I conclude that oral argument is unnecessary and I make the following rulings based on the parties' submissions.

---

[1] I have considered the plaintiff's arguments in his Motion to Strike the Cisco Defendants' Partial Motion to Dismiss (Docket No. 20) as arguments in opposition to the three defendants' motion (Docket No. 17), and his Motion in Response to Defendant Russo's Motion to Dismiss (Docket No. 35) as his opposition to Russo's motion (Docket No. 31).

## I.    Summary of Alleged Facts

For the purpose of evaluating the motions to dismiss, the following factual allegations by the plaintiff are assumed to be provable:

Bayad is a Moroccan born United States citizen.  In 1995 he began working for Lucent Technologies, Inc. ("Lucent") as a manager in the company's Largo, Florida office, where he reported to Russo, Savastano and Wiese.  While at Lucent, Bayad created a plan of action to save Lucent's failing data networking business and communicated his plan to Russo, Savastano, Wiese, and Lucent Chairman, Henry Schachts.  Thereafter, Savastano and Russo sent Wiese to meet with Bayad and to advise him that by communicating Lucent's business flaw to Schachts, Bayad had given Lucent a black eye and that it would be just a matter of time before he was fired.

Over the course of his employment with Lucent, Bayad became aware that Russo, Savastano, Wiese, and other Lucent managers did not like him because of his Arab descent.  Russo, Savastano, and Wiese conspired to discriminate against Bayad by stripping him of his status as lead manager without cause and in order to humiliate him.

On January 21, 1997, Bayad applied for the vacant position of general manager of Lucent's Largo, Florida office, but Savastano refused to promote him and promoted a less experienced white employee instead.  Savastano also prevented Bayad's promotion to other management positions within Lucent.  In addition, Wiese told Bayad that Lucent would never promote or consider an Arab to be Vice President of Operations.

On January 23, 1997, Savastano directed Lucent corporate police to imprison Bayad in a room where he was mentally tortured, interrogated, intimidated, physically assaulted, and accused of stealing from Lucent by incurring personal charges on his corporate American Express credit card.

2

Savastano led the conspiracy to falsely accuse Bayad of stealing from the company. When Bayad tried to leave the room, Savastano and corporate security police attempted to restrain him and keep him in the room. A scuffle ensued and Bayad was dragged or thrown down a flight of stairs and ended up submerged head first in a fountain on the floor below. Bayad received injuries to his head and neck. While Bayad was on his way to the hospital, Savastano, who was on the phone with Wiese and Russo, terminated his employment with Lucent. The defendants also had Bayad committed to a psychiatric hospital for seventy-two hours before being released.

Between 1997 and 1999, Bayad attempted to find subsequent employment in the data networking industry, but Russo, Savastano, and Wiese conspired to prevent him from obtaining and sustaining employment with other companies, including Bay Network, Inc. and International Networking Services, Inc.

In April 2000, Bayad began working as a project engineer at the Lexington, Massachusetts office of Cisco Systems, Inc. ("Cisco"). During a business trip to Cisco's San Jose, California office, Bayad was spotted by Savastano, who was also now a Cisco employee. Savastano reported to John Chambers, the President of Cisco. Upon returning to Massachusetts, Bayad's manager, Lynn Fraser, began keeping close tabs on Bayad in order to find a reason to terminate his employment with Cisco.

In November 2000,[2] Bayad applied for the position of systems manager or engineer for Cisco in the North Africa region. After three interviews for the position in Dubai, London and Paris, Bayad was given a verbal offer by the region manager but was advised that the decision to hire him had to be approved by Cisco's corporate office in California. Even though Bayad, who speaks Arabic,

---

[2] It appears that Bayad incorrectly states this date as November 2, 2001 in paragraph 88 of his complaint, because he also alleges that he applied for the systems manager position *before* being terminated from Cisco in May 2001. Compl. ¶ 88.

French and English, was a perfect match for the position, he was not given the position. Bayad complained to Chambers of the discriminatory treatment and misconduct, but was ignored.

In May 2001, Bayad was terminated from Cisco. Lynn Fraser told Bayad that he was laid off due to the economy and that he would be eligible for rehire one year from the date of termination. His termination was completely pretextual. He was then asked to sign documents and contracts behind closed doors in the presence of Cisco corporate police. After Bayad's termination, Savastano told one of Bayad's former coworkers that Bayad and other minorities had no business at Cisco, and Chambers prevented Bayad from obtaining his Cisco Internetworking Expert Certification.

In September 2001, Bayad formed his own computer and networking technology company and attempted to do business with Cisco, but Chambers instructed Cisco employees not to do any business with minorities and Arabs such as Bayad.

Since at least September 2003, Bayad has applied for a multitude of employment opportunities at Cisco but has been denied a position. On or about December 3, 2003, in connection with one of Bayad's applications to Cisco, the defendants sent Bayad an email requesting he provide his ethnic or racial background and gender before Cisco could proceed with its hiring decision.

On March 8, 2004, Bayad filed the instant action.

## II.    Discussion

Chambers, Savastano, and Wiese, who are now all employees of Cisco, move to dismiss all of the claims against them, except for claims for violation of 42 U.S.C. § 1981 that arose after May 2001, on the grounds that they are barred by the applicable statutes of limitation, res judicata, collateral estoppel, have been released, or fail to comply with the statutory prerequisites for filing such claims. Russo moves to dismiss all of the claims against her on the grounds that they are barred

4

by the applicable statutes of limitation, res judicata, collateral estoppel, or because Title VII does not create individual liability.

