UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY BAYAD,<br><br>*Plaintiff*,<br><br>v.<br><br>CISCO SYSTEMS, INC., BRUCE BASTIAN, KATE DCAMP, LYNN FRASER, CELIA HARPER-GUERRA, and RICK JUSTICE,<br><br>*Defendants*. | CIVIL ACTION NO. 05-11005-PBS |

## **STATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the District of Massachusetts, the Defendants, by their counsel, state that there is no genuine issue to be tried with respect to the following material facts:

**I.    The Parties.**

1.    Plaintiff Anthony Bayad is a former employee of Cisco Systems, Inc. ("Cisco").  (Compl. ¶ 12.)  Cisco employed Bayad from May 1, 2000 until May 1, 2001.  (Declaration of Lynn Fraser ("Fraser Decl.") ¶ 3.)

2.    Cisco is a global technology company that employed approximately 40,000 individuals at the time it employed Bayad.  (Compl. ¶ 9.)

3.    Defendant Bruce Bastian is a Channel Account Manager for Cisco who has been employed by Cisco since October of 1998.  (Declaration of Bruce Bastian ("Bastian Decl.") ¶ 1.)

4. Defendant Kate DCamp is a Senior Executive Advisor for Cisco who has been employed by Cisco since May 2000. (Declaration of Kate DCamp ("DCamp Decl.") ¶ 1.)

5. Defendant Lynn Fraser is a Business Operations Manager for Cisco who has been employed by Cisco since February 22, 1999. (Declaration of Lynn Fraser ("Fraser Decl.") ¶ 2.)

6. Defendant Celia Harper-Guerra is a director of human resources for Cisco who has been employed by Cisco since October 30, 1997. (Declaration of Celia Harper-Guerra ("Harper-Guerra Decl.") ¶ 1.)

7. Defendant Richard Joseph Justice is a Senior Vice President of World Wide Sales for Cisco who has been employed by Cisco since December 6, 1996. (Declaration of Richard Joseph Justice ("Justice Decl.") ¶ 1.)

**II.    The First Bayad Discrimination Suit ("Bayad I").**

8. On March 8, 2004, Bayad sued John Chambers, Cisco's Chief Executive Officer and President; Patricia Russo, the Chairman and Chief Executive Officer of Lucent Technologies, Inc. ("Lucent"); Anthony Savastano, Cisco's Vice-President of Finance; and Carl Wiese, a Cisco Area Vice-President (collectively, the "Bayad I Defendants") alleging discriminatory treatment during and after Bayad's employment with Cisco and Lucent. (Complaint in Bayad v. Chambers, et al., Civil Action No. 04-10468-PBS ("Bayad I Complaint") ¶ 1, attached as Tab A to Affidavit of Matthew Iverson ("Iverson Affidavit"); Report and Recommendation in Bayad v. Chambers, et al., Civil Action No. 04-10468-PBS, dated May 25, 2005 ("First Recommendation") at 6, attached as Tab B to Iverson Affidavit).

2

9. In October 2004 Judge O'Toole dismissed all of the claims against Russo and some of the claims against the other Bayad I defendants. (Memorandum and Order dated October 25, 2004 ("Bayad v. Chambers Order"), at 10, attached as Tab C to Iverson Affidavit.) He held that a number of Bayad's discrimination and state law claims were time barred or precluded by res judicata, that Bayad's claims under Title VII should be dismissed because the statute was inapplicable to individuals, and that Bayad's state law discrimination claims failed because Bayad had not filed a timely claim with the Massachusetts Commission Against Discrimination. (Bayad v. Chambers Order at 5-9.)

10. In May 2005 Bayad filed the Complaint in this matter, alleging that the Defendants conspired with the Bayad I Defendants to commit the same acts of discrimination detailed in Bayad I. (Compl. ¶¶ 32, 41-43, 48, 52-55, 62.)

11. Later that month Magistrate Bowler recommended that summary judgment enter against Bayad on the balance of the claims remain in Bayad I. (First Recommendation at 24.) She concluded that Bayad had voluntarily released all claims relating to his employment and termination (id. at 15) and that he had presented no admissible evidence to support his remaining claims (id. at 16, 22-24). This Court consequently entered summary judgment in favor of the Bayad I Defendants in February 2006 (Order dated February 17, 2006, attached as Tab D to Iverson Affidavit), and the First Circuit Court of Appeals affirmed on July 24, 2006 (Judgment entered July 24, 2006, attached as Tab E to Iverson Affidavit).

### III. Bastian, DCamp, Harper-Guerra, and Justice's Lack of Involvement with Bayad.

12. Bastian never interacted in any way with Bayad and has no personal knowledge of his employment with Cisco. (Bastian Decl. ¶ 3-4.) Bastian also has no

3

personal knowledge concerning and has had no involvement with any decision regarding Bayad's employment with Cisco, the termination of that employment, Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 5, 8.) Prior to the filing of this lawsuit, Bastian had not communicated with any other Cisco employee regarding Bayad. (Id. ¶ 9.)

