UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY BAYAD,<br><br>*Plaintiff,*<br><br>v.<br><br>CISCO SYSTEMS, INC., BRUCE BASTIAN, KATE DCAMP, LYNN FRASER, CELIA HARPER-GUERRA, and RICK JUSTICE,<br><br>*Defendants.* | CIVIL ACTION NO. 05-11005-PBS |

## DECLARATION OF LYNN FRASER

I, LYNN FRASER, declare under the pains and penalties of perjury, pursuant to 28 U.S.C. § 1746, the following:

1. I have read Anthony Bayad's Complaint in the captioned matter and submit this declaration in support of Defendants' Motion for Summary Judgment.

2. I am currently employed as a Business Operations Manager by Cisco Systems, Inc. ("Cisco") at the Boxborough, Massachusetts campus. I have worked for Cisco since February 22, 1999.

3. During Mr. Bayad's employment with Cisco, I was a Manager, Professional Services, and in that capacity, I had direct supervisory authority over Mr. Bayad during the

period of his employment with Cisco, from May 1, 2000 until May 1, 2001. I am therefore fully familiar with the facts and circumstances surrounding Mr. Bayad's employment with Cisco and the termination of that employment.

### Mr. Bayad's Employment With Cisco

4. In early 2000, I began interviewing individuals to fill a vacant position for a Project Engineer II on my team.

5. In or around April 2000, I interviewed Mr. Bayad and extended an offer of employment to him as a Project Engineer II on behalf of Cisco.

6. During the interview process, Mr. Bayad stated that he was very close to attaining his Cisco Certified Internetworking Engineer ("CCIE") certification. To the best of my recollection, Mr. Bayad stated that he would attain his CCIE within a very short period of time and that it was simply of matter of his actually taking the CCIE certification examinations because he had virtually completed the study and preparation necessary to pass the CCIE examinations.

7. The CCIE certification was not essential for this specific position, but is a highly desired qualification because, occasionally, it may be a direct customer requirement or required for a particular effort.

8. Mr. Bayad did not attain his CCIE certification during the year he worked for Cisco, despite the fact that Cisco afforded Mr. Bayad the opportunity of attending additional training classes to assist him in attaining his CCIE.

9. According to Mr. Bayad's own allegations, he still has not attained his full CCIE certification.

### Mr. Bayad's Alleged Application for a North Africa Sales Position

10. I understand that Mr. Bayad alleges he was denied a sales position with Cisco in its North Africa facility for which he alleges he interviewed in or around November 2000.

11. Cisco's policy regarding transfer and promotion, which was in effect at the time of Mr. Bayad's employment with Cisco, prohibits the transfer or promotion of any employee within the first year of employment with Cisco. Thus, Mr. Bayad would have been ineligible for transfer or promotion to any other position within Cisco prior to being employed with Cisco for at least one (1) year.

12. Moreover, Cisco's policy regarding employees who apply for other positions within Cisco requires Cisco's Recruiting department to notify the manager of the employee that the employee is seeking another position. I received no notification from Cisco's Recruiting department that Mr. Bayad was seeking another position of any type with Cisco during the course of his employment with Cisco.

13. To the best of my recollection, Mr. Bayad himself never informed me that he was seeking any such position in November 2000. At the time of his termination in May 2001, however, Mr. Bayad did say informally that he wished I had told him sooner about the RIF termination because "there was someone overseas who expressed an interest" in him.

14. Had Mr. Bayad informed me of his alleged intention to transfer to another position at the time of his alleged interview for such a position, I would have informed him that Cisco's policy prevented such a transfer until his year anniversary with Cisco had passed and, therefore, I would not have approved such a transfer.

15. In addition, Mr. Bayad did not seek authorization from me to travel to London to interview for another position.

16.  If Mr. Bayad's allegation that he traveled to London to interview for another Cisco position are true, and even if Mr. Bayad received an oral offer for such a position, Mr. Bayad did not obtain my authorization, which would have been a necessary prerequisite for such a transfer.

17.  For the reasons described above, it appears to me that even assuming Mr. Bayad ever actually sought a position in North Africa, it was on an informal basis.

### The Termination of Mr. Bayad's Employment With Cisco

18.  In or around February 2001, I was informed by Cisco management that, due to an economic downturn, Cisco intended to restructure its workforce by laying off approximately 8500 total employees (the "RIF"). Cisco management instructed all Managers to reduce the number of employees on their respective teams based upon an assessment of their team members' contribution to the team's overall profitability.

19.  I determined that in order to carry out Cisco's directive, four (4) employees of my team necessarily would be terminated. I selected the four (4) employees who would be subject to the RIF termination based on their seniority with Cisco and based on the selected individuals' overall contribution to the team.

