FILED
IN CLERKS OFFICE

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS 06 23  P 2: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | | |
|---|---|---|
| **ANTHONY BAYAD,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff** , | ) | **CIVIL ACTION** |
| | ) | |
| | ) | |
| | ) | **CASE NO. 05-11005PBS** |
| | ) | |
| **BRUCE  BASTIAN; KATE DCAMP** | ) | |
| **CELIA HARPER-GUERRA;** | ) | |
| **RICK JUSTICE; CISCO SYSTEMS** | ) | |
| **Defendants**, | | |

" **NOTICE** DEFENDANTS ' DECLARATIONS CONTAINS LIES IN PARTICULAR KATE DCAMP COMMITTED PERJURY " **AND PLAINTIFF' MOTION** DEMANDING **THE HONORABLE DISTRICT JUDGE PATTI B. SARRIS** TO PROTECT THE COURT ' INTEGRITY **AND** TO PREVENT ABUSES OF THE JUDICIAL PROCESS AND TO ORDER SANCTIONS- **INCLUDING** DEFAULT JUDGMENT FOR MISCONDUCT **PURSUANT** THE FEDERAL RULES

## DEFINITION OF PERJURY (18 U. S. C. CHAPTER 79 - PERJURY )

(1)       **Perjury** is the "willful and corrupt taking of a false oath in regard to a material matter in a judicial proceeding". It is sometimes called "lying under oath"; that is, deliberately telling a lie in a courtroom proceeding after having taken an oath to tell the truth. It is important that the false statement be material to the case at hand—that it could affect the outcome of the case.     (2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section *1746 of title 28*, United States Code, willfully subscribes as true any material matter which he or she does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more

1

than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

## ATTORNEYS BRUCE FALBY ET, AL. PROVIDED LIES TO THE COURT

**The Army of attorneys** led by Bruce Falby and Bob Matthias are instructing their clients, the Defendants, to introduce lies and false statements to the Court, where one of many declarations introduced without depositions prove lies - deception and corruption that serve to deceive the Court- in particular the declaration of defendant Kate Dcamp. Fact are straight forward proving that Kate Dcamp in her own declaration absent of deposition stated under pain and perjury pursuant to 28 U.S.C. § 1746, the following:

(----**Exhibit 1** is Dcamp Declaration is attaché hereto to the motion)

"       1.     I am a Senior Executive Advisor for Cisco Systems, Inc. ( " Cisco"). I have worked at Cisco since May 2000.

(---- **Exhibit 2 is Cisco Systems Company Biography provided to me by her attorneys attaché hereto to the motion that is proving that she ( Kate Dcamp and her attorneys) are lying under oath about her title at Cisco served to evade liability the Exhibit 3 prove that defendant Kate Dcamp is a "Senior Vice President, Human Resources Cisco Systems" and absolutely a not "Executive Advisor Cisco Systems " . Is she committed Perjury under oath? let ask her attorney Bruce Flaby to explain to us why she lied- as no one is forcing her to lie nor to provide such false statements--)**

         2.     I submit this declaration in support of the Defendants' Motion for Summary Judgment in connection with the captioned matter.

         3.     I had no involvement with and have no personal knowledge of the facts surrounding Anthony Bayad ' employment with Cisco. Until he filed this law suit, I was unaware that Mr. Bayad had ever worked at Cisco .

         4.     I had never interact in any way with Mr. Bayad.

2

5.   My attorneys have provided me with copy of a letter, dated November 29, 2000, that Bayad claims he sent me. I do not recall having seen this letter.

6.   I have no personal knowledge concerning, and have had no involvement with, any decision regarding Mr. Bayad ' employment with Cisco, the termination of his employment, or Mr. Bayad ' alleged subsequent attempts to obtain re-employment with Cisco or employment elsewhere…."

**(----Exhibit 3 is Cisco termination document provided to me by her attorneys proving that she,** Defendant Kate Dcamp and my Manager, Defendant Lynn Fraser participated to my termination **and** both hand signed my termination letter **and such facts prove again that Defendant Kate Dcamp is lying under oath , when no one is forcing her to lie under oath. The evidence and facts speaks for them selves see** Exhibit 3 her own hand writing signature. **It is disturbing. It is shame and sickening to lie to the Court.)**

**:_____:**

**Now comes Plaintiff Bayad ( "I")** , states to the district Court  and  to the Honorable

District Judge, the Honorable Patti B. Sarris, who is presiding in the above caption matter as her

name is on the Docket of this case.  I state to you your honor that I provided during the entire

litigation only the truths and strong facts regarding my discrimination cases, that  have  started

the year of 1997 Lucent Technologies Inc.(1),   followed me to three companies,

International Networks Services Inc. (2) and now Cisco Systems Inc. ( 3) ; see Docket Entry # 1

surrounding such facts.       However, what disturb me  the most  is that the army of lawyers are

given or thinking they were given  the red carpet, when are allowed to do what ever they wish

in this litigation – when  even are allowed to introduce lied to the Court. They are even lying

under oath when they introduced the declaration of the defendant Kate Dcamp, who stated

under pain and perjury that " **she is a Senior advisor for Cisco Systems**"  when the facts

