## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD,           )

    Plaintiff ,           )
                        )
                        )
                        )      **CASE NO. 05-11005PBS**
                        )

BRUCE  BASTIAN; KATE DCAMP    )
CELIA HARPER-GUERRA; LYN FRASER )
RICK JUSTICE; CISCO SYSTEMS     )
       **Defendants,**

---

**MOTION # 1 TO CONSIDER/ADMIT: ORDER DATE NOVEMBER 10, 2005 CASE No. 04-CV40146FDS  (D. Mass)** "PLAINTIFF[S]SHOULD BE PERMITTED TO SHOW THAT DEFENDANTS' PAST PRACTICES MANIFEST A PATTERN OF DISCRIMINATION" & "SIMILAR ACT OF DISCRIMINATION IS ADMISSIBLE"

### Exhibit 1 is the order attached hereto

The Honorable Chief Magistrate Judge <u>Charles B. Swartwood III,</u> ordered :

( see Page 3-4 of such order)

> "This court has previously found that, " plaintiff[s] should be  permitted to show that defendants'  past practices manifest a pattern of . . . discrimination." *Jackson v. Harvard*, 111 F.R.D. 472, 475 ( D. Mass. 1986, D.J.).   In other words , evidence of a pattern of behavior is relevant to discrimination claims such as those which have been asserted by plaintiff. See e.q. *Scales v. J.C. Bradford and Co.*, 925 F.R.D. 901, 906 ( 6th Cir. 1991) ("It is well settled that information concerning an employer' s general employment practices is relevant even to title VII/(1981/1985) individual disparate impact claim"; *Gleen v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002) "<u>similar acts of  discrimination  is admissible</u> . . . "

### SIMILAR ACT OF DISCRIMINATION BY THE SAME DEFENDANTS IS ADMISSIBLE ( Defendant Cisco Systems [ its owners] - Tony Savastano - Carl wiese)

Anthony Savastano  and Carl Wiese ( 04-10468PBS – D. Mass) have discriminated

Against Bayad  in three ( 3) companies, Lucent Technologies – International Network

Services – and now Cisco Systems , have exercised their racist vendatta upon  Bayad in

criminal way, where the District Attorney of Pinellas county of Florida turned his back

and did not want to allow him  to press  charges because they were connected in Florida

( AT&T). These two individuals  ( Wiese and Savastano) are owners of Lucent

Technologies Inc., then  they become owners of International Network Services. They

did not rest,  once again,  have been let go from Lucent Technologies  and landed a job at

Cisco Systems Inc.,  where Bayad was employed, employed at Cisco Systems with them

( Carl Wiese and Anthony Savastano), as they are owners/partners of Cisco Systems. See

*Serapio  vs.  Martinez*, 119 F 3.d  982, 990 ( 1st Cir. 1997), cert. Denied, 118 S.Ct.  690

(1998) ( an individuals are **owner[s]** when showing have ownership in organization,

receives compensation based on its profits, and participate in managing the organization

would qualify as an "owner" or "partner"); see *Stroller vs Marsh*,  682 F. 2d. 971, 972

(D.C.Cir. 1982).

### THIS COURT FOUND THAT SIMILAR ACT OF DISCRIMINATION AND HISTORY OF DISCRIMINATION IS ADMISSIBLE  ALLOWED BY THIS COURT: *Briddell  v. Saint Gobain Abrasives Inc.*, **Case No. 04-cv-40146-FDS**

Plaintiff Anthony Bayad should be permitted to show history/pattern/motive of

similar act of discrimination  as this court has done in the past. Also, Bayad is requesting

respectfully  the honorable Patti B. Sarris to consider the  admission of Cisco ' Owner

Anthony Savastano and Carl Wiese ' act[s] of past history motive of discrimination

and their personal racist vendetta aimed at Bayad' race, his Arab Race, as they have done

to another Arab descend, <u>Hamdi Elsiah</u> during his employment with them

at Lucent Florida as evidence into the record. The following cases of Arab race

discrimination in support:

### *Exhibit 2 attached hereto of the case for the honorable Patti B. Sarris to review*

    <u>See:</u>  *Anthony Bayad v. Lucent Technologies ( Carl Wiese-Owner) ; Anthony Savastano*:  Case No. U.S.D.C., S.D. Fla.,  Case No. 97-6671-Civ-Roettger.

### *Exhibit 3 attached hereto of the case for the honorable Patti B. Sarris to review*

    <u>See:</u>  *Hamdi Elsiah  v.  Lucent Technologies ( Carl Wiese - owner); Anthony Savastano et al.*;  Case the  U.S.D.C., S.D. Fla., Case No. 97-6778-Civ-Marcus.

**Plaintiff Bayad has once filed a complaint with EEOC under  Title VII against defendants Cisco Systems (Carl Wise & Anthony Savastano) right-to-sue-letter was provided**

    Plaintiff Bayad has stated clearly  in his complaint Docket entry #1 at section of

jurisdiction, that he has once filed a complaint with the EEOC and <u>right-to- sue letter</u>

was provided, thereafter the law suit was filed in the United States District Court of Fort

Lauderdale, District of Florida, against Lucent  Technologies ( Carl Wiese) and

Anthony Savastano,  whom are now the owners of Cisco Systems , the Defendants in the

above caption matter.   Facts are straight forward,  when the law is retroactive cure

plaintiff Bayad ' claim of discrimination as it is very clear that <u>Title  VII section 704</u>

makes it unlawful for an employer as Cisco Systems and its owners  ( Carl Wiese &

Savastano) " to discriminate against any of his employees. . . because he/she as Plaintiff

Bayad, who  has opposed any practices made an unlawful employment practice by this

subchapter, or because he has made a charge, testified, assisted, or participated in any

manner in an investigation,  proceeding, or hearing under this subchapter. See the right to

sue letter provided by the EEOC is **attached to Exhibit 3** to the law suit filed in U.S

district Court of Fort Lauderdale Florida.

## CONCLUSION

Your Honor, <u>Patti B. Sarris</u>, this case discrimination case is not about the Cisco-No-

Hire-List, the Cisco-No-Hire-List is only one of many evidence of 100 of evidences,  but

it is about race discrimination of a motive dated the year of 1997 – 2000 , and 2001 to

Present time, the year of 2006. Unless you honor do not stop it is not going to stop and I

am not going to let my right for the third times be violated. Sorry respectfully.

## RELIEF THAT IS REQUESTED

**<u>PUNITIVE DAMAGES</u> ( Published by Dla Piper Rudnick Gray Carry  'official web site)**

• "The record are clear that federal race discrimination claims brought under Title 42 Section 1981 as well as claims brought under numerous state laws are not subject to **any  limits**, A recent unpublished opinion in the Fourth Circuit Court of Appeals, *White v. BFI Waste Services, LLC* (No. 05-1804, 4th Cir. May 23, 2006), serves as a pointed, when the jury in *White* found that defendant BFI's supervisors subjected two African-American plaintiffs to a racially hostile work environment for over **ten years** and awarded the plaintiffs <u>$4 million</u> in punitive damages on top of $1.2 million in compensatory damages. And Several recent cases illustrate just how costly discrimination and harassment punitive damages can be;  also  In *Issa v. Roadway Package Sys.*, a California jury awarded two FedEx drivers $50 million in punitive damages after finding that a manager subjected the two <u>drivers to ethnic harassment</u> and ridicule during their two years of employment at FedEx (June 2, 2006).  See In *Zubulake v. UBS Warburg*, a federal jury in New York awarded a single plaintiff over $20 million in punitive damages on her gender discrimination claims (April 6, 2005). . . . etc"

## 1.    COUNT I RACE  DISCRIMINATION

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference

or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 2.    COUNT III CLASSIFICATION OF RACE – CISCO-NO-HIRE-LIST

Respectfully, Plaintiff request relief on Count III ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 3.    COUNT VI BREACH OF ORAL CONTACT AND CONTRACTUAL OF OBLIGATION

Respectfully, Plaintiff request relief on Count VI ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 4.    COUNT VIII CONSPIRACY

Respectfully, Plaintiff request relief on Count VIII ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 5.    COUNT IX FALSE IMPRISONMENT

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 6.    RETALIATION ( NOT MASSACHUSETTS LAW )

Respectfully, Plaintiff request relief on Count ( Retaliation record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the

presumption. see *Santiago-Ramos    vs.    Centennial    P.R.    Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

**WHEREFORE, the Plaintiff respectfully seek relief on  punitive and on all the above claims,  that survived defendants ' motion to dismiss ( docket No. 4 ),  that stated in the Order of the United States District Court, the honorable Patti B. Sarris,  as the court deems and proper or tier of fact or by jury .**

## CERTIFICATION OF SERVICE

I, Anthony Bayad, certify that I caused this document to be served upon Attorney Bruce Falby, Dla Piper Rudnick Gray Cray Carry, 33 Arch Street, 26 th, Boston, MA 02110, by First class - U.S. Mail on November 3, 2006, 2006.


**Respectfully submitted**

**Anthony Bayad**
**2 Magoun Avenue**
**Medford, MA 02155**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

ROBERT BRIDDELL, )
      Plaintiff )
    )
V. )
    )
SAINT GOBAIN ABRASIVES INC., )
      Defendant )
    )

**CIVIL ACTION**
**NO.  04-CV-40146-FDS**

---

### Order
**November 10, 2005**

**Swartwood, C.M.J.**

### Nature of the Proceeding

By Order of Reference dated September 1, 2005, Plaintiff's Motion to Compel (Docket No. 25) was referred to me for disposition.

### Nature of the Case

Robert Briddell ("Mr. Briddell" or "Plaintiff") has filed a Complaint against St. Gobain Abrasives, Inc. ("St. Gobain" or "Defendant") in which he alleges that St. Gobain: violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*, as amended ("Title VII") by discriminating against him on account of his race, color and/or ethnicity (Count I), and retaliating against him because of his complaints of discrimination and/or his opposition to St. Gobain's discriminatory practices (Count II); and violated his rights under the 42 U.S.C. § 1981, as amended ("Section 1981") by engaging in a continuing course of

discrimination against him on the basis of his race and color and depriving him of his right to equal protection of the law (Count III). See Complaint (Docket No. 1).

