UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD,

      *Plaintiff*,

v.

CISCO SYSTEMS, INC., BRUCE
BASTIAN, KATE DCAMP, LYNN
FRASER, CELIA HARPER-GUERRA, and
RICK JUSTICE,

      *Defendants*.

CIVIL ACTION NO. 05-11005-PBS

## SUPPLEMENTAL DECLARATION OF MATTHEW IVERSON

I, MATTHEW IVERSON, declare under the pains and penalties of perjury, pursuant to 28 U.S.C. § 1746, the following:

1.      I am an associate at the law firm of DLA Piper US LLP ("DLA"). I represent the defendants in the above-captioned matter. The facts set forth in this declaration are based upon my own personal knowledge.

2.      On January 19, 2007, I participated in a telephonic deposition of defendant Celia Harper-Guerra from DLA's Boston office. On January 22, 2007, I filed a draft copy of the transcript of that deposition as a declaration attachment.

3.      On February 2, 2007, the court reporter provided me with a copy of the final transcript, attached hereto.

        /s/ Matthew Iverson_____
        Matthew Iverson

Dated: February 2, 2007

1-19-07Harper2 (2).TXT

1

```
1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                C.A. NO. 05-11005-PBS

4

5    * * * * * * * * * * * * * * * * *

6   ANTHONY BAYAD,                    *

7              Plaintiff             *

8   vs.                              *

9   BRUCE BASTIAN; KATE DCAMP; LYNN   *

10   FRASER; CELIA HARPER-GUERRA; RICK *

11   JUSTICE; CISCO SYSTEMS, INC.      *

12              Defendants           *

13                                    *

14   * * * * * * * * * * * * * * * * *

15

16       TELEPHONE CONFERENCE DEPOSITION OF

17              CELIA HARPER-GUERRA

18              DLA PIPER US LLP

19          33 Arch Street, 26th Floor

20            Boston, Massachusetts

21         January 19, 2007    1:10 p.m.

22

23

24         Maryellen Coughlin, RPR/CRR
```

2

```
1   APPEARANCES:
```

```
                    1-19-07Harper2 (2).TXT
2    Appearing pro se:   Anthony Bayad

3

4    Representing the Defendants:

5              DLA PIPER US LLP

6              33 Arch Street, 26th Floor

7              Boston, Massachusetts 02110-1447

8              BY:  Bruce E. Falby, Esq.

9                       -and-

10             Matthew J. Iverson, Esq.

11             (617) 406-6020  (617) 406-6120

12             E-mail:  bruce.falby@dlapiper.com

13                      matthew.iverson@dlapiper.com

14

15   PRESENT:  Paula Hughes

16

17

18

19

20

21

22

23

24
```

```
1                   I N D E X

2

3    WITNESS:    CELIA HARPER-GUERRA

4

5

6    EXAMINATION:                          Page
```

1-19-07Harper2 (2).TXT

```
 7   BY MR. BAYAD                                    4
 8
 9
10
11   EXHIBITS FOR IDENTIFICATION:
12   No.            Description              Page
13       None
14
15
16
17
18
19
20
21
22
23
24
```

4

```
 1              P R O C E E D I N G S
 2
 3              CELIA HARPER-GUERRA,
 4     having been first duly sworn, was examined
 5     and testified as follows:
 6
 7                   EXAMINATION
 8   BY MR. BAYAD:
 9        Q.    First, I would like to say, the
10   first thing, that I'm taking the deposition
```

1-19-07Harper2 (2).TXT

11    according to the rules of civil procedure and the

12    rule of, the federal rules of evidence, and also

13    the procedural order of the Honorable Patti B.

14    Sarris that gave us an opportunity to further

15    discovery and gave us Celia Harper that is right

16    now being deposed.  Is that correct, Miss, your

17    name is Celia Harper?

18        A.        My name is Celia Harper-Guerra.

19        Q.        Okay, Miss.  Can you state your --

20    if you don't want to give your address, home

21    address or office address, can you state where is

22    your location that you are working from at this

23    time?

24              MR. FALBY:  I'm going to object to

                                                    5

1     the question because it's not relevant, and the

2     witness is not comfortable answering that

3     question.

4         Q.        Okay.  Because the record states,

5     because there is a confusion.  There is two Celia

6     Harper-Guerra.  At least she can tell me if she

7     is 47 years old, Mr. Falby.  Is she 47 years old?

8               MR. FALBY:  I will stipulate with

9     you that you are deposing Celia Harper-Guerra.

10              MR. BAYAD:  I just want to make

11    sure, Bruce.  Bruce, you are counsel for the

12    record, and you are lead, and I do this for the

13    record.  I just want to know that I'm not talking

14    to another Celia Harper that isn't on the

15    physical evidence that I have.

1-19-07Harper2 (2).TXT

16                    I don't want to spend my time
17    explaining to you.  Can you please just tell me
18    if she is -- this person that I'm talking to
19    right now, is she Celia Harper-Guerra?
20         A.      My name is Celia Harper-Guerra, and
21    my employee number is 15289.
22         Q.      Okay.  And we assume that you are
23    47 years old.
24                    MR. FALBY:  Again, that's not

                                                    6

1    relevant, and it's not a question that I think is
2    appropriate.  She is Celia Harper-Guerra who I
3    think you wanted to be deposed.  We have produced
4    her.
5                    MR. BAYAD:  Also, for the record --
6    no problem we proceed, Mr. Falby.
7                    Celia Harper, what's your title at
8    Cisco Systems as we speak right now, at this
9    time?
10        A.      Director of human resources for
11    U.S., Canada and Channel.
12        Q.      And this is a new title or this is
13    an old title?
14        A.      This is my current title.
15        Q.      Cisco.  Prior to this title,
16    Ms. Celia Harper, according to the record that I
17    do have in my possession, it states that you use
18    to be a director, Cisco director of talent.
19        A.      My title is director of human

1-19-07Harper2 (2).TXT

20    resources.

21         Q.       Okay, very good.  Okay.  At this

22    time or prior to this time -- prior to the, prior

23    to -- in the past, you were Celia Harper, Cisco

24    director of talent, human resources; is that

                                                  7

1     correct?

2          A.       No, that's not correct.

3                   MR. BAYAD:  Bruce, can you remind

4     me, as I'm not an attorney, can you remind me

5     what perjury means?  Sir, can you help me,

6     Mr. Falby?

7                   MR. FALBY:  I'm sorry.

8                   MR. BAYAD:  Are we under oath here?

9     Is Celia Harper under oath?

10                  MR. FALBY:  Yes, she's been sworn.

11    She's under oath.

12                  MR. BAYAD:  Does she understand her

13    rights?  As an attorney, would you remind your

14    client what is fifth amendment and what is

15    perjury.  You know that she has a right right now

16    not to be participating here, according to the

17    fifth amendment, if she doesn't want to, right?

18                  MR. FALBY:  I suggest you ask

19    questions.  She's answered your question.  We're

20    here to answer your questions.

21                  MR. BAYAD:  No problem.

22                  I have a news and document from

23    Mr. Tony Martelo on March 16th, 2000, from

24    Computer World that states that you are Celia

                   Page 6

1-19-07Harper2 (2).TXT

8

1      Harper-Guerra, director of talent human
2      resources, and we're going to move on.  I have
3      that, and I will give a copy to counsel, Bruce
4      Falby.
5               MR. FALBY:  Are you asking whether
6      her title in 2000 was Cisco director of talent?
7               MR. BAYAD:  I said from 2000 to --
8      from 2000 to probably 2005 she was a director,
9      Cisco director of talent, human resources, and
10     she use to live, she use to live in Pala,
11     California, and she moved -- after the lawsuit
12     was filed, she moved to England.
13               That's correct, Miss?
14     A.       No.  I did use to leave in Pala,
15     California, and I have resided in the UK, and my
16     title has been director of human resources at
17     Cisco.
18     Q.       Perfect.  Thank you, Miss, that's
19     what I want.  Okay, that means that your
20     statement correspond to my document, that means
21     you are director -- Cisco director of talent,
22     human resources, and you explained to the
23     Computer World that you are an engineer and
24     you're looking for talent.  Is that correct,

9

1      Miss?

1-19-07Harper2 (2).TXT

2          A.          Part of my job responsibilities as

3    director of human resources do include

4    recruitment of talent to Cisco.

5          Q.          Thank you, Celia.  Thank you for

6    your cooperation.  My question to you, would you

7    state to me that Cisco does not have duplicate

8    title as human resources?

9          A.          I don't understand your question.

10          Q.          In other words, Cisco cannot hire

11    two people and give them the same title.  For

12    example, Cisco cannot hire Kate Dcamp and give

13    her senior vice president of human resources,

14    again senior vice president of human resources.

15    They cannot hire another person, Brian Schipper,

16    and also give him the same title, Cisco senior

17    vice president of human resources.  Can Cisco do

18    that or not?

19          A.          My understanding is that we do have

20    a job title with multiple employees utilizing the

21    same job title.

22          Q.          Again, in other words, what you're

23    telling me is that Mr. Chambers has two people

24    doing the same role, the same task with the same


                                                    10


1    title, paying them the same money, Cisco senior

2    vice president of human resources Kate Dcamp, and

3    Brian Schipper from Microsoft just got hired.  He

4    also has the title senior vice president human

5    resources.

6                      Remember, we are not going to keep

1-19-07Harper2 (2).TXT

7       going perjury, Celia.  You've got to cooperate.

8       You're not going to win here by committing

9       perjury one, two, three, four times.  You can't

10      do that.  And I apologize for this inconvenience.

11      I'm just fighting for my rights.

12                  Now, let me repeat the question to

13      you.  Mr. Chambers and the stockholders can have

14      two people, Kate Dcamp, senior vice president of

15      human resources, and at the same time they can

16      have Brian Schipper, Cisco senior vice president

17      of human resources?  Can Mr. Chambers, CEO have

18      two people doing the same job?

19                  MR. FALBY:  I'm going to object.

20      You've asked more than one question.  Do you

21      understand the question, Ms. Harper-Guerra?

22                  MR. BAYAD:  No problem, Bruce.  Let

23      me help you Celia, respectfully.  I got a lot of

24      documents that I have, even though some of them


                                                    11


1       have been stolen by the United States Marshall

2       yesterday at ten o'clock.  They came here and

3       stole everything, but that's okay, that's not

4       your business, and that's not your problem.

5       That's my problem, and Bruce Falby's problem for

6       the record.

7                   Now let's go to Kate Dcamp, senior

8       vice president human resources.  She was -- I

9       have a biographic of her and she was working from

10      2000 to 2005.  Do you agree with me?  And I spoke

1-19-07Harper2 (2).TXT

11    to her.  Do you agree that that's her title from

12    2000 to 2005, under oath?

13          A.       I agree that that is her title.  I

14    don't know the date of employment specifically of

15    Kate Dcamp.  I know that she's worked here.

16          Q.       Thank you.  My second question.  I

17    have a Brian Schipper, and you and I are very

18    professional.  I called Microsoft and asked about

19    Brian Schipper, senior vice president of human

20    resources, when he worked at Microsoft and what

21    was his last day at Microsoft, and I can help you

22    here.  That's not the question.  That's just a

23    heads up.  They told me he left 2006.

24               Now, my question to you, you work

12

1    for Cisco for a long time.  Here's the question

2    now.  Before Brian Schipper, senior vice

3    president of human resources, who was your boss

4    before him?

5          A.       Angus Reynolds.

6          Q.       Who's that?

7          A.       Well, are you asking my direct boss

8    or the boss of all of HR?

9          Q.       I use to deal with Kate Dcamp,

10    senior vice president of human resources.  Now I

11    deal with Brian Schipper, senior vice president

12    of human resources.

13          A.       Yes, my understanding is Kate Dcamp

14    was our senior vice president of human resources,

15    and today Brian Schipper is our senior vice

Page 10

1-19-07Harper2 (2).TXT

16      president of human resources.

17          Q.      Thank you.  Now, my question to

18      you.  I have a document under oath from Kate

19      Dcamp stating to me that she was not a senior

20      vice president of human resources, and my

21      question to you -- I have a contract in front of

22      me that for the record, and this is very serious,

23      this question, and I'm not trying to trick you,

24      Ms. Harper.  I'm just trying to set the record

13

1       straight.  My question here, you are a human --

2       you are high level -- you are the director of

3       human resources at Cisco Systems.  Again, is this

4       correct, yes or no?

5           A.      Yes.

6           Q.      Also, do you understand the rules

7       and regulation and the law that Cisco is guided

8       through in this business world?  Yes or no?

9               MR. FALBY:  Objection.  That's not

10      a yes-or-no question.  Could you be more

11      specific, please?

12              MR. BAYAD:  In other words,

13      Mr. Falby, does Ms. Celia Harper-Guerra

14      understand the regulation that this company is

15      navigating in the real world.

16              MR. FALBY:  I object.  I don't

17      understand the question.  The witness can answer

18      if she understands.

19                  THE WITNESS:  I don't understand

Page 11

1-19-07Harper2 (2).TXT
20    the question of what the regulation is.

21                    MR. BAYAD:   Regulation of Cisco

22    meaning, Mr. Falby, if Ms. Celia Harper-Guerra,

23    for example, have a contract, signed contract

24    printed from Cisco Systems, and Ms. Celia Harper,


                                                          14

1     director of HR, give it to an employee or anyone

2     at Cisco, does she understand the terms, the

3     terms and conditions of such contract, for

4     example?

5                        If she wants to be specific about

6     what type of contract, let's talk about the

7     severance package, for example, or the separation

8     from Cisco or the layoff document that Cisco give

9     to the people when they have laid them off, that

10    means they told them that the economy is so bad

11    that they need to go, and in order for -- and

12    we're going to give you a contract to sign, and

13    we give you one week, two weeks or four weeks of

14    severance package.  Do you understand that

15    contract?  Have you seen Cisco contract in your

16    past?

17                    MR. FALBY:  I'm going to object

18    because there's five or six questions there, but

19    the witness can do her best to answer.

20                    MR. BAYAD:  Please, Mr. Falby.

21                    Let me ask you --

22        A.        Could you please restate the

23    question.

24        Q.        Miss Celia Harper, respectfully,
                        Page 12

1-19-07Harper2 (2).TXT

15

1    you're a wonderful person, and I'm not trying to
2    humiliate you here, nor am I trying to set you up
3    here.  What I'm doing right now from the bottom
4    of my heart, I'm fighting for my heart, for my
5    rights.  And these attorneys, one of them is a
6    wonderful man, and some other person, I'm not
7    insulting anybody, he thinks that other people
8    like myself do not have rights in this country,
9    and I was raised in this country, and I'm sure in
10   this conference call there's more than one
11   person, but that's okay.
12                What I'm going to tell you now, I
13   have a paper, an exhibit from Lynn Fraser, and
14   she told me that -- she gave me a voluntary
15   severance agreement and general release of Cisco
16   Systems.  Have you seen that before, Miss, as a
17   director?
18        A.      So in my role as a director, I am
19   aware of the necessary documents that we utilize
20   through our employment laws and regulations.
21        Q.      And the exhibit Cisco 00048 that
22   counsel finally gave me, that when Cisco got rid
23   of me they gave me a paper to sign.  Did you see
24   that, Miss?

16

1        A.      I do not have that paper in front
Page 13

1-19-07Harper2 (2).TXT
 2    of me.
 3         Q.      Okay.  Well, let me explain to you
 4    this document that Mr. Falby and Lynn Fraser gave
 5    me as a pretext for my termination of employment,
 6    even though I'm very highly educated and also
 7    highly qualified.  I'm a talent.  I'm an art in
 8    this business.  But that's okay.  Okay, this
 9    paper says -- I'm going to give you just the
10    title.  Mr. Falby knows what I'm talking about.
11              When I was let go from Cisco on
12    discriminatory grounds, they gave me a voluntary
13    severance agreement and general release contract
14    to sign and gave me some money with it.  You did
15    see that, right?
16         A.      No, I have not seen that document.
17         Q.      That's good, that's good because I
18    need to go over it with you.  In the last page of
19    such document, and Mr. Falby labeled it as Cisco
20    0052.  To make it easier for my court reporter,
21    it's Cisco 0052.  And it says, "I understand and
22    accepted both terms and notice received in
23    Appendix A, including the separately provided
24    data on the job title and ages of all individual

                                                    17

 1    covered by the program and on the job title age
 2    of all individuals not covered by the program.
 3    This data has been offered for a 45 days prior to
 4    the expiration of the offer of this agreement."
 5    Meaning that in 45 if you don't sign it, you
 6    still work for Cisco.

1-19-07Harper2 (2).TXT

7                    MR. FALBY:  Do you have a question?

8                    MR. BAYAD:  Yes.  I signed that

9        contract, and the contract also said "For Cisco

10       use only."  And if everybody had signed this

11       contract, it has to -- it's only valid if Kate

12       Dcamp, senior vice president of human resources

13       signs it, then it becomes bind.  You agree with

14       this, right?  Somebody signs a contract from

15       Cisco, and it says on the bottom in the black,

16       and also in bold, it says, "This contract is not

17       valid if the employee signs it.  It has to be

18       approved by Cisco human resources senior vice

19       president Kate Dcamp in person."  If she doesn't

20       sign it, for example, my question to you, would

21       this contract be valid or not valid, Miss Celia

22       Harper?

23                    MR. FALBY:  I'm going to object.

24       You're asking a legal conclusion.  The witness


                                                    18

1        can answer if she knows.

2                    MR. BAYAD:  Okay.  Well, this

3        contract is not valid, Mr. Bruce Falby,

4        respectfully, and I'm going to explain to you for

5        the record why.  Because it says it only binds --

6        if I'm fired from Cisco, even if I signed this

7        voluntary, even if I'm locked in a room, but if

8        you sign it, it's only valid if Kate Dcamp signs

9        it.

10                   Now, going back to Kate Dcamp's

                         Page 15

1-19-07Harper2 (2).TXT

11    declaration, she stated under oath I am not a

12    senior vice president of human resources, and

13    here we have Miss Celia Harper stated otherwise,

14    stated that this person does not know her title,

15    meaning Kate Dcamp.  Either she's lying or she's

16    confused, and that we have to take up with the

17    Honorable Judge Patti B. Sarris, but that's okay.

18    Now we just make sure.  According to the

19    document, Celia Harper, that I have, and you are

20    a Cisco rep, also Paula Hughes gave me the same

21    thing, I am still on the book of Cisco because I

22    signed something that is not bind.  That's okay.

23              Now, I'm going to start with your

24    questions.  And I did a lot of work here,


19

1    Miss Celia Harper.  Now, I'm going to go -- I'm

2    going to ask you a question.  How many people

3    work for Cisco Systems, approximately.  You don't

4    have to be right here.  Just tell me a ballpark.

5    1,000, 5,000, 7,000?  What's the number in the

6    best you can tell me?  How many people work for

7    Cisco?

8         A.        50,000 is my guess.

9         Q.        50,000?

10         A.        Is my guess.

11         Q.        Thank you very much.  In this

12    50,000, 57,000 or 50,000, if 7,000 get let go

13    from Cisco Systems, for example, and they want to

14    give references, and this references they need to

15    be provided by Cisco.  My background with Cisco,

1-19-07Harper2 (2).TXT

16    and I tested the system of Cisco.  It's very

17    honest from human resources that I dealt with.

18    When I pick up the phone, I call Cisco Systems.

19    I say I'm looking for a person called Janet,

20    Janet Skadden.  They told me that she does not

21    work for Cisco Systems.  They told me we cannot

22    give you reference, but what we can give you is

23    time of start of this individual, Janet Skadden,

24    and her separation date.  Do you agree with this?

                                                    20

1    Is that a true statement, yes or no, Miss, if you

2    can?

3          A.      Yes.

4          Q.      Thank you.  And they cannot tell --

5    human resource or anybody at Cisco cannot say

6    something other than the date of the hire of

7    Janet Skadden and her termination date; is that

8    correct?

9          A.      That is my understanding.

10          Q.      Likewise.  Also, Ms. Celia Harper,

11    and I apologize, I really don't want to be in

12    this position, but I'm going to ask you a

13    question, and I want to give you a heads up.

14    Please, before you answer, don't think that

15    Mr. Falby is going to help here.  What I mean is

16    if you commit perjury, we're going to have some

17    issues, because a lot of things have been going

18    on in this case.  And now I'm going to ask you,

19    and I want to give you a heads up, and I know

                            Page 17

1-19-07Harper2 (2).TXT

20    you're a very good Christian person, and I know

21    everything about people that I deal with in my

22    life.

23                    Now I'm asking my question to you.

24    From 50,000 people at Cisco Systems, why did I


                                                        21


1    choose you in this lawsuit?  Why did I choose

2    you, Miss?

3          A.      I don't know.

4          Q.      From 50,000 people at Cisco, why

5    did I mention Janet Skadden in this lawsuit, in

6    this deposition?

7          A.      I don't know.

8          Q.      Do you think that I picked you

9    because I have an issue with you at Cisco

10   Systems?

11                 MR. FALBY:  Objection.  These are

12   improper questions.  Why you did what you did is

13   not a proper subject of examination for this

14   witness.  Why don't you ask something that the

15   witness knows.

16         Q.      Miss Celia Harper, have you been

17   sued before?

18         A.      No.

19         Q.      Have you participated in any

20   lawsuit before, discrimination lawsuit or racial

21   lawsuit or sexual harassment lawsuit?

22         A.      No.

23         Q.      When did you first start getting

24   involved in this lawsuit of race discrimination?

