# *IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS*

ANTHONY BAYAD, )
)
)
Plaintiff , )
)
)
)
BRUCE BASTIAN; KATE DCAMP )
LYNN FRASER;CELIA HARPER-GUERRA; )
RICK JUSTICE; CISCO SYSTEMS INC. )
Defendants, )

**CIVIL ACTION**

**CASE NO. 05-11005PBS**

**SUPPLEMENT FILING OF SUN SENTINAL NEWS PAPER ARTICLE WHERE TONY SAVASTANO AND CARL WIESE - CISCO OFFICER(S) OF THE COMPANY AND ANTHONY BAYAD THE PLAINTIFF WERE PUBLISHED IN SUCH ARTICLE OF DISCRIMINATION LAW SUIT IN FLORIDA**

Plaintiff Anthony Bayad ("I") introduce this news paper article published in Fort Lauderdale Florida, the Sun Sentinel, on Saturday , June 27, 1997. Where in such news paper article speaks for it self and support history of discrimination and define - explain what Lucent Managers and now Cisco Managers, Tony Savastano and Carl Wiese ( case 0410468PBS) (D. Mass) have done to me – their act was hate crime. Therefore, this court has duty to review such article and to insert it as direct evidence of past history of discrimination of Cisco Executive Tony Savastsano and Carl Wiese, " owners of Cisco" see *Serapion v. Martinez,* 119 F. 3d 982, 990 (1st Cir. 1997),cert. Denied, 118 S. Ct. 690 (1980). ( definition of ownership or partnership in legal contest); Also see order of this court ( D. Mass) DATE NOVEMBER 10, 2005 case No. **04-CV40146FDS** (D.

Mass) The Honorable Chief Magistrate Judge, the hon. Charles B. Swartwood III, has ordered :

( see Page 3-4)

> "This court has previously found that, " plaintiff[s] should be permitted to show that defendants' past practices manifest a pattern of . . .discrimination." Jackson v. Harvard, 111 F.R.D. 472, 475 ( D. Mass. 1986, D.J.). In other words , evidence of a pattern of behavior is relevant to discrimination claims such as those which have been asserted by plaintiff. See e.q. Scales v. J.C. Bradford and Co., 925 F.R.D. 901, 906 ( 6th Cir. 1991) ("It is well settled that information concerning an employer' s general employment practices is relevant even to title VII/(1981/1985) individual disparate impact claim"; Gleen v. Williams, 209 F.R.D. 279, 282 (D.D.C. 2002) "similar acts of discrimination is admissible .. . "

**Wherefore**, Plaintiff Anthony Bayad ("I") demands that this court: See Complaint Docket # 1 page 36-37, the relief requested.

(a) declare the defendants' conduct to be in violation of my rights;

(b) enjoin defendants from engaging in such conduct in the future;

(c) award me back pay and benefits (with interest) that have accrued to date;

(d) award me front pay until normal retirement age as I am 39 years old;

(e) award me compensatory damages of $ 10,000,000.000 or more for emotional distress, mental anguish, and loss of enjoyment of life and the disparate treatment, and discrimination and false imprisonment that I suffered at the hand of the defendants;

(f) award me compensatory damages of $2, 000,000.000 for interfering with my Civil Rights, conspiring to restrict me from equal rights and benefits, and for defaming and destroying my life, and blocking me for working and conducting my business;

(g) Award my damages of $3, 000,000.000 or more for defamation and damage to my business and my career and my health, my reputation, injury to my character and to my credit standing;

(h) Award me punitive damages in the amount of $20, 000, 000. 000 or more;

(i) Award me costs and legal fees;

(j) Grant me such other relief as the court may deem just proper.