    A.    <u>The Federal and State Employment Discrimination Claims</u>

        1.    The pre-June 1997 claims

Counts I, II, VII, VIII, and IX of Bayad's complaint can be considered together, as there are many overlapping allegations, primarily related to employment discrimination in one facet or another. However, the discrimination claims arising out of Bayad's employment and termination at Lucent (i.e. the pre-June 1997 claims) have already been considered by the United States District Court for the Southern District of Florida and summary judgment was granted for the defendants in that case (Civ. No. 97-06671-NCR).

On June 2, 1997, Bayad, represented by counsel, filed an employment discrimination action in the Southern District of Florida alleging causes of action under Title VII, the Florida Civil Rights Act, 42 U.S.C. § 1981, false imprisonment, intentional infliction of emotional distress, defamation, and breach of contract against Lucent, Savastano and others not parties to the present action. The allegations in his complaint in the Florida action are virtually identical to those in his complaint in this action with respect to events surrounding his employment and termination at Lucent. He also alleged in the Florida action that unnamed Lucent personnel interfered with his attempts to find subsequent employment after he was terminated from Lucent. Summary judgment was granted for the defendants in that action and the Eleventh Circuit dismissed Bayad's appeal.

The judgment in the Florida action bars relitigation of Bayad's Title VII, § 1981, false imprisonment, intentional infliction of emotional distress, and breach of contract claims against Savastano, Wiese and Russo arising out of their pre-June 1997 conduct. See Massachusetts Sch. of Law v. Am. Bar Ass'n, 142 F.3d 26, 38 (1st Cir. 1998) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)). Savastano was a named defendant in the Florida action. Wiese and Russo were allegedly co-conspirators in the discriminatory actions taken against Bayad at Lucent who should have been joined in the Florida action, and Bayad has not offered any good reason why they were not named in that action. Massachusetts Sch. of Law, 1142 F.2d at 38; see also In re El San Juan Hotel Corp., 841 F.2d 6, 10-11 (1st Cir. 1988). His assertion of these pre-June 1997 claims here is an impermissible attempt to relitigate issues already decided.[3]

    2.    The post-June 1997 Title VII and Mass. Gen. Laws ch. 151B claims

Bayad's Title VII claims against all of the defendants must be dismissed because individuals are not subject to suit under Title VII. Foley v. Univ. of Houston Sys., 355 F.3d 333, 340 n.8 (5th Cir. 2003); Holly D. v. California Inst. of Tech., 339 F.3d 1158, 1179 (9th Cir. 2003); Akers v. Alvey, 338 F.3d 491, 500 (6th Cir. 2003); Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1078 (3d Cir. 1996) (en banc).

---

[3] As evidence of his desire for a second bite at the apple, Bayad claims in his current complaint that he is confident that "this time around" the defendants will be declared in violation of the law. Compl. ¶ 61.

Bayad alleges violations of "Massachusetts State law" in Counts I, II, VII, VIII, and IX.[4] I construe the complaint as alleging violations of chapter 151B of the Massachusetts General Laws. See Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 n.2 (1st Cir. 1995) ("Mass. Gen. L. ch. 151B is the exclusive remedy under Massachusetts law for employment discrimination claims."). Unlike Title VII, chapter 151B allows for personal liability of individual employees. Thomas v. EDI Specialists, Inc., 773 N.E.2d 415, 420 (Mass. 2002). However, Bayad's post-June 1997 discrimination claims under Massachusetts law are subject to dismissal for failure to first file a timely administrative complaint with respect to these claims. See Mass. Gen. Laws. ch. 151B, §§ 5-9; Carter v. Comm'r of Correction, 681 N.E.2d 1255, 1259 (Mass. App. Ct. 1997).

Bayad alleges that he filed a charge with the federal Equal Employment Opportunity Commission on April 4, 1997, as a precursor to his Florida lawsuit and was issued a "right-to-sue" letter on April 22, 1997. Compl. ¶ 59. He then filed the Florida action on June 2, 1997. He did not timely file a complaint with the Massachusetts Commission Against Discrimination (the "MCAD"), as is required prior to seeking redress in the courts. See Mass. Gen. Laws. ch. 151B, §§ 5-9; Lindsay v. Future Elec. Corp., 930 F. Supp. 677, 678 (D. Mass. 1996) (filing charge with EEOC insufficient to satisfy exhaustion requirement under Mass. Gen. Laws ch. 151B). Bayad's failure to timely file an administrative complaint with the MCAD requires dismissal of his discrimination claims under Massachusetts law.

---

[4] The complaint also alleges that the defendants violated the "Fair Labor [A]ct" and the "Massachusetts Rules of Law." Compl. ¶¶ 143, 146.

7

3.      The post-June 1997 § 1981 claims

Bayad's § 1981 claims have a four-year statute of limitations. See Jones v. R.R. Donnelley
& Sons Co., __ U.S. __, 124 S.Ct. 1836, 1845-46 (2004).  Therefore, his § 1981 claims against
Chambers, Savastano, and Wiese for discriminatory conduct that occurred prior to March 8, 2000
are time barred, but § 1981 claims against these defendants that arose after March 8, 2000 survive.
Because all of the allegations against Russo concern events that occurred prior to March 8, 2000,
Bayad's § 1981 claims against her are time barred.