13. DCamp never interacted with Bayad and also has no personal knowledge of his employment with Cisco. (DCamp Decl. ¶¶ 3-4.) DCamp has no personal knowledge concerning and has had no involvement with any decision regarding Bayad's employment with Cisco, the termination of that employment, Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 6, 12.) Prior to the filing of this lawsuit, DCamp had not communicated with any other Cisco employee regarding Bayad. (Id. ¶ 13.)

14. DCamp does not recall having seen any of the various letters and emails associated with her in the Complaint, with the exception of an e-mail sent by Tushar Kothari, dated February 19, 2002 (the "Kothari E-Mail"). (Id. ¶¶ 5, 7-9.) The Kothari E-Mail discusses another e-mail allegedly sent by Bastian to an Amado Navas.[1] DCamp is unaware of any connection between the Kothari E-Mail and Bayad. (DCamp Decl. ¶ 7.)

15. Harper-Guerra never interacted with Bayad and has no personal knowledge of his employment with Cisco. (Harper-Guerra Decl. ¶¶ 3-4.) Harper-Guerra

has no personal knowledge concerning and has had no involvement with any decision regarding Bayad's employment with Cisco, the termination of that employment, Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 5-6.) Prior to the filing of this lawsuit, Harper-Guerra had not communicated with any other Cisco employee regarding Bayad. (Id. ¶ 8.)

16. Harper-Guerra has never seen the e-mails associated with her in the Complaint. (Id. ¶ 7.)

17. Justice never interacted with Bayad and has no personal knowledge of his employment with Cisco. (Justice Decl. ¶¶ 3-4.) Justice has no personal knowledge concerning and has had no involvement with any decision regarding Bayad's employment with Cisco, the termination of that employment, Bayad's alleged subsequent attempts to obtain re-employment with Cisco, or his alleged attempts to foster a business relationship with Cisco. (Id. ¶¶ 6, 12.) Prior to the filing of this lawsuit, Justice had not communicated with any other Cisco employee regarding Bayad. (Id. ¶ 13.)

18. Justice does not recall seeing any of the e-mails associated with him in the Complaint. (Id. ¶¶ 7-9.)

---

*(footnote continued from previous page)*

[1] Bayad discussed the Kothari E-Mail in the Complaint, but apparently neglected to attach it. See Compl. ¶ 53 & Ex. 18.

### IV. Bayad's Employment With Cisco.

19.     In early 2000, Fraser, then employed by Cisco as a Professional Services Manager at its Lexington, Massachusetts facility, began interviewing individuals to fill a vacant position for a Project Engineer II on her team.  (Fraser Decl.¶¶ 4-5; Compl. ¶ 12.)

20.     In or around April 2000, Fraser interviewed Bayad and extended an offer of employment to him as a Project Engineer II on behalf of Cisco.  (Fraser Decl. ¶ 5.)

21.     During the interview process, Bayad told Fraser that he was very close to attaining his CCIE certification, which is sometimes needed to work on a particular customer project.  (Id. ¶ 6.)  Bayad explained that it was simply of matter of his actually taking the CCIE examinations because he had virtually completed the study and preparation necessary to pass.  (Id.)

22.     Bayad did not attain his CCIE certification during the year he worked for Cisco, however, despite the fact that Cisco afforded Bayad the opportunity of attending additional training classes to assist him in attaining his CCIE.  (Id. ¶ 8.)  Bayad still has not attained his full CCIE certification.  (Id. ¶ 9; Bayad I Complaint ¶¶ 117-18.)

23.     Cisco's records contain no documents, memoranda, vouchers or any other such materials to substantiate Bayad's allegations that in November 2000 (1) he applied for a sales position with Cisco in its North Africa facility (2) he was flown at Cisco's expense to Europe or Africa to interview for the position and (3) he interviewed with Cisco engineers for the position.  (Declaration of Paula Hughes ("Hughes Decl.") ¶ 5.)

24.     Cisco's Human Resources department has interviewed Cisco employees in an attempt to determine whether Bayad interviewed for a North Africa position and none

of these employees have any memory of any such interview of Bayad having occurred. (Id. ¶ 6.)

25. As of November 2000, Bayad had been working at Cisco for approximately six months and was, pursuant to Cisco's transfer and promotion policy ("Cisco's Policy"), ineligible for transfer or promotion until his year anniversary had passed on May 1, 2001, absent a business necessity and his manager's approval. (Cisco's Policy, Hughes Decl. ¶ 7 and Ex. A.) Bayad never sought or obtained Fraser's approval for any transfer or promotion to North Africa. (Fraser Decl. ¶¶ 13, 16.)