20.  On April 25, 2001, I informed four individuals I had selected of the above circumstances and advised them that their employment with Cisco was to terminate effective not later than June 25, 2001 and that, in accordance with Cisco's re-hire policy, each of them was eligible for rehire by Cisco within one year of their termination effective date.

21.  This group of four individuals was comprised of two (2) white males, another male whose ethnicity and race I do not know, and Mr. Bayad.

22. Mr. Bayad's race and/or ethnicity and/or national origin played no role in my decision to terminate Mr. Bayad's employment as a part of the RIF terminations.

23. Mr. Bayad was selected because, to my recollection, he was the most recently hired and most junior member of my team. In addition, to my recollection, Mr. Bayad was not assigned as a primary leader on any significant project because my team had no project that required such support. Mr. Bayad therefore had done very little substantive work during his time at Cisco because there simply was not enough work for him to do.

24. Instead, Mr. Bayad had spent much of his one (1) year employment with Cisco studying to attain his CCIE. which, as noted above, he failed to attain during the course of his employment with Cisco, despite his assurances during the interview process that he would attain his CCIE very soon after Cisco hired him.

25. None of the other individual defendants in this matter had any involvement in, or in any way influenced my decision to select Mr. Bayad as one of the employees on my team subject to the RIF termination.

26. On April 25, 2001, I provided each of the four (4) individuals selected for the RIF termination with a Voluntary Severance Agreement and Release (the "Release") under which each individual was entitled to a severance payment on condition that the individual agree to waive any then-existing claims against Cisco. I provided Mr. Bayad with the Release in my office. The only other person present was Richard Haddad, a Cisco Director, and my door was not locked. Mr. Bayad was calm and amicable during our conversation and left without any disturbance.

27. Each individuals selected for the RIF termination was afforded up to sixty (60) days to accept or decline Cisco's offer under the Release.

28.   On May 1, 2001, seven (7) days after I provided the Release to Mr. Bayad, he executed the Release and accepted the severance payments offered by Cisco in exchange for the Release. A true and correct copy of the release signed by Mr. Bayad is attached hereto as Exhibit A. He did not sign the release in my presence and I do not know how he returned it to Cisco.

29.   On the Release beneath his signature, I believe it was Mr. Bayad who wrote, "Thank you to all of you and Good Luck."


July 20, 2006                                                      _____
                                                                                Lynn Fraser

# EXHIBIT A

Case 1:05-cv-11005-WGY   Document 39   Filed 07/30/2006   Page 7 of 13



## VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE

Notification Date: 25-APR-2001

Anthony Bayad
278 Main Street Unit 1H
Melrose, MA 02176

Dear Anthony:

This Voluntary Severance Agreement and General Release ("Agreement") confirms our agreement regarding your separation from employment with Cisco Systems, Inc. ("Cisco" or "Cisco Systems"). Cisco Systems has conducted a reorganization of its business. As a result of that reorganization, your employment with Cisco shall end sixty (60) calendar days from your formal notice of this Agreement. This date is referred as the "Scheduled" final date of employment and is provided at the end of this Agreement for your reference. The sixty (60) calendar-day period from this notification to your "Scheduled" final date of employment is referred to as the "Transition Period."

You may voluntarily end your employment with Cisco early by signing this Agreement prior to your "Scheduled" final date of employment. Your employment will then end on the day this Agreement is executed. This date is referred to as the "Self-Selected" final date of employment. The severance benefits provided by this Agreement shall become available on or about fourteen (14) days following the execution of this Agreement as provided below.

1. **What You Will Receive:** You will receive your regular base pay through your "Scheduled" or "Self-Selected" final date of employment plus the value of your unused PTO earned through that date. You will also continue to be eligible for benefits coverage and stock vesting until this date. In exchange for entering into this Agreement, including your agreed-upon ending of employment, Cisco agrees to provide you with the below-described additional consideration following your final date of employment:

- **Severance Pay:** Severance pay equal to four (4) months of base pay less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **Pay In Lieu of Notice:** If you voluntarily sign this Agreement ending your employment prior to the expiration of the sixty (60) calendar-day Transition Period, you will still receive payment in lieu of notice for the remaining days in the Transition Period. This amount will be equal to the regular base pay you would have been entitled to for the period between your "Self-Selected" final date of employment and your "Scheduled" final date of employment, if any, less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

CISCO 00048

- **COBRA Premium Payments:** If you elect to continue group health coverage under COBRA, Cisco will pay the COBRA premiums for up to the first four (4) months of continuing coverage. (This does not apply to flexible health spending accounts.) Upon completion of the first four (4) months of COBRA coverage, Cisco will cease paying COBRA premiums and you will be responsible for all further COBRA payments.