3

indicated that she is " **the Senior President, Human Resources of Cisco Systems**";  see line  1

and in line 3 and 6    " **she stated that she had  no personal knowledge concerning, and have**

**had no involvement with,  any decision regarding Mr. Bayad ' employment with Cisco, the**

**termination of his employment, or Mr. Bayad ' alleged subsequent attempts to obtain re-**

**employment with Cisco  or employment elsewhere.**"   But, again she lying under oath when

the fact provided by her attorneys Bruce Falby et, al. proving that My manager Defendant Lynn

Fraser and defendant kate Dcamp both <u>participated in my termination and both signed my</u>

<u>termination letter</u> and <u>both caused me to be falsely imprisoned</u> and both caused me to revive

back the trauma of the horrible experience at LUCENT  TECHNOLOGIES that I have endure

by her Friend Anthony Savastano,  the  defendant  in case 04-10468 PBS ( D. Mass).

## LEGAL ANALYSIS

**That end the matter**. Here, the army of attorneys Bruce Falby et, al. are engaged in

misconduct with the practice of law that is prejudicial and discriminatory to the administration

of justice; <u>*Shepherd*</u>, 62 F.3d at 1474. In <u>*Shea v. Donohoe Construction Company*</u>, 795 F.2d

1071 (D.C. Cir. 1986) This court must consider set forth one <u>of three basic</u> <u>justifications</u> that

support the use of  default judgment as a sanction for misconduct. *First*, the court may decide

that the errant party's behavior has severely ham-pered the other party's ability to present his

case--in other words, that the other party "has been so prejudiced by the misconduct that it

would be unfair to require him to proceed further in the case." Id. at 1074. *Second*, the court

may take account of the prejudice caused to the judicial system when the party's misconduct has

put "an intolerable burden on a district court by requiring the court to modify its own docket

and operations in order to accommodate the delay." Id. at 1075. *And finally*, the court may

consider the need "to sanction conduct that is disrespectful to the court and to deter similar

misconduct in the future." 15 Id. at 1077. A sanction imposed pursuant to any of these

considerations must be based on findings supported by the record. *Bonds v. District of*

*Columbia*, 93 F.3d 801, 809 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 2453 (1997).

### BRUCE FALBY ET, AL. , ARE NOT THE LAW - ARE NOT THE COURT

**Attorneys** for the Defendants are attempting to take upon them selves the power to

determine what is the law and in doing so, subject them selves to Civil contempt and

disbarment. See   *United States v. United Mine Workers of America*, 330 U.S. 258, 307, 67

S.C.t. 677, 91 L.e.D 884 ( 1947). When, we are aware that Federal Rule of Civil Procedure

and the Professional Ethics are meant to be applied in such way to promote justice; see Federal

Rule of Civil Procedure,   **Rule 1**, and **the Rule of Professional Ethics**. In addition, the

integrity of judicial process demands that the attorneys Bruce Falby et, al., to comply with the

Court rule and orders, whether for the attorneys may called to the bare of justice is not for them

selves to decide. Attorneys Bruce Falby et, al., committed   Perjury – contempt - fraud upon the

Court and had been  preserved and it was availing. By its plain terms, Bayad had provided proof

of such misconduct,  then and now,  and it is for this Court to take a proper action because

there is no room in the profession of the law for those ( Attorneys) who have committed

5

deliberately falsehood in Court, see *matter of Budnitz*, 425 Mass. 1018, 1019 ( 1997), quoting

*Bar Ass'n of City of Boston v. Sleper*, 251 Mass. 6 20, 146 N.E. 269 ( 1925), and citing also

Matter of *Spei,10 Mass. Att'y Discipline Rep*. 246 ( 1994). ( an attorney ' making false

statements and presenting false evidence to a martial master in the course of representing a

client is an act which has resulted in a term suspension).  Thus, Bruce Falby et, al., [a]n

attorney(s) ' making false statements and presenting false evidence to a marital master in the

course of representing his  clients is an act which has resulted in a term suspension. *Budnitz*,

425 at 1019, citing *Matter of Basncnes, S.J.C*. No. 96-029 BD ( July  18 1996) ( resulting in a

term suspension). "[ F]raud on the Court. . . cannot complacently be tolerated.  In   *Matter of*

*MacCarthy*, 416 Mass. 423,  431 ( 1993) quoting *Hazel – Atlas Glass Co.  v.  Harford-Empire*

*CO.*, 323 **U.S.** 238, 246, 64 S.Ct. 997, 1001 ( 1944).