## Discussion

Mr. Briddell seeks an order compelling St. Gobain to produce, "a witness pursuant to FRCP 30(b)(6) prepared to discuss [St. Gobain's] knowledge as to FRCP 30(b)(6) topics 2, 3, 7, 8, 10, and 11 and documents responsive to Schedule A requests 7, 8, 9, and 10". Plaintiff's Motion to Compel (Docket No. 25), at pp. 2-3. St. Gobain has objected to Mr. Briddell's motion to compel on the grounds that it should not be required to produce a 30(b)(6) witness to testify concerning: any topics which are overly broad; where it would be unduly burdensome to familiarize the witnesses concerning any such topics; and any topics which are immaterial or irrelevant to this action, or are unlikely to lead to discovery of admissible evidence. St. Gobain further argues that some topics which Mr. Briddell has indicated he will inquire of the 30(b)(6) witness would require disclosure of private information about individuals who are not parties to this action and therefore, are not discoverable. Id. at pp. 14-19. [1]

## Rule 30(b)(6) Deposition Topic No. 3

---

[1] At the hearing on Plaintiff's motion to compel, the parties informed the court that they had reached agreement concerning Topic No. 2.

In Topic No. 3, Mr. Briddell asks St. Gobain to designate a witness to testify concerning:

> Defendant's investigations and purported good faith efforts to address workplace discrimination, retaliation and/or disparate treatment, through its purportedly comprehensive, effective and well-publicized policies, including any action taken by the Defendant to ensure that these policies were actually followed with respect to promotions and with respect to discipline at the Worcester Facility between January 1999 and the date of Plaintiff's termination [February 6, 2002].

Defendant's Opposition to Plaintiff's Motion to Compel (Docket No. 27) ("Opposition"), at p.8. In response, St. Gobain has agreed to produce Richard Zeena of its Human Resources department to testify about Topic No. 3 for the period of March 2000 to February 6, 2002. Id. As to Mr. Briddell's request that St. Gobain's 30(b)(6) witness be prepared to testify concerning employee promotions and/or disciplinary actions during the period from January 1999 through February 2000, St. Gobain argues that since Mr. Briddell did not apply for any promotions and was not disciplined during this period, it is unlikely that such information would be relevant to his claims or lead to admissible evidence. St. Gobain also argues that since Richard Zeena did not start working for them until March 2000, having to prepare him to testify concerning that fourteen month period, or to identify someone else to testify concerning that period, would be unduly burdensome.

In his motion to compel, Mr. Briddell is seeking information about general company practices in order to demonstrate a pattern of discriminatory conduct on the part of St. Gobain. This court

-3-

has previously found that, "Plaintiff[s] should be permitted to show that defendants' past practices manifest a pattern of...discrimination." Jackson v. Harvard, 111 F.R.D. 472, 475 (D.Mass. 1986)(Garrity, D.J.). In other words, evidence of a pattern of behavior is relevant to discrimination claims such as those which have been asserted by Mr. Briddell. See e.g. Scales v. J.C. Bradford and Co., 925 F.R.D. 901, 906 (6th Cir. 1991)("It is well settled that information concerning an employer's general employment practices is relevant even to a title VII individual disparate impact claim"); Glenn v. Williams, 209 F.R.D. 279, 282 (D.D.C. 2002)("Similar acts may be admissible as bearing on the motive with which the organization acted when confronted with a similar situation"); and United States v. Massachusetts Indust. Fin. Agency, 162 F.R.D. 410, 413 (D.Mass. 1995)("Evidence of how other organizations were treated by [defendant] might well be relevant to a determination of whether it discriminated against [Plaintiff organization]"). Furthermore, as pointed out by Mr. Briddell, such information is relevant with respect to St. Gobain's Seventh Affirmative Defense, that it, "at all material times made good faith efforts to comply with its obligations under the federal employment discrimination statutes." Answer, at p. 9; See McGrath v. Nassau County Health Care Corp., 204 F.R.D. 240, 244-5 (E.D.N.Y. 2001)(defendant put its conduct at issue by claiming that it took adequate remedial measures in response to plaintiff's discrimination claims).

-4-

At the same time, relevant information, which is otherwise discoverable, may be limited both "geographically" and "temporally" in order to avoid overly broad and unduly burdensome requests. Glenn, 209 F.R.D. at 281-2. Therefore, a plaintiff will not be permitted an open-ended review of corporate records in order to establish discriminatory employment practices. On the other hand, "a time frame which merely brackets the contested employment action would foreclose plaintiff from elucidating past practices or identifying a pattern". Harvard, 111 F.R.D. at 475; See also Pleasants v. Allbaugh, 208 F.R.D. 7, 10 (D.D.C. 2002)(where court allowed 8 years for discovery to allow plaintiff opportunity to demonstrate, "a continuum of events affecting African-American people  that extended over the period of time that [plaintiff] worked for [defendant]"). Although courts have permitted discovery periods as long as eight to ten years, the norm in employment discrimination cases seems to be anywhere between three and five years. See Massachusetts Indust. Fin. Agency, 162 F.R.D. at 414 (three year window of discovery); Obiajulu v. City of Rochester, 166 F.R.D. 293, 296 (W.D.N.Y. 1996)(discovery allowed from three years prior to suit until the time the case was heard); Glenn, 209 F.R.D. at 282 (three year time frame for discovery);  Swackhammer v. Sprint, 225 F.R.D. 658, 662 (D.Kan. 2004)(time period of three years prior to discrimination and two years afterwards allowed).

In this case, Mr. Briddell requests that St. Gobain provide information concerning promotion and disciplinary practices for the

-5-

period from January 1999 through February 6, 2002, which includes a fourteen month period which precedes any alleged discriminatory actions against him by St. Gobain. I agree with Mr. Briddell that such information is relevant to his attempt to demonstrate a pattern of improper behavior on the part of St. Gobain. Accordingly, I find the time period for which Mr. Briddell seeks such information to be entirely reasonable.

As to St. Gobain's argument that Richard Zeena, its designated rule 30(b)(6) witness, does not have personal knowledge of the information requested by Mr. Briddell for the period of January 1999 to March 2000, rule 30(b)(6) places the burden upon the deponent to "make a conscientious good-faith endeavor to...prepare [it's designee(s)] in order that they can answer fully, completely, unevasively." Mitsui & Co. (U.S.A.) V. Puerto Rico Water Resources Authority, 93 F.R.D. 62, 67 (D.P.R. 1981). This duty of preparation "goes beyond matters personally known to that designee or to matters in which that designee was personally involved." U.S. v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996). If necessary, the deponent must use documents, past employees, and other resources in performing this required preparation. Id. (citing Ierardi v. Lorillard, Inc., 1991 U.S. Dist. LEXIS 11887, at *3 (E.D.Pa. 1991)). Therefore, St. Gobain shall educate Mr. Zeena as to the information requested in Topic 3 for the period from January 1999 to February 6, 2002, or designate a second 30(b)(6) witness with knowledge concerning that period.

-6-

### Rule 30(b)(6) Deposition Topics and Schedule A Requests 7-10

In these Topics and Requests, Mr. Briddell asks for testimony

and documents concerning all employees in the "Worcester Facility"[2]

disciplined between January 1999 and January 2004[3] for: creating

contaminated mixes (topic 7); failing to sign manufacturing orders

(topic 8); failing to use the CONCAM system (topic 9); and creating

heavy pans or committing "other safety violations" (topic 10).

Opposition, at p. 9. Defendant asserts that the information sought

in these Topics/Requests is overbroad, irrelevant, unduly

burdensome and, in regard to Topic/Request No. 10, an invasion of

privacy.

St. Gobain's primary objection concerns Mr. Briddell's catch-

all request for information concerning "other safety violations,"

which St. Gobain argues is overly broad and unduly burdensome as it

will encompass a multitude of minor infractions that bear little

resemblance to any of the infractions for which Mr. Briddell was

disciplined. I agree that the request is overly broad, and I will

restrict the inquiry to safety violations which, under St. Gobain's

established policies, carry with them punishments similar in

---

[2] It is unclear what Mr. Briddell means by saying, "Worcester Facility". However, from the hearing, it appears that Mr. Briddell is seeking such discovery with respect to the Worcester Bonded Abrasives Division.

[3] St. Gobain again objects to providing information for the period from January 1999 to March 2000 and seeks to limit its responses to the period form April 2000 to January 2004. I find that Mr. Briddell has established that the relevant time period is January 1999-January 2004.

-7-

severity to the violations that Mr. Briddell allegedly committed during his employment.

Regarding the claim of undue burden, Richard Zeena has stipulated in his Declaration that a full review of the employment files necessary to respond to the requests, as initially constituted, would take 175-200 hours and cover 700-800 employees. Declaration of Richard J. Zeena, ¶ 5 (Docket No. 28).[4] As such, Defendant claims that the request is unduly burdensome. In response, Mr. Briddell's counsel offered to personally perform the document review and executed a protective order with St. Gobain in an effort to alleviate any privacy concerns. Stipulation and Protective Order of Confidentiality, (Docket No. 23).