                         Page 18

1-19-07Harper2 (2).TXT

22

```
 1                MR. FALBY:  I'm going to object.  I
 2     don't understand the question.  Are you asking
 3     whether she's been deposed in another lawsuit?
 4                MR. BAYAD:  Yes.  Participated
 5     means deposed, being sued, all the above.
 6     Mr. Falby, please, let's help this process so we
 7     can move on with our lives.  You're getting paid,
 8     Mr. Falby.  I'm not.  She has family.  Her job is
 9     on the line, Mr. Falby.  This is not our job,
10     Mr. Falby.  We're not here because we hate each
11     other.  We're here fighting for our work,
12     survival here, especially my survival.
13                Now my question to you, Miss, have
14     you participated in any discrimination or lawsuit
15     or race discrimination, sexual harassment, fraud,
16     anything like that, any lawsuit in the federal
17     court in general?
18        A.      No.
19        Q.      Thank you.  Have you asked yourself
20     why were you named in this lawsuit, why?  'Cause
21     we are human beings.  When you got served or been
22     advised by this lawsuit, did you say to yourself,
23     Miss Celia Harper, why me?  Did you say that,
24     Miss?
```

23

```
 1        A.      No.
```

1-19-07Harper2 (2).TXT
```
 2          Q.        Did you say why is this guy suing
 3    me in this lawsuit?
 4          A.        No.
 5          Q.        Do you know why you are being sued
 6    in this race discrimination lawsuit?
 7          A.        No.
 8          Q.        I'm going to tell you why.  Because
 9    your name is everywhere.  And we're going to
10    start now.  And that's why I told you, Miss Celia
11    Harper, and now you have to pay attention.  And
12    we spoke earlier.  We said why Janet Skadden, why
13    Celia Harper.  See, Lynn Fraser knows why.
14    Mr. Savastano knows why.
15                    MR. FALBY:  Excuse me.  Mr. Bayad,
16    please ask questions of the witness.
17                    MR. BAYAD:  Okay.
18                    Before we move forward, I want to
19    ask you, ask you to read me your declaration for
20    the record, slowly, please, if you can.
21                    MR. FALBY:  The declaration goes on
22    for a number of pages.  I don't think it's a
23    productive use of the deposition.  If you would
24    like her to read it, she will.  Do you want her
```

                                                            24

```
 1    to actually read the whole thing?
 2                    MR. BAYAD:  No, that would be abuse
 3    of her discretion.  In your declaration under
 4    oath -- you provided a declaration in this
 5    lawsuit.  Is that correct, Miss Celia Harper?
 6          A.        That is correct.
```
                              Page 20

1-19-07Harper2 (2).TXT

```
7         Q.        On page 5 you mention Cisco no-hire

8    List, right?

9         A.        No.

10        Q.        What did you mention on page 5 from

11   No. 9 to I believe -- from No. 9 to No. 13 you

12   mention a lot of things about Cisco no-hire List.

13        A.        I did not mention about a no-hire

14   list.

15        Q.        Okay.  Did you get the chance to

16   review my Cisco no-hire list, the electronics

17   copy?

18        A.        Yes.

19        Q.        Thank you.  In the copy -- it's a

20   file, right?  What's the file called, if you

21   remember?

22        A.        Sensitive hire policy.  We do not

23   have a no-hire list.  We have a sensitive hire

24   policy.
```

                                                            25

```
1         Q.        Okay, I'm sorry.  In this, in this

2    lawsuit or in this deposition, we cannot change

3    the name of Cisco no-hire list to the sensitive

4    list, can you agree with me?  That's the name of

5    it, right?

6         A.        No.

7         Q.        Okay.  The list that I gave you,

8    what would you call it?

9                   MR. FALBY:  I'm putting in front of

10   the witness your Exhibit 14 in your complaint
```

1-19-07Harper2 (2).TXT
11    which I assume is what you're asking about.

12             MR. BAYAD:  Yeah, Exhibit 14 with

13    hard copies and soft copies, the electronic

14    copies, according to the Rule of Civil -- the

15    Rule of Federal Procedure 91 and also 8013.

16             MR. FALBY:  Is the question -- are

17    you asking the witness whether she knows what

18    Exhibit 14 is?

19             MS. BAYAD:  Yes.

20             THE WITNESS:  Yes, I do.

21        Q.    (By Mr. Bayad) Okay.  Thank you.

22    When I get a chance to open the Cisco no-hire

23    list that is Exhibit 14 on the complaint,

24    Complaint Docket 1, Exhibit 14, hard copy that is


                                      26


1    Exhibit 14, and also the electronics copy, the

2    file is an Excel sheet called "Sensitive List."

3        A.    The file is a sensitive hire list

4    and policy.

5        Q.    Yes.  That's correct, right?

6        A.    That is correct.

7        Q.    Yes.  Okay.  When I took that

8    electronics, electronics copy of such I call a

9    Cisco no-hire list, this is my data that I took,

10    and I'm going to share it with you, and I'm going

11    to ask you questions, because it's hard -- the

12    reason I mention it to you is because if you were

13    in front of me, we would share it together.

14    Since Mr. Falby is sending me somewhere and you

15    are somewhere, it's very hard, and I have to tell

1-19-07Harper2 (2).TXT

16    you what I'm going to tell you and then ask you a

17    question about it.  Is that a fair statement,

18    Miss?

19          A.       Correct.

20          Q.       Okay.  This sensitive list I call

21    Cisco no-hire list, it was authored, that mean it

22    was made by Janet Skadden, at Cisco human

23    resources, your division, tells me that she's no

24    longer with Cisco Systems.  Plus, we went further

27

1     to the Cisco no-hire list electronic copy.  We

2     want to make sure that the date that was

3     attached, and we look, not just me, a lot of

4     people, a lot of smart people in this country

5     looked at it because you cannot produce direct

6     evidence to the federal court, and it is

7     fabricated.  It's very serious consequences,

8     that's why we make sure that we give it to the

9     right people to look at it.

10              To refresh your memory, Ms. Celia

11    Harper, that Cisco no-hire list has a date that

12    was modified on 9/22/2000.  Now, let me ask you

13    this, why this list was modified on 9/22/2000,

14    why?  Why not 9/20 -- the month nine which is

15    September, probably September 25th, September

16    30th, September probably 29th.  Why this list is

17    saying it was modified on September 22nd, 2000?

18          A.       The exhibit that I am reviewing

19    currently that you have entered into this

1-19-07Harper2 (2).TXT
20     deposition --
21          Q.          Yes.
22          A.          -- this document --
23          Q.          Yeah, date of current copies, yes,
24     Miss Harper.


                                                    28

1          A.          I am not aware of this document
2     with the modifications that are on it.  So the
3     document that you're referencing from 9/22 that
4     you just stated --
5          Q.          Yes.  In other words, you don't
6     know about this date, right?  You don't know this
7     date.
8                    MR. FALBY:   Excuse me, let the
9     witness finish, please.
10          Q.          Go ahead.
11          A.          This document that you've mentioned
12     on 9/22 of modification is not a document that
13     I'm aware of at Cisco Systems for our sensitive
14     hire policy.
15          Q.          Okay.  This Exhibit 14 of the
16     complaint, Cisco no-hire list that I call, we
17     took the, we took the electronic copy that we
18     provided to the court, many, many copies.  We did
19     some analysis.  Let me tell you this analysis.
20     The Cisco no-hire list was authored and created
21     by Janet Skadden.  The date of the modification
22     was 9/22/2000, which is September 22nd, 2000, at
23     2:21 p.m.  Which if you look at the 2:21 p.m.,
24     minus 4 would be, for example, the morning of San
                    Page 24

1-19-07Harper2 (2).TXT

29

1    Jose, California.  That's okay.  And the size of,
2    the size of that Cisco no-hire list I gave you
3    guys on Exhibit 14 and assorted copies according
4    to the Rule of Civil Procedure -- the Rule of
5    Federal Evidence 901 and also according in the
6    meaning of 803 1.  The size of such list, Cisco
7    no-hire list that has my name no hire, do not
8    hire Anthony Bayad, has a 279 kilobyte, which is
9    the size of the Cisco no-hire list, the
10   electronics file.  And the reason, I'm asking
11   you, why it was modified on 9/22/2000, September,
12   why?  Why not another time?  Why, why September
13   22nd, 2000?  September 22nd, 2000, why?
14                MR. FALBY:  I'm going to object.
15   She's already testified that this document is not
16   an authentic Cisco document.
17        Q.      It's not a Cisco document?
18        A.      This is not an authentic
19   Cisco-approved document with that modification.
20        Q.      Okay, no problem.  That's your
21   answer, right?  Well, we did -- we took the Cisco
22   no-hire list, and we looked at the content of it
23   and the meaning of civil -- Federal Rule of
24   Evidence 803 and 1, and what we found, we found

30

1    that a lot of stuff that nobody can have, would
Page 25

1-19-07Harper2 (2).TXT

2      you agree with me?  If you look at Exhibit 14,

3      the Cisco no-hire list that I call, that Cisco

4      calls, would you state that it has a lot of

5      information that nobody know about.  It's very

6      sensitive, yes or no?

7               MR. FALBY:  I'm going to object to

8      the question.  The witness can answer it if she

9      understands.

10         A.      I don't understand your question.

11         Q.      Looking at the electronics file and

12     the hard copies, I see companies, I see names of

13     Cisco people.  These people are true people.

14     They work for Cisco, yes or no?

15              MR. FALBY:  What people are you

16     referring to?

17              MR. BAYAD:   The Cisco no-hire list.

18              MR. FALBY:  There is no such thing

19     as a Cisco no-hire list.

20              MR. BAYAD:   Okay.  Well, let's

21     change the name for convenience to make Celia

22     Harper comfortable because she's a H.R., and we

23     don't want to hurt people's feelings here.

24              Okay, the list, whatever is the


                                          31

1      name you call it.  Why Anthony Bayad give it to

2      Bruce Falby and the court and have them review?

3      On this list, we find the name of people, the

4      address of people, companies that Cisco does

5      business with.  They've all been verified.  I'm

6      talking about the companies that Cisco does
                        Page 26

1-19-07Harper2 (2).TXT

7       business with, the resellers.  Why does Cisco

8       no-hire list that is found on Docket Entry 1,

9       Exhibit 14, has lot of information about Cisco

10      partners, Cisco employees and some stuff that

11      nobody can have, only human resources, why?

12              MR. FALBY:  I'm going to object to

13      your continued use of no hire.  You're asking the

14      witness to explain what the point of the

15      selective hiring list is?

16              MR. BAYAD:  Mr. Falby,

17      respectfully, don't keep doing that because we

18      don't have time.  What name do you want me to

19      call this list, Cisco, Cisco Bayad or Cisco Celia

20      Harper or Cisco Bruce Falby, please?

21          A.      This particular document that

22      you're referencing is called a sensitive hire

23      policy.

24          Q.      Okay.


                                                        32

1           A.      However -- may I finish, please?

2       However, you referenced a document with a

3       modification on there.  This is not an

4       authenticated document produced by Cisco,

5       therefore I'm unable to answer your question as

6       you relate it to this document, 'cause it's not

7       an authenticated document of Cisco.

8           Q.      When you say it's not

9       authenticated, in the meaning of what?  For

10      example, what's not authenticated?  That means

                        Page 27

1-19-07Harper2 (2).TXT

```
11        G.E. does not do business with Cisco?  That means
12        Bob Bruce, Cisco contact, does not work for
13        Cisco?  That means that Glen Liznetz does not
14        work for Cisco?  That means that AT&T Broadband,
15        Bank of America, their contact is Jim Roche,
16        they're not clients of Cisco and Jim Roche is not
17        Cisco employee?  That's what you're telling me,
18        right?
19             A.      I don't know Jim Roche.
20             Q.      Well, if you look at the Cisco
21        no-hire list, I'm telling you the Cisco contact,
22        all of them there?  Why the Cisco contacts are
23        there if it's not authenticated, why?  Please
24        why.  I'm just talking about the people of Cisco.
```

                                                                33

```
1         Why are the people of Cisco in that list, why?
2         Why not other people?  Why Cisco people contact
3         are there, why?  And we can go through names.
4         Tell me why.
5              A.      So can you please explain to me
6         what Cisco names and where they are in the
7         document so I can reference the document that
8         you've produced?
9              Q.      Sure.  This is the document.  The
10        document that I gave you.  On Column 27 it says,
11        "Highly Sensitive."  You move to the right you
12        see, "Cisco Contact, Sensitive, Cisco Contact and
13        Comments."
14                     In the Highly Sensitive, "All
15        CCIE's employed by ANY customer/Partners," that's
```

1-19-07Harper2 (2).TXT

16    28.    Why does it state CCIE here unless it has a

17    meaning?

18              Also, Column No. 29 of that Cisco

19    no-hire list says, "AE Business Solutions, Cisco

20    Contact Bob Bruce."  When you say Celia Harper

21    that is not authenticated, why Bob Bruce that

22    works for Cisco, that AE Business Solutions

23    knows.   Bob Bruce came to their premises and did

24    business with them, and he works for Cisco.


34


1              Now, let's go easy, easy company,

2    because that's in Boston, and I know those

3    people.   Let's go for Bank of America.   Why Bank

4    of America Celia Harper, why Bank of America has,

5    Column 37, has Jim Roche?  Why not Lynn Fraser,

6    why Jim Roche?  And Jim Roche has gone to Bank of

7    America, has done job for Bank of America, unless

8    you want me to go and get a statement from Bank

9    of America.   I can do that.   I don't need a

10    subpoena.   I know those people, and people can

11    give anything they want if they feel it would

12    help.   Now you tell me why Cablevision is there,

13    why Chase Manhattan Bank is there.   And guess

14    what, Chase Manhattan Bank is my favorite.   You

15    know why, because the person that's promoting

16    Lynn Fraser, my manager, the one that started the

17    whole nine yard, is Nick Adamo.   And looking at

18    the chart, the reason of Cisco.  Yes, yes, yes,

19    Nick Adamo is the point contact of this very

1-19-07Harper2 (2).TXT

20    crucial customer of Cisco, Chase Manhattan Bank.

21    Now, if I go to Chase Manhattan Bank -- and I

22    know those people, too.  I use to work for them

23    in the past when I use to work, when I use to be

24    a human being -- they can both tell me, yes,

35

1    Anthony, if I give them the Cisco -- I'm going to

2    give them the Cisco no-hire list.  They can tell

3    me Chase Manhattan Bank is Nick Adamo.  And I'm

4    waiting for the Honorable Patti B. Sarris to

5    decide at the end what she's going to do with

6    this case because this list is going to go to

7    these people.

8            Now, my question to you, honestly

9    Celia Harper, you're under oath, ask yourself why

10    you are saying that this list, Exhibit 14 on the

11    Complaint No. 1, 931 has Nick Adamo that I know

12    very well, and my friend knows him.  He's named

13    as the contact for Chase Manhattan.  Why, please?

14        A.        At Cisco we have a number of our

15    partners and our customers that have

16    relationships, and the owners of our accounts,

17    and so when it says the contact name, which you

18    mentioned a Nick Adamo or a few other employees

19    at Cisco, they are responsible for the

20    relationship and the ownership of that account.

21        Q.        And also, here it's very

22    disturbing.  If you do not answer this,

23    Miss Celia Harper, it's going to be very, very --

24    I don't think it's, I don't think it's right to

Page 30

1-19-07Harper2 (2).TXT

36

1      do.   Why this list have Aztec Communication in

2      the contact, why?  And I don't mean to laugh.

3      Aztec Communication is here in this no-hire list

4      and has a contact.  It states a person that I

5      know very well.  I don't have to mention the

6      name.  I don't want to get him in trouble.

7              A.       I don't understand your question.

8              Q.       My question to you is why this, why

9      this -- we're trying to authenticate this Cisco

10     no-hire list.  I'm asking you why this list has

11     Aztec Communication, my former company, why, if

12     it's not authenticated?  And my former company

13     Aztec -- I use to work for Aztec Communication.

14     We use to be a partner with Cisco Systems.  Why

15     my company that I use to work for was listed in

16     this no-hire list?  Because somebody -- because

17     Cisco no-hire list does -- it's been created by

18     Janet Skadden.

19             A.       Well, let me just answer your

20     question.  There's two parts here.  The names of

21     the companies which are Cisco partners and

22     customers and the contact details of Cisco

23     employees is an authentic list.  It is produced

24     by Cisco.

37

1              Q.       Okay.

1-19-07Harper2 (2).TXT
2          A.          Let me finish, please.    At the top
3     of the document that you have produced, that is
4     not authenticated by Cisco.    The document that we
5     have produced here is solely used as a guideline
6     for Cisco in human resources to enable us to not
7     proactively recruit from Cisco's top customers
8     and top partners.    And that is the intent of this
9     document, to bring awareness that we will not
10    proactively poach or recruit from those customers
11    or those partners.
12         Q.          Okay.    The summary of your under
13    oath statement state that the contact in this
14    list that I provided authenticate what you can
15    have; is that correct?
16         A.          The contact names that are
17    associated with the particular companies that we
18    have listed in this portion of this document that
19    is authenticated was accurate at the time.
20         Q.          Okay.    Again, the contact of the
21    people, companies, the sensitive statement that
22    you have put -- Celia, you are the admin.    You
23    are the custodian of the record according to
24    federal rules of evidence 901 with the meaning of


                                                        38

1     federal evidence 813, and your lawyer will tell
2     you.
3                      Now, I want to again make sure that
4     I understand that you're saying the contact of
5     this document, the companies, the statement in
6     it, they are authenticate.    Is that correct?    You

1-19-07Harper2 (2).TXT
```
 7    are under oath, Miss.
 8         A.        The contacts of the document under,
 9    and I don't have the actual --
10         Q.        The question to you --
11         A.        I'm going to answer it.
12         Q.        I don't want an explanation.  I
13    want to know if Bank of America and all you wrote
14    in this document called whatever you want to call
15    it, the one that is found in the Complaint Docket
16    1 entry -- the Complaint Docket Entry 1,
17    Exhibit 14, with both of the electronic copy
18    under the federal rule of evidence, now reveal
19    all the company names, all the e-mail address,
20    all the statement that you wrote under oath.  You
21    are the admin.  You are the custodian of the
22    record.  You are under oath.  All those stated in
23    that list are customers of Cisco, and that's what
24    you have put, since 1997, the creation of this
```

                                                        39

```
 1    Excel sheet that you named sensitive list.  Is it
 2    yes or no?
 3                   MR. FALBY:  Objection to the form
 4    of the question.  It's not a yes-or-no question.
 5    You can answer it.
 6         A.        So I'll answer the question for
 7    you.  The companies, the Cisco contacts are
 8    accurate at the time of the document, and the
 9    subject matter of process is accurate.  The
10    inaccurate modification of the document is under
```

1-19-07Harper2 (2).TXT
11    the heading of "Highly Sensitive."

12         Q.        Okay.  What you're saying is that

13    everything, everything from top to bottom is

14    authentic.

15         A.        No, no.  Let me finish my

16    statement, please.

17         Q.        I'm sorry.  I'm not trying to trick

18    you or anything.  I'm not in business to trick

19    you.

20              MR. FALBY:  Please let her finish

21    her answer.  Go ahead.

22         Q.        Go ahead, Miss, please.

23         A.        The document is accurate with the

24    exception of the following statement that has


                                             40

1    been modified.

2         Q.        Okay, what statement?  First you

3    said that you don't have the list.  You never saw

4    the list.  Now you're telling me -- now how do

5    you know that the top of the list is something

6    else and the bottom of the list is authentic.

7                   Now what you're saying to me is

8    that column probably -- let's help you here.  And

9    I'm not trying to set you up or anything.  I'm

10    just trying to clear up this issue.  What you're

11    saying is Column 1 -- when I say Column 1, it's

12    the first line.  The first line says,

13    "Confidential."  Is that a true statement?  It is

14    there, right?  "Confidential," right?

15         A.        Correct.

1-19-07Harper2 (2).TXT

16          Q.         All right.  If you go to Line 2

17    which is called Column 2, "Do not download.  The

18    Sensitive List is updated on a regular basis and

19    changes are made to company listings."  Is that

20    correct, Miss, please?

21          A.         That is correct.

22          Q.         Thank you.  The third line says,

23    "For recruiting purpose only."  That's true,

24    right?

                                                          41

1           A.         Correct.

2           Q.         And the fourth line says -- I don't

3     know who put that date there.  I did not put that

4     date there because I -- this is only, file only.

5     You cannot touch this file because it has step,

6     and this forensic expert that Mr. Falby, the U.S.

7     marshall came here and took the CDs.  Everybody

8     came here yesterday.  They took everything.  I

9     just want to let you know that you're not alone

10    here.  A lot of people are here helping you and

11    helping me.  Thank you.

12                     Now, let's go back to Column 5 --

13    I'm sorry, Column 4.  It says, "Effective

14    September 10th, 2000," of the Cisco sensitive

15    list.  You see that date there, right?  Effective

16    September 10th, right?

17          A.         No.

18          Q.         Okay.  That should not be there,

19    right?  It should be a blank, right?

                          Page 35

1-19-07Harper2 (2).TXT

20        A.        Let me explain myself in answering

21    this.

22        Q.        Respectfully, I don't have time.

23                  MR. FALBY:  Mr. Bayad, let the

24    witness answer the question.  You asked it.  Let


                                                    42


1    her answer it.  Go ahead.

2                  MR. BAYAD:  Okay.

3        A.        There are no such documents that

4    have been modified on September 10th, 2000.

5        Q.        Okay, let's move, you know, let's

6    move for a while, no problem.  Column 4 you state

7    that you have no clue why that date is there,

8    effective September 10th, 2000.  September 10th,

9    2000, I was at Cisco Systems working.  Is that

10    true, yes or no?

11        A.        I do not know.

12        Q.        Anthony Bayad worked -- okay.  If

13    you don't know, then I refresh your memory.  My

14    termination from Cisco Systems, it was -- let me

15    see.  It was April, April, I believe the 18th,

16    2001.  And in this comment of Cisco no-hire list

17    it says, "Effective September 10th, 2000."  Now,

18    why that date is there, why, for what purpose?

19    I'm still working for Cisco.  Huh?

20        A.        I don't understand your question.

21        Q.        Okay.

22        A.        I will share with you that -- two

23    things.  One, that there were no modifications

24    made to the document on September 10th, 2000.
                        Page 36

1-19-07Harper2 (2).TXT

43

1      Additionally, this document was never a read-only
2      document?
3            Q.        No, no.   When we took it, when we
4      took it, the people that gave it to us, it was
5      read only.   You cannot change it, just to let you
6      know.   Now, we don't have to argue with this.
7      This document cannot be stamped.   If it's
8      stamped, it will be corrected.   Again, just to
9      let you know.
10                     Let's go back to make sure what's
11     authentic and what's not authentic.   What's
12     authentic on Column 6 of this Cisco no-hire list
13     found in Exhibit 14 of the complaint?   Number 6
14     says, "Highly sensitive."   That's authentic.
15     That should be there, right?
16            A.        No.
17            Q.        Okay.   And Column 7, it's not
18     authentic?   Now, Column 7 says, "Do not
19     hire/transfer/promote Anthony Bayad Cisco
20     Employee No. 7379."   Is it authentic or not
21     authentic?
22            A.        Not authentic.
23            Q.        No. 8 says, "Should you have
24     questions, contact Tony Savastano regarding

44

1      Anthony Bayad."   Authentic, not authentic?

1-19-07Harper2 (2).TXT

2          A.          Not authentic.

3          Q.          Why anybody would put such

4     statement there, "Should you have question,

5     contact Tony Savastano regarding Anthony Bayad."