For the following count(s):

**PUNITIVE DAMAGES ( Published by Dla Piper Rudnick Gray Carry 'official web site)**

- "The record are clear that federal race discrimination claims brought under Title 42 Section 1981 as well as claims brought under numerous state laws are not subject to **any limits**, A recent unpublished opinion in the Fourth Circuit Court of Appeals, *White v. BFI Waste Services, LLC* (No. 05-1804, 4th Cir. May 23, 2006), serves as a pointed, when the jury in *White* found that defendant BFI's supervisors subjected two African-American plaintiffs to a racially hostile work environment for over **ten years** and awarded the plaintiffs $4 million in punitive damages on top of $1.2 million in compensatory damages. And Several recent cases illustrate just how costly discrimination and harassment punitive damages can be; also In *Issa v. Roadway Package Sys.*, a California jury awarded two FedEx drivers $50 million in punitive damages after finding that a manager subjected the two drivers to ethnic harassment and ridicule during their two years of employment at FedEx (June 2, 2006). See In *Zubulake v. UBS Warburg*, a federal jury in New York awarded a single plaintiff over $20 million in punitive damages on her gender discrimination claims (April 6, 2005). . . . etc"

**1. COUNT I RACE DISCRIMINATION**

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

**2. COUNT III CLASSIFICATION OF RACE – CISCO-NO-HIRE-LIST**

Respectfully, Plaintiff request relief on Count III ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp*., 217 F. 3d 46, 56 ( 1st Cir.)

3. **COUNT VI BREACH OF ORAL CONTACT AND CONTRACTUAL OF OBLIGATION**

Respectfully, Plaintiff request relief on Count VI ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp*., 217 F. 3d 46, 56 ( 1st Cir.)

4. **COUNT VIII CONSPIRACY**

Respectfully, Plaintiff request relief on Count VIII ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp*., 217 F. 3d 46, 56 ( 1st Cir.)

5. **COUNT IX FALSE IMPRISONMENT**

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp*., 217 F. 3d 46, 56 ( 1st Cir.)

6. **RETALIATION ( NOT MASSACHUSETTS LAW )**

Respectfully, Plaintiff request relief on Count ( Retaliation record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp*., 217 F. 3d 46, 56 ( 1st Cir.)

**<u>As the court deems and proper or tier of fact or by jury</u>. (See Docket Entry #1, in support)**

**<u>CERTIFACTION OF SERVICE</u>**

I, Anthony Bayad, certify that I caused this document to be served upon Attorney Bruce Falby, Dla Piper Rudnick Gray Cray Carry, 33 Arch Street, 26 th, Boston, MA 02110, First class - U.S. Mail on March 14, 2007.

**Respectfully submitted**

**Anthony Bayad**
**2 Magoun Avenue**
**Medford, MA 02155**



AP

e decorated with a new computerized
ransferred onto a cake using food coloring.

ogy that are pushing down costs, as well as by heightened fears about security. Indeed, the recent slaying of Jonathan Levin, apparently for his bank card number, has emphasized the need for a better method for screening bank-account holders.

"I think it's going to make people think a little bit more about security," said Erik Bowman, an industry analyst with *Personal Identification News*, an industry newsletter.

"Biometrics is a way to solve that."

Demand for the scanning devices, while still

Please see **SCANNERS** 8E

# 'ares

s clearly some softening."
eases are nowhere near as
increases announced the
the discerning vacationer
can fly round trip between
cisco for $390, a third less
the heavily traveled New
arket, the cheapest round-
d to $550, from $1,025 in
to Topaz Enterprises, an
verage fare out of Detroit
than a year ago — and 19
hiladelphia.

iers, who have taken the
s fare boosts, are noticing
savvy ones have been able
hat don't have the usual
day advance-purchase re-
cted fares are also down
The cost of flying between
has fallen to $236 round
anuary; in three months,
een New York and San
ped almost in half.

happen? Consumer confi-

Please see **FARES** 2E

# Fired engineer accuses Lucent of racial bias

■ The suit also alleges that the man was held prisoner in the company's Largo office.

Sun-Sentinel

FORT LAUDERDALE — A former engineer with telecommunications giant Lucent Technologies has filed a $10-million lawsuit against the company, alleging he was fired because he is a black Muslim from Morocco and his colleagues didn't like the way he spoke English.

Anthony Bayad's suit in U.S. District Court in Fort Lauderdale cites an electronic mail message from a group leader in Lucent's Largo office to an unidentified employee:

"Anthony Bayad needs to be stopped or before you know it he will be running this company, " reads the message purportedly sent by the group leader. "He is nothing but a sand n— or a dirty Arab or something like that. I think that with your help, we can make him look bad in the eyes of upper management, so we can finally get rid of him . . . once and for all."

The message, titled "It's Done!" was sent Jan. 24, the day after Bayad was fired, the suit says.