4.      The post-June 1997 § 1985 and state law conspiracy claims

Similarly, Bayad's conspiracy claims under 42 U.S.C. § 1985 and Massachusetts law against
Chambers, Savastano, and Wiese for discriminatory conduct that occurred prior to March 8, 2001
are time barred because these claims are subject to a three year statute of limitations.  Nieves v.
McSweeney, 73 F. Supp.2d 98, 102 n.4 (D. Mass. 1999), aff'd, 241 F.3d 46 (1st Cir. 2001).[5]
But § 1985 and state law civil conspiracy claims against these defendants that arose after March 8,
2001 survive.  Because all of the allegations against Russo concern events that occurred prior to
March 8, 2001, Bayad's § 1985 and state law conspiracy claims against her are time barred.

I reject the defendants' contention that the narrow "intracorporate conspiracy doctrine"
requires dismissal of Bayad's § 1985 claims at this stage of the litigation, as I find he has at least
sufficiently alleged a series of acts over time by Chambers, Savastano, and Wiese going beyond simple
ratification of managerial decisions.  See Strathos v. Bowden, 728 F.2d 15, 21 (1st Cir. 1984).

---

[5]  Bayad fails to articulate a specific legal basis for his conspiracy allegations in Count V, so I
liberally construe this count as setting forth a claim under both federal and state law.

8

B.    The State Law Tort and Contract Claims

    1.    False imprisonment

Though Bayad alleges false imprisonment under both federal and Massachusetts law, Count III is essentially a claim under state tort law for events occurring in 1997 and is therefore time barred. See Lavecchia v. Massachusetts Bay Transp. Auth., 804 N.E.2d 932, 936 (Mass. 2004) (noting three-year statute of limitations for false imprisonment claims under Mass. Gen. Laws ch. 260, § 2A). This claim is also barred under the doctrine of res judicata. See discussion, supra, Part II(A)(1). To the extent that Bayad alleges a claim for false imprisonment during his tenure at Cisco, there are no factual allegations to support such a claim against the named defendants. The arguably relevant allegations are that Lynn Fraser at Cisco, who is not a defendant in this action, confined Bayad to a room to sign Cisco documents upon his termination. Compl. ¶ 104. Accordingly, Count III is dismissed against all defendants.

    2.    Intentional infliction of emotional distress and
        breach of contract

As noted above, Bayad's pre-June 1997 intentional infliction of emotional distress and breach of contract claims are barred under the doctrine of res judicata. See discussion, supra, Part II(A)(1). Bayad fails to adequately plead claims under Massachusetts law for intentional infliction of emotional distress and breach of contract for conduct that occurred post-June 1997. Counts IV and VI are dismissed against all defendants.

9

**III.    Conclusion**

For all the foregoing reasons, the motion to dismiss of Chambers, Savastano, and Wiese (Docket No. 17) is GRANTED IN PART AND DENIED IN PART, and the motion to dismiss of Russo (Docket No. 31) is GRANTED.    All of the claims against Chambers, Savastano, and Wiese except for the § 1981 claims against them that arose after March 8, 2000 and the § 1985 and state law conspiracy claims against them that arose after March 8, 2001, are dismissed.  The complaint is dismissed in its entirety as against Russo.

It is SO ORDERED.

October 25, 2004                                    \s\ George A. O'Toole, Jr.

DATE                                                        DISTRICT JUDGE

10

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD, Pro Se,
    Plaintiff,

    v.                                    CIVIL ACTION NO.
                                          04-10468-GAO
JOHN CHAMBERS, PATRICIA RUSSO,
ANTHONY SAVASTANO, and
CARL WIESE,
    Defendants.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 65);**
**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 73)**

**May 25, 2005**

**BOWLER, U.S.M.J.**

    Pending before this court are cross motions for summary
judgment filed by defendants John Chambers ("Chambers"), Anthony
Savastano ("Savastano") and Carl Wiese ("Wiese") (collectively,
"defendants") (Docket Entry # 65) and plaintiff Anthony Bayad
("Bayad") (Docket Entry # 73). After conducting a hearing on
March 22, 2005, this court took the motions (Docket Entry ## 65 &
73) under advisement.


PROCEDURAL BACKGROUND

    Bayad filed the instant action on March 8, 2004. The
complaint alleges numerous counts of employment discrimination
under Title VII, 42 U.S.C. § 1981 ("section 1981"), 42 U.S.C. §
1985 ("section 1985") and Massachusetts General Laws chapter 151B

("chapter 151B") in addition to claims of false imprisonment, intentional infliction of emotional distress and breach of contract. (Docket Entry # 1). In October 2004, the court dismissed all claims except the section 1981 claims arising after March 8, 2000, and the conspiracy claims under section 1985 and Massachusetts law arising after March 8, 2001.[1] Chambers, Savastano and Wiese are the only remaining defendants.[2] In sum, the only claims remaining before this court are the post-March 8, 2000 claims under section 1981 and the post-March 8, 2001 conspiracy claims against Chambers, Savastano and Wiese.

Bayad complains that defendants individually and collectively acted and conspired to discriminate against him by denying him employment opportunities at Cisco System's, Inc. ("Cisco") on account of his race and national origin. (Docket Entry # 1). Reduced to their essence, Bayad's allegations relevant to defendants' post-March 8, 2000 conduct revolve around a denial of a promotion, his termination and the failure to rehire. (Docket Entry # 1, ¶¶ 79-143).

Generally speaking, Bayad's complaint recounts the following story. In November 2000, while employed at Cisco, Bayad applied

---

[1]   The court dismissed the section 1981 claims arising prior to March 8, 2000, as well as the conspiracy claims under section 1985 and Massachusetts law arising prior to March 8, 2001, as time barred.