26. For any transfer or promotion, Cisco's Policy also requires Cisco's Recruiting department to notify the manager of the employee that the employee is seeking another position. (Id. ¶ 12.) Fraser received no notification from Cisco's Recruiting department that Bayad was seeking another position of any type with Cisco during the course of his employment there. (Id.) Bayad never informed Fraser that he was seeking any such position in November 2000. (Id. ¶ 13.) Bayad did not seek authorization from Fraser to travel to London to interview for another position. (Id. ¶ 15.)

27. Cisco's records concerning Bayad's employment also reflect that Bayad did not seek or receive Paid Time Off ("PTO") at any time during the month of November 2000, when he alleges he was traveling in Europe or Africa. (Bayad's PTO Records, May 1, 2000 -- May 2001, Hughes Decl. ¶ 9 and Ex. B.) According to Cisco's records, Bayad received regular pay for performing his usual duties at Cisco's Lexington, Massachusetts facility. (Id.)

28.     In or around February 2001, Cisco informed its managers that, due to an economic downturn, Cisco intended to restructure its workforce by laying off approximately 8,500 total employees.  (Fraser Decl. ¶ 18.)  Cisco management instructed all Managers to reduce the number of employees on their respective teams based upon an assessment of their team members' contribution to the team's overall profitability.  (Id.)

29.     Fraser determined that in order to carry out Cisco's directive, four employees of her team necessarily would be terminated.  (Id. ¶ 19.)  Fraser selected the four employees who would be subject to the RIF termination based on their seniority with Cisco and based on the selected individuals' overall contribution to the team.  (Id.)

30.     This group of four individuals was comprised of two white males, another male whose ethnicity and race Fraser does not know, and Bayad.  (Id. ¶ 21.)

31.     Bayad's race and/or ethnicity and/or national origin played no role in Fraser's decision to terminate Bayad's employment as a part of the RIF terminations.  (Id. ¶ 22.)

32.     Fraser selected Bayad because he was the most recently hired and most junior member of Fraser's team.  (Id. ¶ 23.)  In addition, Bayad was not assigned as a primary leader on any significant project because Fraser's team had no project that required such support.  (Id.)  Bayad therefore had done very little substantive work during his time at Cisco because there simply was not enough work for him to do.  (Id.)

33.     Bayad spent most of his one year employment with Cisco studying to attain his CCIE.  (Id. ¶ 24.)

34.     None of the individual Defendants had any involvement in or influenced Fraser's decision regarding who would be subject to the RIF.  (Id. ¶ 25.)

8

35. On April 25, 2001, Fraser informed the four employees that she had selected of Cisco's decision to restructure and advised them that their employment with Cisco was to terminate effective not later than June 25, 2001. (Id. ¶ 20.)

36. Fraser provided each of these individuals with a Voluntary Severance Agreement and Release (the "Release") under which each individual was entitled to a severance payment on condition that the individual agree to waive any then-existing claims against Cisco. (Id. ¶ 26.) Fraser gave the Release to Bayad in an unlocked office with only another Cisco employee present. (Id.) Bayad was calm and amicable when he learned of his termination. (Id.)

37. Each individuals selected for the RIF termination was afforded up to sixty days to accept or decline Cisco's offer under the Release. (Id. ¶ 27.) Fraser also advised them that, in accordance with Cisco's re-hire policy, each of them was eligible for re-hire by Cisco within one year of their termination effective date. (Id. ¶ 20.)

38. On May 1, 2001, seven (7) days after Fraser provided the Release to Bayad, he executed it and accepted the severance payments offered by Cisco in exchange. (Release, Fraser Decl. ¶ 28 and Ex. A.) Fraser was not present when Bayad executed the Release and does not know how he returned it to Cisco. (Id.)

39. On the Release beneath his signature, Bayad wrote, "Thank you to all of you and Good Luck." (Release, Fraser Decl. Ex. A, at 5.)

40. By the terms of the Release, Bayad was entitled to revoke his acceptance within seven (7) days, but did not do so. (Release, Fraser Decl. Ex. A, at 3; First Recommendation at 8.)

9

### V.     Bayad's Post-Employment Actions.

41.     Cisco personnel have been unable to find any record that a company named Global Internetworking Consulting, Inc., ever attempted to do business with Cisco.  (Hughes Decl. ¶ 14.)

42.     Cisco's Human Resources department has undertaken a diligent search of Cisco's personnel files and interviewed Cisco employees to attempt to determine what positions, if any, Bayad applied for after his termination of employment with Cisco, and the disposition of any such applications.  (Hughes Decl. ¶ 10.)