- **Limited Option Exercise Period Extension:** All vested and available Cisco non-qualified stock option shares as of your final day of employment with Cisco, to the extent that the exercise price of such shares is more than the NASDAQ final market stock share price as of your final day of employment, will remain exercisable for twelve (12) months after your final day of employment with Cisco pursuant to the terms of Cisco's stock option plan, and subject to your executing any required implementation documents.

- **Outplacement Services:** On-line outplacement services as determined by Cisco and provided through Drake, Beam and Morin (DBM) (or an equivalent firm) for a period up to two (2) months from your final date of employment. (This is separate and in addition to the DBM Placement Services provide prior to your final date of employment.)

- **Relocation Loan Repayment Extension:** To the extent that you have a relocation loan secured by real property that will in part or in full become due within twelve (12) months of your final date of employment, Cisco will extend the time for repayment until twelve (12) months after your final date of employment. Interest will accrue during the repayment period at the rate specified in your loan documents, however if no rate of interest is specified, interest shall accrue at the minimum per annum rate if required to avoid the imputation of compensation income to you under the federal tax laws.

II. **What You Are Agreeing To Release:** In consideration for the additional outplacement services, extended stock exercise period, COBRA premium payments, and four-month (4-month) severance lump sum payment, you release Cisco Systems, any affiliated companies, and their current and former officers, directors, agents, and employees and assigns from any and all claims up through the date of the execution of this Agreement, and you agree that your final date of employment shall be either the "Scheduled" date below or the earlier "Self-Selected" date. The claims subject to this release include, but are not limited to, those related to your employment with Cisco. All such claims (including related attorneys' fees and costs) are barred without regard to whether those claims are based on any alleged breach of a duty arising in statute, contract, or tort. This expressly includes waiver and release of any rights and claims arising under any and all laws, rules, regulations, or ordinances, including but not limited to the Age Discrimination in Employment Act (ADEA); the Workers Adjustment and Retraining Notification Act (WARN); Title VII of the Civil Rights Act of 1964, as amended; the Americans with Disabilities Act; the Equal Pay Act of 1963; the California Fair Employment and Housing Act (if applicable); and any similar law of any other state or governmental entity. The parties agree to apply California law in interpreting this Agreement. Accordingly, you further waive any rights under Section 1542 of the Civil Code of the State of California or any similar state statute. Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known to him, must have materially affected his settlement with the debtor."

III. **Timeline For Considering and Signing the Agreement:** You understand and agree that you have been provided a period of sixty (60) days within which to consider whether you will execute this Agreement, no one hurried you into executing this Agreement during that sixty-day (60-day) period, and no one coerced you into executing this Agreement. The offer of this Agreement shall expire on the sixty-first (61st) day after you have received it. If this day is a Saturday, Sunday or holiday recognized by the U.S. Postal Service, the expiration date is extended to the next business day. Nonetheless, in limited circumstances such as a medical

CISCO 00049

emergency, Cisco reserves the right at its sole discretion to accept an Agreement signed after the expiration date.

Completed releases must be delivered or mailed to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050, on or before the end of the sixty-first (61st) day after receiving this Agreement. Unless you personally deliver the signed Agreement on or before this date, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before this date (the end of the sixty-first (61st) day after receiving this Agreement). The expiration which occurs on the sixty-first (61st) day of the Agreement will be extended to the next business day should it fall on a Saturday, Sunday or a holiday recognized by the U.S. Postal Service.

You understand that unless more time is allowed by applicable law, you have a limited period of seven (7) calendar days after signing to revoke your acceptance of this Agreement. You must deliver or mail written notification of revocation to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050. Unless you personally deliver the signed revocation within this seven (7) calendar-day period, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before the end of the seven (7) calendar day period after signing this Agreement. This deadline will be extended to the next business day should it fall on a Saturday, Sunday or holiday recognized by the U.S. Postal Service.

Because of this revocation period, you understand that the payment requirements of this Agreement shall not become effective or enforceable until the eighth (8th) calendar day after the date you sign this Agreement. Therefore, your severance payment will be made available to you on or about the fourteenth (14th) calendar day after you sign this Agreement.

Your employment will terminate on the day you execute this Agreement, but not later than the "Scheduled" final date of employment (which provides you with sixty (60) days' advance notification). Should you execute this Agreement prior to your "Scheduled" final day of employment, your employment will end on that "Self-Selected" day and you will become eligible for the severance benefits listed above. This specifically includes, if any, pay in lieu of notice from the "Self-Selected" until the "Scheduled" final day of employment.