## CONCLUSION

However, [T]he  defendants  bearing the burden of proof has lost. The

allocation of the  burden of proof have  drove the case's final disposition.

**RELIEF REQUESTED**

**PUNITIVE DAMAGES ( Published by Dla Piper Rudnick Gray Carry  'official web site)**

- "The record are clear that federal race discrimination claims brought under Title 42
Section 1981 as well as claims brought under numerous state laws are not subject to **any  limits**,
A recent unpublished opinion in the Fourth Circuit Court of Appeals, *White v. BFI Waste*
*Services, LLC* (No. 05-1804, 4th Cir. May 23, 2006), serves as a pointed, when the jury in
*White* found that defendant BFI's supervisors subjected two African-American plaintiffs to a
racially hostile work environment for over **ten years** and awarded the plaintiffs $4 million in

punitive damages on top of $1.2 million in compensatory damages. And Several recent cases illustrate just how costly discrimination and harassment punitive damages can be;  also  In *Issa v. Roadway Package Sys.*, a California jury awarded two FedEx drivers $50 million in punitive damages after finding that a manager subjected the two <u>drivers to ethnic harassment</u> and ridicule during their two years of employment at FedEx (June 2, 2006).  <u>See</u> In *Zubulake v. UBS Warburg*, a federal jury in New York awarded a single plaintiff over $20 million in punitive damages on her gender discrimination claims (April 6, 2005). . . . etc"

## 1.   COUNT I RACE  DISCRIMINATION

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial   P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 2.       COUNT III CLASSIFICATION OF RACE – CISCO-NO-HIRE-LIST

Respectfully, Plaintiff request relief on Count III ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial   P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 3.       COUNT VI BREACH OF ORAL CONTACT AND CONTRACTUAL OF OBLIGATION

Respectfully, Plaintiff request relief on Count VI ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial   P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 4.       COUNT VIII CONSPIRACY

Respectfully, Plaintiff request relief on Count VIII ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial   P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

5.        **COUNT IX FALSE IMPRISONMENT**

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos    vs.    Centennial    P.R.    Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

6.        **RETALIATION ( NOT MASSACHUSETTS LAW )**

Respectfully, Plaintiff request relief on Count  ( Retaliation  record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos    vs.    Centennial    P.R.    Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

**WHEREFORE, the Plaintiff respectfully seek relief on  punitive and on all the above claims,  that survived defendants ' motion to dismiss ( docket No. 4 ),  that stated in the Order of the United States District Court, the honorable Patti B. Sarris,  as the court deems and proper or tier of fact or by jury .**

### CERTIFICATION OF SERVICE

I, Anthony Bayad, certify that I caused this document to be served upon Attorney Bruce Falby, Dla Piper Rudnick Gray Cray Carry, 33 Arch Street, 26 th, Boston, MA 02110, by First class - U.S. Mail on August 22, 2006.

**Respectfully submitted**

**Anthony Bayad**
**2 Magoun Avenue**
**Medford, MA 02155**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

ANTHONY BAYAD,

     *Plaintiff,*

v.

CISCO SYSTEMS, INC., BRUCE
BASTIAN, KATE DCAMP, LYNN
FRASER, CELIA HARPER-GUERRA,
and RICK JUSTICE,

     *Defendants.*

CIVIL ACTION NO. 05-11005-PBS

---

## **DECLARATION OF KATE DCAMP**

I, KATE DCAMP, declare under the pains and penalties of perjury, pursuant to 28 U.S.C. § 1746, the following:

1.     I am a Senior Executive Advisor for Cisco Systems, Inc. ("Cisco"). I have worked at Cisco since May 2000.

2.     I submit this declaration in support of the Defendants' Motion for Summary Judgment in connection with the captioned matter.

3.     I had no involvement with and have no personal knowledge of the facts surrounding Anthony Bayad's employment with Cisco. Until he filed this lawsuit, I was unaware that Mr. Bayad had ever worked at Cisco.

4.     I have never interacted in any way with Mr. Bayad.

5.     My attorneys have provided me with a copy of a letter, dated November 29, 2000, that Bayad claims he sent to me. I do not recall having ever seen this letter.

6.    I have no personal knowledge concerning, and have had no involvement with, any decision regarding Mr. Bayad's employment with Cisco, the termination of his employment, or Mr. Bayad's alleged subsequent attempts to obtain re-employment with Cisco or employment elsewhere.

7.    My attorneys have provided me with a copy of an e-mail, dated February 19, 2002, that Mr. Bayad alleges a Cisco employee named Tushar Kothari sent to myself and several others. I do recall receiving this e-mail. I am not aware of any connection between the subject matter of that e-mail and Mr. Bayad.