Courts have routinely limited discovery to protect the privacy interests of parties and non-parties alike. See Gehring v. Case Corp., 43 F.3d 340 (7th Cir. 1994); Harvard, 11 F.R.D. at 476; Johnson v. Washington Times Corp., 208 F.R.D. 16; and Glenn, 209 F.R.D. at 282. While at times I have found that protective orders which limit review to counsel and/or experts who have executed confidentiality agreements are sufficient to protect privacy interests of third parties, given the sheer volume of records in this case, the amount of personnel information contained in such

---

[4] During a hearing on this motion, Defense Counsel explained this massive time estimate. St. Gobain keeps employees' disciplinary records in their general employment files. Different versions of these files are stored at the divisional and company-wide levels. This complex filing system makes investigations of the sort requested by Mr. Briddell difficult and contributes significantly to the total time required.

records and the likelihood that a substantial amount of the information will be irrelevant to Plaintiff's claims, I find that entry of such an order would not be advisable in this case. Consequently, any such review must be conducted by St. Gobain, in the first instance.

While I understand St. Gobain's objections to having to carry out such a sizeable investigation, it is St. Gobain's own record keeping policies which have contributed significantly to the burden imposed on it. Courts have been loathe to reward (and possibly encourage) poor record keeping by shielding companies with inefficient recording methods from discovery. See Keene v. Brighman and Women's Hospital, Inc., 439 Mass. 223, 242, 786 N.E.2d 824, 837 (Mass. 2003); and Societe Internationale v. Rogers, 357 U.S. 197, 211 (1958). It is inconceivable to me that a company the size of St. Gobain would not have a more rational method of tracking which employees have been subjected to disciplinary action. Therefore, St. Gobain will be required to conduct the necessary review of its employee files and provide Mr. Briddell's counsel with copies of the employee files responsive to this request, as limited in my prior ruling. Any such files produced to Mr. Briddell's counsel will, of course, be subject to the confidentiality agreement that has been executed between the parties.

### Conclusion

It is Ordered that:

1.    Plaintiff Robert Briddell's Motion to Compel is <u>allowed</u> in part, and <u>denied</u> in part, as provided in this Order.

<u>/s/ Charles B. Swartwood III</u>
**Charles B. Swartwood, III**
**CHIEF MAGISTRATE JUDGE**

**Publisher Information**

Note* This page is not part of the opinion as entered by the court.

The docket information provided on this page is for the benefit

of publishers of these opinions.

4:04-cv-40146-FDS Briddell v. Saint Gobain Abrasives, Inc.

F. Dennis Saylor, IV, presiding

Charles B. Swartwood, referral

Date filed: 07/30/2004 Date of last filing: 11/16/2005

**Attorneys**

| | | |
|---|---|---|
| Philip F. Coppinger  Seder & Chandler  339 Main Street  Suite 300  Worcester, MA 01608  508-757-7721  508-831-0955 (fax)  pfcoppinger@sederlaw.com Assigned: 09/15/2005 ATTORNEY TO BE NOTICED | representing | Robert Briddell  (Plaintiff) |
| Darragh K. Kasakoff  Seder & Chandler  339 Main Street  Suite 300  Worcester, MA 01608  508-757-7721  508-798-1863 (fax)  darragh@rcn.com  Assigned: 07/30/2004 LEAD ATTORNEY  ATTORNEY TO BE NOTICED | representing | Robert Briddell  (Plaintiff) |
| Mary E. Kelly  Livingston, Adler, Paidu,  Meiklejohn and Kelly  557 Prospect Avenue  Hartford, CT 06105  860-233-9821  860-232-7818  (fax)  mekelly@lapm.org Assigned: 06/17/2005  LEAD ATTORNEY ATTORNEY TO BE  NOTICED | representing | Robert Briddell  (Plaintiff) |
| David J. Kerman  Jackson Lewis LLP  75 Park | representing | Saint Gobain Abrasives, Inc. |

Plaza 4th Floor Boston, MA 02327 617-367-    ng    (Defendant)

0025 617-367-2155 (fax)

kermand@jacksonlewis.com Assigned:

09/27/2004 ATTORNEY TO BE NOTICED
Thomas W. Meiklejohn Livingston, Adler, Pulda,    representi    Robert Briddell (Plaintiff)

Meiklejohn & Kelly 557 Prospect Avenue    ng

Hartford, CT 06105 860-233-9821 Assigned:

07/30/2004 LEAD ATTORNEY ATTORNEY TO

BE NOTICED
Amanda S. Rosenfeld Jackson Lewis LLP 75    representi    Saint Gobain Abrasives, Inc.

Park Plaza Boston, MA 02116 617-367-0025    ng    (Defendant)

rosenfea@jacksonlewis.com Assigned:

11/16/2004 ATTORNEY TO BE NOTICED
Guy P. Tully Jackson Lewis LLP 75 Park Plaza    representi    Saint Gobain Abrasives, Inc.

4th Floor Boston, MA 02327 617-367-0025 617-    ng    (Defendant)

367-2155 (fax) tullyg@jacksonlewis.com

Assigned: 07/14/2005 ATTORNEY TO BE

NOTICED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CIV-ROETTGER

ANTHONY   BAYAD,

                    Plaintiff,

v.

LUCENT TECHNOLOGIES INC.,
LEWIS KASLOW, MIKE REED,
RONALD LAURINO, ANTHONY
SAVASTANO, and JOAN GROHE,

                    Defendants.

_____

**97- 6671**

Case No.

Florida Bar No.: 0081078

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Anthony Bayad complains of Defendants Lucent Technologies Inc., Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, and Joan Grohe as follows:

### PRELIMINARY STATEMENT

1.   This action seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and attorneys' fees and costs for racial, ethnic, religious, and national origin discrimination; breach of contractual obligations; false imprisonment; intentional or negligent infliction of emotional distress, and; defamation suffered by Plaintiff Anthony Bayad while employed by Lucent Technologies Inc.

### JURISDICTION

2.   This action arises under the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq.; and the laws of the State of Florida.



3.    Jurisdiction over the federal issues is invoked pursuant to 28 U.S.C. § 1343(4) and, subject to being held in abeyance until the receipt of a requested right-to-sue letter, 42 U.S.C. § 2000e-5(f); and over the state law claims pursuant to the doctrine of supplemental jurisdiction, now codified at 28 U.S.C. § 1367.

4.    Declaratory, injunctive, and equitable relief is sought pursuant to 28 U.S.C. §§ 2001 and 2002; 42 U.S.C. §§ 1981 and 2000e-5(g); and the supplemental state law claims.

5.    Compensatory and punitive damages are sought pursuant to 42 U.S.C. § 1981; 42 U.S.C. § 2000e et seq.; and the supplemental state law claims.

6.    Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k), Federal Rule of Civil Procedure 54, and also under state law.

### VENUE

7.    This action properly lies in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b), because the claim initially arose in this judicial district, and pursuant to 42 U.S.C. § 2000e-5(f)(3), because the Plaintiff would have worked in this judicial district but for the allegedly unlawful employment practice.  Moreover, Defendant Lucent Technologies Inc. has a business office located in this judicial district and the Plaintiff resides here.

2

## PARTIES

8.   Plaintiff Anthony Bayad is a black Muslim who was born in Morocco and is of Arabic ethnicity.   Plaintiff is currently a United States citizen who resides in the United States.

9.   Defendant Lucent Technologies Inc. ("Lucent") is an employer that engages in an industry affecting commerce and employs more than 15 regular employees.  Defendants Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, and Joan Grohe are all current employees of Lucent.

## FACTS

10.   Mr. Bayad was born in Morocco and immigrated to the United States when he was 17 years old in the hopes of creating a better life for himself and his family.

11.   Mr. Bayad worked his way through college in the United States and received a Bachelor of Arts degree in Computer Engineering in 1994 from the Wentworth Institute of Technology in Boston, Massachusetts.

12.   Mr. Bayad graduated from college with a "B+" grade point average.

13.   While in college, Mr. Bayad worked at a Burger King, as a gas station attendant, and at a construction job in order to help finance his way through school.

14.   Mr. Bayad became employed by Lucent on or about December 15, 1995.   At that time, Mr. Bayad worked in Lucent's Largo, Florida office (outside of Tampa).

3

15. Mr. Bayad's first position with Lucent was as a network engineer and his starting salary was $68,000.

16. Within one week of becoming employed by Lucent, Mr. Bayad was promoted to the position of Group Leader and he began teaching networking and computer classes to the other engineers employed by Lucent in Largo, Florida.

17. Some of Mr. Bayad's co-workers resented his promotion, openly stating that Mr. Bayad did not deserve a promotion because they did not like the way he spoke English.

18. When Defendant Savastano became General Manager of Mr. Bayad's group he immediately stripped Mr. Bayad of his status as Group Leader for no reason.

19. In March of 1996, at the insistence of Defendant Savastano, Mr. Bayad became "Certified" in the line of Bay Network products. This certification was very advantageous to Lucent since it entitled the company to significant discounts from its supplier, Bay Networks.

20. Mr. Bayad was an excellent network engineer who consistently satisfied Lucent customers with his expertise and service. A copy of a letter commending Mr. Bayad's work performance is attached as Exhibit A to the Complaint.

21. Because of his exemplary skill and dedication to Lucent, Mr. Bayad was asked by Defendant Savastano to head the start up of Lucent's new office in Fort Lauderdale, Florida.

22. Although it was Lucent's policy to pay relocation benefits whenever an employee moved more than 100 miles, Mr. Bayad

4

received no relocation benefits to compensate him for the 300-mile move to Fort Lauderdale.

23. Defendant Savastano promised Mr. Bayad a promotion to "B-band manager" for starting the Fort Lauderdale office.

24. Mr. Bayad worked extremely hard to get the Fort Lauderdale office up and running and even wore a beeper so that he could respond to customer needs around the clock.

25. After the Fort Lauderdale office had been in successful operation for several months, Mr. Bayad inquired about the promised promotion, but never received it.

26. Defendant Savastano also denied Mr. Bayad a promotion to a "B-band manager" once before. Mr. Bayad had been offered a lucrative transfer and promotion to a sales management position in another Lucent division, but Defendant Savastano refused to promote Mr. Bayad or allow Mr. Bayad to be promoted within the company.

27. Instead, Defendant Savastano raised Mr. Bayad's salary to $83,000, but consistently refused to allow Mr. Bayad a promotion.