6     Why not should you have question contact Celia

7     Harper regarding Anthony Bayad, why?

8          A.          Well, it does state that in the

9     document.  So if you go down to a further line it

10    says, "Should you have questions, contact Celia

11    Harper-Guerra."  At the inception of this

12    particular document, the document has been --

13         Q.          Celia Harper, I'm conducting this

14    deposition.  You are very welcome to do the same

15    thing vice versa at any time.  My schedule is

16    open.  I have not worked.  Let's go back, Miss.

17              Why should you have question,

18    contact Tony Savastano regarding Anthony Bayad?

19    Why not Lynn, contact Lynn Fraser regarding

20    Anthony Savastano -- regarding Anthony Bayad?  Do

21    not hire Anthony Bayad, transfer and promote

22    Anthony Bayad, but if you have any question, go

23    talk to Savastano.  My question to you, I'm just

24    asking you a question here, why your name is not


                                             45

1     there, why not Lynn Fraser, why not Kate Dcamp,

2     why not John Shiba, why?  Why that person in

3     particular, why?  Why not Carl Wiese, why?  Why,

4     Miss?  Please explain to me why the best you can

5     under oath.

6          A.          The document --
                       Page 38

1-19-07Harper2 (2).TXT

7          Q.        Yeah, this document.  Why this line
8     in the Cisco no-hire list, No. 7 and then 8, why
9     it's there, why, why?
10         A.        I can't answer --
11         Q.        Yes, please, I'm sorry.
12         A.        I can't answer this.
13         Q.        Okay, you can't answer it.
14         A.        And the reason why is that this is
15    not an authenticated document by Cisco.
16         Q.        Miss, please don't confuse the
17    record because it will be hearsay, she said.  And
18    guess what, that's a problem here, and Mr. Falby
19    knows.  The Honorable Judge O'Toole has ordered
20    one time.  He cannot flip flop.  We're human
21    beings.  Don't flip flop.  Now keep going, Miss.
22              Now, Miss, remember you said that
23    this first line or five lines at the top is not
24    authentic, but you have said that No. 2 -- Column


                                                      46

1     No. 2 states, "Do not download."  The sensitive
2     list is updated on a regular basis and changes
3     are made to company listings.  You said earlier
4     that it's authentic.  It should be there.  Now,
5     you said to me that this, "Do not
6     hire/transfer/promote Anthony Bayad Cisco
7     Employee 73799.  Should you have any question,
8     contact Tony Savastano regarding Anthony Bayad."
9     You said now that should not be added there.  But
10    you're completely contradicting yourself because

1-19-07Harper2 (2).TXT
11    flip flop.  I don't know if it's perjury or if
12    it's denial.  Which one, Miss, please?
13              MR. FALBY:  Objection.  It's an
14    improper question.  Please ask another question.
15         Q.     Okay.  Then we move on to No. 9 on
16    the Cisco no-hire list.  You said, you wrote with
17    your hand because you are the custodian of
18    record, the admin in our language, you said in
19    number 9, "Interviewing may not occur with any
20    company on this list until the Cisco manager
21    servicing that Customer/Partner approves.  To
22    identify the Cisco manager, please visit
23    StarViper at:  http://wwwin.cisco.com/CustAdv
24    /InfoSys/sales/star/viper/."  That's it, that's


                                                      47


1    it.  Can I ask you 11, Column 11, under oath
2    Miss Celia Harper?  And I know the contact of
3    that StarViper.
4         A.     That's correct.
5         Q.     It is correct.  God bless you.
6    Thank you.  And this Line 11, nobody from outside
7    can get in.  Is that a true statement yes or no?
8         A.     It's an internal --
9         Q.     You are under oath.  You are under
10   oath.
11        A.     -- tool at Cisco.  It's an internal
12   tool at Cisco.
13        Q.     Internal tool.  So Line, again, 11
14   is authentic, and if right now -- I am on laptop
15   right now -- if I insert this, when Cisco did not

1-19-07Harper2 (2).TXT

16    see this before.  In other words you did not know
17    that Anthony Bayad had this.  If I went there
18    right now from my home, can I get in?
19              MR. FALBY:  Objection.  If you
20    know.
21        Q.      You are under oath, Miss?
22        A.      I don't know the answer to that.
23        Q.      This is an internal site, in other
24    words, internal site.  You know, you cannot get


                                              48


1    into this internal site unless you are inside
2    Cisco or you have proper authorization, yes or
3    no?
4        A.      Correct.
5        Q.      Thank you.  Let's move on.  Inside
6    this Viper, what's inside of this Viper file?
7    You are under oath.
8        A.      It has a --
9              MR. FALBY:  Mr. Bayad, please stop
10    advising the witness she is under oath.  She
11    knows she is under oath.  She is doing her best
12    with your almost incomprensible questions.
13              MR. BAYAD:  I apologize, Mr. Falby.
14    And believe me you are making me do this,
15    Mr. Falby.  I do not want to be here, God bless
16    you, and I not want to hurt anybody's future.
17    When people get involved in lawsuits, it's not
18    nice.  And when it's federal and a high level
19    case like this, it becomes a problem because a

1-19-07Harper2 (2).TXT
20    lot of people are involved now.  Now, I'm not

21    trying to --

22                    MR. FALBY:  Excuse me, do you want

23    an answer to the question?

24                    MR. BAYAD:  Please, I want an


                                              49


 1    answer to this question.  I want to know what's

 2    in the Viper, and that's it.

 3          A.        The StarViper tool --

 4          Q.        Yes.

 5          A.        -- is a tool that has the customers

 6    of Cisco's as well as the partners of Cisco's as

 7    well as the current account manager or regional

 8    sales manager who has a relationship with that

 9    particular customer or partner.

10          Q.        Thank you.  Now we move on to

11    No. 12, and I appreciate your help, because, you

12    know, I do have a lot of information that

13    Mr. Falby does not know, but that's okay.

14                    No. 12, Column No. 12 on Cisco

15    no-hire list.  It says, "After receiving approval

16    to continue their application, Cisco recruiter

17    must contact the applicant's current manager to

18    confirm."  Is that correct, authentic, that line?

19          A.        That is correct.

20          Q.        Yes or no?  What's your answer,

21    Miss?

22          A.        Yes.

23          Q.        Thank you.  No. 13 on the Cisco

24    no-hire list, "Interviewing should only occur
                          Page 42

1-19-07Harper2 (2).TXT

50

```
1    after the responsible Cisco VP approves."
2    Authentic, not authentic?  Should be there?
3         A.      Correct.
4         Q.      Going back to Tony Savastano, do
5    you know his title, Tony Savastano?
6                 MR. FALBY:  His title today?
7                 MR. BAYAD:  Did it change?  I
8    thought he was the VP of finance.
9         A.      I don't know what his title is.
10        Q.      And I agree with you don't know
11   because you don't know this guy probably.  Do you
12   know this guy?  You don't know this guy?
13        A.      I do know Tony Savastano.  Tony
14   Savastano is in finance, and therefore Tony
15   Savastano would not have any direct access to
16   this document or somebody's client because it's a
17   human resources document.
18        Q.      Correct, because this is a human
19   resources document, correct?
20        A.      Correct.
21        Q.      And Mr. Savastano is a VP of
22   finance.  He has nothing to do with human
23   resources, right?
24        A.      Correct.
```

51

```
1         Q.      And you said earlier that you do
```

Page 43

                    1-19-07Harper2 (2).TXT
2    know Mr. Savastano.

3                MR. FALBY:   What's the question?

4                MR. BAYAD:   Does she know

5    Mr. Savastano, the VP of finance.

6        A.        I don't know what his title is.  I

7    know Tony Savastano, but I do not know his title.

8        Q.        I have a paper here Mr. -- I'm

9    sorry.  Ms. Celia Harper, I have a paper that was

10   provided to me by Mr. Bruce Falby under oath, and

11   I know -- and it has been a lot of confusion.  I

12   have a paper here, that Mr. Falby himself

13   provided me with this form.  This form has your

14   name, Celia Harper, has also the name of Anthony

15   Savastano, also has Anthony Bayad's name, and

16   this paper was not yet -- I did not provide it to

17   the court under Mr. Bruce Falby.  This paper that

18   I'm going to tell you that's your name, Celia

19   Harper, Anthony Savastano, Anthony Bayad and

20   corporate security with e-mails and everything,

21   all the nine yards.  It states that your name, my

22   name, his name are here, as corporate police or

23   corporate security.

24               Let me ask you this question, why


                                          52

1    this, why this paper, document from Cisco that

2    was provided to me under oath by Bruce Falby?  It

3    was provided to me under 27 -- I think 26,

4    Federal Rule of Civil Procedure 26 1, and we

5    talked, me and -- I remind, Mr. Falby, remember

6    our first hearing with the Magistrate Bowler, the
                    Page 44

1-19-07Harper2 (2).TXT

```
 7      Honorable Magistrate Bowler?  You and I, we met
 8      at the court, and you decided to showed this
 9      document, and I said, "Why Celia Harper is here?"
10      And you were shaking your head.
11                  Anyway, my question to you, Miss,
12      why this document has my name, your name.  It is
13      internal document.  Cisco internal document has
14      my name, your name and corporate police, why?
15                  MR. FALBY:  Objection.
16      Q.      You don't know why your name is
17      there, too, and my name and Anthony Savastano and
18      corporate police?
19      A.      I don't know which document you're
20      talking about.
21      Q.      Oh, you do not.  You do not know?
22      A.      If you could reference the
23      document, but I do not know which document you're
24      referencing.
```

53

```
 1      Q.      When this litigation began in 2004,
 2      Case 04-10468, Anthony Bayad versus Chambers,
 3      Anthony Savastano, Carl Wiese, Mr. Bruce Falby
 4      gave me that document when I called personally
 5      Mr. Savastano and advised him under normal phone
 6      call telling Mr. Savastano I'm going to proceed
 7      with the lawsuit, you discriminated against me at
 8      Lucent Technologies and now at Cisco, and he
 9      called you, called HR.  You called corporate
10      police, Cisco Corporate police, and you guys
```

1-19-07Harper2 (2).TXT

11    start investigating me.  In other words, he

12    initiated a complaint to you.  Why he initiate a

13    complaint to you?

14              MR. FALBY:  I will object for the

15    record.  Do you understand the question?

16         A.        I don't understand the question.

17         Q.        Why Anthony Savastano when he heard

18    Anthony Bayad called him he did not call

19    corporate police directly himself.  He called you

20    directly.  Why you, why you?

21         A.        Anthony Savastano never called me

22    directly.

23         Q.        That's not what we have, the

24    document that Bruce Falby has, but that's no

                                                    54

1     problem.  You said that you know him, right?

2          A.        I do know Anthony Savastano as an

3     employee of Cisco.

4          Q.        Respectfully when you know

5     somebody -- you met somebody.  You met

6     Mr. Savastano.  You have a chance to talk to

7     Mr. Savastano as human resources with finance

8     department.  Do you talk to your peer?  Did you

9     talk to him?  If you know him, that means you met

10    him, right?

11         A.        I have met Anthony Savastano.

12         Q.        Thank you.  Again, for the record

13    you know Savastano, Savastano knows you, right?

14         A.        Yes.

15         Q.        Thank you.  That's all we want,

1-19-07Harper2 (2).TXT

16    Miss.  Thank you for your time.  Now, you said,

17    "Interviewing" -- go back to Column 13 on the

18    complaint.  Exhibit 14, Column 13 it says,

19    "Interviewing should only occur after the

20    responsible Cisco VP approves."  Authentic,

21    right?  You said yes earlier.

22         A.    Correct.

23         Q.    Okay.  14, "No targeted recruiting

24    efforts within these companies."  Yes or no,

                                                  55

1    authentic?

2         A.    Authentic.

3         Q.    No. 15 of the Cisco no-hire list,

4    Exhibit 14, in the complaint says, "Should you

5    have questions, contact Celia-Harper-Guerra."

6    That's why -- now we're going to start.  Why, why

7    now, why your name is on the column?  Is it

8    authentic or not authentic?

9         A.    Authentic.

10        Q.    Thank you.  I am very -- no

11   problem.  Now, we're going to stop here for a

12   while.  For the record, we're going to stop here.

13   I'm going to tell you -- I'm going to tell you

14   some stuff right now, and I'm not trying to trick

15   you.  I must tell you what happened.  About the

16   Cisco no-hire list, and I'm sorry, I have a lot

17   of stuff here.

18             The Cisco no-hire list, very quick,

19   was ordered by Janet Skadden.  It was modified on

Page 47

1-19-07Harper2 (2).TXT

20    September 22nd, 2000.  Let me repeat for the

21    court reporter.  This Exhibit No. 14 on the

22    complaint was modified.  What that mean modified

23    for the record means it was attached

24    September 22nd, 2000.


                                                    56


1                My question to you, if you go back

2     down, if you scroll down, now you prove to me

3     that you are reading something now because you

4     went column by column.  Now, once you go all the

5     way down, I'm going to give you some columns.

6     Okay, Column 162 of this Cisco no-hire list in

7     the complaint, Exhibit 14.

8                MR. FALBY:  We don't have column

9     numbers.  We're working off of the hard copy

10    that's attached to the complaint.  Do you have a

11    page number?

12               MR. BAYAD:  Yes, 162.  Kent

13    Electronics gold partner.

14               MR. FALBY:  What is it?

15               MR. BAYAD:  It says on Column No.

16    62.  Mr. Falby, I gave you five -- I gave you

17    about seven editorial copies, and you're getting

18    paid a lot of money to help your client, that's

19    not nice like that.  You got to help us both.

20    I'm a pro se.  I'm not trying to be a lawyer

21    here.

22               MR. FALBY:  What column are you

23    talking about?

24               MR. BAYAD:  I'm referring to the
                          Page 48

1-19-07Harper2 (2).TXT

57

1          Cisco no-hire list, Exhibit 14.  And in the
2          exhibit there is a -- I'm looking at my editorial
3          copies -- a Column No. 62.  And Mr. Iverson can
4          help us, too.  Matt Iverson, he can help you.
5          The Cisco no-hire list.  162.
6                         MR. IVERSON:  Anthony, I know you
7          filed an electronic copy with the court, but
8          Bruce doesn't have that with him.
9                         MR. BAYAD:  Matt or counsel,
10         Mr. Iverson, within the federal rule of evidence,
11         it is my duty to give you two, to give you the
12         hard copies for the convenience of the honorable
13         court, and it is my duty also, according to the
14         Federal Rule of Evidence 91 with the meaning of
15         80 1 to provide you the electronic copies.
16                         MR. FALBY:  What's in the line that
17         you want her to look at?
18                         MR. BAYAD:  No. 162, Kent
19         Electronics gold partner.  And looking at my
20         electronic copy, I see it there too.
21                         MR. IVERSON:  Kent Electronics?
22                         MR. BAYAD:  Yes, Kent Electronics
23         gold partner.
24                         MR. FALBY:  How do you spell it?

58

1                         MR. BAYAD:  Kent, K-E-N-T,
                              Page 49

1-19-07Harper2 (2).TXT
2      Electronics.  If you don't have it or -- if you

3      don't have it or you don't know about it, let me

4      read it to you.  In such column it says on the

5      Cisco no-hire list, Exhibit 14 of the complaint,

6      Column 162 says, "Kent Electronics Gold Partner."

7      And let me ask you, Celia, Miss Celia Harper,

8      Kent Electronics gold partner.  In your best of

9      knowledge, is it a very important partner?

10     Because it's gold partner, right?

11         A.      I don't know the status of the

12     partner today.

13         Q.      Yeah, but is this partner doing

14     business with you?  My record shows yes.  What's

15     your record show?  If I go to Cisco locator, you

16     know, easy to go, partner/reseller, it's coming

17     up many times.  Mr. Matt Iverson can do it right

18     now.

19             Well, let me help you.  It is

20     partner, according to Cisco partner/reseller,

21     also according to Cisco no-hire list.  They are

22     partner yes or no?

23             MR. FALBY:  Are you asking her if

24     they're a partner now?


                                        59

1             MR. BAYAD:  Yes.  She is admin of

2      Cisco no-hire list.  Oh, okay.

3         A.      I don't -- to answer your question,

4      at the time they were a partner of Cisco.  I

5      don't know if today if they're a partner.

6         Q.      At that time, yes.  That time, that
                        Page 50

1-19-07Harper2 (2).TXT

 7    time.
 8         A.      At that time they were a partner.
 9         Q.      Thank you.
10         A.      I do not what the status of the
11    partner, whether it was gold, silver or premium.
12    I don't have that information in front of me.
13         Q.      Kent Electronics Company is a
14    partner with Cisco, yes?
15         A.      Yes, and I don't know if it does
16    today.
17         Q.      I don't care about today.  I care
18    about the list now.  And if you go down to
19    Column 163 -- and you know this very well because
20    you are the admin of such list -- Mrs. Celia
21    Harper, it says, "Effective today, September
22    22nd, there is a "hands off" hiring moratorium
23    for 90 days for Kent Electronics and its
24    subsidiaries.  This is due to recent recruiting


                                               60

 1    activities ignoring the adopted protocol which
 2    specifically addresses how we are to handle
 3    candidates from the companies on our list.
 4    Specifically, the managers who are ultimately
 5    responsible for this partner have not been
 6    appropriately contractor -- contacted prior to
 7    the candidate being introduced to the interview
 8    process.  We will communicate to you when this
 9    moratorium has been lifted."  See, I do not speak
10    English very well, and I do not understand what
                         Page 51

1-19-07Harper2 (2).TXT
11    moratorium.  What's moratorium,

12    M-O-R-A-T-O-R-I-U-M?  See, I cannot come up with

13    this word because I do not speak English very

14    well.  What does that mean this word?  You wrote

15    this word.

16        A.      What is your question.  You asked

17    about four or five questions.  I'm trying to

18    understand what is your question.

19        Q.      Mr. Bruce Falby can read this in

20    good English.  I don't want to confuse my court

21    reporter.  What I'm saying is in such paragraph

22    under Kent Electronics, you put, you inserted

23    your personnel, or personal statement saying a

24    word that's very hard to understand, and I don't


61

1    know what's the meaning.  What's the meaning of

2    M-O-R-A-T-O-R-I-U-M, moratorium?

3               Mr. Falby, what's moratorium mean

4    in English?  You are good in English.

5               MR. FALBY:  It means to temporarily

6    stop, to stop.

7               MR. BAYAD:  I swear to God I never

8    knew that word.

9               Now, Miss --

10              MR. FALBY:  It's in the dictionary.

11    You should look it up.

12              MR. BAYAD:  Okay.  I just want to

13    let you know that I never knew that word.  This

14    word is very hard.  Miss Celia Harper put that

15    word.  I just want to make sure that, you know.

1-19-07Harper2 (2).TXT

16      It's a very hard word.

17              And also, if you go back to this

18      paragraph that you wrote under Kent Electronics,

19      Column 162, you said, "Effective today, September

20      22nd."  Is that correct, yes or no?

21              I have some document here that

22      says, Effective today, September 22nd, no Cisco

23      can hire Kent Electronics.  Authentic, not

24      authentic?

62

1               Do you agree with me that you wrote

2       this, "Effective today, September 22nd, there is

3       a "hands off" hiring moratorium for 90 days for

4       electronics -- Kent Electronics Company"?  Yes or

5       no, Miss Celia Harper, please?

6       A.      I don't remember.

7       Q.      Okay.  You don't remember, but you

8       wrote, "Effective today, September 22nd."  I

9       don't know what the year, but I know that you put

10      "Effective today September 22nd."  Yes?  Yes or

11      no, authentic or not authentic?

12              MR. FALBY:  Object to the form.

13      You can answer.

14      Q.      Can you answer, please?

15      A.      Yeah, I don't believe so.

16      Q.      You don't believe that you put that

17      word there?

18      A.      Which word are you describing?

19      Q.      You said earlier that you put the

Page 53

1-19-07Harper2 (2).TXT
20    paragraph there under Kent Electronics.  You're

21    tell Cisco because you're the admin of -- you're

22    custodian, record custodian.  You are the Cisco

23    no-hire list admin.  It is your duty.  You spoke

24    to some people or the sales force, and you told

63

1    them that effective September today -- you said,

2    "Effective today" -- you said today -- "September

3    22nd, there is a "hands off" hiring moratorium

4    for 90 days for Kent Electronics and its

5    subsidiaries.  This is due to recent recruiting

6    activities ignoring the adopted protocol which

7    specifically addresses how we are to handle

8    candidates."

9                Now, if we go back to the Cisco

10    record and we ask you to provide everybody that

11    was hired prior to September 22nd, and you decide

12    to give me -- if you don't want to give me that,

13    that's okay, because Bruce Falby never gave me

14    anything.  But if I go talk to my buddies at Kent

15    Electronics, you know, and I tell them can you

16    give me who you fired or who left the company for

17    CCIE, and they told me that A, B, C guy, John,

18    you know, Mark, Bruce left the company before

19    September 22nd, 2000.  Did you put that

20    paragraph, Miss, please -- you are under oath --

21    yes or no?

22        A.      I don't remember.

23        Q.      Okay.  You don't say you don't

24    remember.  If you don't remember, that means you
                        Page 54

1-19-07Harper2 (2).TXT

64

1      did put it there.  You have to say, and counsel

2      can quote you, you have to say I do not recall.

3      I just want to help you.

4                  MR. FALBY:  Can you ask another

5      question, please?

6          Q.      Now, when you do not remember that

7      you put that date, effective today, September

8      22nd -- the reason I'm mentioning that September

9      22nd is because you said today.  In English,

10     Miss Celia Harper, what's today?  That means it's

11     the past or the present or today is the action of

12     that time, yes?

13         A.      Yes.

14         Q.      Now, if I read effective today,

15     that mean effective today I have to comply with

16     your paragraph.  Yes or not?

17                 MR. FALBY:  Objection.  I don't

18     understand what you're asking.

19                 MR. BAYAD:  In other words, if she

20     said to Cisco people do not hire effective today,

21     September 22nd, do not hire anybody from Kent

22     Electronics, that means effective today, right?

23     You said yes earlier, yeah?

24                 MR. FALBY:  She said she doesn't

65

1      remember this paragraph.

Page 55

1-19-07Harper2 (2).TXT

2          MR. BAYAD:  Yeah, but I asked her

3    the English language.

4          MR. FALBY:  Well, the English

5    language means what it says, and frankly, it's

6    not a good question, and it's a waste of time.

7    If you have something that you want to ask her --

8          MR. BAYAD:  Okay, Mr. Falby, what I

9    understand effective today, that means today.

10          MR. FALBY:  Yes, effective today,

11    the plain meaning of that means today.

12    Q.    (By Ms. Bayad)  Today, today.  From

13    today.  Nothing can go beyond today.  Tomorrow,

14    tomorrow nobody can hire Kent Electronics, right?