Dan Coulter, a spokesman for New Jersey-based Lucent, issued a statement regarding the lawsuit:

"Lucent Technologies believes it's important to provide a work environment that is free from unlawful discrimination. We've only recently received this suit, but I

Please see **LUCENT** 8E

Next page

# e on sweatshops standing still












... six or seven, we hear.

successor, David Komansky, ever to find himself. As Komansky relates, Tully insisted that he know how to hold a golf club before taking control of the company.

"I said, 'Dan, I've been doing okay for 27 years without golf — I can entertain clients by taking them out to a ballgame," Komansky recounts. But Tully insisted.

"So," says Komansky, who is now hellbent on breaking golf's triple-digit barrier, "I would estimate that 50 or 60 thousand dollars later, here I am."

And so it is that we asked our double-break question: Does your chief play golf, and how good is he? (While we were cognizant of the association between golfing, fishing and lying, we decided, in general, to trust what we were told. Future generations may judge our wisdom.)

We learned quickly that the subject is so sensitive that half a dozen spokesmen, when asked, told us, more or less, to drop dead. On Lee Raymond, of No. 3 Exxon: "We're not going to comment." On

Real-estate tycoon Donald Trump absolutely will not discuss his golf game on the record. But someone with knowledge of his golfing thoughts says Trump was a scratch golfer (no handicap). Now his handicap is four or five, says pal Bill Fugazy, the New York limo mogul, adding, "He could have probably been a pro."

To Komansky of Merrill Lynch, golf is more of a pain in the keister than an addiction. Says he: "I joined an expensive country club. I took lessons. I bought the most expensive clubs I could find. I bought every piece of golf gear and clothing you can imagine. I went to Arizona twice for personal lessons from famed golf guru Jim Flick.

"Everyone tells me golf is a fun game. Painful is a more appropriate description. You do see some beautiful places. And I do think it's a great way to spend quality time with clients. But nothing can prepare you for the humbling experience of trying to hit that little white ball."


| MSRP† |
| --- |
| Engine |
| All-Speed Traction Control |
| Side Air Bags |
| Total Passenger Space |
| Front Leg Room |
| Rear Leg Room |
| Steering Wheel Radio and Climate Controls |
| Driver's Outside Auto-Dimming Mirror |
| OnStar Satellite Tracking System For Directions And Concierge Services |

†MSRP includes dealer prep and destination charge. Tax, license and optional equipment extra.


## Lucent from 1E

can assure you that when we receive such a complaint we take it very seriously and investigate thoroughly. We're currently investigating the claims made in the case so it's inappropriate for us to discuss the details at this time."

Lucent is a former division of AT&T, which makes telecommunications equipment and software. The company had $23.3-billion in revenue last year and employs 121,000 workers worldwide.

Stephanie Alexander, Bayad's attorney in Lauderdale-By-The-Sea, said several Lucent employees are prepared to testify that the e-mail message about her client is authentic if the case goes to trial.

Alexander said Lucent officials were made aware of the e-mail and other alleged discriminatory acts in January but have done nothing to reprimand the people involved.

Also named in the lawsuit are four other Lucent employees who are accused of holding Bayad prisoner in the company's Largo office, hitting him and urging him to sign a confession saying he stole money from the company, the lawsuit says.

Bayad went to work for Lucent in the company's Largo office in December 1995 as a network engineer. His starting salary was $68,000. Within a week, he was promoted to group manager and began teaching computer classes to other Lucent engineers, the suit says.

But when Anthony Savastano was named general manager of the Largo office last year, Bayad was immediately stripped of his status as group leader, the suit says. He was assigned to open a new Lucent office in Fort Lauderdale and was promised a promotion. Although his salary was increased to $83,000, the promotion never came, the suit says. Bayad also was denied reimbursement for moving expenses.

Over the next year, Bayad's suit claims he was denied several promotions and "became repeatedly aware that certain employees and managers of Lucent did not like his ethnic background, religion, race and place of national origin."

The lawsuit says the company fired him because he used his corporate American Express card to purchase two airline tickets to fly his elderly parents from Morocco to the United States.

Bayad says he had been given prior approval to buy them and has since reimbursed the company for the tickets.

Lucent officials declined to discuss Bayad's termination.







The Cadillac
The Lux