[2]   All claims against Patricia Russo were dismissed as either time barred or precluded under res judicata.

2

for a transfer/promotion to a systems manager position in Cisco's North Africa region. Bayad was flown abroad for three separate interviews for the position at Cisco's expense in the cities of Dubai, London and Paris. Following the interviews, Bayad received a verbal offer for the position but was advised that the decision would have to be approved by Cisco's corporate office in California. Despite claiming to be "highly qualified" due to his language background and knowledge of the North African region, Bayad was ultimately rejected for the transfer position. Around this time, Savastano purportedly ordered Lynn Fraser ("Fraser"), Bayad's manager, to "micromanage" Bayad in order to find grounds to terminate his employment with the company. Bayad was ultimately terminated in May of 2001. Following Bayad's termination, he applied for several positions with Cisco but was denied employment in each instance. Bayad asserts that the denial of the promotion, his subsequent termination and the failure to rehire all resulted from defendants' racial animus.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

3

56(c); <u>Seaboard Surety Co. v. Town of Greenfield</u>, 370 F.3d 215, 218 (1st Cir. 2004). A factual issue is "genuine" where "the evidence on the point is such that a reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party." <u>Blackie v. State of Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996). A factual issue is "material" where it "has the potential to alter the outcome of the suit under the governing law." <u>Blackie v. State of Maine</u>, 75 F.3d at 721.

The burden initially rests with the party seeking summary judgment to demonstrate that "no genuine issue of material fact exists." <u>National Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir. 1995). The party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . party's pleading." Fed. R. Civ. P. 56(e). The nonmovant, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e); <u>Triangle Trading Co. v. Robroy Ind., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999). Factual disputes must be resolved in a "light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir. 1995).

Cross motions for summary judgment do not alter the normal summary judgment standard. <u>Wightman v. Springfield Terminal Ry.</u>

4

<u>Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996).  "Cross motions simply require us to determine whether either of the parties deserves judgment as a mater of law on facts that are not disputed." <u>Wightman v. Springfield Terminal Ry Co.</u>, 100 F.3d at 230.

## FACTUAL BACKGROUND[3]

Bayad began working for Cisco at its Lexington, Massachusetts facility in May 2000.  At the time of Bayad's employment, Cisco maintained approximately 40,000 employees.  The title of Bayad's position was Project Engineer II.  Fraser, currently employed as the Senior Sales Manager/Advanced Services in the company's Lexington, Massachusetts facility (the

---

[3] Facts are taken from the affidavits and the agreed upon facts set forth in the parties' Local Rule 56.1 statements. Citations to the record are provided only for direct quotes. Facts are construed in a light most favorable to the nonmoving party.
    Pursuant to Local Rule 56.1, defendants properly submitted a statement of undisputed facts along with their memorandum in support of summary judgment.  (Docket Entry # 67).  Bayad, on the contrary, failed to submit his own Local Rule 56.1 statement with either his opposition or cross motion.  In this situation, "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for the purposes of the motion to be admitted by the opposing parties unless controverted by the statement required to be served by opposing parties."  LR. 56.1.  While courts must allow for the liberal construction of complaints by pro se litigants in accordance with <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521 (1972), a litigant's status as pro se "does not insulate him 'from complying with procedural and substantive law.'"  <u>Kenda Corp., Inc. v. Pot O'Gold Money Leagues</u>, 329 F.3d 216, 225 n.7 (1st Cir. 2003) (citations and internal quotations omitted).  Accordingly, defendants' statement of undisputed facts (Docket Entry # 67) shall be adopted into the factual record.

"Massachusetts facility"), interviewed Bayad for the Project Engineer II position in or around April 2000 and subsequently extended an offer of employment.  During the interview, Bayad informed Fraser that he expected to attain his Cisco Certified Internetworking Engineer ("CCIE") certification within a short period of time.[4]  Throughout Bayad's employment with Cisco, Fraser served as Bayad's manager and direct supervisor.

Chambers is the Chief Executive Officer and President of Cisco and has been employed by the company at its San Jose, California facility (the "California facility") from 1991 to the present.  Savastano is Cisco's Vice President of Finance and has been employed by the company at the California facility from April 28, 2000 to the present.  Wiese has served as Area Vice President for Advanced Technology at Cisco's Edison, New Jersey office from August 27, 2002 to the present.

In or around February 2001, Cisco management notified Fraser that "due to an economic downturn" the company would be forced to undergo a large scale reduction in force ("RIF") "by laying off approximately 8500 total employees."  (Docket Entry # 68, Att. 3, ¶ 18).  All Cisco managers were instructed to reduce the number of workers on their respective teams "based upon an assessment of

---

[4]  According to Fraser, while the "CCIE certification was not essential for [Bayad's] position . . . it is a highly desired qualification because, occasionally, it may be a direct customer requirement or required for a particular effort."  (Docket Entry # 68, Att. 3, ¶ 7).

their team members' contribution to the team's overall profitability." (Docket Entry # 68, Att. 3). Based on this directive, Fraser determined that four members of her team would have to be terminated. This group of individuals consisted of Bayad, two white males and an additional male whose race and ethnicity Fraser was unable to recall.

At the time of his termination, Bayad had been employed at Cisco for less than one year and was the most junior member of Fraser's team. While employed at Cisco, Bayad was not assigned as a primary leader to any significant project. Bayad had spent the majority of his time studying for the CCIE certification exam, which he ultimately failed to obtain. Fraser avers that defendants had no involvement in and in no way influenced her decision to select Bayad for lay off.