43.     Cisco's records reflect that in the fall of 2003, Bayad applied to Cisco for a Systems Engineer II position (Requisition No. 713833) based at the company's Lexington, Massachusetts facility.  (Id. ¶ 11.)  Cisco rejected Bayad's application for this Systems Engineer II position because Bayad did not meet the minimum requirements necessary for that position.  (Id.)  The position required extensive experience in Network Security; Bayad did not possess such experience.  (Id.)  Moreover, the individual hired for Requisition No. 713833 did have extensive experience in Network Security and had won Cisco's "Systems Engineer of the Year" award the previous year.  (Id. ¶ 12.)

44.     Cisco's records also reflect that Bayad applied for a Voice Specialist position in Cisco's California facility.  (Id. ¶ 13.)  The Cisco Human Resources Manager who Bayad contacted did not consider him for the position after Lynn Fraser, who she called at Bayad's suggestion, truthfully told her that Bayad, despite commitments to do so, had never completed the CCIE certification.  (E-mail, Jan. 7, 2004, Hughes Decl. Ex. C and ¶ 13.)

45.     Bayad alleges he applied for a variety of other positions at Cisco and describes various requisition numbers and contact names for each.  (Compl. ¶ 56.)  Cisco's files contain no record of Bayad applying for any of these Cisco positions.  (Hughes Decl. ¶ 10.)  In addition, Cisco's Human Resources department has inquired of Cisco employees likely to have knowledge about these positions and have been unable to find any corroboration for Bayad's claims.  (Id.)

**VI.     The No-Hire List**

46.     Bayad attached to the Complaint a purported "no-hire" list that he claims he obtained from Cisco (the "Plaintiff's No-Hire List").  (Compl. ¶¶ 41-43 and Ex. 14.)  The "Plaintiff's No-Hire List" states that it is "effective September 10, 2000."  In a box near the top the document states, "Do not hire/transfer/promote Anthony Bayad Cisco Empl #73799***  Should you have any questions, contact Tony Savastano regarding Anthony Bayad."  (Id.)

47.     Bayad relied on the Plaintiff's No-Hire List in the Bayad I litigation as well.  There Magistrate Bowler found the Plaintiff's No-Hire List to be immaterial both because it was not properly authenticated and because it was not facially discriminatory.  (Report and Recommendation dated November 15, 2006 (the "Second Recommendation") at 8, attached as Tab F to Iverson Affidavit.)

48.     Cisco did, at one time, maintain lists of business partners from whom Cisco had agreed not to recruit ("Partner Lists") and separate lists of partner employees whom Cisco had agreed not to hire ("Engineer Lists").  (Harper-Guerra Decl. ¶¶ 9-14.)  Harper-Guerra maintained both the Partner Lists and Engineer Lists.  (Id. ¶¶ 10, 13.)  The

11

Defendants provided Bayad with examples of both lists as part of their pre-trial disclosures. (Iverson Affidavit ¶ 8 and Tab G.)

49.     The Plaintiff's No-Hire List appears to be a Partner List in all respects, except that a notation has been added at the top indicating that Bayad should not be hired, transferred, or promoted. (Id. ¶ 15.) Harper-Guerra did not make this notation, and no other Cisco employee could have generated a Partner List containing such a notation without her knowledge. (Id. ¶ 16.) Harper-Guerra has found no record of any other Partner List containing a similar notation.(Id. ¶ 17.)

50.     None of the individual Defendants that Bayad associates with the No-Hire List had ever seen it prior to this litigation. (Bastian Decl. ¶ 7; DCamp Decl. ¶ 11; Harper-Guerra Decl. ¶¶ 15-17; Justice ¶ 11.) Neither did they ever place or instruct anyone to place Bayad's name on a "no-hire" list. (Bastian Decl. ¶ 7; DCamp Decl. ¶ 11; Harper-Guerra ¶¶ 15-17; Justice ¶ 11.)

**VII.    Discovery**

51.     Defendants complied with Fed. R. Civ. P. 26's requirement for pre-trial mandatory disclosure on April 13, 2006. Iverson Affidavit ¶ 8 and Tab G. Bayad has

neither complied with Rule 26's pre-trial disclosure requirement nor requested any written discovery.  Id.

                    Respectfully submitted,

                    DEFENDANTS JOHN CHAMBERS,
                    ANTHONY SAVASTANO, and
                    CARL WIESE

                    By their attorneys,

                    __/s/ Matthew Iverson_____
                    Bruce E. Falby, Esq. (BBO #544143)
                    Matthew Iverson, Esq. (BBO #653880)
                    DLA PIPER RUDNICK GRAY CARY US LLP
                    33 Arch Street, 26th Floor
                    Boston, MA  02110-1447
                    (617) 406-6000 (*telephone*)
                    (617) 406-6100 (*fax*)

Dated:  July 30, 2006