IV.   Protecting Your Rights: You understand that rights or claims that may arise after the date this Agreement is executed are not waived. In understanding the terms of this Agreement and your rights, you are advised to consult with an attorney of your choice prior to executing this Agreement. Also, nothing in this Agreement shall prohibit you from exercising legal rights that are, as a matter of law, not subject to waiver such as: (1) your rights under applicable workers' compensation laws; (2) your right, if any, to seek unemployment benefits; and (3) your right to file a charge with appropriate administrative agencies such as the Equal Employment Opportunity Commission (EEOC). Additionally, Attachment A is incorporated into this Agreement. It contains important information about the age composition of those impacted by this business reorganization.

You understand that if you execute this Agreement before the sixty-day (60-day) notice period expires you will forgo benefits that would otherwise continue for the full sixty (60) days. (Cisco health insurance benefits terminate on the last day of the month during which your employment ends, unless coverage is continued through payment of the COBRA premium.) Nonetheless, you will receive a payment equal to your base pay for this period as described above. The option of an early "Self-Selected" final day of employment allows you to resign and immediately commence the seven-day revocation period and the waiting period for the receipt of severance benefits. This option is strictly voluntary. It may be appropriate for someone who wishes immediately

to commence other employment and will be covered under the new employer's benefit program, but again, this is your choice.

WARNING: You are cautioned that important exercise rights regarding certain stock options commence running as of your final day of employment. You may be required to exercise your vested options as early as the final date of your employment, meanwhile thirty (30), sixty (60) and ninety (90) calendar day exercise periods from your final date of employment may also exist. Cisco will send you a courtesy notice regarding the exercise of these options usually within fifteen (15) days of your final date of employment, but it is your responsibility independently to determine your rights and take appropriate action. Failure to receive such a notice from Cisco following your final day of employment will not justify your failure to exercise vested options within the appropriate post-termination exercise period as set forth in your individual stock option grant agreements. Cisco disclaims any verbal or written representations or advice on the exercise of stock options other than what is contained in your written stock option grant agreements. You are encouraged to seek independent professional financial advice.

V: Protecting Cisco's Rights: In executing this Agreement, you acknowledge that you have not relied upon any statement made by Cisco, or any of its representatives or employees, with regard to this Agreement unless the representation is specifically included in this written Agreement. Furthermore, this Agreement contains our entire understanding regarding eligibility for and the payment of severance benefits and supersedes any or all prior representations and agreements regarding the subject matter of this Agreement. However, this Agreement does not modify, amend or supersede written Cisco agreements that are consistent with enforceable provisions of this Agreement such as Cisco's "Property Information and Invention Agreement" and Cisco's Arbitration Agreement and Policy. Once effective and enforceable, this Agreement can only be changed by another written agreement signed by you and each of the persons (or their designees) who sign below.

VI: Enforceability Of This Agreement: Any controversy or any claim arising out of or relating to the interpretation, enforceability or breach of this Agreement shall be settled by arbitration in accordance with Cisco's Arbitration Agreement and Policy that you acknowledge receiving with your Notification Letter. If for any reason this Arbitration Agreement is not enforceable, you agree to arbitration under the employment arbitration rules of the American Arbitration Association or any successor hereto. The parties further agree that the arbitrator shall not be empowered to add to, subtract from, or modify, alter or amend the terms of this Agreement. Any applicable arbitration rules or policy shall be interpreted in a manner so as to ensure their enforceability under applicable state or federal law.
Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

We trust that the severance payment, placement services, and other considerations will assist you in your transition of employment. We wish you the best in your future endeavors.

Notice: Your "Scheduled" Final Day of Employment is 25-JUN-2001

CISCO 00051

I understand and accept the above terms and acknowledge receiving Appendix A, including the separately provided data on the job titles and ages of all individuals covered by the Program and on the job titles and ages of all individuals not covered by the Program. This data has been offered for a full forty-five (45) days prior to the expiration of the offer of this Agreement.

_____
Signature of Employee

Anthony Bayad
Printed Name of Employee

#73799
Cisco Employee # or Social Security Number

5-1-01
Date Actually Signed
(If signed and dated before Scheduled final date of employment shown below, this "Self-Selected" date is your final date of employment.)

LEXINGTON, MA
Location Signed at (e.g., San Jose, CA, USA)

Thank you to all of you and Good Luck



---

**EMPLOYEE ACKNOWLEDGEMENT**

I acknowledge that on 25-APR-2001, I received the following documents:

- US EMPLOYEE NOTIFICATION LETTER;
- VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE
- ARBITRATION AGREEMENT AND POLICY,

and that I have been advised that I must promptly and carefully read each document, as important rights will be affected

Signature of Employee    Date 4/25/01



Employee's mailing address and phone number for reception of additional documentation:
Street: 279 Main Street Suite 1H
City: Melrose    State: MA    ZIP: 02176
Phone: (781) 662-4950

CISCO 00053