8.    My attorneys have provided me with a copy of an e-mail, dated September 26, 2002, that Mr. Bayad alleges was sent by a Cisco employee named Paul Mountford. I have never seen this e-mail before and have no independent knowledge of its contents.

9.    My attorneys have provided me with copies of e-mails, dated December 3, 2003 and January 28, 2004, that Mr. Bayad alleges Cisco sent to him. I have never seen these e-mails before and have no independent knowledge of their contents.

10.    To my knowledge, Cisco does not, and never has, maintained a no-hire list targeting minorities as alleged by Mr. Bayad.

11.    My attorneys have provided me with a copy of the "no-hire" list Mr. Bayad produced in the course of this litigation that refers to Mr. Bayad by name. I have never seen it before. I have never placed nor instructed anyone to place Mr. Bayad's name on a "no-hire" list. I have never instructed anyone at Cisco not to hire, promote, or transfer Mr. Bayad.

2

12.     I have no personal knowledge concerning, and have had no involvement with, any decision regarding Mr. Bayad's alleged attempts, on behalf of himself or anyone else, to foster any type of business relationship with Cisco or anyone else.

13.     I have never communicated with any Cisco employee about Mr. Bayad prior to the filing of this lawsuit.

Kate DCamp

Kate DCamp

Dated: July 26, 2006

# Biography



**Kate DCamp**
**Senior Vice President, Human Resources**
**Cisco Systems, Inc**

A recognized leader in Human Resources, Kate DCamp has more than 20 years of human resource and business experience building high performance organizations. As a member of Cisco's executive leadership team and the SVP of Cisco's global HR organization, Kate DCamp is charged with building a development culture at Cisco that creates a sustainable and agile supply of leadership and talent. Along with a team of HR professionals, she is guiding an evolution of the HR function to a position as a true business partner.

Since beginning her leadership role in May 2000, Kate has implemented new processes and programs to transition Cisco from a company that brought in talent through direct hiring and an aggressive acquisition strategy to one that will build the next generation of leaders. Cisco is building on its early leadership in e-HR to create business processes that can only be built through intelligent networks and the Internet to increase the ROI of its talent.

Cisco has developed a world-class executive education program, a comprehensive employee listening process focused on enhancing the employee experience and the award-winning e-communication model. Utilizing the network, Kate has also introduced a creative approach to e-Learning that addresses the needs of the rapidly changing global workforce of today and tomorrow and blurs the lines between communication and learning.

As part of an effort to redefine the role of HR in a changing world, Kate has leadership responsibilities for learning and outreach to constituencies in addition to Cisco's 36,000 employees. The Cisco Media Network delivers rich media (video, audio, Flash) over the network to enhance learning and communication for employees, partners and customers. Managing the world-class Cisco Career Certifications program and Networking Academies is also a key component of Kate's vision for changing the way people around the world learn. Kate also leads Cisco's Corporate Social Responsibility and Philanthropy efforts.

Before joining Cisco, Kate served as Global Leader Compensation and Executive Programs for GE Capital where she designed and managed the executive, compensation, and recognition related programs for the company's 130,000 employees and 28 businesses.

Prior to GE, Kate held other Human Resource leadership roles. At The Associated Group, she led executive development and designed the annual business operating plan and metrics. Kate also developed a new compensation and governance model for the Acordia Companies for an IPO of this subsidiary business on the New York Stock Exchange. Kate began her career at AEtna Life & Casualty as an actuarial consultant in the commercial pension business.

Kate is a member of the Credit Suisse Corporate University Advisory Board, the Cowdrick Group, Human Resources Roundtable, and the National Advisory Board on Executive Compensation for World at Work. She was recently named to *HR Executive* magazine's "25 Most Powerful Women in HR," a list which names the most influential women leading HR organizations. Kate also holds the professional designations of Certified Compensation Professional and



**CISCO SYSTEMS**

**Updated 10/05**

**CISCO SYSTEMS**
.ıll
▁▁▁▁▁▁▁▁▁▁

Home | Log In | Register | Contacts & Feedback

"ıll| Select a Loca

**About Cisco**        🔅 |GO|

ABOUT CISCO
▼ NEWS@CISCO
   Corporate Overview        +
   Media Resources        +
   Corporate News
   Product & Technology News  +
   Global News        +
   Customer News        +
   Partner News        +
   Community & Philanthropy  +
   News
   Video Archive
▾ News Releases and Feature
   Articles
   News Releases, By Date
   News Releases, By Topic
   Feature Articles, By Date
   Feature Articles, By Topic
   Video Archive

**Search:**

**NEWS@CISCO**

**Feature Article**

News@Cisco

## Fortune Magazine Lists Cisco Systems as One of the Best Places to Work

**Company Makes List for Eighth Straight Year**

January 14, 2005

*By G. Patrick Pawling, News@Cisco*

Once again, Cisco Systems has landed high on Fortune magazine's annual "best places to work" list. This time the company is ranked #4 among large companies - those with more than 10,000 employees. Fortune applauded Cisco's efforts to make the workplace fun, mentioning the nearly famous "nerd lunches" (technology-talk lunches) and the movie-themed food available in some cafeterias on Oscar day.