28. Over the course of his employment at Lucent, Mr. Bayad became repeatedly aware that certain employees and managers of Lucent did not like him because of his ethnic background, religion, race and/or place of national origin.

29. In January of 1997, Mr. Bayad applied for the vacant position of General Manager of the Largo office (as well as other management positions), but was also denied these promotions by Lucent.

5

30.  On January 23, 1997, Defendant Lewis Kaslow called Mr. Bayad in Fort Lauderdale.

31.  Defendant Kaslow had been promoted to the Largo General Manager position that Mr. Bayad and others had sought, despite the fact that he knew virtually nothing about the data networking field.

32.  During this conversation, Defendant Kaslow demanded that Mr. Bayad fly from Fort Lauderdale to Largo immediately to meet him, but refused repeated requests to explain the reasons behind his demand.

33.  When Mr. Bayad explained that he was scheduled to meet with a Lucent client and could not fly to Largo on such short notice, Defendant Kaslow called him a "dirty Arab" and stated that he "didn't care if [Mr. Bayad] had to take a flying carpet" to Largo.

34.  Mr. Bayad understood Defendant Kaslow's remarks to be demeaning and disparaging to his Arabic background, his race, his religion, and/or his ethnicity.

35.  Mr. Bayad flew from Fort Lauderdale to Largo on January 23, 1997 at Defendant Kaslow's insistence.

36.  Upon his arrival at Lucent's Largo office, Mr. Bayad was escorted by Defendant Joan Grohe to a meeting with Defendants Anthony Savastano, Lewis Kaslow, and Ronald Laurino (a Lucent police or security officer).

37.  Mr. Bayad was then imprisoned alone in a room with Defendant Laurino who proceeded to scream at Mr. Bayad and accuse

6

him of stealing from Lucent by charging personal items on his corporate American Express card.

38.   Defendant Laurino made it very clear to Mr. Bayad that he was not free to leave the interrogation room.   At one point, Defendant Laurino struck Mr. Bayad on the back of the head and neck.

39.   In response to Defendant Laurino's false and malicious allegations, Mr. Bayad explained that he had been given permission to use his American Express card to purchase supplies and furnishings for the newly opened Fort Lauderdale office.   To that end, Mr. Bayad charged approximately $18,000 worth of company assets on his American Express card, the propriety of which Lucent has not disputed.

40.   Mr. Bayad also informed Mr. Laurino that he been given advance permission by Lucent employees (including Defendant Joan Grohe) to purchase two airplane tickets for his elderly parents on his American Express card, so long as he paid for the tickets himself.

41.   Defendant Laurino made no attempt to verify Mr. Bayad's explanation for the purchases charged on his American Express card.

42.   Although Mr. Bayad could have easily afforded to pay for his parents' plane tickets, Mr. Bayad chose to use his American Express card for the insurance coverage it afforded such purchases. Mr. Bayad had planned to mail the plane tickets to his parents in Morocco and was afraid that they might get lost in Morocco's less than reliable mail system.

7

43. By bringing his elderly parents to live with him in the United States, Mr. Bayad was fulfilling a childhood promise that he made to support his parents.

44. After being screamed at, abusively interrogated, intimidated, physically assaulted, and confined alone in a room with Defendant Laurino, Mr. Bayad became extremely scared and afraid for his safety.

45. Mr. Bayad asked Mr. Laurino if he could leave the room, if he could call his attorney, or if someone else could be admitted to the room so that his personal safety could be assured.

46. Defendant Laurino refused Mr. Bayad's requests and kept him falsely imprisoned and proceeded to scare, harass, intimidate, and assault Mr. Bayad for a continued period.

47. During Defendant Laurino's harassment and interrogation of Mr. Bayad, he continuously made derogatory remarks about Mr. Bayad's ethnic, religious and racial background and about Mr. Bayad's ability to speak English.

48. For example, during Defendant Laurino's false imprisonment of Mr. Bayad, he stated things like: "I don't know what's wrong with this company hiring people like you." and "Ten years ago I wouldn't even be talking to someone like you."

49. Such remarks were directed specifically at Mr. Bayad's racial, religious, and ethnic background and the fact that he had been born in Africa and was a foreigner.

50. During the interrogation and false imprisonment, Defendant Laurino also tried to force Mr. Bayad into signing a

8

false confession, but Mr. Bayad refused and, in an attempt to escape his false imprisonment, asked again if he could consult with a lawyer before signing anything or if he could talk to someone from Lucent's human resources department.

51. Mr. Bayad's refusal to sign a false confession further enraged Defendant Laurino who repeatedly threatened to send Mr. Bayad to jail, despite the fact that Mr. Bayad had done nothing wrong. In particular, Defendant Laurino stated that he was going to send Mr. Bayad to jail and that "Black guys were going to marry him" there.

52. After being falsely imprisoned and abusively interrogated by Defendant Laurino for such an intense period, Mr. Bayad became sick with fear and asked to receive medical attention.

53. When Defendant Laurino opened the door to get medical attention, Mr. Bayad attempted to leave the room because he was sick and scared.

54. When Mr. Bayad reached the door, several other security officers attempted to physically restrain him and keep him locked in the room where he was being falsely imprisoned.

55. In the scuffle that ensued, Mr. Bayad was dragged or thrown down a flight of stairs and ended up submerged head first in a fountain on the floor below.

56. As a result of the scuffle, Mr. Bayad received injuries to his head and neck and his clothes were torn.

57. An ambulance was called to take Mr. Bayad to the hospital.

9

58.   While he was lying in the ambulance and being treated by paramedics, Mr. Bayad was terminated from Lucent at the direction of Defendants Laurino and Kaslov.

59.   While lying in the ambulance and with an I.V. in his arm, Mr. Bayad was forced through the further humiliation of having to give back his business cards, his pager, and his corporate American Express card, despite the fact that the card had already been deactivated and could no longer be used by anyone.

60.   At the direction, order, or encouragement of the Defendants, Mr. Bayad was taken to a hospital where the Defendants caused him to be involuntarily committed to a psychiatric ward against his will.

61.   At the scene, Lucent Human Resource Manager Joan Grohe was heard to exclaim, "I warned them." or "I told them not to do it.  They fucked it up." Ms. Grohe also knew that Mr. Bayad was going to be "Baker Acted" (or committed to the psychiatric ward against his will) before the ambulance had even left the parking lot of the Largo office and remarked to a bystander that "We're going to Baker Act him."

62.   Defendant Joan Grohe clearly knew of the discriminatory conspiracy or plan against Mr. Bayad in advance and actively participated in it.  Indeed, Defendant Grohe actually aided and encouraged the commission of atrocities against Mr. Bayad since she had specifically given Mr. Bayad permission to charge his parents' plane tickets on his American Express card.

10

63.    The Defendants also had a trespass complaint sworn out against Mr. Bayad while he was in the ambulance or en route to the hospital, even though Mr. Bayad had been ordered to come to the Largo office by Defendant Kaslow and had never threatened anyone in anyway.

64.    On the same day, while Mr. Bayad was confined to a psychiatric ward, Lucent also had the locks changed in the Fort Lauderdale office so that Mr. Bayad could not get back in.  A copy of the letter directing the change in locks is attached to the Complaint as Exhibit B.

65.    Despite the fact that he was perfectly sane, Mr. Bayad spent a terrible and scary night in the psychiatric ward where he was witness to things so horrible that he still has nightmares about them.

66.    Mr. Bayad was released from the hospital on January 24, 1997 (the very next day after his false imprisonment and termination) by his treating physician who realized that Mr. Bayad had been improperly confined in the psychiatric ward.  Mr. Bayad had originally been admitted for a minimum of three days of observation and treatment.

67.    When Mr. Bayad was released from the hospital, he was left by the Defendants without any money, clothes, or means of transporting himself back to his home in Fort Lauderdale.

68.    Mr. Bayad's termination was the result of a conspiracy or plan against him on account of his race, ethnic, religious, and place of national origin by the very prejudiced and discriminatory

11

Defendants.

69.  Proof of the Defendants' abject discrimination in this case is supported by an e-mail, titled "It's done!", that was sent in the early morning hours of January 24, 1997 (the day after Mr. Bayad's horrible false imprisonment, interrogation, termination, and confinement).  This e-mail was authored by Defendant Mike Reed and exhorts:

> Bruce, I need your help we need to stop these damned foreigners [sic] they think they can come over to my country and first of all take our jobs, then be our bosses.  Anthony Bayad needs to be stopped or before you know it he will be running this company.  He is nothing but a sand nigger or a dirty arab or something like that. I think that with your help, we can make him look bad in the eyes of upper management, so we can finally get rid of him and his spick boss, once and for all.
>
> Tony [Savastano] already has a plan Scott Boda will get certified in the near future, and two other people they told to get certified, we can finally get rid of them. Even if they are right in saying most people in this company [] don't like to work hard, and all they do is play games they should not come in and make waves.
>
> Mike Reed.

A copy of this e-mail is attached as Exhibit C to the Complaint.

70.  Further proof of a discriminatory conspiracy against Mr. Bayad lies directly in the fact that the "plan" specifically outlined in this offensive and despicable e-mail actually came to pass.

71.  The e-mail speaks of getting rid of Mr. Bayad and his "spick boss" Amado Navas.  Both were falsely fired for the alleged misuse of their corporate American Express card.  The e-mail also speaks of Defendant Savastano's plan to get Scott Boda and other

12

white employees "certified" with Bay Networks in Mr. Bayad's place. Upon information and belief, Scott Boda and another Lucent employee have recently been so certified or have taken the certification test. Apparently, Defendant Savastano's "plan" has worked like a charm.

72.    Lucent was made aware of the offending e-mail and of the outlined discriminatory conspiracy against Mr. Bayad, but has done nothing to reprimand the offending parties or to remedy the harm done to Mr. Bayad.