15    Yes or no, sir?

16          MR. FALBY:  She said she doesn't

17    remember the paragraph.  It's not appropriate to

18    be asking her questions what it means.

19    Q.    (By Ms. Bayad) Okay, let me ask

20    you.  If he said today, effective today,

21    September 12th, nobody from Cisco can hire Kent

22    Electronics employees, that mean you make some

23    changes in such, in such statement, right?  You

24    have to insert that in that statement, right?


                                             66

1    It's an electronics copy, that means you have to

2    enter it, right?  When you type something on the

3    Excel sheet, Miss Celia Harper, you make changes,

4    right?  Therefore it is modified.  Yes or not,

5    Miss?

6          MR. FALBY:  Objection.

1-19-07Harper2 (2).TXT

```
 7                    MR. BAYAD:  Mr. Falby, please
 8     Mr. Falby, we just are trying to help you.
 9                    Miss, can you answer the question,
10     please?
11                    MR. FALBY:  The question is
12     incomprehensible.  Can you rephrase it please?
13                    MR. BAYAD:  Okay.  And Mr. Falby,
14     I'm not a lawyer.  You need to help me.
15                    MR. FALBY:  I don't need to help
16     you, but I do have a right to ask you to ask my
17     witness questions that make sense.
18                    MR. BAYAD:  Okay, no problem.
19                    Miss Celia Harper, under oath you
20     are HR, right?
21         A.     That's correct.
22         Q.     You work with Excel sheets a lot,
23     right?
24         A.     Correct.
```

                                                        67

```
 1         Q.     You are very professional.  Very
 2     educated, right?
 3         A.     Correct.
 4         Q.     Excel sheet no problem for you,
 5     right?
 6         A.     Correct.
 7         Q.     Okay.  That means if you enter
 8     something on the Excel sheet you make
 9     modification, right?  Because you work for a
10     highly, highly tech company, that means we have
```

Page 57

1-19-07Harper2 (2).TXT

11    to use this term.  You modify, right?  You make

12    changes, right, to the Excel sheet, right?  When

13    you make changes, do you save it, yes or not?

14        A.      Yes, when you make changes to a

15    document, you send it and save the document, yes.

16        Q.      Okay, thank you.  If you make

17    changes -- to recall your statement, you said you

18    work very well with the Excel sheet, and you work

19    with Excel sheets such as Exhibit 14 of the

20    complaint.  That mean you are very good with the

21    software, Microsoft Excel sheet, right?  Yes?  Or

22    you wouldn't have job with a high tech --

23        A.      Yes, yes.

24        Q.      Okay.  I mean, yes, you are very


                                                        68


1    good with Excel sheet, Microsoft Excel sheet as

2    this one, right?

3        A.      Yes, I'm good with Excel.

4        Q.      Thank you.  That mean -- you work

5    for high tech company, and you are highly in the

6    level of Cisco executive, an officer of the

7    company.  You know if you work with Excel sheet

8    you make changes.  In order for those changes to

9    stay in that Excel sheet, what do you need to do?

10    You have to save it somehow, right?

11        A.      Correct.

12        Q.      And when you save it, it becomes

13    permanent at such time, right?  And if you go

14    back and open it, you're going to find it saved,

15    right?

1-19-07Harper2 (2).TXT

16          A.        Correct.

17          Q.        Okay.  Now, Miss, going back to the

18    statement that you said, you said if you enter

19    September under Column 162 of Exhibit 14 of the

20    complaint, if you enter effective today,

21    September 22nd, there is a "hands off" of hiring

22    such company Kent.  You add something, you change

23    and you modified it, right.  And then you're

24    going to go and save it, right?  When you save


                                                    69


1     it, right, that's it, right?  When you go back

2     it's going to open, right?  And you can go back

3     and whatever you enter is going to stay there,

4     right?

5          A.        So let me answer your question

6     here.  This document is not a valid document.

7          Q.        I'm not trying to be a smart guy

8     here.

9                    MR. FALBY:  Excuse me, let her

10    answer the question.

11                   MR. BAYAD:  No, she asking me a

12    question.

13                   MR. FALBY:  No, she's not.  She's

14    answering your question.

15                   MR. BAYAD:  Very well.  What I'm

16    saying to you --

17                   MR. FALBY:  No, no.  Excuse me, let

18    her answer the question, please.

19                   MR. BAYAD:  I'm sorry.  I

                          Page 59

1-19-07Harper2 (2).TXT

20    apologize.

21             MR. FALBY:  Go ahead.

22        A.       This document and the reference

23    line that you referred me to are not accurate in

24    the fact that they are not authentic.  They have


                                               70

1    been manipulated and changed, and the dates do

2    not reflect accurately, as you have September

3    10th on your document on the front page and now

4    you have September 22nd without a year in there.

5    This is not an authorized, authentic document of

6    Cisco's.

7        Q.       Let me ask you this.  Why the

8    people that understand Microsoft like -- and he's

9    a funny person, too.  Brian Schipper, right, work

10   for Microsoft.  He knows.  He's going to tell you

11   the same thing.  If you make changes, it's going

12   to be stamped.  And if you stamp, it going to

13   tell you the date and time.  You cannot mess with

14   this.

15             Now, if you look at effective

16   today, September 22nd, on Column 163, and going

17   back to the complaint, the Complaint Docket S214

18   you can see that if you go -- take the sensitive

19   list, the Cisco no-hire list, the contact, the

20   whole file that I mentioned earlier, and you went

21   with me, and you knew what I was telling you,

22   that it was -- the size is 279 k, kilobyte, and

23   it was modified according to Microsoft gurus on

24   September 22nd, 2000, that's what you just wrote

1-19-07Harper2 (2).TXT

71

```
 1    over there.  Tell me why, why did Microsoft Excel
 2    analysis state it was touched, this file, with
 3    the 279 kb, with all the companies from Cisco
 4    that you admin, you are custodian of record.  Why
 5    does it have size of 270 kilobytes?  If you don't
 6    know the size, I can help you.  Size 275
 7    kilobyte, and it says it was modified 9/22/2000,
 8    which is September 22nd, 2000.  Why, why, why it
 9    was modified on September 9th -- I'm sorry,
10    September 22nd, 2000?  And it match.  It's
11    authentic.  Effective today, September 22nd,
12    because you entered that date and you saved that
13    file 'cause you have authorization to save it,
14    and you saved it, and you moved on with your life
15    the next day.  Because if we go back -- remember
16    you said it's authentic.  You said it's authentic
17    line as stated.
18              Please, Ms. Celia Harper, I'm going
19    to with you, with the line that you say is
20    authentic, and I write everything what you said.
21    "Do not download.  Sensitive list is upgraded."
22    I'm sorry.  "Do not download.  The sensitive list
23    is updated on a regular basis, and changes are
24    made to company listings."
```

72

```
 1              MR. FALBY:  Is there a question?
```

Page 61

1-19-07Harper2 (2).TXT
2           MR. BAYAD:  Yes.  Why we have
3    modified, and why we entered the September 22nd?
4    Because you are an admin, yes or no?
5           MR. FALBY:  Objection.  Your
6    question is incomprehensible.
7           MR. BAYAD:  Okay, Mr. Falby, I'll
8    be very straight with you.
9           Are you official admin of such list
10   that you have right now, that we have been
11   talking about for two hours, yes or no?
12       A.      Yes, I am the owner at that time of
13   an authenticated list provided by Cisco.
14       Q.      Okay.  I appreciate.  Let me ask
15   you why you talking about Kent Electronics, why
16   you talking now about AT&T, Column 170, and AT&T
17   right know have a lot of people working for them,
18   and you know what I'm talking about.  I'm not
19   going to say nothing.  I'm just going to tell you
20   that we have rules, that AT&T -- and you're going
21   to say, yes, they are a very good customer for
22   Cisco.  Now, on Column 170 on document entry
23   number -- this is for no-hire list -- Docket
24   entry No. 1 which is the complaint, Exhibit 14,


                                              73

1    you state in Column 170, "AT&T, no recruiting,
2    hands-off policy."  Did you say that yes or no?
3    Authentic or not authentic?  At such time, yes or
4    no, Miss?
5           A.      Can you please restate exactly what
6    line?  Remember, we don't have the line.  Could

1-19-07Harper2 (2).TXT

7       you read the paragraph that you're referencing?

8              Q.      No problem.  On line 170, "AT&T, no

9       recruiting, hands-off policy."  Remember, I've

10      got a lot of friends at AT&T.  You stated in this

11      paragraph -- and it is good English.  I cannot

12      write this English.  Nobody can write this

13      English -- "Recently, we have hired a number of

14      AT&T employees without following the guidelines

15      of the Sensitive List" -- meaning the no-hire

16      list, Cisco no-hire list -- "particularly as it

17      relates to the highly sensitive category.

18      Therefore, Rick Justice and the Sales

19      Organization have asked us to implement a

20      hands-off policy related to the hiring of all

21      AT&T employees (all divisions).  This policy will

22      be in affect for a minimum of 90 days, but may be

23      extended for a longer period.  If you currently

24      have AT&T employees in the interview process,


                                                74


1       please work with your Employment Manager who will

2       help to resolve each situation on a case by case

3       basis."  Miss, who can put this paragraph but

4       only you and you only?  Yes or no, Miss?

5              A.      It would be me.

6              Q.      Thank you.  And you were right, you

7       are you, 'cause you hired a lot of people from

8       AT&T, and I protected you.  I did not give them

9       the list.  Let's move on.

10                     The next question, Dell Computer,

                         Page 63

1-19-07Harper2 (2).TXT

11    no recruitment.  On Column 180 on Cisco no-hire

12    list, Exhibit 14, you said, "Dell Computer no

13    recruiting until further notice.  Due to high

14    volume of hiring from Dell Computer recently and

15    in the spirit of our partnership with them, there

16    will be no recruiting of any Dell employees,

17    until further notice."  Did you write this yes or

18    no, Miss?

19        A.    No.

20        Q.    You didn't write this?

21        A.    No.

22        Q.    Who wrote this, Janet Skadden?

23        A.    I don't know.

24        Q.    Okay.  Somebody from HR wrote this,

75

1    right?

2        A.    I don't know.

3        Q.    No problem.  Let's move on.  Column

4    185 of the Exhibit 14 of the complaint you

5    stated -- this is very high sensitive because I

6    never work for government because I don't have a

7    high clearance, because nobody can get high

8    clearance, only if you work for the military or

9    you sponsor 14,000 for the record, then you get

10    clearance.  Only people from the CIA.  This is

11    very sensitive.  I should not have this list, by

12    the way.  No problem.

13            My question to you is, Column 185,

14    Miss, Exhibit 14 of the complaint you said, "All

15    employment" -- this is government hired

1-19-07Harper2 (2).TXT

16    procedure, our government, the United States of

17    America.  God bless.  You stated -- I don't know

18    who stated the following:  "All employment

19    discussions with current and/or former U.S.

20    Government employees must be coordinated with

21    Cisco Human Resources, attorney for Federal

22    Operations, Tara Flannagan" -- the name of the

23    person called Tara Flannagan, last name

24    F-L-A-N-N-A-G-A-N -- "and Federal Compliance


76

1    Specialist Alyssa Vanga."  First name

2    A-L-Y-S-S-A.  Vanga, V-A-N-G-A.  "This includes

3    inquiries made by current or former government

4    employees regarding future employment with Cisco;

5    or recruiting attempts initiated by Cisco

6    employees or representatives with current or

7    former government employees.  All candidates are

8    required to fill out a compliance questionnaire

9    (prior to interview) and submit to Alyssa Vanga."

10    And you provided her Cisco address, avanga at

11    Cisco dot-com.

12                    Now, in this paragraph you mention

13    two people, Alyssa Vanga and another person, Tara

14    Flannagan.  Remember, Miss, you are under oath.

15    Earlier you said 50,000 employees.  Who knows

16    these two people?  You do.  Did you write this

17    paragraph, yes or no, Miss?

18        A.        Yes.

19        Q.        Thank you.  And at the end, Miss --

Page 65

1-19-07Harper2 (2).TXT
20    and I apologize, Miss, for putting you through

21    this.  And at the end, Miss, something very

22    important that you needed to know.  This Cisco

23    no-hire list -- right? -- whatever the name you

24    call it, but I call it Exhibit 14, for the


                                                    77

1    record, of the complaint.  If you look underneath

2    there is subtitle.  In other words, you call it

3    Americas, which is what you just described me

4    that you wrote, the last paragraph, the name of

5    the company, and you authentic them, and the next

6    subdirectory or subfile you named the second one

7    on the right.  The first one on the right, the

8    second one, which is the first one is Americas.

9    The second one is Americas International.  All I

10   see, and I apologize for this, I see

11   Confidential, American International, for

12   recruiting purpose only effective 2/4 FY 2000.

13   You put company.  For example, you put promo,

14   highly sensitive promo CVM, HV, IBM, Prona, then

15   you said sensitive equal a lot of companies.  I

16   just want to make sure, that subfile existed,

17   right?

18        A.      Are you looking at a soft document,

19   'cause in our hard copy document it doesn't

20   provide that for us in this exhibit.

21        Q.      Okay, but counsel do have the

22   electronics copy for the record, and counsel did

23   ask the Honorable Judge Sarris to conduct these

24   interrogatories -- I'm sorry -- this deposition
                    Page 66

1-19-07Harper2 (2).TXT

78

1     from far away to make it difficult for me, and
2     that's not fair, and he has duty, as the
3     honorable judge said, has mentioned, that he need
4     to be proactive.  He need to help you understand.
5     But no problem, I'm going to make it very easy
6     because I'm going to ask some question here.  No
7     problem.
8                Now, a lot of people provided -- a
9     lot of defendants provided me declaration.  Is
10    that your statement, Miss?
11               MR. FALBY:  What's the question?
12         Q.       Did you provide me your
13    declaration, Miss Celia Harper?  I have
14    declaration in front of me.  Did you provide me
15    with a declaration of yours?
16         A.       Yes.
17         Q.       In support of your proposed motion
18    for summary judgment; is that correct?
19         A.       Yes.
20         Q.       And in such declaration you
21    provided me the following:  On page No. 5 -- on
22    such page -- you state that on such page "Cisco's
23    former no-hire policy," right?  Right?
24         A.       I'm just trying to find the

79

1     document you're in Exhibit A, correct.  I'm

1-19-07Harper2 (2).TXT
```
 2    trying to follow along with you.

 3         Q.      Yeah, let me make it easier, no

 4    problem.  I'm sorry, I'm confusing you.  I'm not

 5    use to this, and I don't want to be here.

 6                 Respectfully, Ms. Celia Harper, you

 7    provided me with a declaration under oath.  Yes

 8    or no, Miss?

 9         A.      Yes, I did.

10         Q.      In such declaration you have

11    inserted exhibits of people with names and their

12    e-mail address, right?

13         A.      Correct.

14         Q.      Okay.  Now, Miss, respectfully and

15    under oath, from where did you print those, those

16    exhibits with a lot of minority or Cisco

17    employees?  Where did you get, where did you

18    get -- from where did you print it?  You printed

19    it from Cisco no-hire list or from somewhere

20    else?

21         A.      This is from our offshore partners,

22    from HCL and Wipro provides a --

23         Q.      Thank you for your honesty, that's

24    correct.  In such exhibit under oath that you


                                                    80

 1    provided me to, attached to your declaration

 2    under oath you gave me a lot of names, right?

 3    That exhibit has lot of names in it, right?

 4         A.      Correct.

 5         Q.      Not to be hired, right?

 6         A.      Correct.
```

1-19-07Harper2 (2).TXT

```
 7          Q.        And in such -- and in that exhibit
 8     that you provided with a lot of people with
 9     names, and I think they are from other countries.
10     Can we call them minorities or foreigners?  They
11     don't have the -- they don't have the American
12     name, right?  They have very funny names, right?
13                    MR. FALBY:  I'm going to object to
14     your characterization of these names.
15                    MR. BAYAD:  Okay, Mr. Falby.
16                    MR. FALBY:  You can answer.
17          A.        Let me answer that question for
18     you, Anthony.  These names are contract
19     employees.
20          Q.        I don't want to know what they are.
21     My question to you, Miss, I conduct deposition,
22     and you can do the same thing.  My schedule is
23     open, and I don't have a lot of time, and I'm
24     getting tired.  And when I get tired, I get very
```

<br>

                                                     81

```
 1     ill because I'm not very healthy.  My question to
 2     you, you did provide exhibit under oath attached
 3     to your declaration under oath.  It says, "Cisco
 4     Offshore Development No-Hire Policy," right?  Is
 5     that correct?
 6          A.        Correct.
 7          Q.        And also on such file that you gave
 8     me there's a paragraph that says the following:
 9     "Cisco has a no-hire policy with the two partner
10     companies in India, HCL and Wipro, who have set
```

1-19-07Harper2 (2).TXT

11    up dedicated development centers for Cisco in

12    Chennai and Bangalore."  Also you stated,

13    "Specifically, our policy is that we will not

14    hire any engineer."  Let me repeat this.  You

15    stated, and it's in your declaration under oath,

16    the exhibit in support of your declaration.  You

17    provided it.  Mr. Falby provided it.  Paula

18    Hughes who is listening provided it.  Everybody

19    provided what you provided me.  And also you said

20    in such exhibit of Cisco no-hire list, you said,

21    "Specifically, our policy is that we will not

22    hire any engineer as a Cisco employee or

23    contractor."

24         A.    So let me just explain it.


                                                   82


 1         Q.    Let me finish, Miss.  You said

 2    specifically in your exhibit under oath attached

 3    to your declaration, "Specifically, our policy is

 4    that we will not hire any engineer as a Cisco

 5    employee or contractor, working at these

 6    development centers during their employment with

 7    these companies and for a period of 6 months

 8    after they have left their employment.  The

 9    policy applies to engineers who may travel to

10    U.S. for training or for transfer of information.

11    Hiring of partner's engineers, even after they

12    leave their employment, contributes to higher

13    attrition among the remaining engineers and will

14    affect the stability of the development centers

15    and the projects being executed.  We appreciate

1-19-07Harper2 (2).TXT

16      your support in implementing the no-hire policy."
17      So then you went in and you wrote, "If you have
18      any questions, please contact HR," which is you,
19      "or Global Partner Engineering Management," and
20      you stated, "Active employee details as of 6th
21      September 2000."  Let me repeat the date again.
22      "Active employee details as of 6th September
23      2000."  Then you put the names of hundred
24      thousand that I call respectfully all minority.


83

1       Miss, let me ask you a question.  As human
2       resources, you understand what's the law for
3       discriminating against minorities.  These people
4       are minorities, and I'm going to tell you why.
5       I'm going to help you, and this is a good lesson,
6       and I'm not trying to be superstar.  I'm just
7       tired.  Do you understand what are you doing
8       right now to these people?  Do you know what you
9       are doing, Miss, to these people that are dying
10      to come to this country like you and I.  You and
11      I we are immigrants.  We came to this country as
12      immigrants, Ms. Celia Harper, and you and I we
13      are American under the law.  Now, do you know
14      what you are doing here right now?  You are
15      discriminating against this individual because
16      Mr. -- Miss Celia Harper, I'm going to ask you a
17      question.  Under the law of the immigration
18      naturalization services, the law, can you hire a
19      person without proper paper at Cisco Systems, if

1-19-07Harper2 (2).TXT

20    somebody knocked on your door right now, or to

21    make it very simple, if one of these guys came to

22    your office with an application on file for --

23    and filed an application and he wants to get a

24    job, and you are very good with the people 'cause

84

1    your title is director of human resources of

2    talent, and this guy has a Ph.D., he is topnotch,

3    but he's a minority.  Would you hire him, yes or

4    no, if he had proper paper?

5              In other words, if you hire a

6    foreigner, what would you ask him for, as HR?

7    You know the law of immigration, right?  If

8    somebody right now walked into your door, what's

9    the law of employment of immigration/

10   naturalization?  We call it now homeland

11   security.  What would you ask the candidate to

12   provide if he is qualified and you went through

13   all the process?  Now you have to verify his

14   what?  His passport, find out if he has a green

15   card, valid social security and a valid driver's

16   license?  Is that correct, Miss?  That's your

17   policy at Cisco Systems?  You do not hire illegal

18   immigrants, do you, yes or no?

19        A.      We do not hire illegal immigrants.

20        Q.      But you do hire any person that has

21   the proper paper under the law of our respective

22   country, the law of employment, of homeland

23   security.  What would you ask a person that is

24   going to be hired?  I don't care.  I'm just

1-19-07Harper2 (2).TXT

85

1      asking you what proper paper do you ask.  If
2      today you hire me, my name was on this list -- if
3      you go to the new list that you provided under
4      oath, a declaration under oath, that list of all
5      these minorities, let's pick one for an example.
6      Udayakumar, Udayakumar, that's his name, and it's
7      not funny.  If he came to you today and he was
8      qualified, what would you ask him for last
9      process of his employment, the verification of
10     employment?  What type of paper would you ask
11     him, Ms. Celia Harper?  Please answer the
12     question what you ask him.  You said you do not
13     illegal immigrants, but what would you ask him to
14     hire, what would you ask him?
15          A.      As we would with any applicant, we
16     ask them to fill out an application, provide us
17     with a resume, provide us with the necessary
18     documents to provide their employment rights here
19     within the United States.  Now, that does vary by
20     various countries, so --
21          Q.      We are Americans here.  I am an
22     American.  You are an American.
23          A.      But this particular list that you
24     keep referencing is offshore, and these are the

86

1      particular names that are on this list.

Page 73

1-19-07Harper2 (2).TXT
2       Q.        Let's go back to the paragraph that
3   you wrote.  It says if they come to U.S., United
4   States of America, and if they hire -- these
5   people that you have, they're not to be hired at
6   Cisco, and you said even if they come to the U.S.
7   If they arrive right now to your country, to my
8   country, you and I, and they were qualified to be
9   hired, what types of paper would you ask them to
10  provide you in order to fill the requirement and
11  hire them, knowing that they are highly
12  qualified?  What type of immigration paper would
13  you ask them for, as a qualified director of
14  human resources?  Please, Miss Celia Harper,
15  answer this question.
16      A.        As I stated before, they have to
17  fill out an application, they have to --
18      Q.        I don't care about the application.
19  I'm asking you about the requirement of the
20  homeland security.  I'm stating to you that
21  Udayakumar, Employee Cisco No. TC08837, for some
22  reason he end up, he arrived in this country, and
23  he wants a job.  What type of immigration paper
24  would you ask him to provide you in order to


                                                87

1   fulfill his requirement?  Knowing that he is
2   qualified, educated to be hired at Cisco in
3   America, what type immigration paper would you
4   ask him, as HR?  As a director of HR for Cisco,
5   what type immigration paper would you ask him
6   before you can hire him, what type of paper?