On April 25, 2001, Fraser informed the four members of her team selected for termination, including Bayad, that they were being layed off due to failing economic conditions. The terminations were to be effective no later than June 25, 2001. The individuals were informed that they would be eligible for rehire after one year in accordance with Cisco's rehire policy. The individuals were each provided with a Voluntary Severance Agreement and General Release ("Release"). Under the conditions of the Release, each individual was entitled to a severance payment conditioned upon that individual waiving any then-

existing claims against Cisco.  Bayad and the others were each
provided up to 60 days to accept or decline the Release.  Bayad
executed the Release and accepted the severance payment on May 1,
2001, seven days after he was provided with the document by
Fraser.[5]  According to the terms of the Release, Bayad was
allowed up to seven days to revoke his acceptance, which he
ultimately declined to do.  On the Release below his signature,
Bayad wrote, "Thank you to all of you and Good Luck."  (Docket
Entry # 68, Att. 3, Ex. A).

     In the fall of 2003, Bayad applied for and was denied a
position with Cisco as Systems Engineer II at the Massachusetts
facility.  According to Cisco's personnel records, the position
required "extensive experience in Network Security and, following
a preliminary telephone screening interview, the hiring manager
determined that" Bayad lacked this necessary minimum requirement.
(Docket Entry # 68, Att. 7, ¶ 11).  The individual ultimately
selected for the position had "extensive experience in Network
Security and had won Cisco's 'Systems Engineer of the Year' award
the previous year."  (Docket Entry # 68, Att. 7, ¶ 12).

     Around the same time, Bayad applied for an additional
position with Cisco as a "Voice Specialist" position in the

_____

     [5]  Bayad's complaint alleges that he was forced to sign the
Release behind "closed doors" in the presence of Cisco's
"Corporate Police."  Bayad, however, has failed to support this
assertion through an affidavit or evidence otherwise allowable
under Rule 56, Fed. R. Civ. P.

California facility.[6]  (Docket Entry # 68, Att. 7, ¶ 13).  Upon

considering Bayad's application, the Human Resources Manager

contacted Fraser, Bayad's former supervisor, and was informed

that Bayad had never completed the CCIE certification.  Moreover,

"Cisco was not at that time paying to relocate prospective

employees."  (Docket Entry # 68, Att. 7, ¶ 13).  Because Bayad

was then living in Massachusetts and the position was in

California, relocation would have been necessary had Cisco

decided to hire Bayad.  Based on these factors, Bayad was not

selected for the position.[7]

In reviewing company records, defendants have been unable to

uncover any documents or testimony supporting Bayad's allegation

that he applied for a transfer position in November 2000.[8]  As of

_____

[6]  The record does not expressly reflect the time period of
Bayad's application for the Voice Specialist position.  Based on
the email correspondence from the Human Resources Manager, the
time frame for this application appears to have been the fall of
2003.  (Docket Entry # 68, Att. 7, Ex. C).

[7]  In his complaint, Bayad alleges that he applied for a
number of positions at Cisco.  (Docket Entry # 1).  Cisco's
personnel files, however, contain no record of Bayad applying for
any positions other than the two described above.  Cisco's Human
Resources department has inquired whether various employees
likely to have knowledge about these positions have any
independent recollection of Bayad's application.  All have
answered in the negative.  Moreover, while Bayad raises these
allegations in his complaint, he presents no evidence through
affidavit or other means allowable under Rule 56, Fed. R. Civ. P.

[8]  In her affidavit, Paula Hughes, Cisco's Human Resources
Manager, avows that after conducting "an exhaustive search of
Cisco's records," she has "located no documents, memoranda,

9

November 2000, Bayad had been employed at Cisco for approximately six months.  Pursuant to Cisco's transfer and promotion policy, an employee was ineligible for transfer or promotion until completing one year of employment absent approval from a manager. Fraser does not recall Bayad ever seeking her approval for a transfer to North Africa.  Cisco's policy further requires "Cisco's Recruiting department to notify the manager of the employee" whenever an employee is seeking another position. (Docket Entry # 68, Att. 3, ¶ 12).  Fraser does not recall receiving notification from the Recruiting department of Bayad's seeking a transfer in November 2000.  Cisco records further reflect that Bayad did not seek or receive paid time off during November 2000, the time he alleges he was interviewing in Europe and Africa.  According to company records, Bayad received regular pay for performing his duties at Cisco's Lexington, Massachusetts facility.

While Bayad's complaint asserts numerous factual allegations, summarized above, the majority are unsupported through affidavits or other forms of properly documented evidence that may be considered at summary judgment.  The only evidence submitted by Bayad that comports with Rule 56(e), Fed. R. Civ.

---

vouchers or any other such materials that substantiate . . .
Bayad's allegations that (1) he applied for the [North Africa]
position, (2) he was flown at Cisco's expense to Europe or Africa
to interview for the position or (3) he interviewed with Cisco
engineers for the position."  (Docket Entry # 68, Att. 7, ¶ 5).

10

P., is the affidavit of Amado Navas ("Navas"), another former employee of Cisco. (Docket Entry # 75). According to Navas, shortly after Savastano began working at Cisco, Savastano traveled to the Cisco office in Saint Petersburg, Florida, where Navas was employed and proceeded to threaten Navas. Savastano instructed Navas to relay a massage to Bayad "that his days at Cisco are numbered" because "[Savastano's] friend Lynn Fraser [sic] will take care of him soon." Savastano further stated that, "[Bayad] and his people need to go back where they came from, ha ha . . .." (Docket Entry # 75).