Cisco, #27 on the overall Fortune list, has now made the elite ranking eight straight years. That's no accident. Company officials say that enriching the work - and non-work - experience of employees is a core commitment.

"Cisco is proud to be recognized by Fortune Magazine for the eighth consecutive year as one of the 100 Best Companies to Work For," says Kate DCamp, senior vice president, human resources. "We strive to create a culture of open communication with employees so that we can create programs and services that will meet the needs of our diverse work force and increase employees' commitment to Cisco."

The much sought-after Fortune list is based on an evaluation of the policies and culture of each company and the opinions of the company's employees. Two-thirds of the score comes from employee responses to a 57-question survey going to a minimum of 350 randomly selected employees from each company. The survey asks about things such as attitudes towards management, job satisfaction and camaraderie. The remaining score is based on an evaluation of each company's demographic makeup, pay and benefits programs and culture. Companies are scored for credibility (communication to employees); respect (opportunities and benefits); fairness (compensation, diversity); and pride/camaraderie (philanthropy, celebrations).

**MORE INFORMATION**

**Related Website**
Fortune

**Related Link**
Corporate Fact Sheet

**LATEST NEWS**

Unified Communications: Curbing Chaos

Video: SureWest Delivers High Speed Services on a Cisco Network

Cisco Completes Acquisition of Meetinghouse

Improving Parent-School Communications

Vietnam's State Bank Deploys Advanced Technology from Cisco

**More News**

**Related Tools**
Email Alerts: N
Media Relation:
Feedback Surv
Syndicated Nev
Podcasts |POD

**News@Cisco V**
Asia Pacific | L
Europe, Middle
Japan | Canada

**Useful Links**
Executive Thou
Linksys News
Analyst Relatio
Investor Relatic
Government Af



While Fortune cited Cisco's "fun" aspects such as catered family movie
nights on the lawn in San Jose, the company's culture of enrichment and
support goes much deeper.

**Thoughtful Benefits**

All new employees get an initial stock option grant and all employees are
eligible for ongoing grants. Employees may also buy shares for 15 percent
less than market price, through the Employee Stock Purchase Program.
The company's health insurance covers long-term care. It has four fitness
centers in the U.S. and Canada and in some locations it offers on-site
mammograms and body fat analysis screenings. There are also on-site
programs such as Weight Watchers, along with personal trainers, massage
therapists, cooking classes and seminars on financial planning and
ergonomics.

Cisco allows for flexible schedules and paid time off. Women get up to 28
weeks of maternity leave. On-site child-care programs extend to
kindergarten, and available children's classes include music, dance,
gymnastics and Berlitz language instruction. Parents also have the
advantage of looking in on their kids during the day via Internet TV - just
one more example of how Cisco makes good use of its own leading-edge
technology. Cisco's campuses, for example, are wireless throughout, with
employees often taking their laptops to meetings or lunch. This gives
employees mobility and flexibility - even if they simply want to work outside
on a nice sunny afternoon.

The company often runs forums in which any employee can ask real
questions of executives, including CEO John Chambers. Similarly, every
employee is expected to be a leader, and to that end Cisco offers multiple
initiatives, including the Cisco Leadership Series - week-long sessions with
instructors from top global business schools.

**Personal Touches**

Cisco also offers an Employee Discount Program providing access to
hundreds of top-tier retailers - online, in-store, and via catalogues. More
than half of Cisco's employees use the program every month.

The company also puts out a quarterly "Work/Life" newsletter covering
issues such as childcare, living with teenagers and caring for aging
parents. Employees appreciate the personal touches. Employees who call
to request childcare information receive books - What to Expect When
You're Expecting, for example.

These are some of the many programs that make Cisco Systems a unique
work environment - and have kept Cisco on Fortune's elite list of being one
of the best places to work.

Pat Pawling is a freelance journalist located in Ocean City, NJ.

**Rate this Content**

Please let us know what your profession is:
Select One

Did you find this content useful?
Not at all **1** - **2** - **3** - **4** - **5** Very useful

**Related News**

18-AUG-06
Cisco Shareholder Class Action Lawsuit Resolved

16-AUG-06
Cisco Systems Completes Acquisition of Meetinghouse Data Communications

10-AUG-06

Cisco Announces Investment to Focus on Data Center Development

08-AUG-06
CEO John Chambers and CFO Dennis Powell Discuss Cisco's Q4 and Year
End Fiscal Year 2006 Performance

08-AUG-06
Cisco Systems Reports Fourth Quarter and Fiscal Year 2006 Earnings

© 1992-2006 Cisco Systems, Inc. All rights reserved. Important Notices, Privacy Statement, Cookie Policy and T
Systems, Inc.