73.    Mr. Bayad was allegedly terminated for violating the Lucent Technologies Code of Conduct because he charged two plane tickets for his elderly parents on his American Express card.

74.    The asserted reason for Mr. Bayad's termination is completely pretextual since he had been given permission to use his American Express card to charge the plane tickets by Defendant Grohe and other Lucent management personnel.

75.    The asserted reason for Mr. Bayad's termination is completely pretextual since Mr. Bayad paid for the plane tickets himself and never attempted to defraud Lucent by asserting that the plan tickets were somehow a company expense.

76.    The asserted reason for Mr. Bayad's termination is completely pretextual since many other employees (with either the express or implied permission of Lucent) have used the card for personal charges and these employees have not been dismissed or even reprimanded.

13

77.  The asserted reason for Mr. Bayad's termination is completely pretextual since the Lucent Code of Conduct (now apparently called the "Lucent Business Guideposts") was changed only after Mr. Bayad's termination to specifically provide that the use of the corporate credit card for personal charges was cause for dismissal.  Instead, Mr. Bayad was actually terminated because he was the victim of a discriminatory conspiracy or "plan", as outlined in Defendant Reed's horrible e-mail.

78.  All of the discriminatory and prejudiced actions taken against Mr. Bayad by the Defendants were done intentionally, maliciously, wantonly, or with a reckless disregard for Mr. Bayad's rights and well-being.

79.  At all times pertinent to this Complaint, Lucent had an employee handbook and a stated policy barring discrimination on the basis of race, religion, and national origin.

80.  On April 4, 1997, Mr. Bayad filed a charge of discrimination under Title VII of the Civil Rights Act with the Equal Employment Opportunity Commission.

81.  Mr. Bayad was issued a Right-To-Sue letter by the EEOC on April 22, 1997 (attached as Exhibit D to the Complaint).

82.  Shortly after his termination, Mr. Bayad attempted to find subsequent employment in the data networking industry.  Mr. Bayad was informed by several prospective employers that Lucent personnel had told them not to hire Mr. Bayad and that Mr. Bayad was crazy and that he had been fired for stealing from Lucent.

14

83. Due to the discrimination, harassment, unfair treatment, and false imprisonment committed by the Defendants, Mr. Bayad suffered and continues to suffer severe emotional distress, mental anguish, and humiliation.

84. Due to the defamation of Mr. Bayad by the Defendants, Mr. Bayad has suffered severe emotional distress, mental anguish, humiliation, damage to his reputation, and Mr. Bayad has been unable to find subsequent employment in his chosen field.

85. Due to the fact that Mr. Bayad was wrongfully terminated for discriminatory reasons and that he has been unable to find subsequent employment, Mr. Bayad has been left virtually destitute. He is no longer able to support his elderly parents and has had to send them back to Morocco.

## COUNT I

### RACE, ETHNIC, NATIONAL ORIGIN, AND RELIGIOUS DISCRIMINATION

(Against Lucent Technologies Inc.)

86. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

87. By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, Lucent has violated Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq.

15

## COUNT II

### RECONSTRUCTION ERA CIVIL RIGHTS ACT CLAIM

#### (Against All Defendants)

88. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

89. By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, the Defendants have violated the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981.

### COUNT III

#### FALSE IMPRISONMENT

#### (Against All Defendants)

90. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

91. By unreasonably confining Mr. Bayad to a locked room at Lucent's Largo office against his will and by refusing to let him leave that room, the Defendants have violated Florida law against false imprisonment.

92. By ordering, encouraging, arranging, or causing Mr. Bayad's illegal and unwarranted confinement in a psychological ward, the Defendants have violated Florida law against false imprisonment.

16

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

93.  Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

94.  By engaging in a concerted effort to harass and discredit Mr. Bayad, by fostering a hostile work environment, by locking him in a room, screaming at him and hitting him and falsely accusing him of improper purchases on his corporate credit card, by firing him from his employment while he was in an ambulance on the way to the hospital, by ordering, arranging, or encouraging Mr. Bayad's confinement in a psychiatric hospital, by leaving him stranded in Largo after his release from the hospital without any money or means of transportation back to his home in Fort Lauderdale, and/or by the swearing out of a trespass complaint against him while he was hospitalized and after he had been specifically ordered to come to the Largo facility by Defendant Kaslow, Lucent and the other Defendants have intentionally, or in the alternative, negligently inflicted emotional distress upon Mr. Bayad in violation of Florida law.

17

## COUNT V

### DEFAMATION

#### (Against All Defendants)

95. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

96. By intentionally and/or recklessly communicating and/or allowing the communication of malicious and defamatory e-mail about Mr. Bayad's racial, ethnic, religious, and national origin to others, the Defendants have defamed Mr. Bayad in violation of Florida law.

97. By intentionally and/or recklessly communicating malicious, injurious, negative, and false information about Mr. Bayad to prospective employers, the Defendants have defamed Mr. Bayad in violation of Florida law

## COUNT VI

### BREACH OF CONTRACT

#### (Against Lucent Technologies Inc.)

98. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

99. By failing to follow its own personnel policies and procedures on evaluating, promoting, and providing equal employment opportunity and by failing to truthfully investigate and reprimand the author of the hateful e-mail against Mr. Bayad and the other conspirators in discrimination, Lucent Technologies has breached its contractual obligations to Mr. Bayad in violation of Florida law.

18

## COUNT VII

## RACE, ETHNIC, NATIONAL ORIGIN AND RELIGIOUS DISCRIMINATION

## IN VIOLATION OF FLORIDA LAW

(Against Lucent Technologies Inc.)

100. Mr. Bayad incorporates as if realleged paragraphs 1 through 85 of the Complaint.

101. By purposefully restricting Mr. Bayad's promotional opportunities, and by harassing, abusing, and finally terminating him on account of his race, ethnicity, national origin, and religion, Defendant Lucent Technologies has violated the Florida Civil Rights Act of 1992.

## RELIEF REQUESTED

102. WHEREFORE, Plaintiff Anthony Bayad prays that this Court:

(a) declare the Defendants' conduct to be in violation of his rights;

(b) enjoin Defendants from engaging in such conduct;

(c) award him back pay and benefits (with interest) that have accrued to date;

(d) award him front pay until normal retirement age;

(e) award him compensatory damages of $1,000,000 or more for emotional distress, mental anguish, and humiliation on account of the discrimination and false imprisonment he suffered at the hands of the Defendants;

(f) award him damages of $1,000,000 or more for defamation and damage to his career and reputation;

(g) award him punitive damages in the amount of $5,000,000 or

19

more;

(h) award him costs and attorneys' fees; and

(i) grant such other relief as the Court may deem just and proper.

### JURY DEMAND

103. Mr. Bayad demands a jury on all claims triable as a matter of right by a jury.

Dated:    June 2, 1997

> STEPHANIE ALEXANDER, CHARTERED
> Attorneys for Plaintiff
> 4403 West Tradewinds Avenue
> Lauderdale-By-The-Sea, FL 33308
> (954) 772-2644
> (954) 772-2845 (fax)

By: _Stephanie alexander_
   STEPHANIE ALEXANDER
   Fla. Bar No. 0081078

20



**Lucent Technologies**
Bell Labs Innovations

Lucent Technologies Inc.
Suite 110
1819 Central Parkway North
San Antonio, Texas 78232

July 3, 1996

Jeff Akers
National Vice President of Technical Support Operations
Lucent Technologies
6140 Greenwood Plaza Boulevard
Englewood, CO 80111

Dear Jeff:

Your organization employs two gentlemen out of the Largo, FL operations that are outstanding in their knowledge level as well as dedication in the data networking field. Amado Navas and Anthony Bayad know what it takes to support customers who are creating new wide area networks (WANs) and who need support for existing WANs using our product line. Anthony went beyond the normal call of duty to work after hours over several evenings to complete a new network installation for Play by Play out of San Antonio, TX. This was a 7 site installation of BayNetworks routers and data access equipment that required an after hours cutover beginning one Friday night and lasting through until the following Saturday afternoon. The customer had purchased another company and needed access to the new network. This installation was so complex that the customer did not have the correct and complete information that we normally need to achieve a successful installation. The fact that the customer did not have the information necessary about their own network is not uncommon in the SBD marketplace.

These two gentlemen exemplify the type of technical assistance and dedication that we need to be successful in this marketplace. This sale started out as a $40,000 sale and because of their technical skills and willingness to assist, this turned into a $140,000 sale with over $30,000 in services. Once the customer saw the complexity of their network and how skillful Anthony was, they allowed us to assist them in other areas that a consultant had attempted to assist them with.

Please extend our gratitude to both Anthony and Amado for their support. We would not be able to sell wide area networks of this type without people like them.

Sincerely,

Larry Clarkson
General Manager
SBD San Antonio

cc: Jennifer K. Ramirez, ASC
    Amado Navas, Technical Support Manager
    Anthony Bayad, Systems Engineer

*Lucent Technologies-Formerly the Communications Systems and Technology Units of AT&T*

 **AT&T**

**EXHIBIT A**

January 23, 1997

Abood and Associates
Attn: Deanna Lobinsky
FAX: 954-564-6335

Deanna,

Per our phone conversation, please make arrangements to immediately change the locks for the Lucent Technologies penthouse facilities at your 2455 E. Sunrise Blvd location. I attempted to contact Amado Navas prior to his departure but was unable to contact him in time to authorize this request.

I am the Lucent facilities manager for the Largo, FL office and was asked to handle this change. I have contacted John Stalzer of that Lucent office and asked him to see you about obtaining the new keys for the main door and deadbolt. I understand from Amado that there are eight (8) sets of keys, so please arrange for eight (8) keys to be made for the new lock.

If there are any questions, please contact me at (813) 530-8184, Amado Navas at (813) 530-8760, or Lew Kaslow (Amado's manager) at (813) 532-5463. Thank you for any expediency you can provide.