1-19-07Harper2 (2).TXT

```
 7        A.        Green card.

 8        Q.        What else?

 9        A.        Verification of his social

10   security.

11        Q.        Thank you very much.  Let me recall

12   for the record, make sure I'm not confusing my

13   court reporter, and I appreciate her help.  It's

14   very hard to write, and I have an accent, a heavy

15   accent.

16                  You stated if one of the guys that

17   you have listed in the, in your Cisco no-hire

18   list, if such person asked, Udayakumar Cisco No.

19   TCO8837, if he came to you and he was qualified

20   to be hired, the immigration law and

21   naturalization requires them to provide a green

22   card and social security?  Is that correct, yes,

23   so we can move on?  Yes?

24        A.        What is your question?  Can you
```

                                                  88

```
 1   please state it again?

 2        Q.        You said after the last phase of

 3   the application process and he is qualified, he

 4   is in America that you can ask him to provide a

 5   social security and a green card, yes or no?

 6        A.        Yes.

 7        Q.        Okay.  Miss, you stated earlier

 8   that you are a director of human resources,

 9   right?

10        A.        Yes.
```

1-19-07Harper2 (2).TXT
11          Q.          And you are very educated, I know
12     you are, because you would not be working for
13     Cisco, neither am I.  Cisco is not easy to work
14     for unless you have good talent, and you do.   My
15     question to you, you do know the law, right?
16          A.          Yes.
17          Q.          Employment, right?
18          A.          Yes.
19          Q.          Now, you just proved to me that you
20     know immigration law, and I apologize.   And since
21     you know the immigration law, I'm going to ask
22     you, if the person that we took from your list
23     no-hire, and they are on your list, and his name
24     is Udayakumar, Cisco No. TC08837, if he provide


                                                   89

1     with you a green card and social security, what's
2     his status in this country?
3          A.          I don't know his status in this
4     country.
5          Q.          What's green card mean?  You said
6     that he needs green card, what's green card,
7     green card or permit resident card?
8          A.          Yes, that's so he has a right to
9     work in the United States.
10          Q.          The resident, the green card or
11     probably it's called also probably what they call
12     an alien card.  It has three names, alien card
13     green card, resident card, whatever.  It means
14     that he has right to work in our country, right?
15          A.          Correct.

1-19-07Harper2 (2).TXT

16          Q.       Okay, Miss, very good.  Now you're

17     following me, what I'm getting to you.  I'm

18     taking you where.  I'm taking you to me now.

19     Now, how can you put a United States resident

20     with social security, a minority with a name, a

21     minority with dark skin probably, we don't care,

22     but the law is the law, how can you put his name

23     not to be hired on your Cisco no-hire list that I

24     did provide to you, and you're admin.  You say as


                                                    90


1     a director of HR that you are discriminating,

2     probably -- I don't know if you're doing a -- do

3     you know what you're doing?

4          A.       We never put your name on a list.

5          Q.       Miss, my name is on the list, and

6     I'm going to prove it to you, no problem.  Just

7     bear with me.

8                    Now, if this guy, you have his name

9     not to be hired, do you think you're

10     discriminating against him, or you're just --

11     well, what are you doing to this guy?  If he has

12     a green card, social security and his name is on

13     this list, what are you doing?  You are in

14     violation of what?  Of his civil rights, right?

15          A.       No.

16          Q.       You are in violation of the law of

17     discrimination, Title VII.  Do you know what EEOC

18     means, Miss Celia Harper?  Do you know what EEOC

19     means?

1-19-07Harper2 (2).TXT

| 20 | A. | Yes. |
|----|----|------|
| 21 | Q. | Can you say? |
| 22 | A. | Employer of Equal Opportunity. |
| 23 | Q. | Employer? |
| 24 | A. | Employer of Equal Opportunity. |

91

1        Q.      EEOC, Equal Employer Opportunity?
2    No violation, no?
3        A.      I said yes.
4        Q.      Okay.  If Mr. Udayakumar, found out
5    his name is not -- his name is on Cisco no-hire
6    list, what would you do?  Does he have right,
7    does he have right to go to the EEOC and complain
8    against your company Cisco Systems?
9        A.      State that again for me.
10       Q.      I'm stating to you, if you know
11   what EEOC means, and you're putting a United
12   States resident on the Cisco no-hire list, what
13   are you doing to him?
14       A.      So I'm just going to state
15   regarding the Cisco no-hire policy for the
16   companies --
17       Q.      I am asking you --
18       A.      I'm going to answer your question.
19       Q.      Okay, no problem.  I'm going to
20   refresh your memory.  You know, Miss, what you're
21   doing to him, you are discriminating against him
22   based on his race, and that's it, and I'm going
23   to prove it to you why, because Title VII state
24   that you cannot discriminate against minority,

1-19-07Harper2 (2).TXT

92

1      right?  Yes or no, Miss?

2                MR. FALBY:  Objection.  You won't

3      let her answer the question.  What do you want

4      her to do.  Do you want to ask questions or not?

5                MR. BAYAD:  Yes, please.  I'm

6      asking if this guy has a green card and you put

7      his name, and you're telling him that you are not

8      going to be hired, because you have a policy, a

9      policy that is contradicting the policy of your

10     business code of ethics.

11                MR. FALBY:  She already told you

12     your name was never on --

13                MR. BAYAD:  Mr. Falby, you're not

14     deposed.  If you want to be deposed, you please

15     let me know and I will add you to the list.  I

16     will talk to the Honorable Patti B. Sarris.

17                To be honest I'm trying to take

18     this wonderful person, Celia Harper -- I don't

19     want to have trouble with anybody.  I want to

20     make sure that what she's doing is wrong so she

21     can go back and correct it.  Also, I want to make

22     sure that she understands what her company's

23     policy about discrimination, and let me ask her

24     this question very quick.  Do you promote

93

1      discrimination -- on the business code of ethics,

1-19-07Harper2 (2).TXT

2        do you promote equal opportunity employment, or

3        you do not?

4              A.      I promote equal employment

5        opportunity.

6              Q.      No, I'm not asking you you.  I

7        mean, I'm asking you about the profession --

8        Cisco business code of professional ethics.  You

9        know, the guideline that Cisco has on the web.

10       It says do we promote discrimination or we do

11       not, or we promote employment opportunity

12       employer.  Are you?

13             A.      We are an employer that supports

14       equal opportunity.

15             Q.      Okay, very good.  And earlier,

16       Miss, earlier you stated to me under oath, you

17       stated to me under oath the following:  Anybody

18       from the street, any company out there wants to

19       hire somebody from Cisco -- they use to work for

20       Cisco -- your policy state that -- I'll just

21       remind you.  You stated the following:  Anybody

22       that calls asking for reference about a former

23       Cisco employer, you telling them what?  You tell

24       them start date, if he's asking for reference

94

1        about such person like Anthony Bayad.  Let's put

2        Anthony Bayad as an example to make the court

3        reporter at least -- I mean, I help her out.  If

4        Lucent Technologies called you and asked you did

5        Anthony work for Cisco Systems, and we want

6        reference about Anthony Bayad, what would you

1-19-07Harper2 (2).TXT

7      say, according to the policy of your company?

8      You are under oath, Miss.

9                  MR. FALBY:  Let me just object.   Go

10     ahead.

11         A.      I would reference them to -- if

12     somebody called and asked for a reference, I

13     would reference them to --

14         Q.      Anthony Bayad, for example.  Yeah,

15     just an example.  Lucent Technologies called you

16     today and says, did Anthony work for you?  We

17     want a reference for poor Anthony Bayad.  What

18     would you tell them, or any other employee that

19     use to work for Cisco in the past, and he's

20     looking for an opportunity to work for other

21     company to support his family.  If he found a job

22     and his employer, like Lucent Technologies,

23     called you personally, you or your company, HR,

24     what's your guideline about giving references?


                                                   95


1          A.      As we would do for any employee

2      that left Cisco to talk to another company that

3      asked for verification or a reference, that we

4      would refer this person to the human resource

5      center.  The human resource center will verify

6      dates of employment.

7          Q.      And the date of the termination,

8      good word, the separation of the company, right?

9          A.      Which falls under the dates of

10     employment --

1-19-07Harper2 (2).TXT
11      Q.       Exactly.

12      A.       -- a start and an end date.

13  Exactly.

14      Q.       You would not discuss anything

15  else.  Is that a correct statement?

16      A.       Our policy is to verify dates of

17  employment.

18      Q.       Thank you for your honesty, and

19  that's what is the Cisco policy.  We tested the

20  system, and yes, you are correct.  Now I ask my

21  question to you.  We were talking about the

22  business, the Cisco business code of ethics --

23  I'm sorry.  I'm talking right now about Cisco

24  business code of professional ethics, and you


                                                96

1   know it very well, as well I do.  It state, and

2   you just said today, right now, that you cannot

3   say anything else -- right? -- about any former

4   employee, right?  Only the date of the start and

5   the separation from the company, in good faith,

6   correct, right?

7       A.       Correct, dates of employment.

8       Q.       Now, and also your business code of

9   ethic -- we don't care about the law.  Your

10  guidelines.  If anybody violated that business

11  code of ethics, what happen to him?  If somebody

12  is racist in your company or somebody is going,

13  going -- if somebody, a hiring manager, for

14  example.  Let's take Lynn Fraser.  What would you

15  say about Lynn Fraser if somebody called her --
                   Page 82

1-19-07Harper2 (2).TXT

16    right? -- and asked her, "Do you know Anthony
17    Bayad?  We want a reference.  We are Lucent
18    Technologies."  Remember what you just said,
19    Miss.  You are under oath, please.  Please say
20    the truth.  If somebody called Lynn Fraser about
21    Anthony, Lucent Technologies called Lynn Fraser
22    and asked her did Anthony work for you, what her
23    first step she need to do?
24        A.      She should recommend that

                                                        97

1     individual contact the human resource connection.
2         Q.      God bless you.  That's what Cisco
3     procedures and that's what Cisco guidelines
4     state.  Yes, Lynn Fraser cannot say anything
5     else, right?  Correct or not?
6             MR. FALBY:  Say it again, please.
7         Q.      Because of the Cisco guidelines,
8     and Miss Celia Harper, is going through this step
9     by step, she just state that anybody that called
10    Lynn Fraser, the only thing that she has to do is
11    to refer Anthony Bayad or Lucent Technologies to
12    the human resources center, right?
13            MR. FALBY:  Is your question about
14    Lucent calling?
15            MR. BAYAD:  Any company calling
16    about Anthony Bayad, me?
17            MR. FALBY:  Anybody outside of
18    Cisco?
19            MR. BAYAD:  Any employer calling

1-19-07Harper2 (2).TXT
20    Cisco Systems, Lynn Fraser and ask her did

21    Anthony work for Cisco, what should -- as human

22    resources, Ms. Harper, what's Lynn Fraser's duty

23    as a manager and officer of the company should

24    say and do and follow what she should do?  Tell

98

1    me, please?

2         A.        As any employee at Cisco, our

3    policy is to refer them to the human resource

4    center to be able to verify dates of employment.

5         Q.        Thank you.  And if such person like

6    Lynn Fraser did not do what you just told me, the

7    following facts, the guideline of Cisco as you

8    are the representative of Cisco Systems, and

9    that's because of Lynn Fraser, that's why you are

10   here, and that's why I apologize to you.  Why

11   Cisco allow Lynn Fraser openly to state to

12   anybody that Anthony Bayad, as I, Lynn Fraser.

13   Under oath she gave it to me.  Mr. Falby knows.

14   She stated that Anthony Bayad -- I, Lynn Fraser,

15   do not recommend Anthony Bayad to Cisco.  Does

16   she have right to say that, Miss, please?

17        A.        Let me just reference that.

18        Q.        Miss, please, we've got to wrap it

19   up, please.

20             MR. FALBY:  Let her answer the

21   question, please.

22        Q.        You're a wonderful person, and

23   you've been very honest.  God bless you.  I just

24   want to tell you, don't protect people, that they
             Page 84

1-19-07Harper2 (2).TXT

99

1    don't deserve to work for Cisco, and I'm not
2    defending anybody.  I'm asking you from the
3    bottom of my heart as the Cisco admin and your
4    word as a good person, a good Christian person.
5    I know you are.  I know everything.  I know
6    everybody, miss.  Please tell me why Lynn Fraser,
7    what she or should not do.  Does she have a right
8    to state the following, because if you said, yes,
9    I'm going to take you somewhere else, and you're
10   going to be stuck with me.  If you say honestly
11   that it's not proper to state, to hurt people's
12   life, then, Miss, we're going to wrap it up, and
13   we can move on.
14             Please tell me, Miss, does Lynn
15   Fraser have right to defend people by telling
16   employers, recruiters, headhunter that, oh,
17   Anthony Bayad, I would not recommend him back to
18   Cisco?  Does she have the right, yes or no?  As
19   to your guideline and to your statement, your
20   statement about this type of guideline of giving
21   recommendation of a former employee like myself.
22   Does she have right, or she does not have right?
23   A.       Well, anybody that is calling
24   externally from Cisco Systems from any other

100

1    corporation or any other reference point and

1-19-07Harper2 (2).TXT

2   calls into Cisco to any employee, the following

3   procedures are required for that individual to

4   process them and to send them to our human

5   resource center.  The human resource center then

6   will verify the information as what we've

7   discussed, the dates of employment.

8        Q.      That's what my understanding, and

9   that's what everybody knows at Cisco.  My buddies

10  Cisco, that right now work for Cisco -- I have a

11  lot of them, in Tampa, New York.  I've been a

12  good engineer.  I've been everywhere -- they told

13  me the same thing, nobody at Cisco Systems, Lynn

14  Fraser or anybody else, they do not have a right

15  to violate the business code of ethic and the

16  regulation of Cisco by defaming any employee

17  because of their race, gender or their origin or

18  their religion.  But you say to me that when

19  people call Lynn Fraser, she have to direct them

20  to HR, and I agree with you that's the proper

21  action?

22       A.      That's fine, and that is if it's

23  somebody externally, but internally inside the

24  company, we do have the right to be able to share


                                             101

1   information around our employees.

2        Q.      Thank you very much.  Now, going

3   back to your statement.  You state that people

4   internally -- right? -- that Lynn Fraser has

5   right to state to them that you do not hire

6   Anthony Bayad, right?  Is that correct, ma'am?
            Page 86

1-19-07Harper2 (2).TXT

7        A.       Who is she going to state that to?

8        Q.       She state that to the hiring

9    managers, many outside, inside.  Now, outside we

10   cleared that issue.  She doesn't have a right to

11   say that.  She is in violation of Cisco code of,

12   business code of ethics, and she's in violation

13   of my civil rights.  You just told me that.

14   Second --

15                 MR. FALBY:  Excuse me.

16                 MR. BAYAD:  Let me finish,

17   Mr. Falby.

18                 MR. FALBY:  Excuse me, let me

19   object.  Lynn Fraser never did anything --

20                 MR. BAYAD:  I don't want your

21   opinion, Mr. Falby.

22                 MR. FALBY:  Why don't you ask a

23   question that has some basis in fact.

24                 MR. BAYAD:  Okay, let me ask a


                                                      102

1    question, okay.

2                  When Lynn Fraser received a call

3    from Nick Adamo -- I know him very well.  Nick

4    Adamo called Lynn Fraser and told her Anthony

5    Bayad -- Nick Adamo, he's the one who hired her,

6    you know that -- no, I don't want to say -- or

7    George O'Mara.  He knows her too.  Let's say

8    George O'Mara calls Lynn Fraser and said, Anthony

9    Bayad is very likeable, highly educated, college

10   grad, all nine yards.  He use to work -- he said

                      Page 87

1-19-07Harper2 (2).TXT
11      in his application, I interviewed him, with six
12      people, that's where I spend my time.   Now, does
13      Anthony -- I want you to tell me, did Anthony
14      work for you, and can you tell me about Anthony?
15      And when George O'Mara asked Lynn Fraser for, to
16      give reference about Bayad, does she have a right
17      to state to George O'Mara, for example, or Nick
18      Adamo that Anthony Bayad is not recommended -- I,
19      Lynn Fraser, do not recommend Anthony Bayad not
20      to be hired because -- we don't got to tell you
21      why, that's between them.   He finished the
22      sentence.   Does she have the right to say this
23      statement?  You must be careful because I'm going
24      to take you again somewhere else.   I got a lot of


                                                        103

1       facts here, and you don't want to be backing her
2       up.   You want to say the truth, nothing but the
3       truth and get this out of your bed so we can all
4       go home.   Now, if you tell me the truth, I'm
5       going to finish this deposition, and I'm going to
6       thank you from the bottom of my heart, and I
7       apologize to you.   Now you tell me if Nick Adamo
8       or George O'Mara called Lynn Fraser and asked
9       her, you, Lynn Fraser, can you give me references
10      about Anthony?  And Lynn Fraser was caught saying
11      to Nick Adamo and George O'Mara that I, Lynn
12      Fraser, do not recommend Anthony Bayad to work
13      for Cisco or Anthony Bayad -- I do not recommend
14      Anthony Bayad back to Cisco.   Does she have right
15      to state this statement?

1-19-07Harper2 (2).TXT

16          A.          I'm going to just reference you to
17    the Cisco policy from anybody calling externally
18    into Cisco.
19          Q.          I appreciate that.  Externally you
20    answered everything, and thank you.  I'm asking
21    you about internal people.  Does she have a right
22    to say I, Lynn Fraser, do not recommend Anthony
23    Bayad back to Cisco?  Does she have a right to
24    say that yes or no?


                                                    104

1          A.          Yes, we have the right to say that
2    internally here at Cisco.
3          Q.          Thank you.
4          A.          To recommend people for a specific
5    job, we have the right to recommend.
6          Q.          Okay.  Then you say that she has
7    right to not recommend Anthony back to Cisco.
8    But during my termination at Cisco, she told me
9    Anthony you are wonderful.  The record speak for
10    itself.  I'm going to talk to you right now about
11    the evidence.  Lynn Fraser told me that, Anthony,
12    I'm sorry, that we're going to let you go,
13    Anthony.  And I know why.  I flew -- Mrs. Celia
14    Harper, again, let me ask you, as HR, very
15    qualified HR, you have experience, you travel the
16    world you state on your background.  You know in
17    America it costs $30 to find out who you are and
18    how you came to this country too.
19                      Let me ask you this question.

1-19-07Harper2 (2).TXT
20    Would you as a Cisco human resource provide plane

21    ticket and spend money, about $20,000, to some

22    engineer and fly him around the world, France,

23    England and Dubai.  You spend money on him

24    because he's qualified -- right? -- to send him


105

1    for interviews around the world from Boston.  Do

2    you spend your money for what, because that

3    person, Anthony Bayad, has talent, that's why you

4    paid money and flew him around the world to these

5    people, because you want to hire him, he speak

6    foreign languages.  Is it true, would you spend

7    money on him flying, that he has talent, right?

8    That I would fly anywhere for interview, right?

9    Yes or no, Miss.

10               MR. FALBY:  I'm going to object to

11    your question which makes no sense.

12               MR. BAYAD:  Okay.  What I'm telling

13    her and what I'm telling Mr. Falby is that Lynn

14    Fraser does not have a college degree, and she

15    does not have opportunity to fly around the

16    world, because, Mr. Falby, she does not have

17    college degree, unless now Northeastern.

18    Mr. Falby, you do not know my background,

19    Mr. Falby.  I know.  I told you again.  I don't

20    have to impress you.  I know everything.  She's

21    still going to Northeastern.  She's lying about

22    her resume.  That when I use to work with her,

23    she didn't even have a degree, and she is my

24    manager.  She does not have CCIE, and she was my
                        Page 90

1-19-07Harper2 (2).TXT

1    manager.  She does not have expert level, and the
2    list goes on and on.
3                Well, my question to you, when Lynn
4    Fraser tells people that she does not recommend
5    Anthony back to Cisco, there is a reason for
6    that, right, Ms. Celia Harper?
7                MR. FALBY:  Let me note for the
8    record that your voice during this deposition has
9    been at a high decibel level, and it's even worse
10   now.  You're shouting, and it's very hard to
11   understand you.
12               MR. BAYAD:  I'm sorry you said
13   that.
14               MR. FALBY:  Your voice is very
15   loud, and you're shouting.
16               MR. BAYAD:  I'm sorry, it's not
17   loud.
18               MR. FALBY:  Calm down and ask
19   questions that make sense.
20               MR. BAYAD:  It's the phone,
21   Mr. Falby.  It's high.  I'm sorry, and I
22   apologize.  You should have stated that earlier.
23   I'm not yelling at nobody, and nobody has the
24   right to yell at nobody, Mr. Falby.

107

1                Let me ask you this.  Ms. Celia

Page 91

1-19-07Harper2 (2).TXT
2      Harper, if somebody tell -- if somebody
3      internally that I, Lynn Fraser, do not recommend
4      Anthony back to Cisco, there is a reason for
5      that, right?  There is a reason for that, right?
6      Yes or no.  Nobody can say I do not recommend you
7      back to Cisco unless something is there, right?
8      Something that that person did.  There is a form
9      at Cisco that raised the flag to Lynn Fraser to
10     deny him an opportunity, right?  Yes or no.
11          A.       I don't know.
12          Q.       Well, you are the HR.
13          A.       You're referencing Lynn Fraser.
14     You're referencing information between the two of
15     you, and I don't know.  I don't know what's
16     transpired.
17          Q.       You are HR.  You are the first line
18     of defense at Cisco Systems, that's why Don
19     Chambers believe in you, that's why the public,
20     invest a lot of money and the American people
21     that love Cisco, the government, the backbone of
22     the world, that's why people are counting on you.
23     You are HR.  You tell me.  That's why you are
24     here today.  Why a manager as Lynn Fraser openly


                                                    108

1      stating on the record that she does not recommend
2      Anthony back to Cisco, why?  When she terminated
3      my employment, she told me you're very welcome.
4      After one year of this termination, you come back
5      to Cisco.  You are very qualified.  Now, my
6      question to you, does she have right to state

1-19-07Harper2 (2).TXT

7      this statement?  Yes or no, please.

8              A.       That she made that statement, I

9      don't know.

10             Q.       Okay, you don't know.  Okay, we're

11     going to ask her.  Now, people that usually do

12     not recommend people.  In your experience level

13     and your time at Cisco, if somebody that you find

14     qualified, and he's manager of some business

15     stated to you, raised the flag to you -- forget

16     about Cisco no-hire list.  Just between them.