Bayad also submits as documentary evidence an alleged no-hire list maintained by Cisco on which his name appears. The top of the no-hire list reads: "Do not hire/transfer/promote Anthony Bayad Cisco Empl # 3799*** Should you have any questions, contact Tony Savastano regarding Anthony Bayad." (Docket Entry # 77). In submitting the document, however, Bayad fails to attach any affidavit to authenticate the document. Defendants challenge the lack of authentication and Bayad fails to explain how the document came into his possession. Absent proper authentication, this court cannot properly consider the alleged no-hire list as evidence supporting Bayad's opposition or cross motion for summary judgment. Fed. R. Civ. P. 56(e); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (failure to authenticate documents

11

precludes consideration in a motion for summary judgment).[9]

DISCUSSION

I. Cisco's Release Agreement

Bayad's complaint raises essentially three separate incidents of racial discrimination by defendants: (1) Bayad's termination from Cisco in May 2001; (2) Bayad's denial of a transfer or promotion to Cisco's North African facility in November 2000; and (3) defendants' failure to rehire Bayad in the fall of 2003 for two separate positions following his termination. Defendants argue that Bayad's valid execution of the Release on May 1, 2001, precludes any claims arising from his employment with and termination from Cisco.

As a general rule, releases of federal statutorily created claims, including those involving employment discrimination, are given legal effect provided that the releases are "knowing and voluntary, as evidenced by the totality of the circumstances." Melanson v. Browning-Ferris Industries, Inc., 281 F.3d 272, 274

---

[9] In their motion for summary judgment, defendants dispute the authenticity of Bayad's no-hire list. Defendants, including Savastano, have each submitted an affidavit averring that they have never seen a copy of the document before Bayad produced it during this litigation. Savastano further avers that he has never placed or instructed anyone to place Bayad's name on a "no-hire" list. After conducting extensive investigation, Cisco's Human Resources department has found no evidence to authenticate the alleged no-hire list.

(1st Cir. 2002) (knowing and voluntary execution of release waiving all claims against employer precluded employee's Title VII claim).  The employer carries the burden of demonstrating that the release was knowing and voluntary.  Melanson v. Browning-Ferris Industries, Inc., 281 F.3d at 276.  To determine whether a given release was knowing and voluntary, the First Circuit has developed a set of six factors:  "(1) plaintiff's education and business experience; (2) the respective roles of the employer and employee in . . . determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice; and (6) the consideration for the waiver." Melanson v. Browning-Ferris Industries, Inc., 281 F.3d at 276 n. 4 (citing Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181 n.3 (1st Cir. 1995)).  Of course, "'no single fact or circumstances is entitled to talismanic significance on the question of waiver.'"  Melanson v. Browning-Ferris Industries, Inc., 281 F.3d at 276 (quoting Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d at 181).

In the instant case, Bayad was offered 60 days to review and execute the Release.  This would have afforded Bayad plenty of time to consider the terms of the Release and to consult counsel if he so desired.  The terms of the Release clearly state that, upon execution, the employee agrees to "release Cisco Systems,

13

any affiliated companies, and their current and former officers,
directors, agents, and employees and assigns from *any and all*
*claims* up through the date of the execution." (Docket Entry #
68, Att. 3, Ex. A) (emphasis added). In no uncertain terms, the
Release states:

> This expressly includes waiver and release of any rights and
> claims arising under any and all laws, rules, regulations,
> or ordinances, including but not limited to the Age
> Discrimination in Employment Act (ADEA); the Workers
> Adjustment and Retraining Notification Act (WARN); Title VII
> of the Civil Rights Act of 1964, as amended; . . . and any
> similar law of any other state or governmental entity.

(Docket Entry # 68, Att. 3, Ex. A). This language is
sufficiently clear to put Bayad on notice that, by signing the
Release, he would be waiving any claims of employment
discrimination against Cisco and its employees that arose during
his employment until May 1, 2001, the date the Release was
executed.

Bayad argues that his execution of the Release was not
voluntary because he was forced to sign the document under
duress.[10] Other than the allegations of his complaint, however,
Bayad has come forward with no evidence to support this
conclusion.[11] Nor does the imminent fact of Bayad's termination
constitute a circumstance of duress. Melanson v. Browning-Ferris

---

[10] Bayad alleges that he was forced to sign the Release
behind closed doors and in the presence of Cisco's corporate
police. (Docket Entry # 1, ¶ 104).

[11] See footnote number five.

14

Industries, Inc., 281 F.3d at 277 (the normal emotional and
financial stress associated with termination is insufficient, by
itself, to create an inference of duress). Bayad's own words
written on the Release below his signature, "Thank you to all of
you and Good Luck," further contradict his assertion of duress.
The allegations in Bayad's complaint, absent further evidence,
are insufficient to create a genuine factual dispute as to
whether the Release was knowing and voluntary in light of the
evidence put forth by defendants.

Summary judgment is therefore warranted as to Bayad's claims
arising from his employment with Cisco from May 1, 2000 to May 1,
2001. Bayad's section 1981, section 1985 and Massachusetts law
conspiracy claims arising from his termination and the November
2000 denial of promotion are therefore subject to summary
judgment. Thus, the only remaining issues to be decided are the
section 1981 and conspiracy claims regarding the two incidents of
the failure to rehire Bayad in the fall of 2003.