I understand and accept the above terms and acknowledge receiving Appendix A, including the separately provided data on the job titles and ages of all individuals covered by the Program and on the job titles and ages of all individuals not covered by the Program. This data has been offered for a full forty-five (45) days prior to the expiration of the offer of this Agreement.

_Signature of Employee_

**Date Actually Signed**
5 - 1 - 01
(If signed and dated before Scheduled final date of employment shown below, this "Self-Selected" date is your final date of employment.)

_Printed Name of Employee_
Anthony Bayad

**Location Signed at** (e.g., San Jose, CA, USA)
LEXINGTON, MA

**Cisco Employee # or Social Security Number:**
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
H 73799

Thank you to all of you and Good Luck

| FOR CISCO USE ONLY | |
|---|---|
| Received by: | Approved by |
| Amy Otregus 5/3/01 | Kathryn DC Kathryn Dcamp |
| Name/Date | Name/Date* |

*Approval to be binding on Cisco must be signed by Kate Dcamp, Vice President, Human Resources, or Authorized Designee.

KATE DCAMP
Signature



## CISCO SYSTEMS

### VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE

Notification Date: **25-APR-2001**

Anthony Bayad
278 Main Street Unit 1H
Melrose, MA 02176

Dear Anthony:

This Voluntary Severance Agreement and General Release ("Agreement") confirms our agreement regarding your separation from employment with Cisco Systems, Inc. ("Cisco" or "Cisco Systems"). Cisco Systems has conducted a reorganization of its business. As a result of that reorganization, your employment with Cisco shall end sixty (60) calendar days from your formal notice of this Agreement. This date is referred as the "Scheduled" final date of employment and is provided at the end of this Agreement for your reference. The sixty (60) calendar-day period from this notification to your "Scheduled" final date of employment is referred to as the "Transition Period."

You may voluntarily end your employment with Cisco early by signing this Agreement prior to your "Scheduled" final date of employment. Your employment will then end on the day this Agreement is executed. This date is referred to as the "Self-Selected" final date of employment. The severance benefits provided by this Agreement shall become available on or about fourteen (14) days following the execution of this Agreement as provided below.

**I.    What You Will Receive:** You will receive your regular base pay through your "Scheduled" or "Self-Selected" final date of employment plus the value of your unused PTO earned through that date. You will also continue to be eligible for benefits coverage and stock vesting until this date. **In exchange for entering into this Agreement, including your agreed-upon ending of employment, Cisco agrees to provide you with the below-described additional consideration following your final date of employment:**

- **Severance Pay:** Severance pay equal to four (4) months of base pay less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **Pay In Lieu of Notice:** If you voluntarily sign this Agreement ending your employment prior to the expiration of the sixty (60) calendar-day Transition Period, you will still receive payment in lieu of notice for the remaining days in the Transition Period. This amount will be equal to the regular base pay you would have been entitled to for the period between your "Self-Selected" final date of employment and your "Scheduled" final date of employment, if any, less applicable payroll deductions, applicable payroll taxes and authorized after-tax deductions.

- **COBRA Premium Payments:** If you elect to continue group health coverage under COBRA, Cisco will pay the COBRA premiums for up to the first four (4) months of continuing coverage. (This does not apply to flexible health spending accounts.) Upon completion of the first four (4) months of COBRA coverage, Cisco will cease paying COBRA premiums and you will be responsible for all further COBRA payments.

- **Limited Option Exercise Period Extension:** All vested and available Cisco non-qualified stock option shares as of your final day of employment with Cisco, to the extent that the exercise price of such shares is more than the NASDAQ final market stock share price as of your final day of employment, will remain exercisable for twelve (12) months after your final day of employment with Cisco pursuant to the terms of Cisco's stock option plan, and subject to your executing any required implementation documents.

- **Outplacement Services:** On-line outplacement services as determined by Cisco and provided through Drake, Beam and Morin (DBM) (or an equivalent firm) for a period up to two (2) months from your final date of employment. (This is separate and in addition to the DBM Placement Services provide prior to your final date of employment.)

- **Relocation Loan Repayment Extension:** To the extent that you have a relocation loan secured by real property that will in part or in full become due within twelve (12) months of your final date of employment, Cisco will extend the time for repayment until twelve (12) months after your final date of employment. Interest will accrue during the repayment period at the rate specified in your loan documents, however if no rate of interest is specified, interest shall accrue at the minimum per annum rate if required to avoid the imputation of compensation income to you under the federal tax laws.