Richard K. Bailer
Lucent Technologies
Facilities Manager

cc:    L. Kaslow
       A. Savastano
       A. Navas

EXHIBIT B

From:        MIKE REED
To:          Bay, BBREWER
Date:        1/24/97 12:25am
Subject:     It's done!

Bruce, I need your help we need to stop these dammned foreingners
they think they can come over to my country and first of all take
our jobs, then be our bosses. Anthony Bayad needs to be stopped
or before you know it he will be running this company. He is nothing
but a sand nigger or a dirty arab or somethig like that.
I think that with your help, we can make him look bad in the eyes
of upper management, so we can finally get rid of him and his
spick boss, once and for all.
Tony already has a plan Scott Boda will get certified in the near
future, and two other people they told to get certified, we can
finally get rid of them. Even if they are right in saying most
people in this company company don't like to work hard, and all they
do is play games they should not come in and make waves.
Mike Reed

**EXHIBIT C**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# NOTICE OF RIGHT TO SUE

*(ISSUED ON REQUEST)*

| To: | From: |
|---|---|
| Anthony Bayad<br>2900 N.E. 30 Avenue, Apt 10 F<br>Ft. Lauderdale, FL 33306 | Miami District Office<br>Equal Employment Opportunity Commission<br>One Biscayne Tower, Suite 2700<br>2 South Biscayne Boulevard<br>Miami, Florida 33131-1805 |
| ☐ On behalf of a person aggrieved whose identity is CONFIDENTIAL (29 C.F.R. 1601.7(a)) | |

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 150 97 2340 | Robert K. Metaxa, Supervisor | (305) 530-9050 or 6021 |

*(See the additional information attached to this form.*

## NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your suit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required). EPA suits must be brought in federal or state court within within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court compliant to this office.

On Behalf of the Commission

**APR 22 1997**

_____
(Date Mailed)

*George E. Evans, Jr.*
Federico Costales, District Director

Enclosures
   Information Sheet
   Copy of Charge

cc:  Henry B Schacht             J. David Huskey, Jr., Esq.
      Chief Executive Officer      McGee, Gainey & Huskey, P.A.
      Lucent Technologies, Inc.    International Building
      600 Mountain Avenue       Penthouse West
      Murray Hill, NJ 07974      2455 East Sunrise Blvd.
                             Fort Lauderdale, FL 33304

EEOC Form 161-B (10/96)

**EXHIBIT D**

# CIVIL COVER SHEET

97 6671

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS,**
ANTHONY BAYAD

**DEFENDANTS,**
LUCENT TECHNOLOGIES INC., LEWIS KASLOW,
MIKE REED, RONALD LAURINO, ANTHONY
SAVASTANO, and JOAN GROHE.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** BROWARD
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

A-NORTH 667 / NCP 455

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
STEPHANIE ALEXANDER, CHARTERED (954) 772-2644
4403 West Tradewinds Avenue
Lauderdale-By-The-Sea, FL 33308

ATTORNEYS (IF KNOWN)

**IV. CAUSE OF ACTION**
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

42 U.S.C. section 1981; 42 U.S.C. section 2000e et seq. (racial, ethnic, religious, and national origin discrimination).

IV.a. 7 days estimated (for both sides) to try entire case

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

**VII. REQUESTED IN COMPLAINT**    CLASS ACTION    DEMAND $ $10,000,000+    JURY DEMAND: XX YES  NO

DATE 06/02/97    SIGNATURE OF ATTORNEY OF RECORD  Stephanie Alexander

UNITED STATES DISTRICT COURT

FOR OFFICE USE ONLY: Receipt No. 511649    Amount 150.00
Date Paid: 6/2/97

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**CIV — MARCUS**

HAMDI ELSIAH,

        Plaintiff,

v.

LUCENT TECHNOLOGIES INC.,
LEWIS KASLOW, MIKE REED,
RONALD LAURINO, ANTHONY
SAVASTANO, BRUCE BREWER,
DAVID WARD, and the
LUCENT TECHNOLOGIES INC.
SICKNESS AND ACCIDENT
DISABILITY BENEFIT PLAN,

        Defendants.

**97- 6778**

Case No.

MAGISTRATE
JOHNSON

Florida Bar No.: 0081078

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Hamdi Elsiah complains of Defendants Lucent Technologies Inc., Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, Bruce Brewer, David Ward, and the Lucent Technologies Inc. Sickness and Accident Disability Benefit Plan as follows:

## PRELIMINARY STATEMENT

1.    This action seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and attorneys' fees and costs for racial, ethnic, religious, and national origin discrimination; retaliation; breach of contractual obligations; false imprisonment; intentional or negligent infliction of emotional distress; and, denial of employee benefits; suffered by Plaintiff Hamdi Elsiah while employed by Lucent Technologies Inc.



## JURISDICTION

2.    This action arises under the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq.; the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1001 et seq.; and the laws of the State of Florida.

3.    Jurisdiction over the federal issues is invoked pursuant to: 28 U.S.C. § 1343(4) and, subject to being held in abeyance until the receipt of a requested right-to-sue letter, 42 U.S.C. § 2000e-5(f), as well as 29 U.S.C. § 1132(e)(1).  Jurisdiction over the state law claims is invoked pursuant to the doctrine of supplemental jurisdiction, now codified at 28 U.S.C. § 1367.

4.    Declaratory, injunctive, and equitable relief is sought pursuant to 28 U.S.C. §§ 2001 and 2002; 42 U.S.C. §§ 1981 and 2000e-5(g); 29 U.S.C. § 1132; and the supplemental state law claims.

5.    Compensatory and punitive damages are sought pursuant to 42 U.S.C. § 1981; 42 U.S.C. § 2000e et seq.; and the supplemental state law claims.

6.    Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. §§ 1988 and 2000e-5(k), Federal Rule of Civil Procedure 54, 29 U.S.C. § 1132(g)(1), and also under state law.

2

**VENUE**

7.    This action properly lies in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b), because the claim initially arose in this judicial district, and pursuant to 42 U.S.C. § 2000e-5(f)(3), because the Plaintiff would have worked in this judicial district but for the allegedly unlawful employment practice. Venue is also appropriate in this jurisdiction pursuant to 29 U.S.C. § 1132(e)(2) because this is where breach of the employee welfare benefit plan in question took place. Moreover, Defendant Lucent Technologies Inc. has a business office located in this judicial district and the Plaintiff resides here.

**PARTIES**

8.    Plaintiff Hamdi Elsiah is a Muslim who was born in Cairo, Egypt and is of Arabic ethnicity. Plaintiff is currently a United States citizen who resides in the United States.

9.    Defendant Lucent Technologies Inc. ("Lucent") is an employer that engages in an industry affecting commerce and employs more than 15 regular employees. Defendants Lewis Kaslow, Mike Reed, Ronald Laurino, Anthony Savastano, Bruce Brewer and David Ward are all current management employees of Lucent. The Lucent Technologies Inc. Sickness and Accident Disability Benefit Plan is an employee welfare benefit plan sponsored by Defendant Lucent Technologies Inc.

3

**FACTS**

10.  Mr. Elsiah was born in Cairo, Egypt and immigrated to the United States to better his economic possibilities in life.

11.  Mr. Elsiah graduated from college with a "B+" grade point average.

12.  Before being hired by Lucent, Mr. Elsiah had been employed as a computer engineer by various high technology companies such as Bay Networks Inc., an industry leader in data networking.

13.  Mr. Elsiah was hired by Lucent in November of 1996 to support the Bay Network product line. At that time, Mr. Elsiah was assigned to work in Lucent's Fort Lauderdale, Florida office.

14.  Mr. Elsiah's first position with Lucent was as a senior network engineer and his starting salary was $75,000.

15.  Mr. Elsiah was an excellent network engineer who consistently satisfied Lucent customers with his expertise and service.  A copy of a letter commending Mr. Elsiah's work performance is attached as Exhibit A to the Complaint.

16.  Over the course of his employment at Lucent, Mr. Elsiah was repeatedly made aware that certain employees and managers of Lucent did not like him because of his ethnic background, religion, race and/or place of national origin and that many of his white co-workers and managers were openly hostile to minority employees.

17.  On January 23, 1997, Defendant Lewis Kaslow (the General Manager of Lucent's office in Largo, Florida) spoke to Anthony Bayad (Mr. Elsiah's immediate supervisor) on the telephone.

4

Scanned Image - 0:97CV9779 Document 4

Defendant Kaslow demanded that Mr. Bayad fly immediately from Fort Lauderdale to the Largo office to see him.  Mr. Bayad is a Black Muslim from Morocco and is also of Arabic ethnicity.

18.  With Defendant Kaslow's knowledge, Mr. Elsiah had joined the telephone conversation between Mr. Bayad and Defendant Kaslow.

19.  During this conversation, Defendant Kaslow repeatedly demanded that Mr. Bayad fly from Fort Lauderdale to Largo to meet with him, but refused repeated requests to explain the reasons behind his demand.

20.  When Mr. Bayad explained that he was scheduled to meet with a Lucent client and could not fly to Largo on such short notice, Defendant Kaslow called him a "dirty Arab" and stated that he "didn't care if [Mr. Bayad] had to take a flying carpet" to Largo.

21.  Mr. Elsiah heard these remarks and understood Defendant Kaslow to be demeaning and disparaging his Arabic background, his race, his religion, and/or his ethnicity.

22.  Mr. Elsiah flew with Mr. Bayad from Fort Lauderdale to Largo on January 23, 1997 because Mr. Bayad's corporate American Express card was not working and the plane tickets had to be purchased on Mr. Elsiah's corporate American Express card instead.

24.  Upon their arrival at Lucent's Largo office, Mr. Elsiah remained in the car while Mr. Bayad was escorted into the building and to a meeting with Defendants Anthony Savastano, Lewis Kaslow, and Ronald Laurino (a Lucent police or security officer).  After Mr. Bayad entered the front door of the building it was immediately

5

locked behind him.