17     That Lynn Fraser called you and said I do not --

18     you called her and said, why don't you want to

19     hire Anthony?  He has a long, long record.  He is

20     a veteran of extra level in this field that we

21     need.  It's hard to hire somebody that doesn't

22     have qualifications.  He does.  Why don't you

23     want to hire him?  You usually talk to somebody.

24     You want to know why she is thinking that she


                                                  109


1      does not recommend Anthony back to Cisco, right?

2      You have to know why, right?

3                      MR. FALBY:  Objection.  You may

4      answer.

5              A.       I don't know.  I don't have any --

6              Q.       If John Chambers called you and

7      said somebody referenced Anthony, and you came

8      back to John Chambers and told him Anthony cannot

9      be rehired.  He's going to tell you why, why,

10     Celia Harper.  You reply to him, and say, well,

                      Page 93

1-19-07Harper2 (2).TXT
```
11        his manager stated to me that she does not
12        recommend him back to Cisco.  And Mr. Chambers is
13        going to come back to you and is going to tell
14        you, Miss Celia Harper, what's the matter here,
15        why we cannot hire this guy.
16            A.      I have not had any conversation
17        with Lynn nor have I had any conversations with
18        John about your performance and not being able to
19        be hired back.
20            Q.      Let me ask you this.  In such
21        matter if somebody -- if the leader of Cisco,
22        that's why she has a title.  When a manager, an
23        officer of the company, of the company.  The
24        American people have given them money for them to
```

                                                    110

```
1         be a leader in that area of expertise and to be
2         fair and balanced.  To think her statement means
3         either Anthony Bayad is from another country or
4         he's Moroccan or minority or black or homosexual,
5         any of the above, or Anthony Bayad was a slacker,
6         he was loser, he should not be first hired to
7         Cisco, is that correct, right?  Right, Miss?
8         Please, Miss, you're under oath, just say the
9         truth.
10            A.      You know what, all those references
11        I don't know, I don't know anything about.
12            Q.      Oh, no, perfect.
13            A.      I don't know anything about your
14        performance or about you.
15            Q.      Exactly, that means you do not know
```
                    Page 94

1-19-07Harper2 (2).TXT

16     what happened here?  But whatever she said, you
17     don't care what she said, right?  That's what
18     you're telling me, right, miss?  Miss, if this
19     gets to the jury, you're going to look bad.  You
20     have to say something.  You have to answer.
21     Either Anthony Bayad is not recommended back to
22     Cisco because Lynn Fraser is racist, she doesn't
23     like homosexuals, she doesn't like black,
24     Spanish, Indians, any race.  She likes her white

                                                                111

1      race.  And that's respectful.  Or that she has
2      something on the record that Cisco has.  They
3      call it -- let me tell you what they call it.
4      And for the record, we're going to complaint
5      documentary 1, Exhibit No. 2.  Miss, you know
6      what I'm talking about.  I'm talking about the
7      performance review, right?  Cisco has performance
8      review, correct?  Yes or no.
9             A.      Correct.
10            Q.      Thank you.  And in such Exhibit
11     No. 2 of the complaint.  I'm going to go to the
12     last page, Ms. Celia Harper, and I'm going to
13     tell you the dates, the dates that this review
14     was initiated to me, and it was approved by two
15     people, my director -- according to the rules or
16     the policy of Cisco, my director has to sign it,
17     right?  Yes or no?
18            A.      Yes.
19            Q.      And then -- I'm sorry, I'm

1-19-07Harper2 (2).TXT

20    confusing you.  I'm sorry, and I apologize.  This

21    performance review, Cisco job performance review

22    has to be signed by two people, my direct manager

23    and the next level, probably director or our

24    supervisor above both of us, right?


112

1         A.      That is correct.

2         Q.      In such exhibit, Cisco performance

3    review, my job review as an engineer while I was

4    working at Cisco, in such review, Ms. Celia

5    Harper, the dates of my manager Lynn Fraser who

6    initiated, who created this review, who filled

7    it, who approved it, she signed it on

8    February 19th, 2001, 02/19/2001.  Then it's been

9    sent to Chicago to my director, Sigmund

10   Shoemaker, and Sigmund Shoemaker, she sign that

11   document on March 26th, 2001.  Do you see the

12   difference.  It's a one-month difference, right?

13        A.      Correct.

14        Q.      Thank you.  And then you are HR,

15   you provide, you introduced this policy.  Then

16   this review has to be approved and also read and

17   shared with the employee.  That's me, right?

18        A.      Well, you signed it, so you read

19   it, yes.

20        Q.      Thank you.  I'm not trying to

21   confuse you.  What I'm saying, when my manager

22   and my director finish filling up all the

23   performance and evaluating my performance at

24   Cisco Systems, they sign it, my manager Lynn

1-19-07Harper2 (2).TXT

113

```
 1        Fraser signs it, she gives it to her boss, she
 2        signs it, and then she gives it to who, she gives
 3        it to Anthony Bayad by law -- not by law, by
 4        Cisco policy.  We sit down in a room for two
 5        hours, and she tell me, okay, Anthony we have to
 6        go over your performance, what you need to do and
 7        what your weakness and your good things at Cisco,
 8        right?
 9             A.        Right.
10             Q.        Thank you.  Also, I'm going to ask
11        you a question, Miss, as I'm doing.  My manager
12        stated the following for the record, and I want
13        to ask you about this.  That Cisco has -- they
14        call it a customer satisfaction survey, yes or
15        no, at HR?
16             A.        Yes.
17             Q.        Thank you.  Let me ask you if the
18        customers -- if my manager writes, "Anthony Bayad
19        maintained an average customer satisfaction score
20        of 4.6 for assigned projects."  What's 4.6, is it
21        good or bad, as HR?  You should know that.
22             A.        It's good.
23             Q.        Thank you.  "Anthony Bayad maintain
24        effective utilization."  Yes or no, is it good or
```

114

```
 1        bad?
```

1-19-07Harper2 (2).TXT

2       A.      Say that to me again.  I couldn't

3  hear you.

4       Q.      She stated after maintain an

5  average score -- I'm sorry.  "Maintain an average

6  customer satisfaction score of 4.6 for assigned

7  projects," that means it's good or bad?  It's

8  good?

9       A.      "Maintain customer satisfaction

10  score of 4.6."

11      Q.      For assigned projects, yes?  Is it

12  good, good score or bad score?

13      A.      Good.

14      Q.      Good, right?

15      A.      Yes.

16      Q.      That means the customer filled.

17  Nobody has a water pistol on their head.  The

18  project manager gave them a survey and told them,

19  Anthony, give them to survey.  The customer gives

20  me 4.6 out of 50.  You said it's good, right?

21      A.      Yes.

22      Q.      Thank you.  Then she stated, my

23  manager.  I didn't write this.  I don't have

24  right to right this.  She write, "Maintain

115

1  effective utilization.  What does that mean

2  maintain effective utilization?  That means time

3  sheet.  I'm sorry, time sheet.  You know time

4  sheet.  In our utilization, that means how many

5  hours I work per week, 40 weeks or 80 weeks or 90

6  weeks.  Is that correct, Miss.

1-19-07Harper2 (2).TXT

 7        A.      It means how many hours per week?

 8        Q.      Oh, no.  I want to make sure you

 9    understand what I'm saying.  I'm not trying to

10    confuse you.  I'm saying when she wrote, "Anthony

11    Bayad maintain effective utilization," it means

12    that Anthony was producing, was working with

13    customer, right?

14                MR. FALBY:  Where does it say

15    maintain effective utilization?

16                MR. BAYAD:  Page 5, Mr. Falby.  And

17    that's where, Mr. Falby, you messed up,

18    respectfully.

19        A.      So it says on here for your next

20    performance period these are the following

21    initiatives.  And where you're referencing

22    maintain effective utilization, that is for your

23    next performance period.  So they're asking you

24    that you need to maintain effective utilization.


                                                    116


 1        Q.      Okay.  That's what she meant,

 2    right?  That's what she meant, right?

 3        A.      Well, they're asking you for your

 4    next performance, so we're going to measure you

 5    in your next performance that you must maintain

 6    effective utilization.

 7        Q.      No problem.  Well, this is what

 8    we're going to do, so we can understand what she

 9    is saying.  If you go to No. I now.  I want to

10    make sure you help me on this because I've been

1-19-07Harper2 (2).TXT

11    reading this a thousand times, and I cannot

12    understand why she is telling me not to be hired

13    at Cisco, and I think she has a race problem.

14              Now, let's go back to exhibit,

15    again Exhibit 2 of the complaint, of the review.

16    She said here -- what she said -- I want you to

17    read it to me, tell me what she said under

18    "Initiatives/Results."

19         A.    I'm on "Part IV:   Initiatives for

20    Next Performance Period."  Is that where you're

21    at, same place?

22         Q.    Page 1 on my review.

23         A.    All right, you're on page 1, okay.

24         Q.    "Initiative:   Maintain customer


                                              117


1    satisfaction score of 4.6."

2         A.    Correct.

3         Q.    Result she says, "Received customer

4    Sat Score of 4.9 on QWEST Project."  Oh my God,

5    now 4.9.  No more 4.6.  What's 4. -- Miss Celia

6    Harper, she said to me the result was, "Received

7    Customer Sat Score of 4.9 on QWEST project."

8    What does that mean?

9         A.    A good score.

10        Q.    Out of five, right?

11        A.    Yup.

12        Q.    Now, respectfully, Miss, and I

13    apologize to you for putting you through this.

14    4.9 out of 5.0, college grad 4.6 out of 5.0.  I'm

15    sorry, college grad approximately 3.4 out of 4.0.

                     Page 100

1-19-07Harper2 (2).TXT

16    In this field that you are making money and

17    you're supporting your family, been certified

18    since 1990.  My question to you, when Cisco

19    started this business, when Cisco adventured in

20    this real world?

21        A.      Twenty-three years ago.

22        Q.      Miss, make the record straight.

23    I'm from this industry.  Cisco started this

24    business approaching --


                                                    118

1        A.      Twenty-three years ago.  It was --

2        Q.      1997.

3        A.      Thank you.

4        Q.      God bless you.  1997, right?

5        A.      No, it didn't start in 1997.  It

6    started in the '80s.

7        Q.      But it became Cisco in 1997 with

8    Well Fleet Communication.  Now, my question to

9    you --

10        A.      We did not merge with WellFleet

11    Communication.

12        Q.      I'm not saying WellFleet.

13    WellFleet Communication and Bay Networks which is

14    Synaptics and Cisco Systems is the only people

15    that were in this industry.  Yes or no.  You are

16    from San Jose.  You lived in San Diego.  Correct

17    or not correct?

18            MR. FALBY:  Objection, what are you

19    asking?

1-19-07Harper2 (2).TXT

20                    MR. BAYAD:  I'm asking if she

21     worked for these companies.  Lynn Fraser never

22     worked for these companies.  That mean I'm a

23     veteran.  No problem, let's move on.

24                    Back to Exhibit 2 of the complaint.


                                                    119

1      My manager wrote with her own hands.  She said,

2      "Initiative:  Achieve high level of expertise on

3      AVVID Products and Technologies."  What this

4      statement mean, Miss Celia Harper, to you, if you

5      read this from my manager?

6            A.      It says that you have the technical

7      expertise with specific products and

8      technologies.

9            Q.      And what's the name of that

10     product, AAVID?

11           A.      Correct.  In a very specific set of

12     products.

13           Q.      "Achieve a high level of expertise

14     on AAVID Products and Technologies."  That mean I

15     am high level, I have high level of expertise on

16     AVVID.  I speak telephony.  You follow me here,

17     right?

18           A.      Yes.

19           Q.      And the result, "Constantly

20     continuing to achieve a high level of expertise

21     on AVVID products and technologies.  Attended

22     AVVID BOOTCAMP and participated in the internal

23     AAVID deployment for the New York Pen Plaza."

24     Does Cisco have an office in Pen Plaza?

1-19-07Harper2 (2).TXT

120

```
 1          A.       Yes.
 2          Q.       Thank you.  "Also, constant hands
 3    on with the Call Manager, the 6500 Catalyst, and
 4    the 2600 Cisco products.  Other means of keeping
 5    up with the technology is reading the material
 6    and practice in the Lab (utilization of the
 7    Chicago Lab and Lexington Lab)," and the rating
 8    is E.  What's E as HR of Cisco Systems?
 9          A.       Average.
10          Q.       E, it's excellent.  Do you want to
11    go back and see what it means in the -- and on
12    page 7 of Exhibit 2 of the complaint, my
13    performance review at Cisco Systems, page 7, it
14    states what's the meaning of the letter E.
15    That's the rate they give us.  That letter E if
16    you're good or bad.  And Cisco said here E means,
17    can you read that for me?
18          A.       E is successful; meets or exceeds
19    all key performance expectations.
20          Q.       Let me recall for the record.
21    That's not my -- I didn't come up with E, right?
22    Cisco has a rating scale -- right? -- about their
23    engineers, right?
24          A.       All employees are rated on these
```

121

```
 1    three categories.
```

1-19-07Harper2 (2).TXT
2          Q.          And this paper is not a joke,
3    right? It's not joke.  HR not come up with this
4    because somebody felt that they needed to look
5    busy, no?  Yes or no?
6          A.          This is an annual performance
7    review.
8          Q.          Thank you.  Cisco takes it very
9    serious, right?
10         A.          Yes.
11         Q.          And going back to No. 1 of the same
12   Cisco job review, Exhibit 2 of the complaint, you
13   said, "Achieve high level of expertise on AVVID,"
14   and I got E, excellent, right, meets and exceeds
15   expectations, right?  Right?
16         A.          E does not mean excellent.  X means
17   excellent and exceptional.
18         Q.          Okay.  Read me what Cisco means
19   with E?  You said employee is --
20         A.          Is an employee is successful.
21         Q.          "Meets or exceeds all key
22   performance expectations," and that's good for
23   under the X, right, excellent, right?
24                     MR. FALBY:  We have to take a


                                                      122

1    five-minute break.  The witness is getting a call
2    from home.  So let's take five minutes.  We've
3    been going a long time.  We will come back on in
4    five minutes.  I'm just going to put us on mute
5    for five minutes.
6                     MR. BAYAD:  What should I do,
                     Page 104

1-19-07Harper2 (2).TXT

```
 7    Mr. Falby?  Should I just come back in five
 8    minutes?
 9                MR. FALBY:  Yeah, you can just
10    wait.  Just wait five minutes, take a five-minute
11    break.
12                MR. BAYAD:  Okay, say something for
13    the record.  Mr. Falby wants to stop this for
14    five minutes.
15                MR. FALBY:  We're taking a
16    five-minute break.  We'll return in five minutes.
17                MR. BAYAD:  Thank you.
18                MR. FALBY:  Thank you.
19                MR. BAYAD:  You're welcome.
20                (A break was taken.)
21        Q.    (By Mr. Bayad) I'm going to keep
22    asking questions about Exhibit 2 of the
23    complaint, and I want Ms. Celia Harper-Guerra to
24    refer to page 3.  At the end of page 3, just to
```

123

```
 1    make it easier, so we can wrap it up soon.  On
 2    page 3 it's talking about success factors,
 3    results about Anthony Bayad, I, my job review at
 4    Cisco system, and the reason I am -- this
 5    Exhibit 2 is very crucial to this litigation is
 6    because we want to show to Mr. Bruce Falby and to
 7    Cisco Systems why a leader as manager Lynn Fraser
 8    has stated to others, hire manager, that she does
 9    not recommend Anthony Bayad back to Cisco.
10                In logic, in any logic reasoning in
```

Page 105

1-19-07Harper2 (2).TXT
```
11    this world, in anybody on the street, if you ask
12    them why somebody would say statement like that,
13    it's either they are racist or you have not
14    performed your duty during your employment, but
15    Exhibit 2 state otherwise, and I would like to
16    ask Celia Harper to guide me through this,
17    page 3.  Successful factors, that means after my
18    performance review they went back, they want to
19    know what Anthony Bayad in his employment as
20    Cisco has done during his employment at Cisco.
21    What did Anthony Bayad contribute to Cisco, and
22    that's what Celia Harper-Guerra, director of
23    human resources is going to tell us, why Cisco
24    came up with this, this review for -- they can
```

                                                                124

```
 1    appraise an employee like myself, they say they
 2    are good to work for Cisco or they need help or
 3    they need to go somewhere, that Cisco is not for
 4    them, and that's why I want Celia Harper to help
 5    me here.
 6              Success factors:  Anthony Bayad
 7    dedication to customers is very, very crucial to
 8    Cisco.  If Mr. Rick Justice or Lynn Fraser does
 9    not meet the requirement with customers, if
10    somebody claim about such person, Mr. Chambers
11    would not tolerate this.  He would let you go.
12    Customers at Cisco is number one, and that's why
13    I want Ms. Celia Harper to help me distinguish if
14    Lynn Fraser has problem with race or Lynn Fraser
15    does not know what she's talking about.  And if
```
                           Page 106

1-19-07Harper2 (2).TXT

16    you want to go after discrimination,
17    discrimination definition is to distinguish and
18    to favor some people to other people based on
19    their race and gender or their origin or their
20    religion, and that's what discrimination and race
21    discrimination is all about.
22                   Now, Cisco, Anthony Bayad, my
23    review, it said Success Factors:  "Dedication to
24    Customers," very important for Cisco.  Anthony --


                                                   125

1     this is in my review.  My manager wrote with her
2     own hand, nobody has pistol, water pistol at her
3     head, did it on her own will.  According to Cisco
4     regulation she wrote, "Dedication to customers."
5     Customers pay the bill for Cisco.  It says,
6     "Positive feedback for QWEST Customer."  This is
7     QWEST company.  It's a big company, big project
8     we work on.  "Customer and Project Managers Sat
9     4.9."  At minimum we got 4.9 out of 5.0, that
10    mean we succeeded.  We made Cisco superstar and
11    we satisfied.  The customer made happy.  We're
12    going to move to next customer.
13                   Also, she said about Anthony Bayad,
14    she said in my job review, Exhibit 2 of the
15    complaint, she said, "Solve problems and make
16    decisions."  I'm a leader.  She said, Contributed
17    to more billable hours."  That means I help Cisco
18    make money.  They sold me to customer and make
19    money.  "Contributed to more billable hours.

1-19-07Harper2 (2).TXT
20    Customer satisfaction.  Presenting the team and
21    given the Customer the best service.  Sat of 4.9
22    (QWEST Project).  Taking initiatives by helping
23    our Eco Systems toward success by helping them do
24    well."  That mean I'm helping everybody.  I get


                                                    126

1     E.  Going back to page 7, I want to know what
2     mean E.  It says, "Employee is successful; meets
3     or succeeds all key performance expectations."
4     That's correct, Ms. Celia Harper, yes or no?
5          A.      Yes, in this series she rated you
6     an E.  And as I stated before, X is excellent,
7     performs above expectations, and E, and N is an
8     employee that needs improvement, is not meeting
9     expectations.  So you have somebody at the top
10    and somebody at the bottom.  So E is somebody
11    that has successfully completed their
12    initiatives.
13         Q.      Good job.  And now --
14         A.      Average.
15         Q.      That's good.  Now, going back to
16    same page, No. 3, "Dedication to Customers:
17    Positive feedback for QWEST Customer and Project
18    Managers.  Sat of 4.9."  We get X.  What you're
19    telling me is that with my customers I get X,
20    that mean I'm the best here.  I'm an employee who
21    clearly performed in an exceptional manner in all
22    areas.  That's customer satisfaction, that's
23    customer sat.  That meaning I'm doing well,
24    right?  Excellent, X, right?

1-19-07Harper2 (2).TXT


127

1          A.       As I stated, the X does clearly

2     state --

3          Q.       Perfect.

4          A.       But let me finish my comment inside

5     of that.  It also states with the project manager

6     as the team element.  Additionally, Cisco

7     measures you in multiple areas as an employee.

8     It does measure you for customer satisfaction.

9          Q.       No problem.

10          A.       It also measures you in a number of

11     other areas.  It's one element.

12          Q.       I understand.  Going back to

13     number, on the same Exhibit 2, page 1.  She

14     said -- not me.  My manager said, "Initiative:

15     Maintain."  Anthony Bayad maintain customer

16     satisfaction score of 4.6 out of 5.0.  "Result:

17     Receive Customer Sat Score of 4.9 on QWEST

18     project."  I get X.  Going back to page 7 and

19     looking at the rating of X, it means employee

20     clearly performed in an exceptional manner in all

21     these areas.

22          A.       Yes.

23          Q.       Thank you.  Going back to No. 3, so

24     we can wrap it up very quick.  I'm going to ask


128

1     you this.  She said, "Drive revenue, drive

1-19-07Harper2 (2).TXT

2    success, and productivity." Anthony Bayad

3    volunteer to help out. Working on CCIE to become

4    more billable. It's not mandatory CCIE. It's

5    just to make more money. "QWEST project, IGX for

6    Robert Stevens bank, possible 6 month post office

7    project in Washington." The government. I get

8    E.

9              Also, teamwork. Very important

10   teamwork. If you don't get along with people,

11   you are a troublemaker, but Anthony Bayad is not

12   a troublemaker because my manager on page 3,

13   Exhibit 2 stated in her own hand and under her

14   own will, she said the following, she rated me

15   about my teamwork, "Knowledge transfer to my team

16   by intensive coaching and mentoring." She give

17   me X.

18             Going back to page 7, what's X

19   mean? "Employee clearly performs in an

20   exceptional manner in all areas." Do you agree

21   with me?

22        A.    Yes.

23        Q.    Thank you. And now, Miss, I don't

24   want to keep going and going. I want you to very


129

1    quick to go back to page 4 of the same Exhibit 2,

2    of the Exhibit 2 of the complaint, and she said

3    development, specific activities completed and

4    date. What I have said and done, right?

5        A.    Yes, sir.

6        Q.    Thank you. "All intellectual

1-19-07Harper2 (2).TXT

7      properties development during my employment with

8      Cisco system:  Cisco Voice over IP, Frame Relay,

9      ATM, PPP."  This is very important protocols for

10     Cisco.  Voice over IP, it's business driven.  You

11     agree with me, right?

12         A.     Yes.

13         Q.     I completed everything.  What's --

14     let me ask you, a date, 05/2000 -- what's '05,

15     that means April 2000, right?

16         A.     Can you just go back and help me

17     understand exactly what you completed under

18     specific activities?  So you state Cisco Voice

19     Over IP, Frame Relay, ATM and PPP.  Exactly what

20     activity with all of those product sets?