II. Bayad's Remaining Section 1981 Claims

Defendants raise two arguments in support of granting
summary judgment as to Bayad's claims under section 1981. First,
defendants argue that their lack of personal knowledge and
involvement regarding any decisions made concerning Bayad's
employment bar liability under section 1981. Second, defendants
further submit that Bayad has failed to establish a genuine issue

15

of material fact that he was subjected to employment
discrimination by any person at Cisco.  The issue of personal
knowledge and section 1981 liability need not be addressed
because Bayad ultimately fails to make a substantive case for
discrimination.  In reviewing the record, this court finds
insufficient evidence from which a reasonable jury could conclude
that defendants' failure to hire Bayad on either occasion was the
result of race-based animus.

For cases involving disparate treatment in the employment
sector, courts use the common analytical framework outlined by
the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.
792, 802-805 (1973), and <u>Texas Department of Community Affairs v.
Burdine</u>, 450 U.S. 248, 253-254 (1981).  Under this framework, the
plaintiff bears the initial burden of establishing each element
of his or her prima facie case.  <u>McDonnell Douglas Corp. v.
Green</u>, 411 U.S. at 802.  This minimal showing functions to raise
an inference of discrimination.  <u>Texas Department of Community
Affairs v. Burdine</u>, 450 U.S. at 253-254.  The burden then shifts
"to the employer to articulate some legitimate, non-
discriminatory reason" for the employment action.  <u>McDonnell
Douglas Corp. v. Green</u>, 411 U.S. at 804.  The plaintiff then
carries the final burden of "proving that the legitimate reasons
offered by the [employer] were not its true reasons, but were a
pretext for discrimination."  <u>Texas Department of Community</u>

<u>Affairs v. Burdine</u>, 450 U.S. at 253.

In establishing pretext, a plaintiff may present evidence including but not limited to "evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence." <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d 62, 72 (1st Cir. 2004). Additional evidence of discriminatory animus is not necessarily required. "In a proper case, the trier of fact may infer the ultimate fact of discrimination from components of the plaintiff's prima facie showing combined with compelling proof of the pretextual nature of the employer's explanation." <u>Rathbun v. Autozone, Inc.</u>, 361 F.3d at 72.

"Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case." <u>Rodriguez-Torres v. Carribean Form Manufacturer, Inc.</u>, 399 F.3d 52, 58 (1st Cir. 2005). Bayad's final allegation of discrimination arises from Cisco's rejection of his two applications for employment in the fall of 2003: the Systems Engineer II position at the Massachusetts facility and the Voice Specialist position at the California facility. To establish a failure to hire claim, an employee must show that: "(1) he is a member of a protected class . . .; (2) he applied for an open position; (3) he was not hired; and (4) the [employer] sought to fill the positions with individuals who had qualifications similar to his." <u>Lewis v. City of Boston</u>, 321 F.3d 207, 217 (1st

17

Cir. 2003).

Regarding the Systems Engineer II position, though Bayad establishes the first three elements of his prima facie case, he fails to establish the fourth. Defendants have submitted evidence that the System Engineer II position required extensive experience in Network Security, which Bayad did not possess. Defendants have further submitted that the individual ultimately selected for the position did possess such qualifications. Bayad has not provided evidence that would support an inference that Cisco sought to fill the Systems Engineer II position with a person of similar qualifications.

Bayad's only remaining allegation under section 1981 is his rejection for the Voice Specialist position. Even supposing Bayad has put forth evidence to establish each prima facie element, defendants nevertheless submit two legitimate non-discriminatory reasons for denying Bayad's application. First, the Human Resources Manager chose not to select Bayad after learning that he had never completed the CCIE certification. Second, at the time of Bayad's application, Cisco was not paying to relocate prospective employees.[12]

The burden then shifts to Bayad to demonstrate that

---

[12] The Voice Specialist position was located at Cisco's California facility, whereas Bayad was living in Massachusetts. Thus, relocation would have been necessary had Bayad been selected.

defendants' proffered reasons are a pretext for discriminatory animus.  To establish pretext, Bayad may demonstrate that the adverse employment action was "(i) more likely motivated by discrimination than by the explanation proffered by [defendants], or (ii) the proffered explanation [was] unworthy of credence." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001) (citations and internal quotations omitted).  Bayad's only evidence of pretext are the discriminatory comments and threats against Bayad made by Savastano, as recounted in the affidavit of Navas.[13]  (Docket Entry # 75).

Under certain circumstances, discriminatory remarks made by key decisionmakers or individuals in a position to influence key decisionmakers may constitute evidence of pretext.  Walton v. Nalco Chemical Co., 272 F.3d 13, 24 (1st Cir. 2001) (citing Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001)); see also Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000).  At the same time, "statements made by nondecisionmakers or decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

---

[13]  Defendants heavily dispute the veracity of the facts alleged in the Navas affidavit.  For the purpose of resolving defendants' motion for summary judgment only, the facts alleged in the affidavit will be taken as true.

19

While Savastano was Cisco's Vice President of Finance, he was not the key decisionmaker in regards to Bayad's application for the Voice Specialist position. Savastano has submitted an affidavit explicitly denying involvement in any decision regarding Bayad's employment with Cisco. There is no evidence that the Cisco Human Resources Director, who actually made the employment decision at issue, harbored discriminatory animus against Arabs. The only outside factor considered by the Human Resources Director in denying Bayad's application was the statement of Fraser that Bayad had never completed his CCIE certification.[14] Even if one could draw an inference that Fraser harbored discriminatory animus, through the influence of Savastano, nothing indicates that the information she gave to the Human Resources Director was either false or misleading. Thus, the evidence supplied by Bayad, which includes the Navas affidavit, is insufficient to rebut the legitimacy of defendants' proffered reasons for the failure to hire.