**II.     What You Are Agreeing To Release:** In consideration for the additional outplacement services, extended stock exercise period, COBRA premium payments, and four-month (4-month) severance lump sum payment, you release Cisco Systems, any affiliated companies, and their current and former officers, directors, agents, and employees and assigns from any and all claims up through the date of the execution of this Agreement, and you agree that your final date of employment shall be either the "Scheduled" date below or the earlier "Self-Selected" date. The claims subject to this release include, but are not limited to, those related to your employment with Cisco. All such claims (including related attorneys' fees and costs) are barred without regard to whether those claims are based on any alleged breach of a duty arising in statute, contract, or tort. This expressly includes waiver and release of any rights and claims arising under any and all laws, rules, regulations, or ordinances, including but not limited to the Age Discrimination in Employment Act (ADEA); the Workers Adjustment and Retraining Notification Act (WARN); Title VII of the Civil Rights Act of 1964, as amended; the Americans with Disabilities Act; the Equal Pay Act of 1963; the California Fair Employment and Housing Act (if applicable); and any similar law of any other state or governmental entity. The parties agree to apply California law in interpreting this Agreement. Accordingly, you further waive any rights under Section 1542 of the Civil Code of the State of California or any similar state statute. Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known to him, must have materially affected his settlement with the debtor."

**III.     Timeline For Considering and Signing the Agreement:** You understand and agree that you have been provided a period of sixty (60) days within which to consider whether you will execute this Agreement, no one hurried you into executing this Agreement during that sixty-day (60-day) period, and no one coerced you into executing this Agreement. The offer of this Agreement shall expire on the sixty-first (61st) day after you have received it. If this day is a Saturday, Sunday or holiday recognized by the U.S. Postal Service, the expiration date is extended to the next business day. Nonetheless, in limited circumstances such as a medical

emergency, Cisco reserves the right at its sole discretion to accept an Agreement signed after the expiration date.

Completed releases must be delivered or mailed to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050, on or before the end of the sixty-first (61st) day after receiving this Agreement. Unless you personally deliver the signed Agreement on or before this date, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before this date (the end of the sixty-first (61st) day after receiving this Agreement). The expiration which occurs on the sixty-first (61st) day of the Agreement will be extended to the next business day should it fall on a Saturday, Sunday or a holiday recognized by the U.S. Postal Service.

You understand that unless more time is allowed by applicable law, you have a limited period of seven (7) calendar days after signing to revoke your acceptance of this Agreement. You must deliver or mail written notification of revocation to A. Goerges or designee, at Cisco Systems, Inc., Mail Stop 5/1, 1245 Walsh Avenue, Dock 38, Santa Clara, CA 95050. Unless you personally deliver the signed revocation within this seven (7) calendar-day period, it must be sent by a traceable overnight delivery service or traceable overnight express mail and postmarked on or before the end of the seven (7) calendar day period after signing this Agreement. This deadline will be extended to the next business day should it fall on a Saturday, Sunday or holiday recognized by the U.S. Postal Service.

Because of this revocation period, you understand that the payment requirements of this Agreement shall not become effective or enforceable until the eighth (8th) calendar day after the date you sign this Agreement. Therefore, your severance payment will be made available to you on or about the fourteenth (14th) calendar day after you sign this Agreement.

Your employment will terminate on the day you execute this Agreement, but not later than the "Scheduled" final date of employment (which provides you with sixty (60) days' advance notification). Should you execute this Agreement prior to your "Scheduled" final day of employment, your employment will end on that "Self-Selected" day and you will become eligible for the severance benefits listed above. This specifically includes, if any, pay in lieu of notice from the "Self-Selected" until the "Scheduled" final day of employment.

**IV.     Protecting Your Rights:** You understand that rights or claims that may arise after the date this Agreement is executed are not waived. In understanding the terms of this Agreement and your rights, you are advised to consult with an attorney of your choice prior to executing this Agreement. Also, nothing in this Agreement shall prohibit you from exercising legal rights that are, as a matter of law, not subject to waiver such as: (1) your rights under applicable workers' compensation laws; (2) your right, if any, to seek unemployment benefits; and (3) your right to file a charge with appropriate administrative agencies such as the Equal Employment Opportunity Commission (EEOC). Additionally, Attachment A is incorporated into this Agreement. It contains important information about the age composition of those impacted by this business reorganization.

You understand that if you execute this Agreement before the sixty-day (60-day) notice period expires you will forgo benefits that would otherwise continue for the full sixty (60) days. (Cisco health insurance benefits terminate on the last day of the month during which your employment ends, unless coverage is continued through payment of the COBRA premium.) Nonetheless, you will receive a payment equal to your base pay for this period as described above. The option of an early "Self-Selected" final day of employment allows you to resign and immediately commence the seven-day revocation period and the waiting period for the receipt of severance benefits. This option is strictly voluntary. It may be appropriate for someone who wishes immediately

to commence other employment and will be covered under the new employer's benefit program, but again, this is your choice.