25. A short time after his arrival, Mr. Bayad was imprisoned alone in a room with Defendant Laurino who proceeded to scream at Mr. Bayad and accuse him of stealing from Lucent by charging personal items on his corporate American Express card.

26. After being screamed at, abusively interrogated, intimidated, physically assaulted, and confined alone in a room with Defendant Laurino, Mr. Bayad became extremely scared and afraid for his safety and asked to receive medical attention.

27. When Defendant Laurino opened the door to get medical attention, Mr. Bayad attempted to leave the room because he was sick and scared.

28. When Mr. Bayad reached the door, several other security officers attempted to physically restrain him and keep him locked in the room where he was being falsely imprisoned.

29. In the scuffle that ensued, Mr. Bayad was dragged or thrown down a flight of stairs and ended up submerged head first in a fountain on the floor below.

30. As a result of the scuffle, Mr. Bayad received injuries to his head and neck and his clothes were torn.

31. An ambulance was called to take Mr. Bayad to the hospital.

32. During the altercation between Mr. Bayad and security, Mr. Elsiah remained in the car.

33. After a period of time, Mr. Elsiah was jolted by a knock on the car window.

6

34.  Joan Grohe (Human Resource Director of Lucent's Largo office) and Defendant Anthony Savastano (former General Manager of Lucent's Largo office) were at the car window asking if Mr. Elsiah could come and help counsel Mr. Bayad.

35.  By this time, a crowd of people had formed in front of the building.  A fire engine, police car, and ambulance had also arrived.

36.  Mr. Elsiah forced his way through the crowd and found Mr. Bayad, who was soaking wet, screaming and crying on the ground. When Mr. Bayad saw Mr. Elsiah, he grabbed onto his shirt, stating "Don't leave me, they will destroy me like they destroyed my career."

37.  Mr. Elsiah helped escort Mr. Bayad to the ambulance.

38.  While Mr. Bayad was lying in the ambulance and being treated by paramedics, Defendant Laurino fired Mr. Bayad and also further humiliated Mr. Bayad by forcing him to give back his pager and his American Express card (despite the fact that it had already been deactivated) while Mr. Bayad was still in the ambulance and in front of the crowd.

39.  At the direction, order, or encouragement of the Defendants, Mr. Bayad was taken to a hospital where the Defendants caused him to be involuntarily committed to a psychiatric ward against his will.

40.  Mr. Elsiah accompanied Mr. Bayad to the hospital in the ambulance but returned to Fort Lauderdale later that same night.

41.  During a conference call the next day, Defendant Anthony

7

Savastano denied that anything had ever happened to Mr. Bayad.

42. Mr. Bayad's termination was the result of a conspiracy or plan against him on account of his race, ethnic, religious, and place of national origin by the very prejudiced and discriminatory Defendants.

43. Proof of the Defendants' abject discrimination in this case is supported by an e-mail, titled "It's done!", that was sent in the early morning hours of January 24, 1997 (the day after Mr. Bayad's horrible false imprisonment, interrogation, termination, and confinement). This e-mail was authored by Defendant Mike Reed and exhorts:

> Bruce, I need your help we need to stop these damned foreingners [sic] they think they can come over to my country and first of all take our jobs, then be our bosses. Anthony Bayad needs to be stopped or before you know it he will be running this company. He is nothing but a sand nigger or a dirty arab or something like that. I think that with your help, we can make him look bad in the eyes of upper management, so we can finally get rid of him and his spick boss, once and for all.

> Tony [Savastano] already has a plan Scott Boda will get certified in the near future, and two other people they told to get certified, we can finally get rid of them. Even if they are right in saying most people in this company [] don't like to work hard, and all they do is play games they should not come in and make waves.

> Mike Reed.

A copy of this e-mail is attached as Exhibit B to the Complaint.

44. Further proof of a discriminatory conspiracy against Mr. Bayad lies directly in the fact that the "plan" specifically outlined in this offensive and despicable e-mail actually came to pass.

8

William Carr, was also present during the interrogations and could have stopped the abuse.

49.  By the time it was Mr. Elsiah's turn to be interrogated, all of the other employees had been released and Mr. Elsiah was left alone with Defendant Laurino and his boss.  Mr. Elsiah, in particular, was taken into the interrogation room, falsely imprisoned, and yelled at by Defendant Laurino who tried to make him sign a false confession that he had made personal purchases with his corporate American Express card.  Mr. Elsiah had never made any such purchases and refused to confess to something he was not guilty of doing.  Instead, Mr. Elsiah would only sign a statement which proved his innocence.  Mr. Elsiah's refusal to sign a false confession completely enraged Defendant Laurino who continued to scream and harass him.  Mr. Elsiah was finally allowed to leave the office at approximately 8:00 pm in the evening.

50.  During the interrogation, Mr. Elsiah was held against his will and was not allowed to leave the room.  Mr. Elsiah became very afraid because of Defendant Laurino's abusive conduct and because he knew that Defendant Laurino had already had Mr. Bayad committed to a mental institution the month before.  Mr. Elsiah was afraid that he would suffer the same fate as Mr. Bayad.

51.  A copy of the "statement" signed by Mr. Elsiah after his abusive interrogation and false imprisonment is attached as Exhibit C to the Complaint.  Mr. Elsiah believes that a tape recording of his interrogation was made by Defendant Laurino and his boss.

10

52.    As a result of the interrogations in Fort Lauderdale, two Hispanic female employees (Tracy Chamot and Johanna Lopez) were fired for personal use of their corporate American Express card, despite the fact they had been given express permission to use the card for personal purchases. Between January and February, 1997, only minority employees of the Largo and Fort Lauderdale offices were fired by Lucent for using their American Express card to make personal purchases. White employees who used their American Express card to make personal purchases have not been terminated.

53.    Several weeks after being abusively interrogated and falsely imprisoned, Defendant Kaslow threatened, on or about March 15, 1997, to suspend Mr. Elsiah because he had remained friendly with Mr. Bayad and had socialized with him after company hours. Diana Canzona-Hindman, a Human Resources employee of Lucent, was also in the room when Defendant Kaslow threatened to suspend Mr. Elsiah.

54.    Later the same day, Defendant Kaslow returned to the Fort Lauderdale office with a copy of the newly printed Lucent "Business Guideposts" (which had apparently replaced the old AT&T Code of Conduct and had been conveniently changed after Mr. Bayad's firing). Defendant Kaslow demanded that all of the Fort Lauderdale employees sit in a circle and read the material aloud like naughty children. The employees, including Mr. Elsiah, found such behavior to be both threatening and intimidating, especially after the horrible things that had happened to Mr. Bayad.

11

55. After Mr. Bayad's termination, Mr. Elsiah was promoted to the position of Design and Configuration Manager of the Fort Lauderdale office. He was also promised further promotions.

56. In the middle of March, Defendant David Ward (a white management employee of Lucent) was promoted to head of the Fort Lauderdale office, essentially demoting Mr. Elsiah. Defendant Ward promised Mr. Elsiah that, even though he had been demoted, Mr. Elsiah would still be the Group Leader of the Fort Lauderdale office.

57. Despite promising the position of Group Leader to Mr. Elsiah, Defendant Ward hired an outsider named Frank O'Connor (a white individual) to be Group Leader of Lucent's Fort Lauderdale office, without directly informing Mr. Elsiah that he had been demoted again. Both of the above demotions were intended to coerce Mr. Elsiah into leaving his employment with Lucent.

58. In addition, after becoming head of Lucent's Fort Lauderdale office, Defendant Ward contacted Mr. Elsiah both in person and by telephone on several occasions. The express purpose of these conversations was to convince Mr. Elsiah to leave the company. In one of the first conversations between the two men, Defendant Ward stated that "he could have gotten anybody from bum fuck Egypt to run the operation" and that Mr. Elsiah was, therefore, nothing special.

59. During another such conversation, Defendant Ward specifically told Mr. Elsiah that he was his friend and that Mr. Elsiah "had no future" at Lucent because of his race and/or

12

national origin.  Defendant Ward also gave Mr. Elsiah the name of a headhunter who could help him leave the company and repeatedly encouraged Mr. Elsiah to leave his employment with Lucent as soon as possible.

60.  On another occasion, Defendant Ward met with Mr. Elsiah at a hotel in Fort Lauderdale.  At this meeting, Defendant Ward told Mr. Elsiah that he was cutting his salary by $10,000 and was assigning Texas as a sales territory to Mr. Elsiah (despite the fact that Mr. Elsiah was not a salesman).  Such a territory is known in the industry as a very poor one since few of Lucent's target customers would be located there.  All of Defendant Ward's actions were taken to try and get Mr. Elsiah to leave Lucent and were motivated by a desire to discriminate against Mr. Elsiah on account of his race, religion, ethnicity, and/or place of national origin.

61.  Mr. Elsiah took Defendant Ward's encouragement to leave and his demotion as a sign that he had been constructively discharged.  In addition, it was repeatedly made clear to Mr. Elsiah that his opportunities for advancement within Lucent were basically nonexistent because of his race, religion, ethnicity, and/or national origin.

62.  Due to the fact that Mr. Elsiah had witnessed the heinous abuse of Mr. Bayad and the constant harassment and discrimination at Lucent, Mr. Elsiah was advised by Lucent's own Employee Assistance Program Manager, Brenda Donalds, to seek treatment with a psychiatrist for "post traumatic stress disorder" ("PTSD").  Ms.

13

Donalds also assured Mr. Elsiah that he would suffer no financial hardship or retaliation for seeking help. Copies of Ms. Donalds letters outlining Mr. Elsiah's PTSD, the discrimination problems at Lucent, and the stress that they caused, are attached as Exhibit D to the Complaint.

63. On April 3, 1997, Mr. Elsiah was granted a short-term disability leave by Lucent and he began receiving short-term disability benefits under the Lucent Technologies Inc. Sickness and Accident Disability Benefit Plan (the "Plan").