21         Q.     You can take that off the record or

22     on the record.  You can ask my manager.  You

23     know, I didn't write this.  She wrote, "All

24     intellectual properties development during my

130

1      employment with Cisco system."  Specific

2      activities completed.  I mean, what I completed.

3      Cisco Voice over IP, that mean AAVID inside and

4      out.  She said Frame Relay for AVVID.  You know,

5      IP telephone.  What she meant here -- she needs

6      some coaching.  She means Anthony is the master

7      with AVVID in 05/2000, completed.  Then she said,

8      "Troubleshooting Cisco IOS."  What's IOS mean,

9      Miss?  Do you know what IOS means?

10         A.     Internet operating system.

Page 111

1-19-07Harper2 (2).TXT

11        Q.        God bless you.   She said completed

12    07/2000.   She said, "Advance OSPF/BGP design and

13    implementation in large Cisco Networks,"

14    completed 08/2000.

15              She said Anthony Bayad completed

16    the Cisco internal AVVID deployment.   I completed

17    everything about AVVID, which is new technology

18    that Cisco is looking to drive, to drive the

19    business and to make more money, and I completed

20    that in 09/2000.

21              She said, "Team hands on lab with

22    Call Manager," which is AAVID, 10/2000, the year

23    10 of 2000.

24              Completed the whole AVVID Boot


                                                     131

1    Camp, 11/2000.   She said CCIE exam completed in

2    10/2000.

3        A.        I don't see that, where it says you

4    completed.

5        Q.        Page 4.   It says CCIE exam,

6    completed 10/2000.   And she said --

7        A.        You completed the written test.

8        Q.        That's the written exam, yup.

9        A.        Okay.

10        Q.        And she said I completed that,

11    right?  I'm a CCIE candidate, right?  I mean,

12    whatever she told me to do I did.   I passed the

13    CCIE exam.

14        A.        That's what this document says.

15        Q.        No, no, that's what Cisco job

1-19-07Harper2 (2).TXT

16    review signed by two people, my manager says.
17    Not me, Miss.  I don't make decisions.  I wish I
18    made decisions.  I wouldn't be here if you want
19    me to make decisions.  I'm telling you what they
20    told me what I was doing at Cisco.  They told me,
21    Anthony, my manager and my director Shoemaker.
22    My manager Lynn Fraser states, CCIE exam
23    completed 10/2000, and she stated also that the
24    easy part, which is the last CCIE Lab, completed


                                                    132

1     02/2001, right?
2           A.      I can only say that I can look at
3     this document and agree that this is what it
4     states on the document.  I don't have any prior
5     knowledge of whether that's been completed or
6     not.
7           Q.      Miss Celia Harper, God bless you.
8     I just want you for the record to clear some
9     fact.  I want you to tell me what you see and
10    what you wrote.  You told me --
11          A.      I did not write anything.  I can
12    share with you that I am looking at a document
13    which is page 4.
14          Q.      Mr. Falby gave me this, and the
15    forensic expert knows that my manager signed it
16    and my director signed it.  Nobody in federal
17    court can forge anything.  You cannot -- there's
18    trouble, bad news.  You don't mess with federal.
19    The court is very honest.  You provide the truth

1-19-07Harper2 (2).TXT
20    and nothing but truth.  God help you.  You know
21    what they say, God help you.  If you lie, God
22    help you.
23                Now I'm telling you I have
24    documents from Mr. Bruce Falby that says here on


                                                    133

1     page 4, Exhibit 2, "CCIE written test, completed
2     10/20, CCIE lab preparation, completed 02/2001,"
3     right?
4         A.      As I see on the document, yes.
5         Q.      And my manager Lynn Fraser she
6     said, Knowledge transfer to the team."  Who is
7     the team, Miss?  Who is the team?  My coworker,
8     right?
9         A.      I don't know who the teams are.
10        Q.      I'm sorry, let me ask you the
11    English language.  According to page 4, if you
12    read as HR, if somebody tells you you need to
13    talk to Anthony and you need to read page 4.  In
14    other words, they want to review.  They want to
15    know who is Anthony, and they told you go to
16    No. 4 of Exhibit 2 of the complaint, and they
17    told you, tell us, is it true Anthony knowledge
18    transfer to the team, coached the team by
19    providing internal classes and hand, how to make,
20    and she doesn't want to say why.  In other words,
21    what she is saying I was training my coworkers.
22                Now, Miss, I don't want to keep
23    going and going and going and going, because it's
24    not the right thing to do.  Now I'm going to go
                        Page 114

1-19-07Harper2 (2).TXT

134

1    back to you and ask you a question.  Now if
2    somebody tells somebody internally at Cisco, my
3    manager tell people about me, I, Lynn Fraser, I
4    do not recommend Anthony Bayad to work at Cisco.
5    Now, we have to base it on two facts under the
6    law, material facts.  We have to go on the
7    right-hand side balanced, and the left-hand side
8    also balanced, and we have to ask ourselves if
9    Lynn Fraser has a problem with race or Lynn
10   Fraser does not know what she's talking about.
11           According to what you just heard,
12   and you have heard my review, she doesn't know
13   what she's talking about, and there's a material
14   fact she has a problem with my race.
15           Now, Miss, I want to ask you the
16   last probably question, and we can wrap it up.  I
17   want you to go back.  By the way, for the record,
18   Lynn Fraser states that she does not recommend
19   Anthony Bayad to be hired at Cisco.  It's that
20   statement, discriminatory statement,
21   discriminatory statement is found Exhibit 26 at
22   the Complaint Docket Entry 1.
23           Now, we're going to go back to
24   Docket No. 27, and it's an e-mail provided to me

135

1    by Cisco.  And such e-mail is asking Anthony

Page 115

1-19-07Harper2 (2).TXT

2    Bayad, "I, the plaintiff, a minority, who Lynn

3    Fraser discriminated against me for no reason

4    under the law.  She told me under the law under

5    her oath, her belief," and I respect everybody's

6    belief, but don't hurt my future and my family,

7    and don't make me homeless on the street.  You

8    guys, human resources, you are human resources,

9    Celia Harper, you stated respectfully, Miss, and

10   this is very emotional.  On page 27 you stated to

11   me, you sent me an e-mail when I filed for --

12   when I applied for a job.  You stated to me that,

13   Anthony Bayad, you need identification.  You're

14   asking me on the e-mail to identify my race and

15   my gender before getting hired.  Going back to

16   you as the HR of this respected company, is it

17   right under the law, not Cisco policy, under the

18   law, and I am a citizen of Massachusetts, a

19   resident of Massachusetts, and I'm an American.

20   Do you have a right -- I don't want to put you on

21   the spot.  Does anybody at human resources, you

22   or anybody, Kate DCamp, Lynn Fraser, Tony

23   Savastano, Carl Wiese, what have you, anybody at

24   Cisco human resources do they have right to send

136

1    an e-mail asking applicant, any applicant about

2    their race and gender before being hired?  Why?

3         A.       At Cisco, and this is dictated from

4    EEO and OSCPP that there is a self-disclosure

5    form that we send to all applicants, and that

6    self-disclosure form, like it said it's

Page 116

1-19-07Harper2 (2).TXT

```
 7    self-disclosure and it's voluntary.  So that is
 8    something that is provided as a company that is
 9    based here in the United States followed by the
10    legal laws relative to employment labor laws.
11         Q.     Okay.  Let me ask you this
12    question.  In Massachusetts, and we can go ask
13    the Honorable Judge Sarris or we can call the
14    EOC, or I can get you a letter from the EOC or
15    any -- and do not forget you have a superstar
16    lawyer sitting next to you.  They are very good
17    lawyers.  You can ask them.  In Massachusetts you
18    do not have right to send -- to ask an applicant
19    before hired his race and gender.  It's against
20    the law.  It's Massachusetts law, and it's
21    federal law.  Do you know this or not, Miss?
22              You are HR.  You do read law
23    because you have to comply with the regulation,
24    and you have to protect the company, and you
```

137

```
 1    always work -- and Paula Hughes can, she's
 2    listening and she can help us out here.  If you
 3    have a question, you have a legal team internally
 4    that you can ask a question, right?  If something
 5    you don't feel comfortable with, you go ask your
 6    internal legal, you go ask Mr. Chandler about an
 7    issue if it arise, right?
 8         A.     Correct, we do have legal counsel
 9    to support us in the areas that we need help in,
10    but I would advise you or I would share with you
```

Page 117

1-19-07Harper2 (2).TXT

11    that Cisco is compliant with the labor laws in

12    each of the states.

13        Q.    Yes, with everybody, but not with

14    Anthony, because if they comply with the labor

15    law they would not send me a letter, an

16    electronic letter from Cisco Networks asking me

17    to provide my race and my gender before hire.

18    It's against --

19        A.    Again, that is a voluntary

20    supplement, and that is compliant with United

21    States federal law.

22        Q.    I'm going to argue with you, Miss

23    Celia Harper.  Any applicant who does not comply

24    with any request in the first stage of the

138

1    application is going to be denied.  This is

2    like -- in other words, it's tell me your race

3    and gender before hire or you're not going to

4    hire.  In the law, in the law of Massachusetts

5    and in the federal law and in our rule of law

6    about civil rights, you cannot ask people about

7    their race and gender before getting hired.  You

8    cannot.  During the first phase.

9              After you hire them, then you ask

10    them, ask them about their gender and their race,

11    and that's what I got because I am not hired

12    right now.  Why I have this Exhibit No. 27 with

13    the password and an e-mail address to log in and

14    identify my race and gender before I get hired.

15    Right now I'm not employee.  That means you asked

1-19-07Harper2 (2).TXT

16    me something before you hired me, and between us

17    I think it's very discriminatory.

18              And furthermore, I want to ask you

19    a question.  Your Cisco code of conduct or

20    business code of conduct, let me ask you this

21    question, does it promote open door policy, and

22    explain to us what's open door policy, Miss Celia

23    Harper, please.

24        A.      All right.  Cisco's open door


                                                    139

1     policy is an opportunity for employees of Cisco

2     to be able to have open discussions with any

3     level of the company, and so that's one element.

4               The second one is I'm going to

5     reference back to your document that you've asked

6     me to review.  And again I want to state that

7     this is something that's compliant with federal

8     law.  It's voluntary.  You may choose to decline

9     any information around your race or gender, and

10    that this information will not subject any

11    applicant or employee to adverse treatment.  So

12    that is something that is required for us to do

13    reporting to the United States federal law.

14        Q.      And that's what we're doing right

15    now.  That's why we're in this litigation.

16        A.      Exactly, and so Cisco is compliant

17    in its regulations of adhering to our

18    implementation of our process with recruitment

19    and with our tools and documentation.

                        Page 119

1-19-07Harper2 (2).TXT

20    Q.        And now you're telling me because I
21    did not comply with your request to identify my
22    racial gender, that's why I don't have a job.
23    A.        No, it does not state that.  It
24    says that you do not have to give that


140

1    information.
2    Q.        Miss Celia Harper, I did not reply
3    to that request, and now you're telling me that
4    that's why I don't have a job.
5    A.        That's not what I'm saying, and
6    that's not what I've stated.  I said that it was
7    by U.S. federal law that we were required to
8    report that data, and that's why it is considered
9    voluntary.  It does not subject you to have any
10    adverse treatment if you do not complete the
11    documentation.
12    Q.        Let me ask you also about Lynn
13    Fraser's comment that is found in Exhibit 26
14    telling people I do not have right to hire, to
15    bring Anthony back to Cisco.  Let me ask you, if
16    you refer to Exhibit 3 of the complaint.  It's a
17    letter from Mr. John Chambers.
18    A.        Would you give me a moment just to
19    locate that document and review it, please.
20    Q.        Please take your time, and thank
21    you for your patience.  Exhibit 3 of the
22    complaint.
23    A.        Okay, I have it.
24    Q.        Exhibit 3 of the complaint, right,
Page 120

1-19-07Harper2 (2).TXT

141

1      it states the 21st August 2000, right?

2            A.      Correct.

3            Q.      This letter is from John Chambers,

4      right?

5            A.      Correct.

6            Q.      The first line says, "Dear,

7      Anthony" -- and also before that he put my

8      address.  Anthony Bayad, my address, then he

9      said, "Dear, Anthony, I want to congratulate you

10     on our 42nd quarter of consecutive revenue and

11     earning growth which was the strongest quarter

12     and year growth we have seen in more than four

13     years."  Did you understand this statement?  Yes,

14     Miss, right?

15           A.      Yes.

16           Q.      And you stand by Mr. Chambers.   He

17     wrote this, right?

18           A.      Yes.

19           Q.      Okay.   From his office?

20           A.      Yes.

21           Q.      Now, let me ask you, why Lynn

22     Fraser put the sticker on top of this letter and

23     give it to me?  And on top of the sticker -- and

24     I'm saying this because I'm very passionate about

142

1      this -- she wrote to me, "Congratulations,

1-19-07Harper2 (2).TXT
2   Anthony, Lynn."  She signed it with her own hand,

3   Lynn.

4        A.      Wait a second.  Which document are

5   you stating from Lynn?

6        Q.      Exhibit 3.

7        A.      Oh, that's up there, okay.  This is

8   the first I've seen of this document, so I've had

9   no previous knowledge of this.  And what I would

10  share with you is this document is stamped with

11  John Chambers's name on it, so.

12       Q.      But it came from Cisco office.

13  It's not fraud, right?  Nobody committed fraud

14  here, right?  Nobody stole this letter from

15  Cisco, John Chambers's office, right?

16       A.      Correct.

17       Q.      Nobody told John Chamber --

18       A.      That is my understanding, that it

19  is not fraud.

20       Q.      Okay.  This has been sent on 21st

21  August 2002 to people like myself, Anthony.  Good

22  guys, right?

23       A.      I don't know.  I mean, yes.  No, I

24  don't know if it was sent to you or how you


                                                143


1   received it.

2        Q.      Perfect.  No problem, no problem.

3   I don't want to put you on the spot.  It's not

4   fair.

5                Okay.  This letter came from Cisco.

6   John Chambers give it to me, and he gave me some

                    Page 122

1-19-07Harper2 (2).TXT

```
 7    money.  He gave me -- you know how much he gave
 8    me, he gave me 5,858.05 that means I got this
 9    money from him because he congratulate me.  I
10    paid taxes on this.  It's on the record.
11          A.      Correct, as all employees that are
12    eligible to participate in the CIP bonus plan,
13    they would receive a letter such as this to be
14    able to notify them of --
15          Q.      Anybody that worked for Cisco on
16    the 42nd quarter, they were successful, all of
17    them, everybody, including you.  Everybody,
18    right?
19          A.      No.
20          Q.      And that's why my group --
21          A.      No.
22          Q.      I'm sorry.
23          A.      No, not everybody.
24          Q.      Thank you.  Only certain people get
```

                                                     144

```
 1    this, right?
 2          A.      That's eligible for a bonus.
 3          Q.      Thank you.  And I was one of
 4    them -- right? -- during my employment at Cisco?
 5          A.      It appears in this document that
 6    you were eligible for a CIP bonus.
 7          Q.      And I got it, and I got stock
 8    options.  I was happy.
 9          A.      I don't know if you got stock
10    options.  I can only see what's written on this
```

Page 123

1-19-07Harper2 (2).TXT

11    document and agree with what's in this paragraph

12    that you're referencing relative to the bonus.

13        Q.    Okay, okay, okay.  He was saying

14    good things about that.  We, did, we did, we did.

15    But my question to you, why Lynn Fraser, because

16    they sent it to my boss, my manager, Lynn Fraser.

17    Why Lynn Fraser she wrote to me "Congratulation,

18    Anthony" in her own hand and wrote and signed it

19    Lynn?

20        A.    I don't know.

21        Q.    You don't know?

22        A.    No.

23        Q.    Okay.  Now, we compare what she

24    said, stated on Exhibit 26 of the complaint.  She

145

1    said she does not recommend Anthony to work for

2    Cisco, and we reviewed the record of my job

3    performance and my personal interaction with my

4    coworkers, and everything is excellent,

5    excellent, excellent, but Lynn Fraser stated to

6    me on Exhibit 26 she does not recommend me to

7    Cisco, but the record speak that she was telling

8    me you're a good man, you're highly educated and

9    all the above.  And I'm going to tell you why.

10    Because the reason she changed her mind about me,

11    and I'm going to help you.  And I want you to go

12    to exhibit, exhibit -- the letter that I sent to

13    Mr. Chambers and Mr. Rick Justice.  I'm sorry,

14    I'm looking for it, because I'm getting tired.

15                Okay.  In the meantime I want to go

1-19-07Harper2 (2).TXT

16      through this very quick, Miss.  On Exhibit 15 of

17      the complaint I produce my time sheet.  Like the

18      job review on Exhibit 2 stated, I was over

19      utilized.  And the time sheet Mr. Falby had

20      admitted to it, that he admit to it, and he told

21      me that I was more utilized than anybody else.  I

22      just want to let you know for the record.

23                  Now I'm looking for the letter

24      dated November 29th, 2000, that I wrote to


                                                          146

1       Mr. John Chambers.  And I'm looking for it.  I

2       think it's in Exhibit 1 or 2 -- 3.  I'm sorry.

3                   Yeah, I got it.  Exhibit 11.

4       Exhibit 11.  It's a Cisco over head letter with

5       Cisco logo.  November 29th, 2000.  I'm still

6       working for Cisco, right?  Because, as you

7       recall, I was terminated in April 2001, right?

8       This letter is dated -- to the best of your

9       knowledge, this letter is dated with

10      November 29th, 2000, right?

11          A.      I have no idea.

12          Q.      Okay.  It was initiated on

13      November 29th, 2000, Anthony Bayad, because I

14      signed this letter.  I used the open-door policy

15      complaining about the Cisco no-hire list.

16          A.      Can you give me a moment to read

17      this document.

18          Q.      You can read it to us if you want.

19      You're good in English.  You can browse through

                        Page 125

1-19-07Harper2 (2).TXT
20    it pretty quick.
21              MR. FALBY:  Why don't you just have
22    her read it to herself.
23              MR. BAYAD:  Okay, no problem.
24              I want to read it for the court


                                                    147

1     reporter, only three lines, because it's very
2     important.  This letter was initiated during my
3     employment at Cisco when I came back from Europe,
4     North Africa and Dubai seeking opportunity
5     elsewhere for my career because I was spotted by
6     Anthony Savastano.  I used the open-door policy,
7     and I wrote the following, a letter with the logo
8     and e-mail and over head letter, interoffice, and
9     I wrote the following to Mr. John Chamber and
10    Rick Justice.  I stated "Subject:  Employment
11    discrimination and retaliation by Anthony
12    Savastano."  At that time Anthony Savastano was
13    director of finance.  I wrote the following:
14    "Dear Mr. Chamber and Mr. Justice."  The reason I
15    wrote to Mr. Chamber and Mr. Justice is because
16    Mr. Justice is responsible about overseas, about
17    sales overseas, is because he's worldwide, that's
18    why I did not write it to somebody else, to Nick
19    Adamo or to anybody else.  I wrote it to John
20    Chambers, I will see you, according to the
21    open-door policy of Cisco, and I asked
22    Mr. Justice, as it states in the letter,
23    Exhibit 11 of the complaint.  I state the
24    following:  "I would like to bring to your

1-19-07Harper2 (2).TXT

148

1    attention that Anthony Savastano has
2    discriminated against me once again by placing my
3    name in the Cisco no-hire list, policy list on or
4    about November 3rd, 2000.  I was offered an
5    opportunity with Cisco Group Middle East in
6    Africa -- France, Middle East and Africa and
7    France to become a system engineer for North
8    Africa region.  Mr. Chandler and Mr. Justice, as
9    you already know, have spent a considerable time
10   being interviewed over the phone by my managers
11   of Cisco Europe before I was invited for
12   one-to-one interviews on and before Cisco Europe
13   decided to proceed with an expenditure over
14   $10,000 on my travel airfare and accommodation
15   and for the time and effort spent by Cisco
16   directors, managers, engineers and myself in the
17   last stage of this hiring selection process.
18           The three set of interviews were
19   very expensive as they were conducted in United
20   Arab Emirate Dubai, the second one in France,
21   Paris, and the third and the last interview in
22   England, London.  The interviews went well.  I
23   was offered a verbal offer by all manager."
24           Since I'm a resident of -- for the

149

1    record, since I'm a resident in Massachusetts,
                     Page 127

1-19-07Harper2 (2).TXT

2    the law state if somebody provide me with oral

3    contract it's binding, just to let you know for

4    the future. It's good to know. Nobody knows

5    this. Also, to know, Miss Celia Harper, in

6    Massachusetts if an employee asks you to give him

7    his personnel record and you deny to give it to

8    me, it's against the law. Any resident in

9    Massachusetts has right to write to the employer,

10    like Cisco, as Anthony did, and ask you for my

11    personnel -- employment personnel record. It's

12    the law. It's not privileged, just to let you

13    know.

14            Let me keep reading. "The pick

15    was" -- I'm talking about the people that I met

16    overseas. I flew half the world. "The pick was

17    adjusted because of my strong technical

18    background and my ability to speak the Arabic,

19    English, French and North African dialect, and

20    it's good business decision for Cisco," and the

21    list goes on and on and on.

22            The reason I wrote this letter -- I

23    did not violate anybody's privacy or right. I

24    followed the business code of conduct set forth

150

1    by you and your team, Celia Harper, that correct?

2    Do I have a right to complain about

3    discrimination to my upper managers, including

4    but not limited to John Chamber and Rick Justice?

5    Do I have right to do that, or I probably have

6    violated something here. Do I have a right to

1-19-07Harper2 (2).TXT

7     complain about this open-door policy?

8                    Also, Miss Celia Harper, when you

9     finish this question, I'm going to ask you

10    another question, and that question need you to

11    help Mr. Bruce Falby because he keep stating some

12    stuff that is not fair, not true.

13                    Miss, if I see myself discriminated

14    in this company, as you state earlier I do have

15    open policy for me to go to the upper management,

16    yes or no?

17         A.     We do have an open policy -- we do

18    have an open policy at Cisco Systems.

19         Q.     To complain about discrimination?

20    Let's not guess Cisco System policy and

21    procedure.   Nobody will be terminated for raising

22    the issue of discrimination at Cisco or any

23    discrimination, gender, origin, religion, sexual

24    harassment.   Anybody who felt uncomfortable, he


                                                    151

1     goes and views the open policy at Cisco by

2     organization of human resources at Cisco and go

3     ahead and complain to upper management, yes or

4     no?

5          A.     The open policy is an opportunity

6     for any employee to be able to voice their

7     opinion about any subject that pertains to them

8     or the company.