III.  Bayad's Remaining Section 1985 Claims

Section 1985(3) "confers a private right of action for injuries occasioned when 'two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any persons or class of persons of the equal protection of the

---

[14]  Notably, the Human Resources Director contacted Fraser at the request of Bayad.

laws, or of equal privileges and immunities under the laws . .

..'" Aulson v. Blanchard, 83 F.3d 1, 3 n.2 (1st Cir. 1996); 42

U.S.C. § 1985(3).

> To state a claim under 1985(3) a plaintiff must allege the
> existence of (1) a conspiracy, (2) a conspiratorial purpose
> to deprive a person or class of persons, directly or
> indirectly, of the equal protection of the laws or of equal
> privileges and immunities under the laws, (3) an overt act
> in furtherance of the conspiracy, and (4) either (a) an
> injury to person or property, or (b) a deprivation of a
> constitutionally protected right or privilege.

Aulson v. Blanchard, 83 F.3d at 3 (citing Griffin v.

Breckenridge, 403 U.S. 88, 102 (1971)).

Defendants correctly point out that Bayad is unable to

demonstrate that he was deprived of a constitutionally protected

right or privilege.  As discussed in the preceding section, Bayad

presents insufficient evidence for a reasonable jury to conclude

that Cisco's failure to hire him was the result of discrimination

as opposed to the legitimate reasons proffered by defendants.

Because Bayad cannot support his substantive claims under section

1981, his conspiracy claims must likewise fail.  Torres-Rosado v.

Rotger-Sabat, 335 F.3d 1 (1st Cir. 2003) (summary judgment

against conspiracy claim upheld where the plaintiff failed to

demonstrate a constitutional deprivation).  Accordingly, Bayad's

remaining section 1985 claims are without merit.

IV.  Bayad's Massachusetts Law Conspiracy Claims

Massachusetts law recognizes a "very limited" and "rare"

cause of action for conspiracy, often referred to as "true

21

conspiracy."  <u>Massachusetts Laborers' Health & Welfare Fund v.</u>
<u>Phillip Morris, Inc.</u>, 62 F.Supp.2d 236, 244 (D.Mass. 1999).  The
plaintiff is required to "allege and prove that by 'mere force of
number acting in unison' the defendants exercised 'some peculiar
power of coercion of the plaintiff which any individual standing
in a like relation to the plaintiff would not have had."
<u>Massachusetts Laborers' Health & Welfare Fund v. Phillip Morris,</u>
<u>Inc.</u>, 62 F.Supp.2d at 244 (quoting <u>Fleming v. Dane</u>, 22 N.E.2d
609, 611 (Mass. 1939)).  In "true conspiracy" cases "the wrong
was in the particular combination of the defendants rather than
in the tortuous nature of the underlying conduct."  <u>Kurker v.</u>
<u>Hill</u>, 689 N.E.2d 833, 836 (Mass.App.Ct. 1998).  "For 'true
conspiracy' the plaintiff must prove that concerted action gave
the defendants a 'peculiar power of coercion' over the plaintiff
enabling them to bring about results that are different in kind
from what any of them could achieve individually."  <u>Massachusetts</u>
<u>Laborers' Health & Welfare Fund v. Phillip Morris, Inc.</u>, 62
F.Supp.2d at 244.

Bayad provides no evidence to support an inference that
defendants acted "in unison" to deprive him of employment at
Cisco after March 8, 2001.  Defendants' affidavits all assert
that they had no individual or collective involvement in any
decision regarding Bayad's employment with Cisco.  Defendants
further aver that they had no communication with one another

22

regarding Bayad's employment at any time during the relevant time period.  Moreover, even if Bayad produced evidence that defendants, in fact, acted in concert, the injury caused to Bayad, his denial of employment, does not appear to be substantially different from what any single defendant could have achieved by himself.

Defendants point to an alternate form of conspiracy recognized under Massachusetts law.  This form of "concerted action" conspiracy "is 'more akin to a theory of common law joint liability for tort.'"  Massachusetts Laborers' Health & Welfare Fund v. Phillip Morris, Inc., 62 F.Supp.2d at 244 (citing Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d 1546 (1st Cir. 1994)).  "Concerted action" conspiracy assigns liability "for actions done by others pursuant to a common design or with the defendants' substantial assistance or encouragement." Massachusetts Laborers' Health & Welfare Fund v. Phillip Morris, Inc., 62 F.Supp.2d at 244 (citations omitted).  While "concerted action" conspiracy does not required a "peculiar power of coercion," it does require "proof of underlying tortuous conduct."  Massachusetts Laborers' Health & Welfare Fund v. Phillip Morris, Inc., 62 F.Supp.2d at 244 (citing Santiago v. Sherwin Williams Co., 3 F.3d 546, 552 (1st Cir. 1993)).  As previously noted, Bayad fails to show that his not being hired was the result of any tortuous conduct by defendants.  Thus,

23

Bayad's lack of a substantive claim precludes any claim under this form of conspiracy.

In accordance with the above reasoning, Bayad fails to satisfy a claim of conspiracy under Massachusetts law. Thus, although this court sympathizes with Bayad's plight and circumstances, the law unfortunately provides him no relief.

## CONCLUSION

_____In accordance with the foregoing discussion, this court **RECOMMENDS**[15] that defendants' motion for summary judgment (Docket Entry # 65) be **ALLOWED** and Bayad's cross-motion (Docket Entry # 73) be **DENIED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[15] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

24