**WARNING: You are cautioned that important exercise rights regarding certain stock options commence running as of your final day of employment. You may be required to exercise your vested options as early as the final date of your employment, meanwhile thirty (30), sixty (60) and ninety (90) calendar day exercise periods from your final date of employment may also exist. Cisco will send you a courtesy notice regarding the exercise of these options usually within fifteen (15) days of your final date of employment, but it is your responsibility independently to determine your rights and take appropriate action. Failure to receive such a notice from Cisco following your final day of employment will not justify your failure to exercise vested options within the appropriate post-termination exercise period as set forth in your individual stock option grant agreements. Cisco disclaims any verbal or written representations or advice on the exercise of stock options other than what is contained in your written stock option grant agreements. You are encouraged to seek independent professional financial advice.**

**V:**     **Protecting Cisco's Rights:** In executing this Agreement, you acknowledge that you have not relied upon any statement made by Cisco, or any of its representatives or employees, with regard to this Agreement unless the representation is specifically included in this written Agreement. Furthermore, this Agreement contains our entire understanding regarding eligibility for and the payment of severance benefits and supersedes any or all prior representations and agreements regarding the subject matter of this Agreement. However, this Agreement does not modify, amend or supersede written Cisco agreements that are consistent with enforceable provisions of this Agreement such as Cisco's "Property Information and Invention Agreement" and Cisco's Arbitration Agreement and Policy. Once effective and enforceable, this Agreement can only be changed by another written agreement signed by you and each of the persons (or their designees) who sign below.

**VI:**     **Enforceability Of This Agreement:** Any controversy or any claim arising out of or relating to the interpretation, enforceability or breach of this Agreement shall be settled by arbitration in accordance with Cisco's Arbitration Agreement and Policy that you acknowledge receiving with your Notification Letter. If for any reason this Arbitration Agreement is not enforceable, you agree to arbitration under the employment arbitration rules of the American Arbitration Association or any successor hereto. The parties further agree that the arbitrator shall not be empowered to add to, subtract from, or modify, alter or amend the terms of this Agreement. Any applicable arbitration rules or policy shall be interpreted in a manner so as to ensure their enforceability under applicable state or federal law.
Should any provision of this Agreement be determined by any court of competent jurisdiction to be wholly or partially invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions are intended to remain in full force and effect.

We trust that the severance payment, placement services, and other considerations will assist you in your transition of employment. We wish you the best in your future endeavors.

**Notice: Your "Scheduled" Final Day of Employment is 25-JUN-2001**

I understand and accept the above terms and acknowledge receiving Appendix A, including the separately provided data on the job titles and ages of all individuals covered by the Program and on the job titles and ages of all individuals not covered by the Program. This data has been offered for a full forty-five (45) days prior to the expiration of the offer of this Agreement.

Signature of Employee

Anthony Bayad
Printed Name of Employee

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

Cisco Employee # or Social Security Number

73799

5-1-01
Date Actually Signed
(If signed and dated before Scheduled final date of employment shown below, this "Self-Selected" date is your final date of employment.)

LEXINGTON, MA
Location Signed at (e.g., San Jose, CA, USA)

Thank you to all of you and Good Luck

---

**FOR CISCO USE ONLY**

Received by:

Amy Sturges 5/3/01
Name/Date

Approved by

Kathryn D Kathryn Dcamp
Name/Date*

*Approval to be binding on Cisco must be signed by Kate Dcamp, Vice President, Human Resources, or Authorized Designee.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that on 25-APR-2001 , I received the following documents:

- US EMPLOYEE NOTIFICATION LETTER ;

- VOLUNTARY SEVERANCE AGREEMENT AND GENERAL RELEASE

- ARBITRATION AGREEMENT AND POLICY,

and that I have been advised that I must promptly and carefully read each document, as important rights will be affected

_____     4/25/01
Signature of Employee                          Date

---

FOR CISCO USE ONLY

Anthony Baird                          73799
Printed Name of Employee              Cisco Employee #
Who Signed Above

Manager(s) or HR Representative(s) Present:
Lyn Fraser
Print Name                             Print Name

Immediately Return to: Brian O'Connor, MC SJC05/3/3 by interoffice mail or Brian O'Connor, 170 West Tasman Drive MC SJC05/3/3, San Jose, CA 95134 by post

---

ERTS                                   FOR CISCO USE ONLY

---

Employee's mailing address and phone number for reception of additional documentation:
Street: 377 Main Street Suite 1H
City: Malrose          State: MA ZIP: 02176
Phone: (781) 662-4252