64. On May 2, 1997, Mr. Elsiah filed a charge of discrimination against Lucent Technologies with the Equal Employment Opportunity Commission (the "EEOC") in Miami, Florida. Mr. Elsiah received a Right-To-Sue Letter from the EEOC on May 13, 1997. A copy of the Right-To-Sue Letter is attached as Exhibit E to the Complaint.

65. Shortly after Lucent learned that Mr. Elsiah had filed a charge of discrimination against it, Mr. Elsiah's disability benefits were suddenly revoked (despite the fact that Mr. Elsiah had already been determined to be eligible for short-term disability benefits and had been receiving benefits thereunder for over a month). Lucent has also demanded that Mr. Elsiah repay the disability benefits that he had already received.

66. Lucent's decision to revoke Mr. Elsiah's disability benefits immediately after Mr. Elsiah filed a charge of discrimination clearly constitutes retaliatory conduct in violation of federal and state anti-discrimination laws.

14

67. The retaliatory nature of Lucent's conduct is further supported by the fact that the appropriate disability Plan procedures were not followed when the decision to revoke Mr. Elsiah's disability benefits were made (i.e., the decision was made by someone without proper authority to make a disability determination, the decision was not communicated to Mr. Elsiah in writing or in an adequate fashion as required by law, and no attempt was made to contact Mr. Elsiah's treating psychiatrist or to obtain his treatment notes before the decision as to Mr. Elsiah's eligibility for disability benefits was made). In short, the decision to revoke Mr. Elsiah's disability benefits was made improperly and without sufficient evidentiary foundation.

68. Because of this retaliatory and illegal conduct, Mr. Elsiah has been left without any means of supporting his wife and three small children.

69. Throughout his employment at Lucent, Mr. Elsiah was repeatedly subject to racially hostile actions and racially hostile remarks. Defendant Brewer, for example, told Mr. Elsiah on one occasion that Mr. Elsiah's "only problem was that he was the same race as" Mr. Bayad (a Black Muslim from Morocco). Defendant Brewer is an Operations Manager in Lucent's Largo office.

70. All of the discriminatory and prejudiced actions taken against Mr. Elsiah by the Defendants were done intentionally, maliciously, wantonly, or with a reckless disregard for Mr. Elsiah's rights and well-being.

15

71.  At all times pertinent to this Complaint, Lucent had an employee handbook and a stated policy barring discrimination on the basis of race, religion, and national origin.

72.  Due to the discrimination, harassment, unfair treatment, false imprisonment, constructive discharge, and wrongful denial of disability benefits committed by the Defendants, Mr. Elsiah suffered and continues to suffer severe emotional distress, mental anguish, and humiliation.

### COUNT I

### RACE, ETHNIC, NATIONAL ORIGIN, AND RELIGIOUS DISCRIMINATION

### (Against Lucent Technologies Inc.)

73.  Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

74.  By purposefully restricting Mr. Elsiah's promotional opportunities, and by harassing, abusing, and finally constructively discharging him on account of his race, ethnicity, national origin, and religion, Lucent has violated Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq.

### COUNT II

### RECONSTRUCTION ERA CIVIL RIGHTS ACT CLAIM

### (Against All Defendants, except the Plan)

75.  Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

76.  By purposefully restricting Mr. Elsiah's promotional opportunities, and by harassing, abusing, and finally constructively discharging him on account of his race, ethnicity,

16

national origin, and religion, the Defendants have violated the Reconstruction Era Civil Rights Act, codified at 42 U.S.C. § 1981.

### COUNT III

### FALSE IMPRISONMENT

#### (Against All Defendants, except the Plan)

77. Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

78. By unreasonably confining Mr. Elsiah to a locked room at Lucent's Fort Lauderdale office against his will and by refusing to let him leave that room, the Defendants have violated Florida law against false imprisonment.

### COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (Against All Defendants, except the Plan)

79. Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

80. By engaging in a concerted effort to harass and discredit Mr. Elsiah, by fostering a hostile work environment, by locking him in a room, screaming at him and falsely accusing him of improper purchases on his corporate credit card, by repeatedly trying to force him to leave the company on account of his race and/or national origin, and by retaliatorily revoking his disability benefits when he had no other means of supporting his wife and three small children, Lucent and the other Defendants have intentionally, or in the alternative, negligently inflicted emotional distress upon Mr. Elsiah in violation of Florida law.

17

## COUNT V

### WRONGFUL DENIAL OF EMPLOYEE BENEFITS

**(Against Lucent Technologies Inc. and the Lucent Technologies Inc.
Sickness and Accident Disability Benefit Plan)**

81.  Mr. Elsiah incorporates as if realleged paragraphs 1
through 72 of the Complaint.

82.  By denying Mr. Elsiah short-term disability benefits to
which he is lawfully entitled, by denying Mr. Elsiah disability
benefits on the fallacious ground that his short-term disability is
not work-related, and by denying him disability benefits without
properly following the legal and written requirements and terms of
the Lucent Technologies Accident and Sickness Disability Plan, the
Defendants have violated the Employee Retirement Income Security
Act, 29 U.S.C. § 1001, _et seq._

83.  Mr. Elsiah has appealed the wrongful denial of disability
benefits to him, but believes that such an appeal is actually
futile since both Lucent and the Plan have already been guilty of
improperly denying him benefits, have failed themselves to properly
follow the claims procedure set out in the Plan, and have revoked
Mr. Elsiah's disability benefits in order to illegally retaliate
against Mr. Elsiah for filing a charge of discrimination.

## COUNT VI

### BREACH OF CONTRACT

#### (Against Lucent Technologies Inc.)

84. Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

85. By failing to follow its own personnel policies and procedures on evaluating, promoting, and providing equal employment opportunity and by failing to truthfully investigate and reprimand the author of the hateful e-mail against foreigners, and by failing to investigate or reprimand the other conspirators in discrimination who repeatedly harassed Mr. Elsiah on account of his race, religion, ethnicity, and/or national origin, Lucent Technologies has breached its contractual obligations to Mr. Elsiah in violation of Florida law.

## COUNT VII

### RACE, ETHNIC, NATIONAL ORIGIN AND RELIGIOUS DISCRIMINATION IN VIOLATION OF FLORIDA LAW

#### (Against Lucent Technologies Inc.)

86. Mr. Elsiah incorporates as if realleged paragraphs 1 through 72 of the Complaint.

87. By purposefully restricting Mr. Elsiah's promotional opportunities, and by harassing, abusing, and finally constructively discharging him on account of his race, ethnicity, national origin, and religion, Defendant Lucent Technologies has violated the Florida Civil Rights Act of 1992.

19



## RELIEF REQUESTED

88.  WHEREFORE, Plaintiff Hamdi Elsiah prays that this Court:

(a) declare the Defendants' conduct to be in violation of his rights;

(b) enjoin Defendants from engaging in such conduct;

(c) award him any back pay and benefits (with interest) that have accrued to date;

(d) award him front pay until normal retirement age or reinstatement him to a comparable position in a non-discriminatory division within Lucent Technologies (if there is such a division);

(e) award him any short-term disability benefits due him;

(f) award him compensatory damages of $1,000,000 or more for emotional distress, mental anguish, and humiliation on account of the discrimination and false imprisonment he suffered at the hands of the Defendants;

(g) award him punitive damages in the amount of $3,000,000 or more;

(h) award him costs and attorneys' fees; and

(i) grant such other relief as the Court may deem just and proper.

20

## JURY DEMAND

89.  Mr. Elsiah demands a jury on all claims triable as a matter of right by a jury.

Dated:  June 27, 1997

> STEPHANIE ALEXANDER, CHARTERED
> Attorneys for Plaintiff
> 4403 West Tradewinds Avenue
> Lauderdale-By-The-Sea, FL 33308
> (954) 772-2644
> (954) 772-2845 (fax)
>
> By: _Stephanie Alexander_
> STEPHANIE ALEXANDER
> Fla. Bar No. 0081078

21

This form is affected by the Privacy Act of 1974; See Privacy Statement before completing this form.

☐ FEPA
☒ EEOC  | 150972617

## Florida Comm. on Human Relations ___ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Handi H. Elsiah | (954) 255-9882 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 8825 Ramblewood Drive, Apartment 1502, Coral Springs, FL 33071 | | 02/11/64 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Lucent Technologies, Inc. | Cat A (15-100) | (908) 582-8509 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 8548  126th Avenue N. Largo, FL 34649 | | 103 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| Lucent Technologies | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| Fort Lauderdale, Florida | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☒ COLOR   ☐ SEX   ☒ RELIGION   ☒ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE EARLIEST | LATEST |
|---|---|
| 01/23/97 | 04/21/97 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

1. Since January 23, 1997 I have been subjected to a hostile work enviornment. I was subjected to racial comments by Lucent management personnel consistent with an E-mail message from Mike Reed to Bruce Brewer, a copy of which is attached hereto as Exhibit A. On April 21, 1997 I was demoted and constructively discharged from my position as Manager of the Respondent's Fort Lauderdale group. I am a Black Egyptian of Muslim decent.

2. Mr. Bruce Brewer, White, B-Band Manager and Lew Kaslow, White, C-Band Manager gave no reason for their harassment or intimidation. Mr. David Ward, White, Manager replaced me and then demoted me. Mr. Ward also told me that I did not have a future with the Respondent. Mr. Ward gave me the name of a Head Hunter.

3. I believe I have been discriminated against based on my national origin, race, color, and religion in violation of Title VII of the Civil Rights Act of 1964, as amended.

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

| NOTARY - (When necessary for State and Local Requirements) |
|---|
| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

I declare under penalty of perjury that the foregoing is true and correct.

| SIGNATURE OF COMPLAINANT |
|---|

| Date: 5/2/97 | Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
|---|---|---|

EEOC FORM 5 (Rev. 06/92)