9          Q.     In other words, what you're

10    stating, what you're stating, Miss Celia Harper,

                    Page 129

1-19-07Harper2 (2).TXT

11    for the record, you're telling me that I did not

12    do anything by going above a director of finance,

13    Mr. Anthony Savastano, who have discriminated

14    against me in three companies.   The record is so

15    outrageous that the United States District Court

16    does not understand what happened here, because

17    nobody saw this discrimination case, not in

18    Florida, Lucent Technologies, move to INS,

19    International Network Services, and end up at

20    Cisco.   Cisco has cleaned up their house right

21    now.

22         A.    I don't know any of that.  I'm not

23    aware of any of that.  I don't have any knowledge

24    of that.


                                                    152


1          Q.      You don't have any knowledge, but

2    the complaint has knowledge.  If you read -- if

3    you read Exhibit 4, it's Mr. Navara's

4    declaration, Mr. Nara's declaration, Mr. Navara's

5    affidavit in support in the case, in the case of

6    said Anthony Bayad versus Anthony Savastano.  You

7    stated earlier that you knew Anthony Savastano.

8    You do, right?

9          A.      Yeah, I do know Anthony Savastano

10   as an employee of Cisco.

11         Q.      Well, let me ask you this.

12   Mr. Savastano was involved in three

13   discrimination lawsuits.  Also, he was named in

14   the newspaper, in the Foreground Hotel.  I have

15   it, and I gave it to Mr. Falby.  He has it for

1-19-07Harper2 (2).TXT

16    the record.  High Tech Scandal.  He stated fired

17    engineer accuse of racial bias.  And in such

18    article you have Anthony Bayad and Anthony

19    Savastano.  Now, Anthony Savastano has the answer

20    of discrimination.  He discriminated against

21    Anthony Alsai, an employee that works for you

22    right now.  He's in Egypt.  We just found that he

23    is in Egypt.  Also, he made, he filed a complaint

24    with the EEOC like I did, and sue Mr. Savastano


                                           153

1     that you know.  Also, we filed, I filed myself a

2     Title VII which you mentioned earlier.  That's

3     with the EEOC -- right? -- Equal Employment

4     Opportunity Commission, right?

5            A.      Correct.

6            Q.      Okay.  In such organization, the

7     EOC, they have loss as Title VII.

8            A.      I was only answering your question

9     and verifying the EEOC.  I am not aware of any

10    files or suits that have been claimed against who

11    you've just named.

12           Q.      Ms. Celia Harper, I don't want to

13    put you on the spot.  Anybody that comes for a

14    deposition, they read Exhibit 4, and they see

15    Exhibit 4 that says in the United States District

16    Court, Southern District of Florida, Anthony

17    Bayad versus Lucent Technologies, Louis Caslow,

18    Mike Reed, Ronald Mohito, Anthony Savastano, and

19    John Gruen.  Anthony Savastano, Case No.

1-19-07Harper2 (2).TXT
20    976671CTV.    Luther was the judge.    In the United

21    States District Court, Southern District of

22    Florida.    Savastano is an employee at Cisco.    You

23    know him, right?

24         A.        I know him as an employee of Cisco.


154

1         Q.        Exactly, and you know Exhibit 3

2    doesn't lie.    If we go right now, if you and I --

3    I'll give it to you right now.    If you want me to

4    send you -- if you want me to go to the docket

5    entry and tell you that I filed a motion similar,

6    discrimination that is admissible, and the

7    honorable court has provided that, has said yes,

8    it is admissible.    Now, what I'm telling you is

9    you have a guy that has a history of

10    discrimination, and he discriminated against me.

11              Also, I want to ask you, did you

12    want to know why I flew around the world for a

13    job overseas, knowing my family are in America

14    and I love my country America.    I do not care

15    about other countries.    I care about this country

16    because I live here.    Ask yourself why I am

17    scared and flying around the world looking for a

18    job at Cisco, calling my buddies at Cisco to hook

19    me up.    Do you know why?    Because exhibit -- I'll

20    tell you, Miss, why.    First you need to review

21    Exhibit 4, that states what Savastano has done to

22    me.    Also, you have to go to Exhibit 5, and

23    Savastano directed others, coerced to call me son

24    nigger, lying culprit.    Also, Exhibit 6 is a
              Page 132

1-19-07Harper2 (2).TXT

155

1    police report.  He abused me, tortured me.
2    That's why I'm like this right now.  That's
3    Exhibit 6.
4             Now going to Exhibit 7, and this
5    they call a knockout respectfully.  They call it
6    a knockout in this discrimination lawsuit.
7    Mr. Savastano, the person that you know, in
8    Exhibit 7 he stated to me -- on January 24th,
9    1997, he said to me, Mr. Anthony Bayad, with the
10   company title Lucent Technologies, Mr. Savastano
11   said the following to me:  "Dear, Anthony Bayad,
12   I have reviewed the information for the security
13   investigation regarding the purchase of two
14   airline tickets from Morocco to Miami."  You know
15   what that means?  He found out that I'm Moroccan.
16   Because my name is Anthony, anybody who can't see
17   me thinks I'm Italian.  So when he found out I'm
18   Moroccan, you know what he said in his letter,
19   "This is a serious violation of the Lucent
20   Technologies code of conduct."  By being
21   Moroccan, by using his authority as a finance
22   director and a VP at Lucent, as he is right now
23   at Cisco, he's a vice president of finance, he
24   stated to me, "misusing the corporate American

156

1    Express card for personal expenses, you are

1-19-07Harper2 (2).TXT
```
 2    fired," he said.  "This is to notify you that
 3    your employment is terminated immediately as a
 4    result of your violation of Lucent Technologies
 5    code of conduct."  The credit card has my name,
 6    but that's another story, that's no problem.
 7              Now, moving back to Exhibit No. 8.
 8    Okay, Exhibit 8, also in this lawsuit is a
 9    knockout.  It's an awful letter.  Remember he
10    fired me from Cisco, Miss Celia Harper.  And
11    Exhibit 8 of the complaint is an awful letter,
12    dated July 21st, 1997.  And if we go back -- I'm
13    sorry.  If you go back to Exhibit 7, the date of
14    that is January 24th.  How many months between
15    January 24th and July 21st, how many months?
16         A.      Six.
17         Q.      Okay.  I have not worked for six
18    months.  I was involved in discrimination lawsuit
19    and I was in hospital by Mr. Anthony Savastano
20    and Carl Wiese, the VPs of this company, this
21    wonderful company Cisco, and I got a letter.
22    Nobody can sue anybody in this industry and find
23    a job in six months, nobody.  You know it.  I
24    know it.  I found a job.  Guess what.  On
```

                                                   157

```
 1    July 30th, 1997, I was terminated.
 2              Now, let's go back to Exhibit 8,
 3    the offer letter from International Network
 4    Services.  Another company gave me an offer
 5    letter, gave me an opportunity, and it was dated
 6    July 21st, 1997, and my job is to start
```
                         Page 134

1-19-07Harper2 (2).TXT

7     July 30th, 1997.  I was terminated on my first
8     day by Anthony Savastano.  And I have an e-mail,
9     and that's Exhibit 8, about his personal
10    secretary doing the same thing as Lynn Fraser has
11    done, discriminating against me, giving me bad
12    references.
13              Now, Ms. Celia Harper, I'm going to
14    ask you last question.  When you hire somebody in
15    your organization, first you look at liability
16    right?  Make sure they're not criminal, right?
17    Yes?
18    A.         We verify --
19    Q.         I have the package here that you
20    guys went through with me when you hired me.
21    First what you do you fill out an application.
22    First if the interview go well with the hired
23    manager, if he likes you, he calls you guys to
24    set up -- to tell you give Anthony an offer

                                                      158

1     letter, right?
2     A.         The process that -- if the
3     candidate --
4     Q.         Miss Celia Harper, we are almost
5     finished.  Please help me.  And you're not,
6     you're not -- whoever is listening here, you're
7     not to blame here.  You are to blame for sticking
8     you with the Cisco no-hire list as the admin, and
9     you cannot say no because you get fired.  I don't
10    know what's your background.  I don't care.  But

                        Page 135

1-19-07Harper2 (2).TXT

11    I can tell you Cisco no-hire list does exist, and

12    you know it and I know it, and Mr. Savastano put

13    my name, because all the evidence is in support

14    of Cisco no-hire list, you know, this Lynn Fraser

15    and everything.

16              Now my question is, I want you for

17    the last moment of this deposition to go step by

18    step with me.  I have the record with me.  When

19    somebody first enter, first apply for job either

20    he goes through the HR personnel direct, send a

21    resume through the system which you, one of you

22    guys at human resources or probably Savastano

23    sent me an e-mail stating to me identify your

24    race and gender before you're hired.  In other

159

1    words, he was laughing at me.  He thought it was

2    a joke.

3              But anyhow, my question now to you

4    is a real question.  When somebody file an

5    application and it goes through the system, you

6    have a, you have like a recruiter internally,

7    right?

8         A.      We do have recruiters internally.

9         Q.      Yes.  Those recruiters they go over

10   the resume.  Probably -- I don't want the

11   details, yes or no.  Probably call the applicant

12   or they refer the application to the hiring

13   manager, yes or no?

14         A.      The recruiter will screen the

15   applicant.

1-19-07Harper2 (2).TXT

16      Q.      The Recruiter reviews it.  And if

17   he decided this guy has talent, then he forward

18   it to the right hiring manager that needs that

19   talent, yes?

20      A.      Let me share the process with you.

21   The applicant comes through the system.

22      Q.      Yes.

23      A.      The system acknowledges that

24   they've received the application and/or the


                                            160

1    resume.  It gets forwarded to the recruiter.  The

2    recruiter then screens the applicant and forwards

3    on to the hiring manager.

4       Q.      Yes.

5       A.      And the hiring manager and a select

6    group of team members will interview the

7    candidate.

8       Q.      And in mine I was interviewed by

9    seven people.  I was very impressed by Cisco.

10   They screened me left and right as you know.

11   Very talented.  From other group and my group

12   which is very good.  Then they give me a offer

13   letter, right?

14      A.      I don't know.  I don't know if they

15   gave you an offer letter.  I don't know the steps

16   of the process that you went through.  I can't

17   verify that.

18      Q.      They gave me a offer letter, right?

19   When they gave me a offer letter -- right? -- I

1-19-07Harper2 (2).TXT
20    want to ask you a question.  Before that offer
21    letter has been initiated to any applicant, me or
22    anybody.  I just don't want to put you in any
23    spot, and I swear to God I'm not trying to trick
24    you.  I just want to know the process.    Any


161

1    applicant before he gets the offer letter, you
2    have a process in place with the hiring, what
3    they call hiring -- there's another organization
4    that do hiring.  What's the name that do the --
5         A.       The process in the place is the
6    Hire Right Company that does the background
7    verification.  So they actually verify the
8    applicant's employment.
9         Q.       That's what I want to ask you, yes.
10        A.       They verify --
11        Q.       Thank you.  Yes, that's correct.
12   They go through everything.  You five years
13   resident.  They check your background against
14   your driver's license.  They check your driver's
15   license if you have a moving violation.  They
16   check everything.  Also they check your district.
17   If I live in Tampa, for example, like Anthony
18   Savastano, they will go to court, and they will
19   find out if there is something about the court.
20   Is that correct, yes or not?
21        A.       I don't know.
22        Q.       Well, they do.  I have it here.
23   Now, my question to you, who hired these two
24   guys, Carl Wiese, Anthony Savastano knowing

1-19-07Harper2 (2).TXT

162

1    they're on a newspaper, knowing they have three
2    lawsuits pending against him that was in Florida,
3    and we don't want to talk about their result.  I
4    mean, I'm going to put you on the spot here, and
5    then we're going to finish this deposition.  If
6    somebody has a long wrap sheet of discrimination
7    and he's a racist, would you hire him or would
8    you not hire him?  I would not hire him because
9    he broke the law.  Would you hire him?  Anthony
10   Savastano, Carl Wiese, why are they working right
11   now?  Why do they have you on the phone right now
12   stretching like this, why, why?  If it wasn't
13   Tony Savastano and Carl Wiese, I would never be
14   on this Cisco no-hire list.  Yes or no, miss?
15        A.      I don't understand your question.
16   Restate it, please.
17        Q.      I would like to ask you why did you
18   hire, your organization hire two guys from a
19   loser company.  With all respect to anybody
20   listening, I call Lucent Technologies losers, and
21   I predicted their downfall, and they beat me up
22   because I'm a Moroccan.
23              When Spanish, Arabs and female are
24   suing Anthony Savastano and Carl Wiese, and the

163

1    record speaks for itself, in Tampa and in Fort
                        Page 139

1-19-07Harper2 (2).TXT

2    Lauderdale, why did you hire these people knowing

3    it is public traded company, Miss.  If this goes

4    to public right now -- you are an officer of the

5    company.  If somebody right now take this

6    deposition and give it to CNBC which I'm not

7    going to do.  I don't care about anybody.  I'm

8    just fighting for my rights.

9                Now, two Cisco senior VPs have a

10   long sheet of discrimination.  They are racists,

11   and they're representing the company.  And

12   knowing if they get promoted to senior vice

13   president, they're going to be publicly on the

14   Internet.  And guess what, what happen to CNBC

15   when they talk to him, what are they going to

16   tell Mr. Savastano?  Do you have a problem with

17   arrest Arabs?  Do you have a problem with

18   Spanish?  Do you have a problem with Puerto

19   Ricans?  He discriminated against a beautiful

20   woman called Joanna Lopez who is Puerto Rican.

21   You know that, right?  To cover up my

22   discrimination because he told my lawyer that

23   Anthony's discrimination lawsuit is too costly

24   because we taught him a lesson.  Why did you hire


                                                    164


1    this guy.  He doesn't have a future.  He cannot

2    be hired or promoted like senior vice president

3    George O'Mara or Nick Adamo.  He can't.

4                As HR I want you to tell me why you

5    have two people that have discriminated against

6    all races, not just Arabs, Spanish, Puerto Rican,

1-19-07Harper2 (2).TXT

7    and black.  I don't know about black, but
8    probably.  Probably, I don't know.  But I know
9    they discriminate against Arabs, North Africans
10   and Puerto Ricans and Hispanics and Southern
11   Spanish.  Why, Miss, why did they get promoted
12   and hired, why?
13               You are human resources, you have
14   to, you have to, you have to answer this question
15   because you know him and you are HR.  It is your
16   duty to answer this question, because one person
17   said do not hire Anthony Bayad, and you did not
18   hire me, and I showed you that I was qualified,
19   but I never discriminated against anybody.  I do
20   not have any criminal record.  I did not, I did
21   not hurt anybody.  My people are the American
22   people.  I did not, Miss.  I did not, I did not
23   participate with any criminal organization.  I'm
24   a topnotch engineer.  I can go to the telephone


                                                   165


1    pole.  I can hack into any phone in the world,
2    any company because I'm very well trained, and I
3    don't do this because I'm an American, a patriot.
4    I love my country.
5               Why do you hire these two people,
6    Carl Wiese and Anthony Savastano, why?  If you
7    don't want to answer this question, I don't know
8    what to tell you.  Because if you do hire
9    somebody, and you also see it yourself with
10   somebody, you become also that person.  That's

1-19-07Harper2 (2).TXT

11    what it is, Miss.  Now tell me why, Miss, before

12    we can cut this and go home.

13         A.     So I'm not aware -- I can't answer

14    that question because I don't know the answer to

15    it, that's why.  I can only tell you that they

16    went through the same process as any other

17    applicant as we would expect.  So they went

18    through the screening of the resumes, went

19    through the interview process, and they went

20    through the background process.

21         Q.     And why John Chamber and Rick

22    Justice -- when Anthony used the open-door policy

23    and blew the whistle on him, Anthony Savastano

24    told them that he has a race problem with Spanish


166

1    and women and Arabs, Moroccan.  And I told them

2    that, and I called Mr. Rick Justice over the

3    phone.  I spoke to him directly.

4         A.     I don't know anything that you're

5    saying about them to be true, so.

6         Q.     Yeah, they have a race problem.

7         A.     I'm not aware of that.  I don't

8    know any of that to be truthful.

9         Q.     No problem.  On November 29th,

10    2000, when somebody tells you that somebody is

11    racist and has a long sheet, a record of

12    discrimination?

13         A.     I'm not aware of that to be

14    truthful.

15         Q.     Okay, okay.  Somebody sues you,

Page 142

1-19-07Harper2 (2).TXT

16    you're not racist.  People just wake up in the

17    morning and go sue people.  You wouldn't have

18    deposition today.  The Honorable Patti B. Sarris

19    work through this case because it's the law.

20          A.       You can sue people, but it does not

21    mean that they are guilty.  You can sue people

22    for anything.  It doesn't mean that they are

23    criminals in that aspect.

24          Q.       I'm not incriminating anybody.  I'm


                                              167


1    not saying they are criminals.  I'm sorry.

2          A.       But you're stating that they're

3    racist, and you're stating that they're dis --

4          Q.       Just for the record --

5          A.       I'm not aware of that, but that

6    doesn't make them --

7          Q.       I'm stating to you that they are,

8    that they have a history of discrimination and

9    they have a pattern of discrimination and they

10    are in violation of Title VII Section 704 and 703

11    which state clearly if anybody violate complaint

12    with the EOC at any time -- they don't specify

13    the time limit, no time limitation -- that person

14    is automatic in a protected activity.  Mr. Falby

15    can explain that to you.

16                   Now, when somebody use open-door

17    policy and state to you that, help me, this guy

18    has a problem with me, doesn't like my race, why

19    does he get promoted and I get fired six months

Page 143

1-19-07Harper2 (2).TXT

20    later?  And why after one year I apply for a job

21    I get denied by Lynn Fraser in support of the

22    Cisco no-hire list.

23             And at the end, Miss, let me tell

24    you something, you want to answer this or not.


                                                    168

1    Ask your attorney Bruce Falby why did he provide

2    the Cisco no-hire list under oath and he did not

3    provide the electronics copy, and I proved that

4    to you the electronics copy, this one that I gave

5    you, it has more people, that's why he don't want

6    to give it to me.

7             Now, Miss, God bless you.  Thank

8    you for your help.  If you have any questions,

9    please ask me.  And thank you for your patience,

10   and I'm sorry, I apologize to you for putting you

11   through this, and it's not personal.  It's just

12   I'm fighting for my rights and my survival

13   because I try to find jobs, move on, become an

14   engineer.  I'm highly educated.  I cannot work.

15   And if I cannot work, I have to go to court.  And

16   I do not like to go to court because it affects

17   my health and my future and my kids.  If I have

18   kids in the future, they're going to be looked at

19   like their father, Anthony Bayad, sue people, his

20   kids also sue people, and I don't, and now I'm

21   almost 40 years old.  You have kids, and I don't.

22   You have future, I don't.  You have savings, I

23   don't.  Thank you, Miss.

24             Mr. Falby, I still need you to give
                        Page 144

1-19-07Harper2 (2).TXT

169

1     me the electronics copy of your declaration.

2               MR. FALBY:   The witness has done

3     her best to answer your questions.   Do you have

4     any more questions of the witness?

5               MR. BAYAD:   No.   Thank you very

6     much.

7               MR. FALBY:   Then let's terminate

8     the deposition.   Thank you.

9               (Deposition concluded at 4:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

170

1               C E R T I F I C A T E

Page 145

1-19-07Harper2 (2).TXT

2          I, Maryellen Coughlin, a Registered

3     Professional Reporter and Notary Public of the

4     State of Massachusetts, do hereby certify that

5     the foregoing is a true and accurate transcript

6     of my stenographic notes of the deposition of

7     Celia Harper-Guerra, who appeared before me,

8     satisfactorily identified themself, and was by

9     me duly sworn, taken at the place and on the

10    date hereinbefore set forth.

11          I further certify that I am neither

12    attorney nor counsel for, nor related to or

13    employed by any of the parties to the action in

14    which this deposition was taken, and further

15    that I am not a relative or employee of any

16    attorney or counsel employed in this case, nor

17    am I financially interested in this action.

18          THE FOREGOING CERTIFICATION OF THIS

19    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF

20    THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT

21    CONTROL AND/OR DIRECTION OF THE CERTIFYING

22    REPORTER.

23

24                    MARYELLEN COUGHLIN, RPR


                                                    171


1               UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3               C.A. NO. 05-11005-PBS

4

5     * * * * * * * * * * * * * * * * *

6     ANTHONY BAYAD,                        *

1-19-07Harper2 (2).TXT

```
 7                Plaintiff              *
 8      vs.                             *
 9      BRUCE BASTIAN; KATE DCAMP; LYNN  *
10      FRASER; CELIA HARPER-GUERRA; RICK *
11      JUSTICE; CISCO SYSTEMS, INC.      *
12                Defendants            *
13                                      *
14      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
15
16                I, Celia Harper-Guerra, do hereby
17      certify, under the pains and penalties of
18      perjury, that the foregoing testimony is true
19      and accurate, to the best of my knowledge and
20      belief.
21                WITNESS MY HAND THIS ____ day of
22      _____, 2007.
23                          _____
24                          Celia Harper-Guerra
```

172

```
 1                CORRECTION SHEET
 2      DEPONENT:  Celia Harper-Guerra
 3      CASE:  Anthony Bayad vs. Bruce Bastian, et al
 4      DATE TAKEN:  1-19-07
 5      ***********************************************
 6      PAGE /  LINE /  CHANGE OR CORRECTION AND REASON
 7           /        /
 8           /        /
 9           /        /
10           /        /
```

1-19-07Harper2 (2).TXT

```
11          /          /
12          /          /
13          /          /
14          /          /
15          /          /
16          /          /
17          /          /
18          /          /
19          /          /
20          /          /
21          /          /
22          /          /
23          /          /
24
```

                                                    173

```
 1    Today's Date:        February 2, 2007
 2    To:                  Bruce Falby, Esq.
 3    Copied to:           Anthony Bayad, Esq.
 4    From:                Maryellen Coughlin, CRR/RPR
 5    Deposition of:       Celia Harper-Guerra
 6    Taken:               January 19, 2007
 7    Action:              Bayad vs. Bruce Bastian, et al
 8    ================================================
 9            Enclosed is a copy of Ms. Harper
10    -Guerra's deposition.
11            Please have Ms. Harper-Guerra sign the
12    enclosed signature page.  If there are any
13    errors, please have her mark the page, line, and
14    error on the enclosed correction sheet.  She
15    should not mark the transcript itself.  This
```
                        Page 148

1-19-07Harper2 (2).TXT

16    addendum should be forwarded to all interested

17    parties.

18              Thank you for your cooperation in this

19    matter.

20

21

22

23

24