UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD,

      *Plaintiff*,

v.

CISCO SYSTEMS, INC., BRUCE
BASTIAN, KATE DCAMP, LYNN
FRASER, CELIA HARPER-GUERRA,
and RICK JUSTICE,

      *Defendants*.

CIVIL ACTION NO. 05-11005-PBS

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## MOTION FOR FINAL JUDGMENT

Plaintiff Anthony Bayad has filed a motion entitled "Motion Moves the Court to Enter Final Judgment for the Plaintiff" (the "Motion," Docket Entry #99). The Motion claims, in conclusory fashion, that "pleading and depositions on file with affidavits" entitle Bayad to summary judgment. Id. at 2. The opposite is true. The materials filed before or after the Court's deadline for Rule 56 submissions, see Order dated July 12, 2006, ¶ 5, demonstrate that the Defendants, not Bayad, are entitled to judgment as a matter of law. See Defendants' Memorandum in Support of Defendants' Cross-Motion for Summary Judgment (Docket Entry #34).

While the Motion states (without citation) that defendant Celia Harper-Guerra made admissions during her deposition that support his claims, id. at 1, the opposite is, again, true. See generally Deposition Transcript of Celia Harper-Guerra (the

"Transcript"), attached hereto.[1] Her testimony supports the Defendants' claims. She

testified, among other things, that the document that Bayad refers to as a "no-hire list" is

not authentic, id. 28:15-29:19; that someone had modified that document to add a

reference to Bayad, id. 38:12-42:4; and that she knew of no truthful basis for Bayad's

allegations of discrimination, id. 162:17-166:23. Accordingly, the Court should deny the

Motion and grant the Defendants' Cross-Motion for Summary Judgment (Docket

Entry #33).

Respectfully submitted,

CISCO SYSTEMS, INC., BRUCE BASTIAN,
KATE DCAMP, LYNN FRASER, CELIA
HARPER-GUERRA, and RICK JUSTICE

By their attorneys,

/s/ Matthew Iverson
Bruce E. Falby (BBO #544143)
Matthew Iverson (BBO #653880)
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000 (*telephone*)
Dated:  March 28, 2007          (617) 406-6100 (*fax*)

## CERTIFICATE OF SERVICE

I, Matthew Iverson, certify that on March 28, 2007, I served this document upon
Anthony Bayad, 2 Magoun Avenue, Medford, Massachusetts, 02155, by Federal Express.

/s/ Matthew Iverson
Matthew Iverson

---

[1]    Docket Entry #103 is a deposition transcript filed by Bayad. Bayad did not serve this document on the
Defendants, and it has been unavailable for inspection at the Clerk's Office. As result, the Defendants
do not know if Docket Entry #103 accurately reflects Harper-Guerra's testimony.

2

**CELIA HARPER-GUERRA**
**January 19, 2007**

Page 1

1            UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3               C.A. NO. 05-11005-PBS

4

5  * * * * * * * * * * * * * * * * * *

6  ANTHONY BAYAD,                        *

7            Plaintiff                   *

8  vs.                                   *

9  BRUCE BASTIAN; KATE DCAMP; LYNN       *

10 FRASER; CELIA HARPER-GUERRA; RICK     *

11 JUSTICE; CISCO SYSTEMS, INC.          *

12            Defendants                 *

13                                       *

14 * * * * * * * * * * * * * * * * * *

15

16      TELEPHONE CONFERENCE DEPOSITION OF

17          CELIA HARPER-GUERRA

18            DLA PIPER US LLP

19         33 Arch Street, 26th Floor

20           Boston, Massachusetts

21      January 19, 2007    1:10 p.m.

22

23

24        Maryellen Coughlin, RPR/CRR

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

2 (Pages 2 to 5)

---

**Page 2**

1 APPEARANCES:
2 Appearing pro se: Anthony Bayad
3
4 Representing the Defendants:
5     DLA PIPER US LLP
6     33 Arch Street, 26th Floor
7     Boston, Massachusetts 02110-1447
8     BY: Bruce E. Falby, Esq.
9         -and-
10        Matthew J. Iverson, Esq.
11    (617) 406-6020  (617) 406-6120
12    E-mail: bruce.falby@dlapiper.com
13            matthew.iverson@dlapiper.com
14
15 PRESENT: Paula Hughes
16
17
18
19
20
21
22
23
24

---

**Page 3**

1           I N D E X
2
3 WITNESS:    CELIA HARPER-GUERRA
4
5
6 EXAMINATION:              Page
7 BY MR. BAYAD               4
8
9
10
11 EXHIBITS FOR IDENTIFICATION:
12 No.     Description       Page
13    None
14
15
16
17
18
19
20
21
22
23
24

---

**Page 4**

1           P R O C E E D I N G S
2
3         CELIA HARPER-GUERRA,
4 having been first duly sworn, was examined
5 and testified as follows:
6
7           EXAMINATION
8 BY MR. BAYAD:
9     Q.    First, I would like to say, the
10 first thing, that I'm taking the deposition
11 according to the rules of civil procedure and the
12 rule of, the federal rules of evidence, and also
13 the procedural order of the Honorable Patti B.
14 Sarris that gave us an opportunity to further
15 discovery and gave us Celia Harper that is right
16 now being deposed. Is that correct, Miss, your
17 name is Celia Harper?
18     A.    My name is Celia Harper-Guerra.
19     Q.    Okay, Miss. Can you state your --
20 if you don't want to give your address, home
21 address or office address, can you state where is
22 your location that you are working from at this
23 time?
24         MR. FALBY: I'm going to object to

---

**Page 5**

1 the question because it's not relevant, and the
2 witness is not comfortable answering that
3 question.
4     Q.    Okay. Because the record states,
5 because there is a confusion. There is two Celia
6 Harper-Guerra. At least she can tell me if she
7 is 47 years old, Mr. Falby. Is she 47 years old?
8         MR. FALBY: I will stipulate with
9 you that you are deposing Celia Harper-Guerra.
10        MR. BAYAD: I just want to make
11 sure, Bruce. Bruce, you are counsel for the
12 record, and you are lead, and I do this for the
13 record. I just want to know that I'm not talking
14 to another Celia Harper that isn't on the
15 physical evidence that I have.
16        I don't want to spend my time
17 explaining to you. Can you please just tell me
18 if she is -- this person that I'm talking to
19 right now, is she Celia Harper-Guerra?
20     A.    My name is Celia Harper-Guerra, and
21 my employee number is 15289.
22     Q.    Okay. And we assume that you are
23 47 years old.
24        MR. FALBY: Again, that's not

---

**CELIA HARPER-GUERRA**
**January 19, 2007**

3 (Pages 6 to 9)

Page 6

1  relevant, and it's not a question that I think is
2  appropriate. She is Celia Harper-Guerra who I
3  think you wanted to be deposed. We have produced
4  her.
5          MR. BAYAD: Also, for the record --
6  no problem we proceed, Mr. Falby.
7          Celia Harper, what's your title at
8  Cisco Systems as we speak right now, at this
9  time?
10     A.    Director of human resources for
11  U.S., Canada and Channel.
12     Q.    And this is a new title or this is
13  an old title?
14     A.    This is my current title.
15     Q.    Cisco. Prior to this title,
16  Ms. Celia Harper, according to the record that I
17  do have in my possession, it states that you use
18  to be a director, Cisco director of talent.
19     A.    My title is director of human
20  resources.
21     Q.    Okay, very good. Okay. At this
22  time or prior to this time -- prior to the, prior
23  to -- in the past, you were Celia Harper, Cisco
24  director of talent, human resources; is that

Page 7

1  correct?
2     A.    No, that's not correct.
3          MR. BAYAD: Bruce, can you remind
4  me, as I'm not an attorney, can you remind me
5  what perjury means? Sir, can you help me,
6  Mr. Falby.
7          MR. FALBY: I'm sorry.
8          MR. BAYAD: Are we under oath here?
9  Is Celia Harper under oath?
10          MR. FALBY: Yes, she's been sworn.
11  She's under oath.
12          MR. BAYAD: Does she understand her
13  rights? As an attorney, would you remind your
14  client what is fifth amendment and what is
15  perjury. You know that she has a right right now
16  not to be participating here, according to the
17  fifth amendment, if she doesn't want to, right?
18          MR. FALBY: I suggest you ask
19  questions. She's answered your question. We're
20  here to answer your questions.
21          MR. BAYAD: No problem.
22          I have a news and document from
23  Mr. Tony Martelo on March 16th, 2000, from
24  Computer World that states that you are Celia

Page 8

1  Harper-Guerra, director of talent human
2  resources, and we're going to move on. I have
3  that, and I will give a copy to counsel, Bruce
4  Falby.
5          MR. FALBY: Are you asking whether
6  her title in 2000 was Cisco director of talent?
7          MR. BAYAD: I said from 2000 to --
8  from 2000 to probably 2005 she was a director,
9  Cisco director of talent, human resources, and
10  she use to live, she use to live in Pala,
11  California, and she moved -- after the lawsuit
12  was filed, she moved to England.
13          That's correct, Miss?
14     A.    No. I did use to leave in Pala,
15  California, and I have resided in the UK, and my
16  title has been director of human resources at
17  Cisco.
18     Q.    Perfect. Thank you, Miss, that's
19  what I want. Okay, that means that your
20  statement correspond to my document, that means
21  you are director -- Cisco director of talent,
22  human resources, and you explained to the
23  Computer World that you are an engineer and
24  you're looking for talent. Is that correct,

Page 9

1  Miss?
2     A.    Part of my job responsibilities as
3  director of human resources do include
4  recruitment of talent to Cisco.
5     Q.    Thank you, Celia. Thank you for
6  your cooperation. My question to you, would you
7  state to me that Cisco does not have duplicate
8  title as human resources?
9     A.    I don't understand your question.
10     Q.    In other words, Cisco cannot hire
11  two people and give them the same title. For
12  example, Cisco cannot hire Kate Dcamp and give
13  her senior vice president of human resources,
14  again senior vice president of human resources.
15  They cannot hire another person, Brian Schipper,
16  and also give him the same title, Cisco senior
17  vice president of human resources. Can Cisco do
18  that or not?
19     A.    My understanding is that we do have
20  a job title with multiple employees utilizing the
21  same job title.
22     Q.    Again, in other words, what you're
23  telling me is that Mr. Chambers has two people
24  doing the same role, the same task with the same

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

4 (Pages 10 to 13)

Page 10

1  title, paying them the same money, Cisco senior
2  vice president of human resources Kate Dcamp, and
3  Brian Schipper from Microsoft just got hired. He
4  also has the title senior vice president human
5  resources.
6      Remember, we are not going to keep
7  going perjury, Celia. You've got to cooperate.
8  You're not going to win here by committing
9  perjury one, two, three, four times. You can't
10 do that. And I apologize for this inconvenience.
11 I'm just fighting for my rights.
12     Now, let me repeat the question to
13 you. Mr. Chambers and the stockholders can have
14 two people, Kate Dcamp, senior vice president of
15 human resources, and at the same time they can
16 have Brian Schipper, Cisco senior vice president
17 of human resources? Can Mr. Chambers, CEO have
18 two people doing the same job?
19     MR. FALBY: I'm going to object.
20 You've asked more than one question. Do you
21 understand the question, Ms. Harper-Guerra?
22     MR. BAYAD: No problem, Bruce. Let
23 me help you Celia, respectfully. I got a lot of
24 documents that I have, even though some of them

Page 11

1  have been stolen by the United States Marshall
2  yesterday at ten o'clock. They came here and
3  stole everything, but that's okay, that's not
4  your business, and that's not your problem.
5  That's my problem, and Bruce Falby's problem for
6  the record.
7      Now let's go to Kate Dcamp, senior
8  vice president human resources. She was -- I
9  have a biographic of her and she was working from
10 2000 to 2005. Do you agree with me? And I spoke
11 to her. Do you agree that that's her title from
12 2000 to 2005, under oath?
13     A.    I agree that that is her title. I
14 don't know the date of employment specifically of
15 Kate Dcamp. I know that she's worked here.
16     Q.    Thank you. My second question. I
17 have a Brian Schipper, and you and I are very
18 professional. I called Microsoft and asked about
19 Brian Schipper, senior vice president of human
20 resources, when he worked at Microsoft and what
21 was his last day at Microsoft, and I can help you
22 here. That's not the question. That's just a
23 heads up. They told me he left 2006.
24     Now, my question to you, you work

Page 12

1  for Cisco for a long time. Here's the question
2  now. Before Brian Schipper, senior vice
3  president of human resources, who was your boss
4  before him?
5      A.    Angus Reynolds.
6      Q.    Who's that?
7      A.    Well, are you asking my direct boss
8  or the boss of all of HR?
9      Q.    I use to deal with Kate Dcamp,
10 senior vice president of human resources. Now I
11 deal with Brian Schipper, senior vice president
12 of human resources.
13     A.    Yes, my understanding is Kate Dcamp
14 was our senior vice president of human resources,
15 and today Brian Schipper is our senior vice
16 president of human resources.
17     Q.    Thank you. Now, my question to
18 you. I have a document under oath from Kate
19 Dcamp stating to me that she was not a senior
20 vice president of human resources, and my
21 question to you -- I have a contract in front of
22 me that for the record, and this is very serious,
23 this question, and I'm not trying to trick you,
24 Ms. Harper. I'm just trying to set the record

Page 13

1  straight. My question here, you are a human --
2  you are high level -- you are the director of
3  human resources at Cisco Systems. Again, is this
4  correct, yes or no?
5      A.    Yes.
6      Q.    Also, do you understand the rules
7  and regulation and the law that Cisco is guided
8  through in this business world? Yes or no?
9      MR. FALBY: Objection. That's not
10 a yes-or-no question. Could you be more
11 specific, please?
12     MR. BAYAD: In other words,
13 Mr. Falby, does Ms. Celia Harper-Guerra
14 understand the regulation that this company is
15 navigating in the real world.
16     MR. FALBY: I object. I don't
17 understand the question. The witness can answer
18 if she understands.
19     THE WITNESS: I don't understand
20 the question of what the regulation is.
21     MR. BAYAD: Regulation of Cisco
22 meaning, Mr. Falby, if Ms. Celia Harper-Guerra,
23 for example, have a contract, signed contract
24 printed from Cisco Systems, and Ms. Celia Harper,

**CELIA HARPER-GUERRA**
**January 19, 2007**

5 (Pages 14 to 17)

Page 14

```
 1   director of HR, give it to an employee or anyone
 2   at Cisco, does she understand the terms, the
 3   terms and conditions of such contract, for
 4   example?
 5          If she wants to be specific about
 6   what type of contract, let's talk about the
 7   severance package, for example, or the separation
 8   from Cisco or the layoff document that Cisco give
 9   to the people when they have laid them off, that
10   means they told them that the economy is so bad
11   that they need to go, and in order for -- and
12   we're going to give you a contract to sign, and
13   we give you one week, two weeks or four weeks of
14   severance package. Do you understand that
15   contract? Have you seen Cisco contract in your
16   past?
17          MR. FALBY: I'm going to object
18   because there's five or six questions there, but
19   the witness can do her best to answer.
20          MR. BAYAD: Please, Mr. Falby.
21          Let me ask you --
22      A.  Could you please restate the
23   question.
24      Q.  Miss Celia Harper, respectfully,
```

Page 15

```
 1   you're a wonderful person, and I'm not trying to
 2   humiliate you here, nor am I trying to set you up
 3   here. What I'm doing right now from the bottom
 4   of my heart, I'm fighting for my heart, for my
 5   rights. And these attorneys, one of them is a
 6   wonderful man, and some other person, I'm not
 7   insulting anybody, he thinks that other people
 8   like myself do not have rights in this country,
 9   and I was raised in this country, and I'm sure in
10   this conference call there's more than one
11   person, but that's okay.
12          What I'm going to tell you now, I
13   have a paper, an exhibit from Lynn Fraser, and
14   she told me that -- she gave me a voluntary
15   severance agreement and general release of Cisco
16   Systems. Have you seen that before, Miss, as a
17   director?
18      A.  So in my role as a director, I am
19   aware of the necessary documents that we utilize
20   through our employment laws and regulations.
21      Q.  And the exhibit Cisco 00048 that
22   counsel finally gave me, that when Cisco got rid
23   of me they gave me a paper to sign. Did you see
24   that, Miss?
```

Page 16

```
 1      A.  I do not have that paper in front
 2   of me.
 3      Q.  Okay. Well, let me explain to you
 4   this document that Mr. Falby and Lynn Fraser gave
 5   me as a pretext for my termination of employment,
 6   even though I'm very highly educated and also
 7   highly qualified. I'm a talent. I'm an art in
 8   this business. But that's okay. Okay, this
 9   paper says -- I'm going to give you just the
10   title. Mr. Falby knows what I'm talking about.
11          When I was let go from Cisco on
12   discriminatory grounds, they gave me a voluntary
13   severance agreement and general release contract
14   to sign and gave me some money with it. You did
15   see that, right?
16      A.  No, I have not seen that document.
17      Q.  That's good, that's good because I
18   need to go over it with you. In the last page of
19   such document, and Mr. Falby labeled it as Cisco
20   0052. To make it easier for my court reporter,
21   it's Cisco 0052. And it says, "I understand and
22   accepted both terms and notice received in
23   Appendix A, including the separately provided
24   data on the job title and ages of all individual
```

Page 17

```
 1   covered by the program and on the job title age
 2   of all individuals not covered by the program.
 3   This data has been offered for a 45 days prior to
 4   the expiration of the offer of this agreement."
 5   Meaning that in 45 if you don't sign it, you
 6   still work for Cisco.
 7          MR. FALBY: Do you have a question?
 8          MR. BAYAD: Yes. I signed that
 9   contract, and the contract also said "For Cisco
10   use only." And if everybody had signed this
11   contract, it has to -- it's only valid if Kate
12   Dcamp, senior vice president of human resources
13   signs it, then it becomes bind. You agree with
14   this, right? Somebody signs a contract from
15   Cisco, and it says on the bottom in the black,
16   and also in bold, it says, "This contract is not
17   valid if the employee signs it. It has to be
18   approved by Cisco human resources senior vice
19   president Kate Dcamp in person." If she doesn't
20   sign it, for example, my question to you, would
21   this contract be valid or not valid, Miss Celia
22   Harper?
23          MR. FALBY: I'm going to object.
24   You're asking a legal conclusion. The witness
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

6 (Pages 18 to 21)

Page 18

1   can answer if she knows.
2        MR. BAYAD: Okay. Well, this
3   contract is not valid, Mr. Bruce Falby,
4   respectfully, and I'm going to explain to you for
5   the record why. Because it says it only binds --
6   if I'm fired from Cisco, even if I signed this
7   voluntary, even if I'm locked in a room, but if
8   you sign it, it's only valid if Kate Dcamp signs
9   it.
10       Now, going back to Kate Dcamp's
11  declaration, she stated under oath I am not a
12  senior vice president of human resources, and
13  here we have Miss Celia Harper stated otherwise,
14  stated that this person does not know her title,
15  meaning Kate Dcamp. Either she's lying or she's
16  confused, and that we have to take up with the
17  Honorable Judge Patti B. Sarris, but that's okay.
18  Now we just make sure. According to the
19  document, Celia Harper, that I have, and you are
20  a Cisco rep, also Paula Hughes gave me the same
21  thing, I am still on the book of Cisco because I
22  signed something that is not bind. That's okay.
23       Now, I'm going to start with your
24  questions. And I did a lot of work here,

Page 19

1   Miss Celia Harper. Now, I'm going to go -- I'm
2   going to ask you a question. How many people
3   work for Cisco Systems, approximately. You don't
4   have to be right here. Just tell me a ballpark.
5   1,000, 5,000, 7,000? What's the number in the
6   best you can tell me? How many people work for
7   Cisco?
8        A.  50,000 is my guess.
9        Q.  50,000?
10       A.  Is my guess.
11       Q.  Thank you very much. In this
12  50,000, 57,000 or 50,000, if 7,000 get let go
13  from Cisco Systems, for example, and they want to
14  give references, and this references they need to
15  be provided by Cisco. My background with Cisco,
16  and I tested the system of Cisco. It's very
17  honest from human resources that I dealt with.
18  When I pick up the phone, I call Cisco Systems.
19  I say I'm looking for a person called Janet,
20  Janet Skadden. They told me that she does not
21  work for Cisco Systems. They told me we cannot
22  give you reference, but what we can give you is
23  time of start of this individual, Janet Skadden,
24  and her separation date. Do you agree with this?

Page 20

1   Is that a true statement, yes or no, Miss, if you
2   can?
3        A.  Yes.
4        Q.  Thank you. And they cannot tell --
5   human resource or anybody at Cisco cannot say
6   something other than the date of the hire of
7   Janet Skadden and her termination date; is that
8   correct?
9        A.  That is my understanding.
10       Q.  Likewise. Also, Ms. Celia Harper,
11  and I apologize, I really don't want to be in
12  this position, but I'm going to ask you a
13  question, and I want to give you a heads up.
14  Please, before you answer, don't think that
15  Mr. Falby is going to help here. What I mean is
16  if you commit perjury, we're going to have some
17  issues, because a lot of things have been going
18  on in this case. And now I'm going to ask you,
19  and I want to give you a heads up, and I know
20  you're a very good Christian person, and I know
21  everything about people that I deal with in my
22  life.
23       Now I'm asking my question to you.
24  From 50,000 people at Cisco Systems, why did I

Page 21

1   choose you in this lawsuit? Why did I choose
2   you, Miss?
3        A.  I don't know.
4        Q.  From 50,000 people at Cisco, why
5   did I mention Janet Skadden in this lawsuit, in
6   this deposition?
7        A.  I don't know.
8        Q.  Do you think that I picked you
9   because I have an issue with you at Cisco
10  Systems?
11       MR. FALBY: Objection. These are
12  improper questions. Why you did what you did is
13  not a proper subject of examination for this
14  witness. Why don't you ask something that the
15  witness knows.
16       Q.  Miss Celia Harper, have you been
17  sued before?
18       A.  No.
19       Q.  Have you participated in any
20  lawsuit before, discrimination lawsuit or racial
21  lawsuit or sexual harassment lawsuit?
22       A.  No.
23       Q.  When did you first start getting
24  involved in this lawsuit of race discrimination?

**CELIA HARPER-GUERRA**
**January 19, 2007**

Page 22

1       MR. FALBY: I'm going to object. I
2   don't understand the question. Are you asking
3   whether she's been deposed in another lawsuit?
4       MR. BAYAD: Yes. Participated
5   means deposed, being sued, all the above.
6   Mr. Falby, please, let's help this process so we
7   can move on with our lives. You're getting paid,
8   Mr. Falby. I'm not. She has family. Her job is
9   on the line, Mr. Falby. This is not our job,
10  Mr. Falby. We're not here because we hate each
11  other. We're here fighting for our work,
12  survival here, especially my survival.
13      Now my question to you, Miss, have
14  you participated in any discrimination or lawsuit
15  or race discrimination, sexual harassment, fraud,
16  anything like that, any lawsuit in the federal
17  court in general?
18      A.    No.
19      Q.    Thank you. Have you asked yourself
20  why were you named in this lawsuit, why? 'Cause
21  we are human beings. When you got served or been
22  advised by this lawsuit, did you say to yourself,
23  Miss Celia Harper, why me? Did you say that,
24  Miss?

Page 23

1       A.    No.
2       Q.    Did you say why is this guy suing
3   me in this lawsuit?
4       A.    No.
5       Q.    Do you know why you are being sued
6   in this race discrimination lawsuit?
7       A.    No.
8       Q.    I'm going to tell you why. Because
9   your name is everywhere. And we're going to
10  start now. And that's why I told you, Miss Celia
11  Harper, and now you have to pay attention. And
12  we spoke earlier. We said why Janet Skadden, why
13  Celia Harper. See, Lynn Fraser knows why.
14  Mr. Savastano knows why.
15      MR. FALBY: Excuse me. Mr. Bayad,
16  please ask questions of the witness.
17      MR. BAYAD: Okay.
18      Before we move forward, I want to
19  ask you, ask you to read me your declaration for
20  the record, slowly, please, if you can.
21      MR. FALBY: The declaration goes on
22  for a number of pages. I don't think it's a
23  productive use of the deposition. If you would
24  like her to read it, she will. Do you want her

Page 24

1   to actually read the whole thing?
2       MR. BAYAD: No, that would be abuse
3   of her discretion. In your declaration under
4   oath -- you provided a declaration in this
5   lawsuit. Is that correct, Miss Celia Harper?
6       A.    That is correct.
7       Q.    On page 5 you mention Cisco no-hire
8   List, right?
9       A.    No.
10      Q.    What did you mention on page 5 from
11  No. 9 to I believe -- from No. 9 to No. 13 you
12  mention a lot of things about Cisco no-hire List.
13      A.    I did not mention about a no-hire
14  list.
15      Q.    Okay. Did you get the chance to
16  review my Cisco no-hire list, the electronics
17  copy?
18      A.    Yes.
19      Q.    Thank you. In the copy -- it's a
20  file, right? What's the file called, if you
21  remember?
22      A.    Sensitive hire policy. We do not
23  have a no-hire list. We have a sensitive hire
24  policy.

Page 25

1       Q.    Okay, I'm sorry. In this, in this
2   lawsuit or in this deposition, we cannot change
3   the name of Cisco no-hire list to the sensitive
4   list, can you agree with me? That's the name of
5   it, right?
6       A.    No.
7       Q.    Okay. The list that I gave you,
8   what would you call it?
9       MR. FALBY: I'm putting in front of
10  the witness your Exhibit 14 in your complaint
11  which I assume is what you're asking about.
12      MR. BAYAD: Yeah, Exhibit 14 with
13  hard copies and soft copies, the electronic
14  copies, according to the Rule of Civil -- the
15  Rule of Federal Procedure 91 and also 8013.
16      MR. FALBY: Is the question -- are
17  you asking the witness whether she knows what
18  Exhibit 14 is?
19      MS. BAYAD: Yes.
20      THE WITNESS: Yes, I do.
21      Q.    (By Mr. Bayad) Okay. Thank you.
22  When I get a chance to open the Cisco no-hire
23  list that is Exhibit 14 on the complaint,
24  Complaint Docket 1, Exhibit 14, hard copy that is

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# CELIA HARPER-GUERRA
# January 19, 2007

8  (Pages 26 to 29)

Page 26

1  Exhibit 14, and also the electronics copy, the
2  file is an Excel sheet called "Sensitive List."
3      A.   The file is a sensitive hire list
4  and policy.
5      Q.   Yes. That's correct, right?
6      A.   That is correct.
7      Q.   Yes. Okay. When I took that
8  electronics, electronics copy of such I call a
9  Cisco no-hire list, this is my data that I took,
10  and I'm going to share it with you, and I'm going
11  to ask you questions, because it's hard -- the
12  reason I mention it to you is because if you were
13  in front of me, we would share it together.
14  Since Mr. Falby is sending me somewhere and you
15  are somewhere, it's very hard, and I have to tell
16  you what I'm going to tell you and then ask you a
17  question about it. Is that a fair statement,
18  Miss?
19      A.   Correct.
20      Q.   Okay. This sensitive list I call
21  Cisco no-hire list, it was authored, that mean it
22  was made by Janet Skadden, at Cisco human
23  resources, your division, tells me that she's no
24  longer with Cisco Systems. Plus, we went further

Page 27

1  to the Cisco no-hire list electronic copy. We
2  want to make sure that the date that was
3  attached, and we look, not just me, a lot of
4  people, a lot of smart people in this country
5  looked at it because you cannot produce direct
6  evidence to the federal court, and it is
7  fabricated. It's very serious consequences,
8  that's why we make sure that we give it to the
9  right people to look at it.
10          To refresh your memory, Ms. Celia
11  Harper, that Cisco no-hire list has a date that
12  was modified on 9/22/2000. Now, let me ask you
13  this, why this list was modified on 9/22/2000,
14  why? Why not 9/20 -- the month nine which is
15  September, probably September 25th, September
16  30th, September probably 29th. Why this list is
17  saying it was modified on September 22nd, 2000?
18      A.   The exhibit that I am reviewing
19  currently that you have entered into this
20  deposition --
21      Q.   Yes.
22      A.   -- this document --
23      Q.   Yeah, date of current copies, yes,
24  Miss Harper.

Page 28

1      A.   I am not aware of this document
2  with the modifications that are on it. So the
3  document that you're referencing from 9/22 that
4  you just stated --
5      Q.   Yes. In other words, you don't
6  know about this date, right? You don't know this
7  date.
8          MR. FALBY: Excuse me, let the
9  witness finish, please.
10      Q.   Go ahead.
11      A.   This document that you've mentioned
12  on 9/22 of modification is not a document that
13  I'm aware of at Cisco Systems for our sensitive
14  hire policy.
15      Q.   Okay. This Exhibit 14 of the
16  complaint, Cisco no-hire list that I call, we
17  took the, we took the electronic copy that we
18  provided to the court, many, many copies. We did
19  some analysis. Let me tell you this analysis.
20  The Cisco no-hire list was authored and created
21  by Janet Skadden. The date of the modification
22  was 9/22/2000, which is September 22nd, 2000, at
23  2:21 p.m. Which if you look at the 2:21 p.m.,
24  minus 4 would be, for example, the morning of San

Page 29

1  Jose, California. That's okay. And the size of,
2  the size of that Cisco no-hire list I gave you
3  guys on Exhibit 14 and assorted copies according
4  to the Rule of Civil Procedure -- the Rule of
5  Federal Evidence 901 and also according in the
6  meaning of 803 1. The size of such list, Cisco
7  no-hire list that has my name no hire, do not
8  hire Anthony Bayad, has a 279 kilobyte, which is
9  the size of the Cisco no-hire list, the
10  electronics file. And the reason, I'm asking
11  you, why it was modified on 9/22/2000, September,
12  why? Why not another time? Why, why September
13  22nd, 2000? September 22nd, 2000, why?
14          MR. FALBY: I'm going to object.
15  She's already testified that this document is not
16  an authentic Cisco document.
17      Q.   It's not a Cisco document?
18      A.   This is not an authentic
19  Cisco-approved document with that modification.
20      Q.   Okay, no problem. That's your
21  answer, right? Well, we did -- we took the Cisco
22  no-hire list, and we looked at the content of it
23  and the meaning of civil -- Federal Rule of
24  Evidence 803 1, and what we found, we found

**CELIA HARPER-GUERRA**
**January 19, 2007**

9 (Pages 30 to 33)

## Page 30

1  that a lot of stuff that nobody can have, would
2  you agree with me? If you look at Exhibit 14,
3  the Cisco no-hire list that I call, that Cisco
4  calls, would you state that it has a lot of
5  information that nobody know about. It's very
6  sensitive, yes or no?
7      MR. FALBY: I'm going to object to
8  the question. The witness can answer it if she
9  understands.
10     A.    I don't understand your question.
11     Q.    Looking at the electronics file and
12 the hard copies, I see companies, I see names of
13 Cisco people. These people are true people.
14 They work for Cisco, yes or no?
15     MR. FALBY: What people are you
16 referring to?
17     MR. BAYAD: The Cisco no-hire list.
18     MR. FALBY: There is no such thing
19 as a Cisco no-hire list.
20     MR. BAYAD: Okay. Well, let's
21 change the name for convenience to make Celia
22 Harper comfortable because she's a H.R., and we
23 don't want to hurt people's feelings here.
24     Okay, the list, whatever is the

## Page 31

1  name you call it. Why Anthony Bayad give it to
2  Bruce Falby and the court and have them review?
3  On this list, we find the name of people, the
4  address of people, companies that Cisco does
5  business with. They've all been verified. I'm
6  talking about the companies that Cisco does
7  business with, the resellers. Why does Cisco
8  no-hire list that is found on Docket Entry 1,
9  Exhibit 14, has lot of information about Cisco
10 partners, Cisco employees and some stuff that
11 nobody can have, only human resources, why?
12     MR. FALBY: I'm going to object to
13 your continued use of no hire. You're asking the
14 witness to explain what the point of the
15 selective hiring list is?
16     MR. BAYAD: Mr. Falby,
17 respectfully, don't keep doing that because we
18 don't have time. What name do you want me to
19 call this list, Cisco, Cisco Bayad or Cisco Celia
20 Harper or Cisco Bruce Falby, please?
21     A.    This particular document that
22 you're referencing is called a sensitive hire
23 policy.
24     Q.    Okay.

## Page 32

1      A.    However -- may I finish, please?
2  However, you referenced a document with a
3  modification on there. This is not an
4  authenticated document produced by Cisco,
5  therefore I'm unable to answer your question as
6  you relate it to this document, 'cause it's not
7  an authenticated document of Cisco.
8      Q.    When you say it's not
9  authenticated, in the meaning of what? For
10 example, what's not authenticated? That means
11 G.E. does not do business with Cisco? That means
12 Bob Bruce, Cisco contact, does not work for
13 Cisco? That means that Glen Liznetz does not
14 work for Cisco? That means that AT&T Broadband,
15 Bank of America, their contact is Jim Roche,
16 they're not clients of Cisco and Jim Roche is not
17 Cisco employee? That's what you're telling me,
18 right?
19     A.    I don't know Jim Roche.
20     Q.    Well, if you look at the Cisco
21 no-hire list, I'm telling you the Cisco contact,
22 all of them there? Why the Cisco contacts are
23 there if it's not authenticated, why? Please
24 why. I'm just talking about the people of Cisco.

## Page 33

1  Why are the people of Cisco in that list, why?
2  Why not other people? Why Cisco people contact
3  are there, why? And we can go through names.
4  Tell me why.
5      A.    So can you please explain to me
6  what Cisco names and where they are in the
7  document so I can reference the document that
8  you've produced?
9      Q.    Sure. This is the document. The
10 document that I gave you. On Column 27 it says,
11 "Highly Sensitive." You move to the right you
12 see, "Cisco Contact, Sensitive, Cisco Contact and
13 Comments."
14     In the Highly Sensitive, "All
15 CCIE's employed by ANY customer/Partners," that's
16 28. Why does it state CCIE here unless it has a
17 meaning?
18     Also, Column No. 29 of that Cisco
19 no-hire list says, "AE Business Solutions, Cisco
20 Contact Bob Bruce." When you say Celia Harper
21 that is not authenticated, why Bob Bruce that
22 works for Cisco, that AE Business Solutions
23 knows. Bob Bruce came to their premises and did
24 business with them, and he works for Cisco.

**CELIA HARPER-GUERRA**
**January 19, 2007**

10 (Pages 34 to 37)

|  | Page 34 |
|---|---|
| 1 | Now, let's go easy, easy company, |
| 2 | because that's in Boston, and I know those |
| 3 | people. Let's go for Bank of America. Why Bank |
| 4 | of America Celia Harper, why Bank of America has, |
| 5 | Column 37, has Jim Roche? Why not Lynn Fraser, |
| 6 | why Jim Roche? And Jim Roche has gone to Bank of |
| 7 | America, has done job for Bank of America, unless |
| 8 | you want me to go and get a statement from Bank |
| 9 | of America. I can do that. I don't need a |
| 10 | subpoena. I know those people, and people can |
| 11 | give anything they want if they feel it would |
| 12 | help. Now you tell me why Cablevision is there, |
| 13 | why Chase Manhattan Bank is there. And guess |
| 14 | what, Chase Manhattan Bank is my favorite. You |
| 15 | know why, because the person that's promoting |
| 16 | Lynn Fraser, my manager, the one that started the |
| 17 | whole nine yard, is Nick Adamo. And looking at |
| 18 | the chart, the reason of Cisco. Yes, yes, yes, |
| 19 | Nick Adamo is the point contact of this very |
| 20 | crucial customer of Cisco, Chase Manhattan Bank. |
| 21 | Now, if I go to Chase Manhattan Bank -- and I |
| 22 | know those people, too. I use to work for them |
| 23 | in the past when I use to work, when I use to be |
| 24 | a human being -- they can both tell me, yes, |

|  | Page 35 |
|---|---|
| 1 | Anthony, if I give them the Cisco -- I'm going to |
| 2 | give them the Cisco no-hire list. They can tell |
| 3 | me Chase Manhattan Bank is Nick Adamo. And I'm |
| 4 | waiting for the Honorable Patti B. Sarris to |
| 5 | decide at the end what she's going to do with |
| 6 | this case because this list is going to go to |
| 7 | these people. |
| 8 | Now, my question to you, honestly |
| 9 | Celia Harper, you're under oath, ask yourself why |
| 10 | you are saying that this list, Exhibit 14 on the |
| 11 | Complaint No. 1, 931 has Nick Adamo that I know |
| 12 | very well, and my friend knows him. He's named |
| 13 | as the contact for Chase Manhattan. Why, please? |
| 14 | A. At Cisco we have a number of our |
| 15 | partners and our customers that have |
| 16 | relationships, and the owners of our accounts, |
| 17 | and so when it says the contact name, which you |
| 18 | mentioned a Nick Adamo or a few other employees |
| 19 | at Cisco, they are responsible for the |
| 20 | relationship and the ownership of that account. |
| 21 | Q. And also, here it's very |
| 22 | disturbing. If you do not answer this, |
| 23 | Miss Celia Harper, it's going to be very, very -- |
| 24 | I don't think it's, I don't think it's right to |

|  | Page 36 |
|---|---|
| 1 | do. Why this list have Aztec Communication in |
| 2 | the contact, why? And I don't mean to laugh. |
| 3 | Aztec Communication is here in this no-hire list |
| 4 | and has a contact. It states a person that I |
| 5 | know very well. I don't have to mention the |
| 6 | name. I don't want to get him in trouble. |
| 7 | A. I don't understand your question. |
| 8 | Q. My question to you is why this, why |
| 9 | this -- we're trying to authenticate this Cisco |
| 10 | no-hire list. I'm asking you why this list has |
| 11 | Aztec Communication, my former company, why, if |
| 12 | it's not authenticated? And my former company |
| 13 | Aztec -- I use to work for Aztec Communication. |
| 14 | We use to be a partner with Cisco Systems. Why |
| 15 | my company that I use to work for was listed in |
| 16 | this no-hire list? Because somebody -- because |
| 17 | Cisco no-hire list does -- it's been created by |
| 18 | Janet Skadden. |
| 19 | A. Well, let me just answer your |
| 20 | question. There's two parts here. The names of |
| 21 | the companies which are Cisco partners and |
| 22 | customers and the contact details of Cisco |
| 23 | employees is an authentic list. It is produced |
| 24 | by Cisco. |

|  | Page 37 |
|---|---|
| 1 | Q. Okay. |
| 2 | A. Let me finish, please. At the top |
| 3 | of the document that you have produced, that is |
| 4 | not authenticated by Cisco. The document that we |
| 5 | have produced here is solely used as a guideline |
| 6 | for Cisco in human resources to enable us to not |
| 7 | proactively recruit from Cisco's top customers |
| 8 | and top partners. And that is the intent of this |
| 9 | document, to bring awareness that we will not |
| 10 | proactively poach or recruit from those customers |
| 11 | or those partners. |
| 12 | Q. Okay. The summary of your under |
| 13 | oath statement state that the contact in this |
| 14 | list that I provided authenticate what you can |
| 15 | have; is that correct? |
| 16 | A. The contact names that are |
| 17 | associated with the particular companies that we |
| 18 | have listed in this portion of this document that |
| 19 | is authenticated was accurate at the time. |
| 20 | Q. Okay. Again, the contact of the |
| 21 | people, companies, the sensitive statement that |
| 22 | you have put -- Celia, you are the admin. You |
| 23 | are the custodian of the record according to |
| 24 | federal rules of evidence 901 with the meaning of |

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

CELIA HARPER-GUERRA
January 19, 2007

11 (Pages 38 to 41)

Page 38

1  federal evidence 813, and your lawyer will tell
2  you.
3        Now, I want to again make sure that
4  I understand that you're saying the contact of
5  this document, the companies, the statement in
6  it, they are authenticate. Is that correct? You
7  are under oath, Miss.
8     A.    The contacts of the document under,
9  and I don't have the actual --
10    Q.    The question to you --
11    A.    I'm going to answer it.
12    Q.    I don't want an explanation. I
13 want to know if Bank of America and all you wrote
14 in this document called whatever you want to call
15 it, the one that is found in the Complaint Docket
16 1 entry -- the Complaint Docket Entry 1,
17 Exhibit 14, with both of the electronic copy
18 under the federal rule of evidence, now reveal
19 all the company names, all the e-mail address,
20 all the statement that you wrote under oath. You
21 are the admin. You are the custodian of the
22 record. You are under oath. All those stated in
23 that list are customers of Cisco, and that's what
24 you have put, since 1997, the creation of this

Page 39

1  Excel sheet that you named sensitive list. Is it
2  yes or no?
3        MR. FALBY: Objection to the form
4  of the question. It's not a yes-or-no question.
5  You can answer it.
6     A.    So I'll answer the question for
7  you. The companies, the Cisco contacts are
8  accurate at the time of the document, and the
9  subject matter of process is accurate. The
10 inaccurate modification of the document is under
11 the heading of "Highly Sensitive."
12    Q.    Okay. What you're saying is that
13 everything, everything from top to bottom is
14 authentic.
15    A.    No, no. Let me finish my
16 statement, please.
17    Q.    I'm sorry. I'm not trying to trick
18 you or anything. I'm not in business to trick
19 you.
20        MR. FALBY: Please let her finish
21 her answer. Go ahead.
22    Q.    Go ahead, Miss, please.
23    A.    The document is accurate with the
24 exception of the following statement that has

Page 40

1  been modified.
2     Q.    Okay, what statement? First you
3  said that you don't have the list. You never saw
4  the list. Now you're telling me -- now how do
5  you know that the top of the list is something
6  else and the bottom of the list is authentic.
7        Now what you're saying to me is
8  that column probably -- let's help you here. And
9  I'm not trying to set you up or anything. I'm
10 just trying to clear up this issue. What you're
11 saying is Column 1 -- when I say Column 1, it's
12 the first line. The first line says,
13 "Confidential." Is that a true statement? It is
14 there, right? "Confidential," right?
15    A.    Correct.
16    Q.    All right. If you go to Line 2
17 which is called Column 2, "Do not download. The
18 Sensitive List is updated on a regular basis and
19 changes are made to company listings." Is that
20 correct, Miss, please?
21    A.    That is correct.
22    Q.    Thank you. The third line says,
23 "For recruiting purpose only." That's true,
24 right?

Page 41

1     A.    Correct.
2     Q.    And the fourth line says -- I don't
3  know who put that date there. I did not put that
4  date there because I -- this is only, file only.
5  You cannot touch this file because it has step,
6  and this forensic expert that Mr. Falby, the U.S.
7  marshall came here and took the CDs. Everybody
8  came here yesterday. They took everything. I
9  just want to let you know that you're not alone
10 here. A lot of people are here helping you and
11 helping me. Thank you.
12        Now, let's go back to Column 5 --
13 I'm sorry, Column 4. It says, "Effective
14 September 10th, 2000," of the Cisco sensitive
15 list. You see that date there, right? Effective
16 September 10th, right?
17    A.    No.
18    Q.    Okay. That should not be there,
19 right? It should be a blank, right?
20    A.    Let me explain myself in answering
21 this.
22    Q.    Respectfully, I don't have time.
23        MR. FALBY: Mr. Bayad, let the
24 witness answer the question. You asked it. Let

# CELIA HARPER-GUERRA
# January 19, 2007

12 (Pages 42 to 45)

Page 42

1  her answer it. Go ahead.
2          MR. BAYAD: Okay.
3      A.    There are no such documents that
4  have been modified on September 10th, 2000.
5      Q.    Okay, let's move, you know, let's
6  move for a while. Column 4 you state
7  that you have no clue why that date is there,
8  effective September 10th, 2000. September 10th,
9  2000, I was at Cisco Systems working. Is that
10 true, yes or no?
11     A.    I do not know.
12     Q.    Anthony Bayad worked -- okay. If
13 you don't know, then I refresh your memory. My
14 termination from Cisco Systems, it was -- let me
15 see. It was April, April, I believe the 18th,
16 2001. And in this comment of Cisco no-hire list
17 it says, "Effective September 10th, 2000." Now,
18 why that date is there, why, for what purpose?
19 I'm still working for Cisco. Huh?
20     A.    I don't understand your question.
21     Q.    Okay.
22     A.    I will share with you that -- two
23 things. One, that there were no modifications
24 made to the document on September 10th, 2000.

Page 43

1  Additionally, this document was never a read-only
2  document?
3      Q.    No, no. When we took it, when we
4  took it, the people that gave it to us, it was
5  read only. You cannot change it, just to let you
6  know. Now, we don't have to argue with this.
7  This document cannot be stamped. If it's
8  stamped, it will be corrected. Again, just to
9  let you know.
10         Let's go back to make sure what's
11 authentic and what's not authentic. What's
12 authentic on Column 6 of this Cisco no-hire list
13 found in Exhibit 14 of the complaint? Number 6
14 says, "Highly sensitive." That's authentic.
15 That should be there, right?
16     A.    No.
17     Q.    Okay. And Column 7, it's not
18 authentic? Now, Column 7 says, "Do not
19 hire/transfer/promote Anthony Bayad Cisco
20 Employee No. 7379." Is it authentic or not
21 authentic?
22     A.    Not authentic.
23     Q.    No. 8 says, "Should you have
24 questions, contact Tony Savastano regarding

Page 44

1  Anthony Bayad." Authentic, not authentic?
2      A.    Not authentic.
3      Q.    Why anybody would put such
4  statement there, "Should you have question,
5  contact Tony Savastano regarding Anthony Bayad."
6  Why not should you have question contact Celia
7  Harper regarding Anthony Bayad, why?
8      A.    Well, it does state that in the
9  document. So if you go down to a further line it
10 says, "Should you have questions, contact Celia
11 Harper-Guerra." At the inception of this
12 particular document, the document has been --
13     Q.    Celia Harper, I'm conducting this
14 deposition. You are very welcome to do the same
15 thing vice versa at any time. My schedule is
16 open. I have not worked. Let's go back, Miss.
17         Why should you have question,
18 contact Tony Savastano regarding Anthony Bayad?
19 Why not Lynn, contact Lynn Fraser regarding
20 Anthony Savastano -- regarding Anthony Bayad? Do
21 not hire Anthony Bayad, transfer and promote
22 Anthony Bayad, but if you have any question, go
23 talk to Savastano. My question to you, I'm just
24 asking you a question here, why your name is not

Page 45

1  there, why not Lynn Fraser, why not Kate Dcamp,
2  why not John Shiba, why? Why that person in
3  particular, why? Why not Carl Wiese, why? Why,
4  Miss? Please explain to me why the best you can
5  under oath.
6      A.    The document --
7      Q.    Yeah, this document. Why this line
8  in the Cisco no-hire list, No. 7 and then 8, why
9  it's there, why, why?
10     A.    I can't answer --
11     Q.    Yes, please, I'm sorry.
12     A.    I can't answer this.
13     Q.    Okay, you can't answer it.
14     A.    And the reason why is that this is
15 not an authenticated document by Cisco.
16     Q.    Miss, please don't confuse the
17 record because it will be hearsay, she said. And
18 guess what, that's a problem here, and Mr. Falby
19 knows. The Honorable Judge O'Toole has ordered
20 one time. He cannot flip flop. We're human
21 beings. Don't flip flop. Now keep going, Miss.
22         Now, Miss, remember you said that
23 this first line or five lines at the top is not
24 authentic, but you have said that No. 2 -- Column

CELIA HARPER-GUERRA
January 19, 2007

13 (Pages 46 to 49)

Page 46

1  No. 2 states, "Do not download." The sensitive
2  list is updated on a regular basis and changes
3  are made to company listings. You said earlier
4  that it's authentic. It should be there. Now,
5  you said to me that this, "Do not
6  hire/transfer/promote Anthony Bayad Cisco
7  Employee 73799. Should you have any question,
8  contact Tony Savastano regarding Anthony Bayad."
9  You said now that should not be added there. But
10 you're completely contradicting yourself because
11 flip flop. I don't know if it's perjury or if
12 it's denial. Which one, Miss, please?
13     MR. FALBY: Objection. It's an
14 improper question. Please ask another question.
15     Q.  Okay. Then we move on to No. 9 on
16 the Cisco no-hire list. You said, you wrote with
17 your hand because you are the custodian of
18 record, the admin in our language, you said in
19 number 9, "Interviewing may not occur with any
20 company on this list until the Cisco manager
21 servicing that Customer/Partner approves. To
22 identify the Cisco manager, please visit
23 StarViper at: http://wwwin.cisco.com/CustAdv
24 /InfoSys/sales/star/viper/." That's it, that's

Page 47

1  it. Can I ask you 11, Column 11, under oath
2  Miss Celia Harper? And I know the contact of
3  that StarViper.
4      A.  That's correct.
5      Q.  It is correct. God bless you.
6  Thank you. And this Line 11, nobody from outside
7  can get in. Is that a true statement yes or no?
8      A.  It's an internal --
9      Q.  You are under oath. You are under
10 oath.
11     A.  -- tool at Cisco. It's an internal
12 tool at Cisco.
13     Q.  Internal tool. So Line, again, 11
14 is authentic, and if right now -- I am on laptop
15 right now -- if I insert this, when Cisco did not
16 see this before. In other words you did not know
17 that Anthony Bayad had this. If I went there
18 right now from my home, can I get in?
19     MR. FALBY: Objection. If you
20 know.
21     Q.  You are under oath, Miss?
22     A.  I don't know the answer to that.
23     Q.  This is an internal site, in other
24 words, internal site. You know, you cannot get

Page 48

1  into this internal site unless you are inside
2  Cisco or you have proper authorization, yes or
3  no?
4      A.  Correct.
5      Q.  Thank you. Let's move on. Inside
6  this Viper, what's inside of this Viper file?
7  You are under oath.
8      A.  It has a --
9      MR. FALBY: Mr. Bayad, please stop
10 advising the witness she is under oath. She
11 knows she is under oath. She is doing her best
12 with your almost incomprensible questions.
13     MR. BAYAD: I apologize, Mr. Falby.
14 And believe me you are making me do this,
15 Mr. Falby. I do not want to be here, God bless
16 you, and I not want to hurt anybody's future.
17 When people get involved in lawsuits, it's not
18 nice. And when it's federal and a high level
19 case like this, it becomes a problem because a
20 lot of people are involved now. Now, I'm not
21 trying to --
22     MR. FALBY: Excuse me, do you want
23 an answer to the question?
24     MR. BAYAD: Please, I want an

Page 49

1  answer to this question. I want to know what's
2  in the Viper, and that's it.
3      A.  The StarViper tool --
4      Q.  Yes.
5      A.  -- is a tool that has the customers
6  of Cisco's as well as the partners of Cisco's as
7  well as the current account manager or regional
8  sales manager who has a relationship with that
9  particular customer or partner.
10     Q.  Thank you. Now we move on to
11 No. 12, and I appreciate your help, because, you
12 know, I do have a lot of information that
13 Mr. Falby does not know, but that's okay.
14     No. 12, Column No. 12 on Cisco
15 no-hire list. It says, "After receiving approval
16 to continue their application, Cisco recruiter
17 must contact the applicant's current manager to
18 confirm." Is that correct, authentic, that line?
19     A.  That is correct.
20     Q.  Yes or no? What's your answer,
21 Miss?
22     A.  Yes.
23     Q.  Thank you. No. 13 on the Cisco
24 no-hire list, "Interviewing should only occur

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

14 (Pages 50 to 53)

Page 50

1  after the responsible Cisco VP approves."
2  Authentic, not authentic? Should be there?
3    A.    Correct.
4    Q.    Going back to Tony Savastano, do
5  you know his title, Tony Savastano?
6        MR. FALBY:  His title today?
7        MR. BAYAD:  Did it change?  I
8  thought he was the VP of finance.
9    A.    I don't know what his title is.
10   Q.    And I agree with you don't know
11 because you don't know this guy probably. Do you
12 know this guy?  You don't know this guy?
13   A.    I do know Tony Savastano. Tony
14 Savastano is in finance, and therefore Tony
15 Savastano would not have any direct access to
16 this document or somebody's client because it's a
17 human resources document.
18   Q.    Correct, because this is a human
19 resources document, correct?
20   A.    Correct.
21   Q.    And Mr. Savastano is a VP of
22 finance. He has nothing to do with human
23 resources, right?
24   A.    Correct.

Page 51

1    Q.    And you said earlier that you do
2  know Mr. Savastano.
3        MR. FALBY:  What's the question?
4        MR. BAYAD:  Does she know
5  Mr. Savastano, the VP of finance.
6    A.    I don't know what his title is. I
7  know Tony Savastano, but I do not know his title.
8    Q.    I have a paper here Mr. -- I'm
9  sorry. Ms. Celia Harper, I have a paper that was
10 provided to me by Mr. Bruce Falby under oath, and
11 I know -- and it has been a lot of confusion. I
12 have a paper here, that Mr. Falby himself
13 provided me with this form. This form has your
14 name, Celia Harper, has also the name of Anthony
15 Savastano, also has Anthony Bayad's name, and
16 this paper was not yet -- I did not provide it to
17 the court under Mr. Bruce Falby. This paper that
18 I'm going to tell you that's your name, Celia
19 Harper, Anthony Savastano, Anthony Bayad and
20 corporate security with e-mails and everything,
21 all the nine yards. It states that your name, my
22 name, his name are here, as corporate police or
23 corporate security.
24       Let me ask you this question, why

Page 52

1  this, why this paper, document from Cisco that
2  was provided to me under oath by Bruce Falby? It
3  was provided to me under 27 -- I think 26,
4  Federal Rule of Civil Procedure 26 1, and we
5  talked, me and -- I remind, Mr. Falby, remember
6  our first hearing with the Magistrate Bowler, the
7  Honorable Magistrate Bowler? You and I, we met
8  at the court, and you decided to showed this
9  document, and I said, "Why Celia Harper is here?"
10 And you were shaking your head.
11       Anyway, my question to you, Miss,
12 why this document has my name, your name. It is
13 internal document. Cisco internal document has
14 my name, your name and corporate police, why?
15       MR. FALBY:  Objection.
16   Q.    You don't know why your name is
17 there, too, and my name and Anthony Savastano and
18 corporate police?
19   A.    I don't know which document you're
20 talking about.
21   Q.    Oh, you do not. You do not know?
22   A.    If you could reference the
23 document, but I do not know which document you're
24 referencing.

Page 53

1    Q.    When this litigation began in 2004,
2  Case 04-10468, Anthony Bayad versus Chambers,
3  Anthony Savastano, Carl Wiese, Mr. Bruce Falby
4  gave me that document when I called personally
5  Mr. Savastano and advised him under normal phone
6  call telling Mr. Savastano I'm going to proceed
7  with the lawsuit, you discriminated against me at
8  Lucent Technologies and now at Cisco, and he
9  called you, called HR. You called corporate
10 police, Cisco Corporate police, and you guys
11 start investigating me. In other words, he
12 initiated a complaint to you. Why he initiate a
13 complaint to you?
14       MR. FALBY:  I will object for the
15 record. Do you understand the question?
16   A.    I don't understand the question.
17   Q.    Why Anthony Savastano when he heard
18 Anthony Bayad called him he did not call
19 corporate police directly himself. He called you
20 directly. Why you, why you?
21   A.    Anthony Savastano never called me
22 directly.
23   Q.    That's not what we have, the
24 document that Bruce Falby has, but that's no

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**CELIA HARPER-GUERRA**
**January 19, 2007**

15 (Pages 54 to 57)

Page 54

1  problem. You said that you know him, right?
2      A.    I do know Anthony Savastano as an
3  employee of Cisco.
4      Q.    Respectfully when you know
5  somebody -- you met somebody. You met
6  Mr. Savastano. You have a chance to talk to
7  Mr. Savastano as human resources with finance
8  department. Do you talk to your peer? Did you
9  talk to him? If you know him, that means you met
10 him, right?
11     A.    I have met Anthony Savastano.
12     Q.    Thank you. Again, for the record
13 you know Savastano, Savastano knows you, right?
14     A.    Yes.
15     Q.    Thank you. That's all we want,
16 Miss. Thank you for your time. Now, you said,
17 "Interviewing" -- go back to Column 13 on the
18 complaint. Exhibit 14, Column 13 it says,
19 "Interviewing should only occur after the
20 responsible Cisco VP approves." Authentic,
21 right? You said yes earlier.
22     A.    Correct.
23     Q.    Okay. 14, "No targeted recruiting
24 efforts within these companies." Yes or no,

Page 55

1  authentic?
2      A.    Authentic.
3      Q.    No. 15 of the Cisco no-hire list,
4  Exhibit 14, in the complaint says, "Should you
5  have questions, contact Celia-Harper-Guerra."
6  That's why -- now we're going to start. Why, why
7  now, why your name is on the column? Is it
8  authentic or not authentic?
9      A.    Authentic.
10     Q.    Thank you. I am very -- no
11 problem. Now, we're going to stop here for a
12 while. For the record, we're going to stop here.
13 I'm going to tell you -- I'm going to tell you
14 some stuff right now, and I'm not trying to trick
15 you. I must tell you what happened. About the
16 Cisco no-hire list, and I'm sorry, I have a lot
17 of stuff here.
18        The Cisco no-hire list, very quick,
19 was ordered by Janet Skadden. It was modified on
20 September 22nd, 2000. Let me repeat for the
21 court reporter. This Exhibit No. 14 on the
22 complaint was modified. What that mean modified
23 for the record means it was attached
24 September 22nd, 2000.

Page 56

1          My question to you, if you go back
2  down, if you scroll down, now you prove to me
3  that you are reading something now because you
4  went column by column. Now, once you go all the
5  way down, I'm going to give you some columns.
6  Okay, Column 162 of this Cisco no-hire list in
7  the complaint, Exhibit 14.
8          MR. FALBY: We don't have column
9  numbers. We're working off of the hard copy
10 that's attached to the complaint. Do you have a
11 page number?
12         MR. BAYAD: Yes, 162. Kent
13 Electronics gold partner.
14         MR. FALBY: What is it?
15         MR. BAYAD: It says on Column No.
16 62. Mr. Falby, I gave you five -- I gave you
17 about seven editorial copies, and you're getting
18 paid a lot of money to help your client, that's
19 not nice like that. You got to help us both.
20 I'm a pro se. I'm not trying to be a lawyer
21 here.
22         MR. FALBY: What column are you
23 talking about?
24         MR. BAYAD: I'm referring to the

Page 57

1  Cisco no-hire list, Exhibit 14. And in the
2  exhibit there is a -- I'm looking at my editorial
3  copies -- a Column No. 62. And Mr. Iverson can
4  help us, too. Matt Iverson, he can help you.
5  The Cisco no-hire list. 162.
6          MR. IVERSON: Anthony, I know you
7  filed an electronic copy with the court, but
8  Bruce doesn't have that with him.
9          MR. BAYAD: Matt or counsel,
10 Mr. Iverson, within the federal rule of evidence,
11 it is my duty to give you two, to give you the
12 hard copies for the convenience of the honorable
13 court, and it is my duty also, according to the
14 Federal Rule of Evidence 91 with the meaning of
15 80 1 to provide you the electronic copies.
16         MR. FALBY: What's in the line that
17 you want her to look at?
18         MR. BAYAD: No. 162, Kent
19 Electronics gold partner. And looking at my
20 electronic copy, I see it there too.
21         MR. IVERSON: Kent Electronics?
22         MR. BAYAD: Yes, Kent Electronics
23 gold partner.
24         MR. FALBY: How do you spell it?

**CELIA HARPER-GUERRA**
**January 19, 2007**

16 (Pages 58 to 61)

Page 58

1    MR. BAYAD: Kent, K-E-N-T,
2  Electronics. If you don't have it or -- if you
3  don't have it or you don't know about it, let me
4  read it to you. In such column it says on the
5  Cisco no-hire list, Exhibit 14 of the complaint,
6  Column 162 says, "Kent Electronics Gold Partner."
7  And let me ask you, Celia, Miss Celia Harper,
8  Kent Electronics gold partner. In your best of
9  knowledge, is it a very important partner?
10 Because it's gold partner, right?
11     A.    I don't know the status of the
12 partner today.
13     Q.    Yeah, but is this partner doing
14 business with you? My record shows yes. What's
15 your record show? If I go to Cisco locator, you
16 know, easy to go, partner/reseller, it's coming
17 up many times. Mr. Matt Iverson can do it right
18 now.
19         Well, let me help you. It is
20 partner, according to Cisco partner/reseller,
21 also according to Cisco no-hire list. They are
22 partner yes or no?
23         MR. FALBY: Are you asking her if
24 they're a partner now?

Page 59

1          MR. BAYAD: Yes. She is admin of
2  Cisco no-hire list. Oh, okay.
3     A.    I don't -- to answer your question,
4  at the time they were a partner of Cisco. I
5  don't know if today if they're a partner.
6     Q.    At that time, yes. That time, that
7  time.
8     A.    At that time they were a partner.
9     Q.    Thank you.
10    A.    I do not what the status of the
11 partner, whether it was gold, silver or premium.
12 I don't have that information in front of me.
13    Q.    Kent Electronics Company is a
14 partner with Cisco, yes?
15    A.    Yes, and I don't know if it does
16 today.
17    Q.    I don't care about today. I care
18 about the list now. And if you go down to
19 Column 163 -- and you know this very well because
20 you are the admin of such list -- Mrs. Celia
21 Harper, it says, "Effective today, September
22 22nd, there is a "hands off" hiring moratorium
23 for 90 days for Kent Electronics and its
24 subsidiaries. This is due to recent recruiting

Page 60

1  activities ignoring the adopted protocol which
2  specifically addresses how we are to handle
3  candidates from the companies on our list.
4  Specifically, the managers who are ultimately
5  responsible for this partner have not been
6  appropriately contractor -- contacted prior to
7  the candidate being introduced to the interview
8  process. We will communicate to you when this
9  moratorium has been lifted." See, I do not speak
10 English very well, and I do not understand what
11 moratorium. What's moratorium,
12 M-O-R-A-T-O-R-I-U-M? See, I cannot come up with
13 this word because I do not speak English very
14 well. What does that mean this word? You wrote
15 this word.
16    A.    What is your question. You asked
17 about four or five questions. I'm trying to
18 understand what is your question.
19    Q.    Mr. Bruce Falby can read this in
20 good English. I don't want to confuse my court
21 reporter. What I'm saying is in such paragraph
22 under Kent Electronics, you put, you inserted
23 your personnel, or personal statement saying a
24 word that's very hard to understand, and I don't

Page 61

1  know what's the meaning. What's the meaning of
2  M-O-R-A-T-O-R-I-U-M, moratorium?
3          Mr. Falby, what's moratorium mean
4  in English? You are good in English.
5          MR. FALBY: It means to temporarily
6  stop, to stop.
7          MR. BAYAD: I swear to God I never
8  knew that word.
9          Now, Miss --
10         MR. FALBY: It's in the dictionary.
11 You should look it up.
12         MR. BAYAD: Okay. I just want to
13 let you know that I never knew that word. This
14 word is very hard. Miss Celia Harper put that
15 word. I just want to make sure that, you know.
16 It's a very hard word.
17         And also, if you go back to this
18 paragraph that you wrote under Kent Electronics,
19 Column 162, you said, "Effective today, September
20 22nd." Is that correct, yes or no?
21         I have some document here that
22 says, Effective today, September 22nd, no Cisco
23 can hire Kent Electronics. Authentic, not
24 authentic?

**CELIA HARPER-GUERRA**
**January 19, 2007**

17 (Pages 62 to 65)

Page 62

1    Do you agree with me that you wrote
2 this, "Effective today, September 22nd, there is
3 a "hands off" hiring moratorium for 90 days for
4 electronics -- Kent Electronics Company"? Yes or
5 no, Miss Celia Harper, please?
6    A.    I don't remember.
7    Q.    Okay. You don't remember, but you
8 wrote, "Effective today, September 22nd." I
9 don't know what the year, but I know that you put
10 "Effective today September 22nd." Yes? Yes or
11 no, authentic or not authentic?
12    MR. FALBY: Object to the form.
13 You can answer.
14    Q.    Can you answer, please?
15    A.    Yeah, I don't believe so.
16    Q.    You don't believe that you put that
17 word there?
18    A.    Which word are you describing?
19    Q.    You said earlier that you put the
20 paragraph there under Kent Electronics. You're
21 tell Cisco because you're the admin of -- you're
22 custodian, record custodian. You are the Cisco
23 no-hire list admin. It is your duty. You spoke
24 to some people or the sales force, and you told

Page 63

1 them that effective September today -- you said,
2 "Effective today" -- you said today -- "September
3 22nd, there is a "hands off" hiring moratorium
4 for 90 days for Kent Electronics and its
5 subsidiaries. This is due to recent recruiting
6 activities ignoring the adopted protocol which
7 specifically addresses how we are to handle
8 candidates."
9    Now, if we go back to the Cisco
10 record and we ask you to provide everybody that
11 was hired prior to September 22nd, and you decide
12 to give me -- if you don't want to give me that,
13 that's okay, because Bruce Falby never gave me
14 anything. But if I go talk to my buddies at Kent
15 Electronics, you know, and I tell them can you
16 give me who you fired or who left the company for
17 CCIE, and they told me that A, B, C guy, John,
18 you know, Mark, Bruce left the company before
19 September 22nd, 2000. Did you put that
20 paragraph, Miss, please -- you are under oath --
21 yes or no?
22    A.    I don't remember.
23    Q.    Okay. You don't say you don't
24 remember. If you don't remember, that means you

Page 64

1 did put it there. You have to say, and counsel
2 can quote you, you have to say I do not recall.
3 I just want to help you.
4    MR. FALBY: Can you ask another
5 question, please?
6    Q.    Now, when you do not remember that
7 you put that date, effective today, September
8 22nd -- the reason I'm mentioning that September
9 22nd is because you said today. In English,
10 Miss Celia Harper, what's today? That means it's
11 the past or the present or today is the action of
12 that time, yes?
13    A.    Yes.
14    Q.    Now, if I read effective today,
15 that mean effective today I have to comply with
16 your paragraph. Yes or not?
17    MR. FALBY: Objection. I don't
18 understand what you're asking.
19    MR. BAYAD: In other words, if she
20 said to Cisco people do not hire effective today,
21 September 22nd, do not hire anybody from Kent
22 Electronics, that means effective today, right?
23 You said yes earlier, yeah?
24    MR. FALBY: She said she doesn't

Page 65

1 remember this paragraph.
2    MR. BAYAD: Yeah, but I asked her
3 the English language.
4    MR. FALBY: Well, the English
5 language means what it says, and frankly, it's
6 not a good question, and it's a waste of time.
7 If you have something that you want to ask her --
8    MR. BAYAD: Okay, Mr. Falby, what I
9 understand effective today, that means today.
10    MR. FALBY: Yes, effective today,
11 the plain meaning of that means today.
12    Q.    (By Ms. Bayad) Today, today. From
13 today. Nothing can go beyond today. Tomorrow,
14 tomorrow nobody can hire Kent Electronics, right?
15 Yes or no, sir?
16    MR. FALBY: She said she doesn't
17 remember the paragraph. It's not appropriate to
18 be asking her questions what it means.
19    Q.    (By Ms. Bayad) Okay, let me ask
20 you. If he said today, effective today,
21 September 12th, nobody from Cisco can hire Kent
22 Electronics employees, that mean you make some
23 changes in such, in such statement, right? You
24 have to insert that-in that statement, right?

# CELIA HARPER-GUERRA
## January 19, 2007

18 (Pages 66 to 69)

**Page 66**

1  It's an electronics copy, that means you have to
2  enter it, right? When you type something on the
3  Excel sheet, Miss Celia Harper, you make changes,
4  right? Therefore it is modified. Yes or not,
5  Miss?
6  　　　　MR. FALBY: Objection.
7  　　　　MR. BAYAD: Mr. Falby, please
8  Mr. Falby, we just are trying to help you.
9  　　　　Miss, can you answer the question,
10  please?
11  　　　　MR. FALBY: The question is
12  incomprehensible. Can you rephrase it please?
13  　　　　MR. BAYAD: Okay. And Mr. Falby,
14  I'm not a lawyer. You need to help me.
15  　　　　MR. FALBY: I don't need to help
16  you, but I do have a right to ask you to ask my
17  witness questions that make sense.
18  　　　　MR. BAYAD: Okay, no problem.
19  　　　　Miss Celia Harper, under oath you
20  are HR, right?
21  　　A.　That's correct.
22  　　Q.　You work with Excel sheets a lot,
23  right?
24  　　A.　Correct.

**Page 67**

1  　　Q.　You are very professional. Very
2  educated, right?
3  　　A.　Correct.
4  　　Q.　Excel sheet no problem for you,
5  right?
6  　　A.　Correct.
7  　　Q.　Okay. That means if you enter
8  something on the Excel sheet you make
9  modification, right? Because you work for a
10  highly, highly tech company, that means we have
11  to use this term. You modify, right? You make
12  changes, right, to the Excel sheet, right? When
13  you make changes, do you save it, yes or not?
14  　　A.　Yes, when you make changes to a
15  document, you send it and save the document, yes.
16  　　Q.　Okay, thank you. If you make
17  changes -- to recall your statement, you said you
18  work very well with the Excel sheet, and you work
19  with Excel sheets such as Exhibit 14 of the
20  complaint. That mean you are very good with the
21  software, Microsoft Excel sheet, right? Yes? Or
22  you wouldn't have job with a high tech --
23  　　A.　Yes, yes.
24  　　Q.　Okay. I mean, yes, you are very

**Page 68**

1  good with Excel sheet, Microsoft Excel sheet as
2  this one, right?
3  　　A.　Yes, I'm good with Excel.
4  　　Q.　Thank you. That mean -- you work
5  for high tech company, and you are highly in the
6  level of Cisco executive, an officer of the
7  company. You know if you work with Excel sheet
8  you make changes. In order for those changes to
9  stay in that Excel sheet, what do you need to do?
10  You have to save it somehow, right?
11  　　A.　Correct.
12  　　Q.　And when you save it, it becomes
13  permanent at such time, right? And if you go
14  back and open it, you're going to find it saved,
15  right?
16  　　A.　Correct.
17  　　Q.　Okay. Now, Miss, going back to the
18  statement that you said, you said if you enter
19  September under Column 162 of Exhibit 14 of the
20  complaint, if you enter effective today,
21  September 22nd, there is a "hands off" of hiring
22  such company Kent. You add something, you change
23  and you modified it, right. And then you're
24  going to go and save it, right? When you save

**Page 69**

1  it, right, that's it, right? When you go back
2  it's going to open, right? And you can go back
3  and whatever you enter is going to stay there,
4  right?
5  　　A.　So let me answer your question
6  here. This document is not a valid document.
7  　　Q.　I'm not trying to be a smart guy
8  here.
9  　　　　MR. FALBY: Excuse me, let her
10  answer the question.
11  　　　　MR. BAYAD: No, she asking me a
12  question.
13  　　　　MR. FALBY: No, she's not. She's
14  answering your question.
15  　　　　MR. BAYAD: Very well. What I'm
16  saying to you --
17  　　　　MR. FALBY: No, no. Excuse me, let
18  her answer the question, please.
19  　　　　MR. BAYAD: I'm sorry. I
20  apologize.
21  　　　　MR. FALBY: Go ahead.
22  　　A.　This document and the reference
23  line that you referred me to are not accurate in
24  the fact that they are not authentic. They have

# CELIA HARPER-GUERRA
## January 19, 2007

Page 70

1  been manipulated and changed, and the dates do
2  not reflect accurately, as you have September
3  10th on your document on the front page and now
4  you have September 22nd without a year in there.
5  This is not an authorized, authentic document of
6  Cisco's.
7        Q.    Let me ask you this. Why the
8  people that understand Microsoft like -- and he's
9  a funny person, too. Brian Schipper, right, work
10  for Microsoft. He knows. He's going to tell you
11  the same thing. If you make changes, it's going
12  to be stamped. And if you stamp, it going to
13  tell you the date and time. You cannot mess with
14  this.
15        Now, if you look at effective
16  today, September 22nd, on Column 163, and going
17  back to the complaint, the Complaint Docket S214
18  you can see that if you go -- take the sensitive
19  list, the Cisco no-hire list, the contact, the
20  whole file that I mentioned earlier, and you went
21  with me, and you knew what I was telling you,
22  that it was -- the size is 279 k, kilobyte, and
23  it was modified according to Microsoft gurus on
24  September 22nd, 2000, that's what you just wrote

Page 71

1  over there. Tell me why, why did Microsoft Excel
2  analysis state it was touched, this file, with
3  the 279 kb, with all the companies from Cisco
4  that you admin, you are custodian of record. Why
5  does it have size of 270 kilobytes? If you don't
6  know the size, I can help you. Size 275
7  kilobyte, and it says it was modified 9/22/2000,
8  which is September 22nd, 2000. Why, why, why it
9  was modified on September 9th -- I'm sorry,
10  September 22nd, 2000? And it match. It's
11  authentic. Effective today, September 22nd,
12  because you entered that date and you saved that
13  file 'cause you have authorization to save it,
14  and you saved it, and you moved on with your life
15  the next day. Because if we go back -- remember
16  you said it's authentic. You said it's authentic
17  line as stated.
18        Please, Ms. Celia Harper, I'm going
19  to with you, with you, with the line that you say is
20  authentic, and I write everything what you said.
21  "Do not download. Sensitive list is upgraded."
22  I'm sorry. "Do not download. The sensitive list
23  is updated on a regular basis, and changes are
24  made to company listings."

Page 72

1        MR. FALBY: Is there a question?
2        MR. BAYAD: Yes. Why we have
3  modified, and why we entered the September 22nd?
4  Because you are an admin, yes or no?
5        MR. FALBY: Objection. Your
6  question is incomprehensible.
7        MR. BAYAD: Okay, Mr. Falby, I'll
8  be very straight with you.
9        Are you official admin of such list
10  that you have right now, that we have been
11  talking about for two hours, yes or no?
12        A.    Yes, I am the owner at that time of
13  an authenticated list provided by Cisco.
14        Q.    Okay. I appreciate. Let me ask
15  you why you talking about Kent Electronics, why
16  you talking now about AT&T, Column 170, and AT&T
17  right know have a lot of people working for them,
18  and you know what I'm talking about. I'm not
19  going to say nothing. I'm just going to tell you
20  that we have rules, that AT&T -- and you're going
21  to say, yes, they are a very good customer for
22  Cisco. Now, on Column 170 on document entry
23  number -- this is for no-hire list -- Docket
24  entry No. 1 which is the complaint, Exhibit 14,

Page 73

1  you state in Column 170, "AT&T, no recruiting,
2  hands-off policy." Did you say that yes or no?
3  Authentic or not authentic? At such time, yes or
4  no, Miss?
5        A.    Can you please restate exactly what
6  line? Remember, we don't have the line. Could
7  you read the paragraph that you're referencing?
8        Q.    No problem. On line 170, "AT&T, no
9  recruiting, hands-off policy." Remember, I've
10  got a lot of friends at AT&T. You stated in this
11  paragraph -- and it is good English. I cannot
12  write this English. Nobody can write this
13  English -- "Recently, we have hired a number of
14  AT&T employees without following the guidelines
15  of the Sensitive List" -- meaning the no-hire
16  list, Cisco no-hire list -- "particularly as it
17  relates to the highly sensitive category.
18  Therefore, Rick Justice and the Sales
19  Organization have asked us to implement a
20  hands-off policy related to the hiring of all
21  AT&T employees (all divisions). This policy will
22  be in affect for a minimum of 90 days, but may be
23  extended for a longer period. If you currently
24  have AT&T employees in the interview process,

# CELIA HARPER-GUERRA
## January 19, 2007

20 (Pages 74 to 77)

Page 74

1  please work with your Employment Manager who will
2  help to resolve each situation on a case by case
3  basis." Miss, who can put this paragraph but
4  only you and you only? Yes or no, Miss?
5      A.    It would be me.
6      Q.    Thank you. And you were right, you
7  are you, 'cause you hired a lot of people from
8  AT&T, and I protected you. I did not give them
9  the list. Let's move on.
10        The next question, Dell Computer,
11  no recruitment. On Column 180 on Cisco no-hire
12  list, Exhibit 14, you said, "Dell Computer no
13  recruiting until further notice. Due to high
14  volume of hiring from Dell Computer recently and
15  in the spirit of our partnership with them, there
16  will be no recruiting of any Dell employees,
17  until further notice." Did you write this yes or
18  no, Miss?
19      A.    No.
20      Q.    You didn't write this?
21      A.    No.
22      Q.    Who wrote this, Janet Skadden?
23      A.    I don't know.
24      Q.    Okay. Somebody from HR wrote this,

Page 75

1  right?
2      A.    I don't know.
3      Q.    No problem. Let's move on. Column
4  185 of the Exhibit 14 of the complaint you
5  stated -- this is very high sensitive because I
6  never work for government because I don't have a
7  high clearance, because nobody can get high
8  clearance, only if you work for the military or
9  you sponsor 14,000 for the record, then you get
10  clearance. Only people from the CIA. This is
11  very sensitive. I should not have this list, by
12  the way. No problem.
13        My question to you is, Column 185,
14  Miss, Exhibit 14 of the complaint you said, "All
15  employment" -- this is government hired
16  procedure, our government, the United States of
17  America. God bless. You stated -- I don't know
18  who stated the following: "All employment
19  discussions with current and/or former U.S.
20  Government employees must be coordinated with
21  Cisco Human Resources, attorney for Federal
22  Operations, Tara Flannagan" -- the name of the
23  person called Tara Flannagan, last name
24  F-L-A-N-N-A-G-A-N -- "and Federal Compliance

Page 76

1  Specialist Alyssa Vanga." First name
2  A-L-Y-S-S-A. Vanga, V-A-N-G-A. "This includes
3  inquiries made by current or former government
4  employees regarding future employment with Cisco;
5  or recruiting attempts initiated by Cisco
6  employees or representatives with current or
7  former government employees. All candidates are
8  required to fill out a compliance questionnaire
9  (prior to interview) and submit to Alyssa Vanga."
10  And you provided her Cisco address, avanga at
11  Cisco dot-com.
12        Now, in this paragraph you mention
13  two people, Alyssa Vanga and another person, Tara
14  Flannagan. Remember, Miss, you are under oath.
15  Earlier you said 50,000 employees. Who knows
16  these two people? You do. Did you write this
17  paragraph, yes or no, Miss?
18      A.    Yes.
19      Q.    Thank you. And at the end, Miss --
20  and I apologize, Miss, for putting you through
21  this. And at the end, Miss, something very
22  important that you needed to know. This Cisco
23  no-hire list -- right? -- whatever the name you
24  call it, but I call it Exhibit 14, for the

Page 77

1  record, of the complaint. If you look underneath
2  there is subtitle. In other words, you call it
3  Americas, which is what you just described me
4  that you wrote, the last paragraph, the name of
5  the company, and you authentic them, and the next
6  subdirectory or subfile you named the second one
7  on the right. The first one on the right, the
8  second one, which is the first one is Americas.
9  The second one is Americas International. All I
10  see, and I apologize for this, I see
11  Confidential, American International, for
12  recruiting purpose only effective 2/4 FY 2000.
13  You put company. For example, you put promo,
14  highly sensitive promo CVM, HV, IBM, Prona, then
15  you said sensitive equal a lot of companies. I
16  just want to make sure, that subfile existed,
17  right?
18      A.    Are you looking at a soft document,
19  'cause in our hard copy document it doesn't
20  provide that for us in this exhibit.
21      Q.    Okay, but counsel do have the
22  electronics copy for the record, and counsel did
23  ask the Honorable Judge Sarris to conduct these
24  interrogatories -- I'm sorry -- this deposition

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

CELIA HARPER-GUERRA
January 19, 2007

21 (Pages 78 to 81)

Page 78

1 from far away to make it difficult for me, and
2 that's not fair, and he has duty, as the
3 honorable judge said, has mentioned, that he need
4 to be proactive. He need to help you understand.
5 But no problem, I'm going to make it very easy
6 because I'm going to ask some question here. No
7 problem.
8          Now, a lot of people provided -- a
9 lot of defendants provided me declaration. Is
10 that your statement, Miss?
11          MR. FALBY: What's the question?
12     Q.   Did you provide me your
13 declaration, Miss Celia Harper? I have
14 declaration in front of me. Did you provide me
15 with a declaration of yours?
16     A.   Yes.
17     Q.   In support of your proposed motion
18 for summary judgment; is that correct?
19     A.   Yes.
20     Q.   And in such declaration you
21 provided me the following: On page No. 5 -- on
22 such page -- you state that on such page "Cisco's
23 former no-hire policy," right? Right?
24     A.   I'm just trying to find the

Page 79

1 document you're in Exhibit A, correct. I'm
2 trying to follow along with you.
3     Q.   Yeah, let me make it easier, no
4 problem. I'm sorry, I'm confusing you. I'm not
5 use to this, and I don't want to be here.
6          Respectfully, Ms. Celia Harper, you
7 provided me with a declaration under oath. Yes
8 or no, Miss?
9     A.   Yes, I did.
10     Q.   In such declaration you have
11 inserted exhibits of people with names and their
12 e-mail address, right?
13     A.   Correct.
14     Q.   Okay. Now, Miss, respectfully and
15 under oath, from where did you print those, those
16 exhibits with a lot of minority or Cisco
17 employees? Where did you get, where did you
18 get -- from where did you print it? You printed
19 it from Cisco no-hire list or from somewhere
20 else?
21     A.   This is from our offshore partners,
22 from HCL and Wipro provides a --
23     Q.   Thank you for your honesty, that's
24 correct. In such exhibit under oath that you

Page 80

1 provided me to, attached to your declaration
2 under oath you gave me a lot of names, right?
3 That exhibit has lot of names in it, right?
4     A.   Correct.
5     Q.   Not to be hired, right?
6     A.   Correct.
7     Q.   And in such -- and in that exhibit
8 that you provided with a lot of people with
9 names, and I think they are from other countries.
10 Can we call them minorities or foreigners? They
11 don't have the -- they don't have the American
12 name, right? They have very funny names, right?
13          MR. FALBY: I'm going to object to
14 your characterization of these names.
15          MR. BAYAD: Okay, Mr. Falby.
16          MR. FALBY: You can answer.
17     A.   Let me answer that question for
18 you, Anthony. These names are contract
19 employees.
20     Q.   I don't want to know what they are.
21 My question to you, Miss, I conduct deposition,
22 and you can do the same thing. My schedule is
23 open, and I don't have a lot of time, and I'm
24 getting tired. And when I get tired, I get very

Page 81

1 ill because I'm not very healthy. My question to
2 you, you did provide exhibit under oath attached
3 to your declaration under oath. It says, "Cisco
4 Offshore Development No-Hire Policy," right? Is
5 that correct?
6     A.   Correct.
7     Q.   And also on such file that you gave
8 me there's a paragraph that says the following:
9 "Cisco has a no-hire policy with the two partner
10 companies in India, HCL and Wipro, who have set
11 up dedicated development centers for Cisco in
12 Chennai and Bangalore." Also you stated,
13 "Specifically, our policy is that we will not
14 hire any engineer." Let me repeat this. You
15 stated, and it's in your declaration under oath,
16 the exhibit in support of your declaration. You
17 provided it. Mr. Falby provided it. Paula
18 Hughes who is listening provided it. Everybody
19 provided what you provided me. And also you said
20 in such exhibit of Cisco no-hire list, you said,
21 "Specifically, our policy is that we will not
22 hire any engineer as a Cisco employee or
23 contractor."
24     A.   So let me just explain it.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**CELIA HARPER-GUERRA**
**January 19, 2007**

22 (Pages 82 to 85)

Page 82

1    Q.    Let me finish, Miss. You said
2    specifically in your exhibit under oath attached
3    to your declaration, "Specifically, our policy is
4    that we will not hire any engineer as a Cisco
5    employee or contractor, working at these
6    development centers during their employment with
7    these companies and for a period of 6 months
8    after they have left their employment. The
9    policy applies to engineers who may travel to
10   U.S. for training or for transfer of information.
11   Hiring of partner's engineers, even after they
12   leave their employment, contributes to higher
13   attrition among the remaining engineers and will
14   affect the stability of the development centers
15   and the projects being executed. We appreciate
16   your support in implementing the no-hire policy."
17   So then you went in and you wrote, "If you have
18   any questions, please contact HR," which is you,
19   "or Global Partner Engineering Management," and
20   you stated, "Active employee details as of 6th
21   September 2000." Let me repeat the date again.
22   "Active employee details as of 6th September
23   2000." Then you put the names of hundred
24   thousand that I call respectfully all minority.

Page 83

1    Miss, let me ask you a question. As human
2    resources, you understand what's the law for
3    discriminating against minorities. These people
4    are minorities, and I'm going to tell you why.
5    I'm going to help you, and this is a good lesson,
6    and I'm not trying to be superstar. I'm just
7    tired. Do you understand what are you doing
8    right now to these people? Do you know what you
9    are doing, Miss, to these people that are dying
10   to come to this country like you and I. You and
11   I are immigrants. We came to this country as
12   immigrants, Ms. Celia Harper, and you and I we
13   are American under the law. Now, do you know
14   what you are doing here right now? You are
15   discriminating against this individual because
16   Mr. -- Miss Celia Harper, I'm going to ask you a
17   question. Under the law of the immigration
18   naturalization services, the law, can you hire a
19   person without proper paper at Cisco Systems, if
20   somebody knocked on your door right now, or to
21   make it very simple, if one of these guys came to
22   your office with an application on file for --
23   and filed an application and he wants to get a
24   job, and you are very good with the people 'cause

Page 84

1    your title is director of human resources of
2    talent, and this guy has a Ph.D., he is topnotch,
3    but he's a minority. Would you hire him, yes or
4    no, if he had proper paper?
5         In other words, if you hire a
6    foreigner, what would you ask him for, as HR?
7    You know the law of immigration, right? If
8    somebody right now walked into your door, what's
9    the law of employment of immigration/
10   naturalization? We call it now homeland
11   security. What would you ask the candidate to
12   provide if he is qualified and you went through
13   all the process? Now you have to verify his
14   what? His passport, find out if he has a green
15   card, valid social security and a valid driver's
16   license? Is that correct, Miss? That's your
17   policy at Cisco Systems? You do not hire illegal
18   immigrants, do you, yes or no?
19        A.    We do not hire illegal immigrants.
20        Q.    But you do hire any person that has
21   the proper paper under the law of our respective
22   country, the law of employment, of homeland
23   security. What would you ask a person that is
24   going to be hired? I don't care. I'm just

Page 85

1    asking you what proper paper do you ask. If
2    today you hire me, my name was on this list -- if
3    you go to the new list that you provided under
4    oath, a declaration under oath, that list of all
5    these minorities, let's pick one for an example.
6    Udayakumar, Udayakumar, that's his name, and it's
7    not funny. If he came to you today and he was
8    qualified, what would you ask him for last
9    process of his employment, the verification of
10   employment? What type of paper would you ask
11   him, Ms. Celia Harper? Please answer the
12   question what you ask him. You said you do not
13   illegal immigrants, but what would you ask him to
14   hire, what would you ask him?
15        A.    As we would with any applicant, we
16   ask them to fill out an application, provide us
17   with a resume, provide us with the necessary
18   documents to provide their employment rights here
19   within the United States. Now, that does vary by
20   various countries, so --
21        Q.    We are Americans here. I am an
22   American. You are an American.
23        A.    But this particular list that you
24   keep referencing is offshore, and these are the

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**CELIA HARPER-GUERRA**
**January 19, 2007**

23 (Pages 86 to 89)

Page 86

1  particular names that are on this list.
2      Q.    Let's go back to the paragraph that
3  you wrote. It says if they come to U.S., United
4  States of America, and if they hire -- these
5  people that you have, they're not to be hired at
6  Cisco, and you said even if they come to the U.S.
7  If they arrive right now to your country, to my
8  country, you and I, and they were qualified to be
9  hired, what types of paper would you ask them to
10  provide you in order to fill the requirement and
11  hire them, knowing that they are highly
12  qualified? What type of immigration paper would
13  you ask them for, as a qualified director of
14  human resources? Please, Miss Celia Harper,
15  answer this question.
16      A.    As I stated before, they have to
17  fill out an application, they have to --
18      Q.    I don't care about the application.
19  I'm asking you about the requirement of the
20  homeland security. I'm stating to you that
21  Udayakumar, Employee Cisco No. TC08837, for some
22  reason he end up, he arrived in this country, and
23  he wants a job. What type of immigration paper
24  would you ask him to provide you in order to

Page 87

1  fulfill his requirement? Knowing that he is
2  qualified, educated to be hired at Cisco in
3  America, what type immigration paper would you
4  ask him, as HR? As a director of HR for Cisco,
5  what type immigration paper would you ask him
6  before you can hire him, what type of paper?
7      A.    Green card.
8      Q.    What else?
9      A.    Verification of his social
10  security.
11      Q.    Thank you very much. Let me recall
12  for the record, make sure I'm not confusing my
13  court reporter, and I appreciate her help. It's
14  very hard to write, and I have an accent, a heavy
15  accent.
16          You stated if one of the guys that
17  you have listed in the, in your Cisco no-hire
18  list, if such person asked, Udayakumar Cisco No.
19  TC08837, if he came to you and he was qualified
20  to be hired, the immigration law and
21  naturalization requires them to provide a green
22  card and social security? Is that correct, yes,
23  so we can move on? Yes?
24      A.    What is your question? Can you

Page 88

1  please state it again?
2      Q.    You said after the last phase of
3  the application process and he is qualified, he
4  is in America that you can ask him to provide a
5  social security and a green card, yes or no?
6      A.    Yes.
7      Q.    Okay. Miss, you stated earlier
8  that you are a director of human resources,
9  right?
10      A.    Yes.
11      Q.    And you are very educated, I know
12  you are, because you would not be working for
13  Cisco, neither am I. Cisco is not easy to work
14  for unless you have good talent, and you do. My
15  question to you, you do know the law, right?
16      A.    Yes.
17      Q.    Employment, right?
18      A.    Yes.
19      Q.    Now, you just proved to me that you
20  know immigration law, and I apologize. And since
21  you know the immigration law, I'm going to ask
22  you, if the person that we took from your list
23  no-hire, and they are on your list, and his name
24  is Udayakumar, Cisco No. TC08837, if he provide

Page 89

1  with you a green card and social security, what's
2  his status in this country?
3      A.    I don't know his status in this
4  country.
5      Q.    What's green card mean? You said
6  that he needs green card, what's green card,
7  green card or permit resident card?
8      A.    Yes, that's so he has a right to
9  work in the United States.
10      Q.    The resident, the green card or
11  probably it's called also probably what they call
12  an alien card. It has three names, alien card
13  green card, resident card, whatever. It means
14  that he has right to work in our country, right?
15      A.    Correct.
16      Q.    Okay, Miss, very good. Now you're
17  following me, what I'm getting to you. I'm
18  taking you where. I'm taking you to me now.
19  Now, how can you put a United States resident
20  with social security, a minority with a name, a
21  minority with dark skin probably, we don't care,
22  but the law is the law, how can you put his name
23  not to be hired on your Cisco no-hire list that I
24  did provide to you, and you're admin. You say as

**CELIA HARPER-GUERRA**
**January 19, 2007**

24 (Pages 90 to 93)

### Page 90

1  a director of HR that you are discriminating,
2  probably -- I don't know if you're doing a -- do
3  you know what you're doing?
4      A.    We never put your name on a list.
5      Q.    Miss, my name is on the list, and
6  I'm going to prove it to you, no problem. Just
7  bear with me.
8          Now, if this guy, you have his name
9  not to be hired, do you think you're
10 discriminating against him, or you're just --
11 well, what are you doing to this guy? If he has
12 a green card, social security and his name is on
13 this list, what are you doing? You are in
14 violation of what? Of his civil rights, right?
15     A.    No.
16     Q.    You are in violation of the law of
17 discrimination, Title VII. Do you know what EEOC
18 means, Miss Celia Harper? Do you know what EEOC
19 means?
20     A.    Yes.
21     Q.    Can you say?
22     A.    Employer of Equal Opportunity.
23     Q.    Employer?
24     A.    Employer of Equal Opportunity.

### Page 91

1      Q.    EEOC, Equal Employer Opportunity?
2  No violation, no?
3      A.    I said yes.
4      Q.    Okay. If Mr. Udayakumar, found out
5  his name is not -- his name is on Cisco no-hire
6  list, what would you do? Does he have right,
7  does he have right to go to the EEOC and complain
8  against your company Cisco Systems?
9      A.    State that again for me.
10     Q.    I'm stating to you, if you know
11 what EEOC means, and you're putting a United
12 States resident on the Cisco no-hire list, what
13 are you doing to him?
14     A.    So I'm just going to state
15 regarding the Cisco no-hire policy for the
16 companies --
17     Q.    I am asking you --
18     A.    I'm going to answer your question.
19     Q.    Okay, no problem. I'm going to
20 refresh your memory. You know, Miss, what you're
21 doing to him, you are discriminating against him
22 based on his race, and that's it, and I'm going
23 to prove it to you why, because Title VII state
24 that you cannot discriminate against minority,

### Page 92

1  right? Yes or no, Miss?
2          MR. FALBY: Objection. You won't
3  let her answer the question. What do you want
4  her to do. Do you want to ask questions or not?
5          MR. BAYAD: Yes, please. I'm
6  asking if this guy has a green card and you put
7  his name, and you're telling him that you are not
8  going to be hired, because you have a policy, a
9  policy that is contradicting the policy of your
10 business code of ethics.
11         MR. FALBY: She already told you
12 your name was never on --
13         MR. BAYAD: Mr. Falby, you're not
14 deposed. If you want to be deposed, you please
15 let me know and I will add you to the list. I
16 will talk to the Honorable Patti B. Sarris.
17         To be honest I'm trying to take
18 this wonderful person, Celia Harper -- I don't
19 want to have trouble with anybody. I want to
20 make sure that what she's doing is wrong so she
21 can go back and correct it. Also, I want to make
22 sure that she understands what her company's
23 policy about discrimination, and let me ask her
24 this question very quick. Do you promote

### Page 93

1  discrimination -- on the business code of ethics,
2  do you promote equal opportunity employment, or
3  you do not?
4      A.    I promote equal employment
5  opportunity.
6      Q.    No, I'm not asking you you. I
7  mean, I'm asking you about the profession --
8  Cisco business code of professional ethics. You
9  know, the guideline that Cisco has on the web.
10 It says do we promote discrimination or we do
11 not, or we promote employment opportunity
12 employer. Are you?
13     A.    We are an employer that supports
14 equal opportunity.
15     Q.    Okay, very good. And earlier,
16 Miss, earlier you stated to me under oath, you
17 stated to me under oath the following: Anybody
18 from the street, any company out there wants to
19 hire somebody from Cisco -- they use to work for
20 Cisco -- your policy state that -- I'll just
21 remind you. You stated the following: Anybody
22 that calls asking for reference about a former
23 Cisco employer, you telling them what? You tell
24 them start date, if he's asking for reference

**CELIA HARPER-GUERRA**
**January 19, 2007**

25 (Pages 94 to 97)

Page 94

1  about such person like Anthony Bayad. Let's put
2  Anthony Bayad as an example to make the court
3  reporter at least -- I mean, I help her out. If
4  Lucent Technologies called you and asked you did
5  Anthony work for Cisco Systems, and we want
6  reference about Anthony Bayad, what would you
7  say, according to the policy of your company?
8  You are under oath, Miss.
9      MR. FALBY: Let me just object. Go
10  ahead.
11     A.    I would reference them to -- if
12  somebody called and asked for a reference, I
13  would reference them to --
14     Q.    Anthony Bayad, for example. Yeah,
15  just an example. Lucent Technologies called you
16  today and says, did Anthony work for you? We
17  want a reference for poor Anthony Bayad. What
18  would you tell them, or any other employee that
19  use to work for Cisco in the past, and he's
20  looking for an opportunity to work for other
21  company to support his family. If he found a job
22  and his employer, like Lucent Technologies,
23  called you personally, you or your company, HR,
24  what's your guideline about giving references?

Page 95

1      A.    As we would do for any employee
2  that left Cisco to talk to another company that
3  asked for verification or a reference, that we
4  would refer this person to the human resource
5  center. The human resource center will verify
6  dates of employment.
7      Q.    And the date of the termination,
8  good word, the separation of the company, right?
9      A.    Which falls under the dates of
10  employment --
11     Q.    Exactly.
12     A.    -- a start and an end date.
13  Exactly.
14     Q.    You would not discuss anything
15  else. Is that a correct statement?
16     A.    Our policy is to verify dates of
17  employment.
18     Q.    Thank you for your honesty, and
19  that's what is the Cisco policy. We tested the
20  system, and yes, you are correct. Now I ask my
21  question to you. We were talking about the
22  business, the Cisco business code of ethics --
23  I'm sorry. I'm talking right now about Cisco
24  business code of professional ethics, and you

Page 96

1  know it very well, as well I do. It state, and
2  you just said today, right now, that you cannot
3  say anything else -- right? -- about any former
4  employee, right? Only the date of the start and
5  the separation from the company, in good faith,
6  correct, right?
7      A.    Correct, dates of employment.
8      Q.    Now, and also your business code of
9  ethic -- we don't care about the law. Your
10  guidelines. If anybody violated that business
11  code of ethics, what happen to him? If somebody
12  is racist in your company or somebody is going,
13  going -- if somebody, a hiring manager, for
14  example. Let's take Lynn Fraser. What would you
15  say about Lynn Fraser if somebody called her --
16  right? -- and asked her, "Do you know Anthony
17  Bayad? We want a reference. We are Lucent
18  Technologies." Remember what you just said,
19  Miss. You are under oath, please. Please say
20  the truth. If somebody called Lynn Fraser about
21  Anthony, Lucent Technologies called Lynn Fraser
22  and asked her did Anthony work for you, what her
23  first step she need to do?
24     A.    She should recommend that

Page 97

1  individual contact the human resource connection.
2      Q.    God bless you. That's what Cisco
3  procedures and that's what Cisco guidelines
4  state. Yes, Lynn Fraser cannot say anything
5  else, right? Correct or not?
6      MR. FALBY: Say it again, please.
7      Q.    Because of the Cisco guidelines,
8  and Miss Celia Harper, is going through this step
9  by step, she just state that anybody that called
10  Lynn Fraser, the only thing that she has to do is
11  to refer Anthony Bayad or Lucent Technologies to
12  the human resources center, right?
13     MR. FALBY: Is your question about
14  Lucent calling?
15     MR. BAYAD: Any company calling
16  about Anthony Bayad, me?
17     MR. FALBY: Anybody outside of
18  Cisco?
19     MR. BAYAD: Any employer calling
20  Cisco Systems, Lynn Fraser and ask her did
21  Anthony work for Cisco, what should -- as human
22  resources, Ms. Harper, what's Lynn Fraser's duty
23  as a manager and officer of the company should
24  say and do and follow what she should do? Tell

**CELIA HARPER-GUERRA**
**January 19, 2007**

26 (Pages 98 to 101)

Page 98

1  me, please?
2      A.    As any employee at Cisco, our
3  policy is to refer them to the human resource
4  center to be able to verify dates of employment.
5      Q.    Thank you. And if such person like
6  Lynn Fraser did not do what you just told me, the
7  following facts, the guideline of Cisco as you
8  are the representative of Cisco Systems, and
9  that's because of Lynn Fraser, that's why you are
10  here, and that's why I apologize to you. Why
11  Cisco allow Lynn Fraser openly to state to
12  anybody that Anthony Bayad, as I, Lynn Fraser.
13  Under oath she gave it to me. Mr. Falby knows.
14  She stated that Anthony Bayad -- I, Lynn Fraser,
15  do not recommend Anthony Bayad to Cisco. Does
16  she have right to say that, Miss, please?
17      A.    Let me just reference that.
18      Q.    Miss, please, we've got to wrap it
19  up, please.
20          MR. FALBY: Let her answer the
21  question, please.
22      Q.    You're a wonderful person, and
23  you've been very honest. God bless you. I just
24  want to tell you, don't protect people, that they

Page 99

1  don't deserve to work for Cisco, and I'm not
2  defending anybody. I'm asking you from the
3  bottom of my heart as the Cisco admin and your
4  word as a good person, a good Christian person.
5  I know you are. I know everything. I know
6  everybody, miss. Please tell me why Lynn Fraser,
7  what she or should not do. Does she have a right
8  to state the following, because if you said, yes,
9  I'm going to take you somewhere else, and you're
10  going to be stuck with me. If you say honestly
11  that it's not proper to state, to hurt people's
12  life, then, Miss, we're going to wrap it up, and
13  we can move on.
14          Please tell me, Miss, does Lynn
15  Fraser have right to defend people by telling
16  employers, recruiters, headhunter that, oh,
17  Anthony Bayad, I would not recommend him back to
18  Cisco? Does she have the right, yes or no? As
19  to your guideline and to your statement, your
20  statement about this type of guideline of giving
21  recommendation of a former employee like myself.
22  Does she have right, or she does not have right?
23      A.    Well, anybody that is calling
24  externally from Cisco Systems from any other

Page 100

1  corporation or any other reference point and
2  calls into Cisco to any employee, the following
3  procedures are required for that individual to
4  process them and to send them to our human
5  resource center. The human resource center then
6  will verify the information as what we've
7  discussed, the dates of employment.
8      Q.    That's what my understanding, and
9  that's what everybody knows at Cisco. My buddies
10  Cisco, that right now work for Cisco -- I have a
11  lot of them, in Tampa, New York. I've been a
12  good engineer. I've been everywhere -- they told
13  me the same thing, nobody at Cisco Systems, Lynn
14  Fraser or anybody else, they do not have a right
15  to violate the business code of ethic and the
16  regulation of Cisco by defaming any employee
17  because of their race, gender or their origin or
18  their religion. But you say to me that when
19  people call Lynn Fraser, she have to direct them
20  to HR, and I agree with you that's the proper
21  action?
22      A.    That's fine, and that is if it's
23  somebody externally, but internally inside the
24  company, we do have the right to be able to share

Page 101

1  information around our employees.
2      Q.    Thank you very much. Now, going
3  back to your statement. You state that people
4  internally -- right? -- that Lynn Fraser has
5  right to state to them that you do not hire
6  Anthony Bayad, right? Is that correct, ma'am?
7      A.    Who is she going to state that to?
8      Q.    She state that to the hiring
9  managers, many outside, inside. Now, outside we
10  cleared that issue. She doesn't have a right to
11  say that. She is in violation of Cisco code of,
12  business code of ethics, and she's in violation
13  of my civil rights. You just told me that.
14  Second --
15          MR. FALBY: Excuse me.
16          MR. BAYAD: Let me finish,
17  Mr. Falby.
18          MR. FALBY: Excuse me, let me
19  object. Lynn Fraser never did anything --
20          MR. BAYAD: I don't want your
21  opinion, Mr. Falby.
22          MR. FALBY: Why don't you ask a
23  question that has some basis in fact.
24          MR. BAYAD: Okay, let me ask a

**CELIA HARPER-GUERRA**
**January 19, 2007**

27 (Pages 102 to 105)

Page 102

1  question, okay.
2          When Lynn Fraser received a call
3  from Nick Adamo -- I know him very well. Nick
4  Adamo called Lynn Fraser and told her Anthony
5  Bayad -- Nick Adamo, he's the one who hired her,
6  you know that -- no, I don't want to say -- or
7  George O'Mara. He knows her too. Let's say
8  George O'Mara calls Lynn Fraser and said, Anthony
9  Bayad is very likeable, highly educated, college
10 grad, all nine yards. He use to work -- he said
11 in his application, I interviewed him, with six
12 people, that's where I spend my time. Now, does
13 Anthony -- I want you to tell me, did Anthony
14 work for you, and can you tell me about Anthony?
15 And when George O'Mara asked Lynn Fraser for, to
16 give reference about Bayad, does she have a right
17 to state to George O'Mara, for example, or Nick
18 Adamo that Anthony Bayad is not recommended -- I,
19 Lynn Fraser, do not recommend Anthony Bayad not
20 to be hired because -- we don't got to tell you
21 why, that's between them. He finished the
22 sentence. Does she have the right to say this
23 statement? You must be careful because I'm going
24 to take you again somewhere else. I got a lot of

Page 103

1  facts here, and you don't want to be backing her
2  up. You want to say the truth, nothing but the
3  truth and get this out of your bed so we can all
4  go home. Now, if you tell me the truth, I'm
5  going to finish this deposition, and I'm going to
6  thank you from the bottom of my heart, and I
7  apologize to you. Now you tell me if Nick Adamo
8  or George O'Mara called Lynn Fraser and asked
9  her, you, Lynn Fraser, can you give me references
10 about Anthony? And Lynn Fraser was caught saying
11 to Nick Adamo and George O'Mara that I, Lynn
12 Fraser, do not recommend Anthony Bayad to work
13 for Cisco or Anthony Bayad -- I do not recommend
14 Anthony Bayad back to Cisco. Does she have right
15 to state this statement?
16     A.   I'm going to just reference you to
17 the Cisco policy from anybody calling externally
18 into Cisco.
19     Q.   I appreciate that. Externally you
20 answered everything, and thank you. I'm asking
21 you about internal people. Does she have a right
22 to say I, Lynn Fraser, do not recommend Anthony
23 Bayad back to Cisco? Does she have a right to
24 say that yes or no?

Page 104

1      A.   Yes, we have the right to say that
2  internally here at Cisco.
3      Q.   Thank you.
4      A.   To recommend people for a specific
5  job, we have the right to recommend.
6      Q.   Okay. Then you say that she has
7  right to not recommend Anthony back to Cisco.
8  But during my termination at Cisco, she told me
9  Anthony you are wonderful. The record speak for
10 itself. I'm going to talk to you right now about
11 the evidence. Lynn Fraser told me that, Anthony,
12 I'm sorry, that we're going to let you go,
13 Anthony. And I know why. I flew -- Mrs. Celia
14 Harper, again, let me ask you, as HR, very
15 qualified HR, you have experience, you travel the
16 world you state on your background. You know in
17 America it costs $30 to find out who you are and
18 how you came to this country too.
19     Let me ask you this question.
20 Would you as a Cisco human resource provide plane
21 ticket and spend money, about $20,000, to some
22 engineer and fly him around the world, France,
23 England and Dubai. You spend money on him
24 because he's qualified -- right? -- to send him

Page 105

1  for interviews around the world from Boston. Do
2  you spend your money for what, because that
3  person, Anthony Bayad, has talent, that's why you
4  paid money and flew him around the world to these
5  people, because you want to hire him, he speak
6  foreign languages. Is it true, would you spend
7  money on him flying, that he has talent, right?
8  That I would fly anywhere for interview, right?
9  Yes or no, Miss.
10     MR. FALBY: I'm going to object to
11 your question which makes no sense.
12     MR. BAYAD: Okay. What I'm telling
13 her and what I'm telling Mr. Falby is that Lynn
14 Fraser does not have a college degree, and she
15 does not have opportunity to fly around the
16 world, because, Mr. Falby, she does not have
17 college degree, unless now Northeastern.
18 Mr. Falby, you do not know my background,
19 Mr. Falby. I know. I told you again. I don't
20 have to impress you. I know everything. She's
21 still going to Northeastern. She's lying about
22 her resume. That when I use to work with her,
23 she didn't even have a degree, and she is my
24 manager. She does not have CCIE, and she was my

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# CELIA HARPER-GUERRA
# January 19, 2007

28 (Pages 106 to 109)

Page 106

1  manager. She does not have expert level, and the
2  list goes on and on.
3          Well, my question to you, when Lynn
4  Fraser tells people that she does not recommend
5  Anthony back to Cisco, there is a reason for
6  that, right, Ms. Celia Harper?
7          MR. FALBY: Let me note for the
8  record that your voice during this deposition has
9  been at a high decibel level, and it's even worse
10 now. You're shouting, and it's very hard to
11 understand you.
12         MR. BAYAD: I'm sorry you said
13 that.
14         MR. FALBY: Your voice is very
15 loud, and you're shouting.
16         MR. BAYAD: I'm sorry, it's not
17 loud.
18         MR. FALBY: Calm down and ask
19 questions that make sense.
20         MR. BAYAD: It's the phone,
21 Mr. Falby. It's high. I'm sorry, and I
22 apologize. You should have stated that earlier.
23 I'm not yelling at nobody, and nobody has the
24 right to yell at nobody, Mr. Falby.

Page 107

1          Let me ask you this. Ms. Celia
2  Harper, if somebody tell -- if somebody
3  internally that I, Lynn Fraser, do not recommend
4  Anthony back to Cisco, there is a reason for
5  that, right? There is a reason for that, right?
6  Yes or no. Nobody can say I do not recommend you
7  back to Cisco unless something is there, right?
8  Something that that person did. There is a form
9  at Cisco that raised the flag to Lynn Fraser to
10 deny him an opportunity, right? Yes or no.
11     A.    I don't know.
12     Q.    Well, you are the HR.
13     A.    You're referencing Lynn Fraser.
14 You're referencing information between the two of
15 you, and I don't know. I don't know what's
16 transpired.
17     Q.    You are HR. You are the first line
18 of defense at Cisco Systems, that's why Don
19 Chambers believe in you, that's why the public,
20 invest a lot of money and the American people
21 that love Cisco, the government, the backbone of
22 the world, that's why people are counting on you.
23 You are HR. You tell me. That's why you are
24 here today. Why a manager as Lynn Fraser openly

Page 108

1  stating on the record that she does not recommend
2  Anthony back to Cisco, why? When she terminated
3  my employment, she told me you're very welcome.
4  After one year of this termination, you come back
5  to Cisco. You are very qualified. Now, my
6  question to you, does she have right to state
7  this statement? Yes or no, please.
8      A.    That she made that statement, I
9  don't know.
10     Q.    Okay, you don't know. Okay, we're
11 going to ask her. Now, people that usually do
12 not recommend people. In your experience level
13 and your time at Cisco, if somebody that you find
14 qualified, and he's manager of some business
15 stated to you, raised the flag to you -- forget
16 about Cisco no-hire list. Just between them.
17 That Lynn Fraser called you and said I do not --
18 you called her and said, why don't you want to
19 hire Anthony? He has a long, long record. He is
20 a veteran of extra level in this field that we
21 need. It's hard to hire somebody that doesn't
22 have qualifications. He does. Why don't you
23 want to hire him? You usually talk to somebody.
24 You want to know why she is thinking that she

Page 109

1  does not recommend Anthony back to Cisco, right?
2  You have to know why, right?
3          MR. FALBY: Objection. You may
4  answer.
5      A.    I don't know. I don't have any --
6      Q.    If John Chambers called you and
7  said somebody referenced Anthony, and you came
8  back to John Chambers and told him Anthony cannot
9  be rehired. He's going to tell you why, why,
10 Celia Harper. You reply to him, and say, well,
11 his manager stated to me that she does not
12 recommend him back to Cisco. And Mr. Chambers is
13 going to come back to you and is going to tell
14 you, Miss Celia Harper, what's the matter here,
15 why we cannot hire this guy.
16     A.    I have not had any conversation
17 with Lynn nor have I had any conversations with
18 John about your performance and not being able to
19 be hired back.
20     Q.    Let me ask you this. In such
21 matter if somebody -- if the leader of Cisco,
22 that's why she has a title. When a manager, an
23 officer of the company, of the company. The
24 American people have given them money for them to

**CELIA HARPER-GUERRA**
**January 19, 2007**

29 (Pages 110 to 113)

Page 110

1  be a leader in that area of expertise and to be
2  fair and balanced. To think her statement means
3  either Anthony Bayad is from another country or
4  he's Moroccan or minority or black or homosexual,
5  any of the above, or Anthony Bayad was a slacker,
6  he was loser, he should not be first hired to
7  Cisco, is that correct, right? Right, Miss?
8  Please, Miss, you're under oath, just say the
9  truth.
10      A.    You know what, all those references
11  I don't know, I don't know anything about.
12      Q.    Oh, no, perfect.
13      A.    I don't know anything about your
14  performance or about you.
15      Q.    Exactly, that means you do not know
16  what happened here? But whatever she said, you
17  don't care what she said, right? That's what
18  you're telling me, right, miss? Miss, if this
19  gets to the jury, you're going to look bad. You
20  have to say something. You have to answer.
21  Either Anthony Bayad is not recommended back to
22  Cisco because Lynn Fraser is racist, she doesn't
23  like homosexuals, she doesn't like black,
24  Spanish, Indians, any race. She likes her white

Page 111

1  race. And that's respectful. Or that she has
2  something on the record that Cisco has. They
3  call it -- let me tell you what they call it.
4  And for the record, we're going to complaint
5  documentary 1, Exhibit No. 2. Miss, you know
6  what I'm talking about. I'm talking about the
7  performance review, right? Cisco has performance
8  review, correct? Yes or no.
9      A.    Correct.
10      Q.    Thank you. And in such Exhibit
11  No. 2 of the complaint. I'm going to go to the
12  last page, Ms. Celia Harper, and I'm going to
13  tell you the dates, the dates that this review
14  was initiated to me, and it was approved by two
15  people, my director -- according to the rules or
16  the policy of Cisco, my director has to sign it,
17  right? Yes or no?
18      A.    Yes.
19      Q.    And then -- I'm sorry, I'm
20  confusing you. I'm sorry, and I apologize. This
21  performance review, Cisco job performance review
22  has to be signed by two people, my direct manager
23  and the next level, probably director or our
24  supervisor above both of us, right?

Page 112

1      A.    That is correct.
2      Q.    In such exhibit, Cisco performance
3  review, my job review as an engineer while I was
4  working at Cisco, in such review, Ms. Celia
5  Harper, the dates of my manager Lynn Fraser who
6  initiated, who created this review, who filled
7  it, who approved it, she signed it on
8  February 19th, 2001, 02/19/2001. Then it's been
9  sent to Chicago to my director, Sigmund
10  Shoemaker, and Sigmund Shoemaker, she sign that
11  document on March 26th, 2001. Do you see the
12  difference. It's a one-month difference, right?
13      A.    Correct.
14      Q.    Thank you. And then you are HR,
15  you provide, you introduced this policy. Then
16  this review has to be approved and also read and
17  shared with the employee. That's me, right?
18      A.    Well, you signed it, so you read
19  it, yes.
20      Q.    Thank you. I'm not trying to
21  confuse you. What I'm saying, when my manager
22  and my director finish filling up all the
23  performance and evaluating my performance at
24  Cisco Systems, they sign it, my manager Lynn

Page 113

1  Fraser signs it, she gives it to her boss, she
2  signs it, and then she gives it to who, she gives
3  it to Anthony Bayad by law -- not by law, by
4  Cisco policy. We sit down in a room for two
5  hours, and she tell me, okay, Anthony we have to
6  go over your performance, what you need to do and
7  what your weakness and your good things at Cisco,
8  right?
9      A.    Right.
10      Q.    Thank you. Also, I'm going to ask
11  you a question, Miss, as I'm doing. My manager
12  stated the following for the record, and I want
13  to ask you about this. That Cisco has -- they
14  call it a customer satisfaction survey, yes or
15  no, at HR?
16      A.    Yes.
17      Q.    Thank you. Let me ask you if the
18  customers -- if my manager writes, "Anthony Bayad
19  maintained an average customer satisfaction score
20  of 4.6 for assigned projects." What's 4.6, is it
21  good or bad, as HR? You should know that.
22      A.    It's good.
23      Q.    Thank you. "Anthony Bayad maintain
24  effective utilization." Yes or no, is it good or

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

30 (Pages 114 to 117)

Page 114

1  bad?
2      A.    Say that to me again. I couldn't
3  hear you.
4      Q.    She stated after maintain an
5  average score -- I'm sorry. "Maintain an average
6  customer satisfaction score of 4.6 for assigned
7  projects," that means it's good or bad? It's
8  good?
9      A.    "Maintain customer satisfaction
10  score of 4.6."
11      Q.    For assigned projects, yes? Is it
12  good, good score or bad score?
13      A.    Good.
14      Q.    Good, right?
15      A.    Yes.
16      Q.    That means the customer filled.
17  Nobody has a water pistol on their head. The
18  project manager gave them a survey and told them,
19  Anthony, give them to survey. The customer gives
20  me 4.6 out of 50. You said it's good, right?
21      A.    Yes.
22      Q.    Thank you. Then she stated, my
23  manager. I didn't write this. I don't have
24  right to right this. She write, "Maintain

Page 115

1  effective utilization. What does that mean
2  maintain effective utilization? That means time
3  sheet. I'm sorry, time sheet. You know time
4  sheet. In our utilization, that means how many
5  hours I work per week, 40 weeks or 80 weeks or 90
6  weeks. Is that correct, Miss.
7      A.    It means how many hours per week?
8      Q.    Oh, no. I want to make sure you
9  understand what I'm saying. I'm not trying to
10  confuse you. I'm saying when she wrote, "Anthony
11  Bayad maintain effective utilization," it means
12  that Anthony was producing, was working with
13  customer, right?
14          MR. FALBY: Where does it say
15  maintain effective utilization?
16          MR. BAYAD: Page 5, Mr. Falby. And
17  that's where, Mr. Falby, you messed up,
18  respectfully.
19      A.    So it says on here for your next
20  performance period these are the following
21  initiatives. And where you're referencing
22  maintain effective utilization, that is for your
23  next performance period. So they're asking you
24  that you need to maintain effective utilization.

Page 116

1      Q.    Okay. That's what she meant,
2  right? That's what she meant, right?
3      A.    Well, they're asking you for your
4  next performance, so we're going to measure you
5  in your next performance that you must maintain
6  effective utilization.
7      Q.    No problem. Well, this is what
8  we're going to do, so we can understand what she
9  is saying. If you go to No. I now. I want to
10  make sure you help me on this because I've been
11  reading this a thousand times, and I cannot
12  understand why she is telling me not to be hired
13  at Cisco, and I think she has a race problem.
14          Now, let's go back to exhibit,
15  again Exhibit 2 of the complaint, of the review.
16  She said here -- what she said -- I want you to
17  read it to me, tell me what she said under
18  "Initiatives/Results."
19      A.    I'm on "Part IV: Initiatives for
20  Next Performance Period." Is that where you're
21  at, same place?
22      Q.    Page 1 on my review.
23      A.    All right, you're on page 1, okay.
24      Q.    "Initiative: Maintain customer

Page 117

1  satisfaction score of 4.6."
2      A.    Correct.
3      Q.    Result she says, "Received customer
4  Sat Score of 4.9 on QWEST Project." Oh my God,
5  now 4.9. No more 4.6. What's 4. -- Miss Celia
6  Harper, she said to me the result was, "Received
7  Customer Sat Score of 4.9 on QWEST project."
8  What does that mean?
9      A.    A good score.
10      Q.    Out of five, right?
11      A.    Yup.
12      Q.    Now, respectfully, Miss, and I
13  apologize to you for putting you through this.
14  4.9 out of 5.0, college grad 4.6 out of 5.0. I'm
15  sorry, college grad approximately 3.4 out of 4.0.
16  In this field that you are making money and
17  you're supporting your family, been certified
18  since 1990. My question to you, when Cisco
19  started this business, when Cisco adventured in
20  this real world?
21      A.    Twenty-three years ago.
22      Q.    Miss, make the record straight.
23  I'm from this industry. Cisco started this
24  business approaching --

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

CELIA HARPER-GUERRA
January 19, 2007

31 (Pages 118 to 121)

Page 118

1    A.    Twenty-three years ago. It was --
2    Q.    1997.
3    A.    Thank you.
4    Q.    God bless you. 1997, right?
5    A.    No, it didn't start in 1997. It
6    started in the '80s.
7    Q.    But it became Cisco in 1997 with
8    Well Fleet Communication. Now, my question to
9    you --
10    A.    We did not merge with WellFleet
11    Communication.
12    Q.    I'm not saying WellFleet.
13    WellFleet Communication and Bay Networks which is
14    Synaptics and Cisco Systems is the only people
15    that were in this industry. Yes or no. You are
16    from San Jose. You lived in San Diego. Correct
17    or not correct?
18        MR. FALBY: Objection, what are you
19    asking?
20        MR. BAYAD: I'm asking if she
21    worked for these companies. Lynn Fraser never
22    worked for these companies. That mean I'm a
23    veteran. No problem, let's move on.
24        Back to Exhibit 2 of the complaint.

Page 119

1    My manager wrote with her own hands. She said,
2    "Initiative: Achieve high level of expertise on
3    AVVID Products and Technologies." What this
4    statement mean, Miss Celia Harper, to you, if you
5    read this from my manager?
6    A.    It says that you have the technical
7    expertise with specific products and
8    technologies.
9    Q.    And what's the name of that
10    product, AAVID?
11    A.    Correct. In a very specific set of
12    products.
13    Q.    "Achieve a high level of expertise
14    on AAVID Products and Technologies." That mean I
15    am high level, I have high level of expertise on
16    AVVID. I speak telephony. You follow me here,
17    right?
18    A.    Yes.
19    Q.    And the result, "Constantly
20    continuing to achieve a high level of expertise
21    on AVVID products and technologies. Attended
22    AVVID BOOTCAMP and participated in the internal
23    AAVID deployment for the New York Pen Plaza."
24    Does Cisco have an office in Pen Plaza?

Page 120

1    A.    Yes.
2    Q.    Thank you. "Also, constant hands
3    on with the Call Manager, the 6500 Catalyst, and
4    the 2600 Cisco products. Other means of keeping
5    up with the technology is reading the material
6    and practice in the Lab (utilization of the
7    Chicago Lab and Lexington Lab)," and the rating
8    is E. What's E as HR of Cisco Systems?
9    A.    Average.
10    Q.    E, it's excellent. Do you want to
11    go back and see what it means in the -- and on
12    page 7 of Exhibit 2 of the complaint, my
13    performance review at Cisco Systems, page 7, it
14    states what's the meaning of the letter E.
15    That's the rate they give us. That letter E if
16    you're good or bad. And Cisco said here E means,
17    can you read that for me?
18    A.    E is successful; meets or exceeds
19    all key performance expectations.
20    Q.    Let me recall for the record.
21    That's not my -- I didn't come up with E, right?
22    Cisco has a rating scale -- right? -- about their
23    engineers, right?
24    A.    All employees are rated on these

Page 121

1    three categories.
2    Q.    And this paper is not a joke,
3    right? It's not joke. HR not come up with this
4    because somebody felt that they needed to look
5    busy, no? Yes or no?
6    A.    This is an annual performance
7    review.
8    Q.    Thank you. Cisco takes it very
9    serious, right?
10    A.    Yes.
11    Q.    And going back to No. 1 of the same
12    Cisco job review, Exhibit 2 of the complaint, you
13    said, "Achieve high level of expertise on AVVID,"
14    and I got E, excellent, right, meets and exceeds
15    expectations, right? Right?
16    A.    E does not mean excellent. X means
17    excellent and exceptional.
18    Q.    Okay. Read me what Cisco means
19    with E? You said employee is --
20    A.    Is an employee is successful.
21    Q.    "Meets or exceeds all key
22    performance expectations," and that's good for
23    under the X, right, excellent, right?
24        MR. FALBY: We have to take a

CATUOGNO COURT REPORTING SERVICES
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
# January 19, 2007

32 (Pages 122 to 125)

## Page 122

1    five-minute break. The witness is getting a call
2    from home. So let's take five minutes. We've
3    been going a long time. We will come back on in
4    five minutes. I'm just going to put us on mute
5    for five minutes.
6         MR. BAYAD: What should I do,
7    Mr. Falby? Should I just come back in five
8    minutes?
9         MR. FALBY: Yeah, you can just
10   wait. Just wait five minutes, take a five-minute
11   break.
12        MR. BAYAD: Okay, say something for
13   the record. Mr. Falby wants to stop this for
14   five minutes.
15        MR. FALBY: We're taking a
16   five-minute break. We'll return in five minutes.
17        MR. BAYAD: Thank you.
18        MR. FALBY: Thank you.
19        MR. BAYAD: You're welcome.
20        (A break was taken.)
21    Q.    (By Mr. Bayad) I'm going to keep
22   asking questions about Exhibit 2 of the
23   complaint, and I want Ms. Celia Harper-Guerra to
24   refer to page 3. At the end of page 3, just to

## Page 123

1    make it easier, so we can wrap it up soon. On
2    page 3 it's talking about success factors,
3    results about Anthony Bayad, I, my job review at
4    Cisco system, and the reason I am -- this
5    Exhibit 2 is very crucial to this litigation is
6    because we want to show to Mr. Bruce Falby and to
7    Cisco Systems why a leader as manager Lynn Fraser
8    has stated to others, hire manager, that she does
9    not recommend Anthony Bayad back to Cisco.
10        In logic, in any logic reasoning in
11   this world, in anybody on the street, if you ask
12   them why somebody would say statement like that,
13   it's either they are racist or you have not
14   performed your duty during your employment, but
15   Exhibit 2 state otherwise, and I would like to
16   ask Celia Harper to guide me through this,
17   page 3. Successful factors, that means after my
18   performance review they went back, they want to
19   know what Anthony Bayad in his employment as
20   Cisco has done during his employment at Cisco.
21   What did Anthony Bayad contribute to Cisco, and
22   that's what Celia Harper-Guerra, director of
23   human resources is going to tell us, why Cisco
24   came up with this, this review for -- they can

## Page 124

1    appraise an employee like myself, they say they
2    are good to work for Cisco or they need help or
3    they need to go somewhere, that Cisco is not for
4    them, and that's why I want Celia Harper to help
5    me here.
6         Success factors: Anthony Bayad
7    dedication to customers is very, very crucial to
8    Cisco. If Mr. Rick Justice or Lynn Fraser does
9    not meet the requirement with customers, if
10   somebody claim about such person, Mr. Chambers
11   would not tolerate this. He would let you go.
12   Customers at Cisco is number one, and that's why
13   I want Ms. Celia Harper to help me distinguish if
14   Lynn Fraser has problem with race or Lynn Fraser
15   does not know what she's talking about. And if
16   you want to go after discrimination,
17   discrimination definition is to distinguish and
18   to favor some people to other people based on
19   their race and gender or their origin or their
20   religion, and that's what discrimination and race
21   discrimination is all about.
22        Now, Cisco, Anthony Bayad, my
23   review, it said Success Factors: "Dedication to
24   Customers," very important for Cisco. Anthony --

## Page 125

1    this is in my review. My manager wrote with her
2    own hand, nobody has pistol, water pistol at her
3    head, did it on her own will. According to Cisco
4    regulation she wrote, "Dedication to customers."
5    Customers pay the bill for Cisco. It says,
6    "Positive feedback for QWEST Customer." This is
7    QWEST company. It's a big company, big project
8    we work on. "Customer and Project Managers Sat
9    4.9." At minimum we got 4.9 out of 5.0, that
10   mean we succeeded. We made Cisco superstar and
11   we satisfied. The customer made happy. We're
12   going to move to next customer.
13        Also, she said about Anthony Bayad,
14   she said in my job review, Exhibit 2 of the
15   complaint, she said, "Solve problems and make
16   decisions." I'm a leader. She said, Contributed
17   to more billable hours." That means I help Cisco
18   make money. They sold me to customer and make
19   money. "Contributed to more billable hours.
20   Customer satisfaction. Presenting the team and
21   given the Customer the best service. Sat of 4.9
22   (QWEST Project). Taking initiatives by helping
23   our Eco Systems toward success by helping them do
24   well." That mean I'm helping everybody. I get

## CATUOGNO COURT REPORTING SERVICES
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

**CELIA HARPER-GUERRA**
**January 19, 2007**

33 (Pages 126 to 129)

Page 126

1  E. Going back to page 7, I want to know what
2  mean E. It says, "Employee is successful; meets
3  or succeeds all key performance expectations."
4  That's correct, Ms. Celia Harper, yes or no?
5      A.   Yes, in this series she rated you
6  an E. And as I stated before, X is excellent,
7  performs above expectations, and E, and N is an
8  employee that needs improvement, is not meeting
9  expectations. So you have somebody at the top
10 and somebody at the bottom. So 'E is somebody
11 that has successfully completed their
12 initiatives.
13     Q.   Good job. And now --
14     A.   Average.
15     Q.   That's good. Now, going back to
16 same page, No. 3, "Dedication to Customers:
17 Positive feedback for QWEST Customer and Project
18 Managers. Sat of 4.9." We get X. What you're
19 telling me is that with my customers I get X,
20 that mean I'm the best here. I'm an employee who
21 clearly performed in an exceptional manner in all
22 areas. That's customer satisfaction, that's
23 customer sat. That meaning I'm doing well,
24 right? Excellent, X, right?

Page 127

1      A.   As I stated, the X does clearly
2  state --
3      Q.   Perfect.
4      A.   But let me finish my comment inside
5  of that. It also states with the project manager
6  as the team element. Additionally, Cisco
7  measures you in multiple areas as an employee.
8  It does measure you for customer satisfaction.
9      Q.   No problem.
10     A.   It also measures you in a number of
11 other areas. It's one element.
12     Q.   I understand. Going back to
13 number, on the same Exhibit 2, page 1. She
14 said -- not me. My manager said, "Initiative:
15 Maintain." Anthony Bayad maintain customer
16 satisfaction score of 4.6 out of 5.0. "Result:
17 Receive Customer Sat Score of 4.9 on QWEST
18 project." I get X. Going back to page 7 and
19 looking at the rating of X, it means employee
20 clearly performed in an exceptional manner in all
21 these areas.
22     A.   Yes.
23     Q.   Thank you. Going back to No. 3, so
24 we can wrap it up very quick. I'm going to ask

Page 128

1  you this. She said, "Drive revenue, drive
2  success, and productivity." Anthony Bayad
3  volunteer to help out. Working on CCIE to become
4  more billable. It's not mandatory CCIE. It's
5  just to make more money. "QWEST project, IGX for
6  Robert Stevens bank, possible 6 month post office
7  project in Washington." The government. I get
8  E.
9          Also, teamwork. Very important
10 teamwork. If you don't get along with people,
11 you are a troublemaker, but Anthony Bayad is not
12 a troublemaker because my manager on page 3,
13 Exhibit 2 stated in her own hand and under her
14 own will, she said the following, she rated me
15 about my teamwork, "Knowledge transfer to my team
16 by intensive coaching and mentoring." She give
17 me X.
18         Going back to page 7, what's X
19 mean? "Employee clearly performs in an
20 exceptional manner in all areas." Do you agree
21 with me?
22     A.   Yes.
23     Q.   Thank you. And now, Miss, I don't
24 want to keep going and going. I want you to very

Page 129

1  quick to go back to page 4 of the same Exhibit 2,
2  of the Exhibit 2 of the complaint, and she said
3  development, specific activities completed and
4  date. What I have said and done, right?
5      A.   Yes, sir.
6      Q.   Thank you. "All intellectual
7  properties development during my employment with
8  Cisco system: Cisco Voice over IP, Frame Relay,
9  ATM, PPP." This is very important protocols for
10 Cisco. Voice over IP, it's business driven. You
11 agree with me, right?
12     A.   Yes.
13     Q.   I completed everything. What's --
14 let me ask you, a date, 05/2000 -- what's '05,
15 that means April 2000, right?
16     A.   Can you just go back and help me
17 understand exactly what you completed under
18 specific activities? So you state Cisco Voice
19 Over IP, Frame Relay, ATM and PPP. Exactly what
20 activity with all of those product sets?
21     Q.   You can take that off the record or
22 on the record. You can ask my manager. You
23 know, I didn't write this. She wrote, "All
24 intellectual properties development during my

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

# CELIA HARPER-GUERRA
## January 19, 2007

34 (Pages 130 to 133)

### Page 130

1   employment with Cisco system." Specific
2   activities completed. I mean, what I completed.
3   Cisco Voice over IP, that mean AAVID inside and
4   out. She said Frame Relay for AVVID. You know,
5   IP telephone. What she meant here -- she needs
6   some coaching. She means Anthony is the master
7   with AVVID in 05/2000, completed. Then she said,
8   "Troubleshooting Cisco IOS." What's IOS mean,
9   Miss? Do you know what IOS means?
10      A.    Internet operating system.
11      Q.    God bless you. She said completed
12  07/2000. She said, "Advance OSPF/BGP design and
13  implementation in large Cisco Networks,"
14  completed 08/2000.
15          She said Anthony Bayad completed
16  the Cisco internal AVVID deployment. I completed
17  everything about AVVID, which is new technology
18  that Cisco is looking to drive, to drive the
19  business and to make more money, and I completed
20  that in 09/2000.
21          She said, "Team hands on lab with
22  Call Manager," which is AAVID, 10/2000, the year
23  10 of 2000.
24          Completed the whole AVVID Boot

### Page 131

1   Camp, 11/2000. She said CCIE exam completed in
2   10/2000.
3       A.    I don't see that, where it says you
4   completed.
5       Q.    Page 4. It says CCIE exam,
6   completed 10/2000. And she said --
7       A.    You completed the written test.
8       Q.    That's the written exam, yup.
9       A.    Okay.
10      Q.    And she said I completed that,
11  right? I'm a CCIE candidate, right? I mean,
12  whatever she told me to do I did. I passed the
13  CCIE exam.
14      A.    That's what this document says.
15      Q.    No, no, that's what Cisco job
16  review signed by two people, my manager says.
17  Not me, Miss. I don't make decisions. I wish I
18  made decisions. I wouldn't be here if you want
19  me to make decisions. I'm telling you what they
20  told me what I was doing at Cisco. They told me,
21  Anthony, my manager and my director Shoemaker.
22  My manager Lynn Fraser states, CCIE exam
23  completed 10/2000, and she stated also that the
24  easy part, which is the last CCIE Lab, completed

### Page 132

1   02/2001, right?
2       A.    I can only say that I can look at
3   this document and agree that this is what it
4   states on the document. I don't have any prior
5   knowledge of whether that's been completed or
6   not.
7       Q.    Miss Celia Harper, God bless you.
8   I just want you for the record to clear some
9   fact. I want you to tell me what you see and
10  what you wrote. You told me --
11      A.    I did not write anything. I can
12  share with you that I am looking at a document
13  which is page 4.
14      Q.    Mr. Falby gave me this, and the
15  forensic expert knows that my manager signed it
16  and my director signed it. Nobody in federal
17  court can forge anything. You cannot -- there's
18  trouble, bad news. You don't mess with federal.
19  The court is very honest. You provide the truth
20  and nothing but truth. God help you. You know
21  what they say, God help you. If you lie, God
22  help you.
23          Now I'm telling you I have
24  documents from Mr. Bruce Falby that says here on

### Page 133

1   page 4, Exhibit 2, "CCIE written test, completed
2   10/20, CCIE lab preparation, completed 02/2001,"
3   right?
4       A.    As I see on the document, yes.
5       Q.    And my manager Lynn Fraser she
6   said, Knowledge transfer to the team." Who is
7   the team, Miss? Who is the team? My coworker,
8   right?
9       A.    I don't know who the teams are.
10      Q.    I'm sorry, let me ask you the
11  English language. According to page 4, if you
12  read as HR, if somebody tells you you need to
13  talk to Anthony and you need to read page 4. In
14  other words, they want to review. They want to
15  know who is Anthony, and they told you go to
16  No. 4 of Exhibit 2 of the complaint, and they
17  told you, tell us, is it true Anthony knowledge
18  transfer to the team, coached the team by
19  providing internal classes and hand, how to make,
20  and she doesn't want to say why. In other words,
21  what she is saying I was training my coworkers.
22          Now, Miss, I don't want to keep
23  going and going and going and going, because it's
24  not the right thing to do. Now I'm going to go

**CELIA HARPER-GUERRA**
**January 19, 2007**

35 (Pages 134 to 137)

Page 134

1  back to you and ask you a question. Now if
2  somebody tells somebody internally at Cisco, my
3  manager tell people about me, I, Lynn Fraser, I
4  do not recommend Anthony Bayad to work at Cisco.
5  Now, we have to base it on two facts under the
6  law, material facts. We have to go on the
7  right-hand side balanced, and the left-hand side
8  also balanced, and we have to ask ourselves if
9  Lynn Fraser has a problem with race or Lynn
10  Fraser does not know what she's talking about.
11         According to what you just heard,
12  and you have heard my review, she doesn't know
13  what she's talking about, and there's a material
14  fact she has a problem with my race.
15         Now, Miss, I want to ask you the
16  last probably question, and we can wrap it up. I
17  want you to go back. By the way, for the record,
18  Lynn Fraser states that she does not recommend
19  Anthony Bayad to be hired at Cisco. It's that
20  statement, discriminatory statement,
21  discriminatory statement is found Exhibit 26 at
22  the Complaint Docket Entry 1.
23         Now, we're going to go back to
24  Docket No. 27, and it's an e-mail provided to me

Page 135

1  by Cisco. And such e-mail is asking Anthony
2  Bayad, "I, the plaintiff, a minority, who Lynn
3  Fraser discriminated against me for no reason
4  under the law. She told me under the law under
5  her oath, her belief," and I respect everybody's
6  belief, but don't hurt my future and my family,
7  and don't make me homeless on the street. You
8  guys, human resources, you are human resources,
9  Celia Harper, you stated respectfully, Miss, and
10  this is very emotional. On page 27 you stated to
11  me, you sent me an e-mail when I filed for --
12  when I applied for a job. You stated to me that,
13  Anthony Bayad, you need identification. You're
14  asking me on the e-mail to identify my race and
15  my gender before getting hired. Going back to
16  you as the HR of this respected company, is it
17  right under the law, not Cisco policy, under the
18  law, and I am a citizen of Massachusetts, a
19  resident of Massachusetts, and I'm an American.
20  Do you have a right -- I don't want to put you on
21  the spot. Does anybody at human resources, you
22  or anybody, Kate DCamp, Lynn Fraser, Tony
23  Savastano, Carl Wiese, what have you, anybody at
24  Cisco human resources do they have right to send

Page 136

1  an e-mail asking applicant, any applicant about
2  their race and gender before being hired? Why?
3         A.    At Cisco, and this is dictated from
4  EEO and OSCPP that there is a self-disclosure
5  form that we send to all applicants, and that
6  self-disclosure form, like it said it's
7  self-disclosure and it's voluntary. So that is
8  something that is provided as a company that is
9  based here in the United States followed by the
10  legal laws relative to employment labor laws.
11         Q.    Okay. Let me ask you this
12  question. In Massachusetts, and we can go ask
13  the Honorable Judge Sarris or we can call the
14  EOC, or I can get you a letter from the EOC or
15  any -- and do not forget you have a superstar
16  lawyer sitting next to you. They are very good
17  lawyers. You can ask them. In Massachusetts you
18  do not have right to send -- to ask an applicant
19  before hired his race and gender. It's against
20  the law. It's Massachusetts law, and it's
21  federal law. Do you know this or not, Miss?
22         You are HR. You do read law
23  because you have to comply with the regulation,
24  and you have to protect the company, and you

Page 137

1  always work -- and Paula Hughes can, she's
2  listening and she can help us out here. If you
3  have a question, you have a legal team internally
4  that you can ask a question, right? If something
5  you don't feel comfortable with, you go ask your
6  internal legal, you go ask Mr. Chandler about an
7  issue if it arise, right?
8         A.    Correct, we do have legal counsel
9  to support us in the areas that we need help in,
10  but I would advise you or I would share with you
11  that Cisco is compliant with the labor laws in
12  each of the states.
13         Q.    Yes, with everybody, but not with
14  Anthony, because if they comply with the labor
15  law they would not send me a letter, an
16  electronic letter from Cisco Networks asking me
17  to provide my race and my gender before hire.
18  It's against --
19         A.    Again, that is a voluntary
20  supplement, and that is compliant with United
21  States federal law.
22         Q.    I'm going to argue with you, Miss
23  Celia Harper. Any applicant who does not comply
24  with any request in the first stage of the

**CELIA HARPER-GUERRA**
**January 19, 2007**

36 (Pages 138 to 141)

Page 138

1  application is going to be denied. This is
2  like -- in other words, it's tell me your race
3  and gender before hire or you're not going to
4  hire. In the law, in the law of Massachusetts
5  and in the federal law and in our rule of law
6  about civil rights, you cannot ask people about
7  their race and gender before getting hired. You
8  cannot. During the first phase.
9      After you hire them, then you ask
10  them, ask them about their gender and their race,
11  and that's what I got because I am not hired
12  right now. Why I have this Exhibit No. 27 with
13  the password and an e-mail address to log in and
14  identify my race and gender before I get hired.
15  Right now I'm not employee. That means you asked
16  me something before you hired me, and between us
17  I think it's very discriminatory.
18      And furthermore, I want to ask you
19  a question. Your Cisco code of conduct or
20  business code of conduct, let me ask you this
21  question, does it promote open door policy, and
22  explain to us what's open door policy, Miss Celia
23  Harper, please.
24      A.    All right. Cisco's open door

Page 139

1  policy is an opportunity for employees of Cisco
2  to be able to have open discussions with any
3  level of the company, and so that's one element.
4      The second one is I'm going to
5  reference back to your document that you've asked
6  me to review. And again I want to state that
7  this is something that's compliant with federal
8  law. It's voluntary. You may choose to decline
9  any information around your race or gender, and
10  that this information will not subject any
11  applicant or employee to adverse treatment. So
12  that is something that is required for us to do
13  reporting to the United States federal law.
14      Q.    And that's what we're doing right
15  now. That's why we're in this litigation.
16      A.    Exactly, and so Cisco is compliant
17  in its regulations of adhering to our
18  implementation of our process with recruitment
19  and with our tools and documentation.
20      Q.    And now you're telling me because I
21  did not comply with your request to identify my
22  racial gender, that's why I don't have a job.
23      A.    No, it does not state that. It
24  says that you do not have to give that

Page 140

1  information.
2      Q.    Miss Celia Harper, I did not reply
3  to that request, and now you're telling me that
4  that's why I don't have a job.
5      A.    That's not what I'm saying, and
6  that's not what I've stated. I said that it was
7  by U.S. federal law that we were required to
8  report that data, and that's why it is considered
9  voluntary. It does not subject you to have any
10  adverse treatment if you do not complete the
11  documentation.
12      Q.    Let me ask you also about Lynn
13  Fraser's comment that is found in Exhibit 26
14  telling people I do not have right to hire, to
15  bring Anthony back to Cisco. Let me ask you, if
16  you refer to Exhibit 3 of the complaint. It's a
17  letter from Mr. John Chambers.
18      A.    Would you give me a moment just to
19  locate that document and review it, please.
20      Q.    Please take your time, and thank
21  you for your patience. Exhibit 3 of the
22  complaint.
23      A.    Okay, I have it.
24      Q.    Exhibit 3 of the complaint, right,

Page 141

1  it states the 21st August 2000, right?
2      A.    Correct.
3      Q.    This letter is from John Chambers,
4  right?
5      A.    Correct.
6      Q.    The first line says, "Dear,
7  Anthony" -- and also before that he put my
8  address. Anthony Bayad, my address, then he
9  said, "Dear, Anthony, I want to congratulate you
10  on our 42nd quarter of consecutive revenue and
11  earning growth which was the strongest quarter
12  and year growth we have seen in more than four
13  years." Did you understand this statement? Yes,
14  Miss, right?
15      A.    Yes.
16      Q.    And you stand by Mr. Chambers. He
17  wrote this, right?
18      A.    Yes.
19      Q.    Okay. From his office?
20      A.    Yes.
21      Q.    Now, let me ask you, why Lynn
22  Fraser put the sticker on top of this letter and
23  give it to me? And on top of the sticker -- and
24  I'm saying this because I'm very passionate about

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**CELIA HARPER-GUERRA**
**January 19, 2007**

37 (Pages 142 to 145)

Page 142

1  this -- she wrote to me, "Congratulations,
2  Anthony, Lynn." She signed it with her own hand,
3  Lynn.
4      A.   Wait a second. Which document are
5  you stating from Lynn?
6      Q.   Exhibit 3.
7      A.   Oh, that's up there, okay. This is
8  the first I've seen of this document, so I've had
9  no previous knowledge of this. And what I would
10  share with you is this document is stamped with
11  John Chambers's name on it, so.
12      Q.   But it came from Cisco office.
13  It's not fraud, right? Nobody committed fraud
14  here, right? Nobody stole this letter from
15  Cisco, John Chambers's office, right?
16      A.   Correct.
17      Q.   Nobody told John Chamber --
18      A.   That is my understanding, that it
19  is not fraud.
20      Q.   Okay. This has been sent on 21st
21  August 2002 to people like myself, Anthony. Good
22  guys, right?
23      A.   I don't know. I mean, yes. No, I
24  don't know if it was sent to you or how you

Page 143

1  received it.
2      Q.   Perfect. No problem, no problem.
3  I don't want to put you on the spot. It's not
4  fair.
5          Okay. This letter came from Cisco.
6  John Chambers give it to me, and he gave me some
7  money. He gave me -- you know how much he gave
8  me, he gave me, 5,858.05 that means I got this
9  money from him because he congratulate me. I
10  paid taxes on this. It's on the record.
11      A.   Correct, as all employees that are
12  eligible to participate in the CIP bonus plan,
13  they would receive a letter such as this to be
14  able to notify them of --
15      Q.   Anybody that worked for Cisco on
16  the 42nd quarter, they were successful, all of
17  them, everybody, including you. Everybody,
18  right?
19      A.   No.
20      Q.   And that's why my group --
21      A.   No.
22      Q.   I'm sorry.
23      A.   No, not everybody.
24      Q.   Thank you. Only certain people get

Page 144

1  this, right?
2      A.   That's eligible for a bonus.
3      Q.   Thank you. And I was one of
4  them -- right? -- during my employment at Cisco?
5      A.   It appears in this document that
6  you were eligible for a CIP bonus.
7      Q.   And I got it, and I got stock
8  options. I was happy.
9      A.   I don't know if you got stock
10  options. I can only see what's written on this
11  document and agree with what's in this paragraph
12  that you're referencing relative to the bonus.
13      Q.   Okay, okay, okay. He was saying
14  good things about that. We, did, we did, we did.
15  But my question to you, why Lynn Fraser, because
16  they sent it to my boss, my manager, Lynn Fraser.
17  Why Lynn Fraser she wrote to me "Congratulation
18  Anthony" in her own hand and wrote and signed it
19  Lynn?
20      A.   I don't know.
21      Q.   You don't know?
22      A.   No.
23      Q.   Okay. Now, we compare what she
24  said, stated on Exhibit 26 of the complaint. She

Page 145

1  said she does not recommend Anthony to work for
2  Cisco, and we reviewed the record of my job
3  performance and my personal interaction with my
4  coworkers, and everything is excellent,
5  excellent, excellent, but Lynn Fraser stated to
6  me on Exhibit 26 she does not recommend me to
7  Cisco, but the record speak that she was telling
8  me you're a good man, you're highly educated and
9  all the above. And I'm going to tell you why.
10  Because the reason she changed her mind about me,
11  and I'm going to help you. And I want you to go
12  to exhibit, exhibit -- the letter that I sent to
13  Mr. Chambers and Mr. Rick Justice. I'm sorry,
14  I'm looking for it, because I'm getting tired.
15          Okay. In the meantime I want to go
16  through this very quick, Miss. On Exhibit 15 of
17  the complaint I produce my time sheet. Like the
18  job review on Exhibit 2 stated, I was over
19  utilized. And the time sheet Mr. Falby had
20  admitted to it, that he admit to it, and he told
21  me that I was more utilized than anybody else. I
22  just want to let you know for the record.
23          Now I'm looking for the letter
24  dated November 29th, 2000, that I wrote to

# CELIA HARPER-GUERRA
## January 19, 2007

38 (Pages 146 to 149)

Page 146

1  Mr. John Chambers. And I'm looking for it. I
2  think it's in Exhibit 1 or 2 -- 3. I'm sorry.
3        Yeah, I got it. Exhibit 11.
4  Exhibit 11. It's a Cisco over head letter with
5  Cisco logo. November 29th, 2000. I'm still
6  working for Cisco, right? Because, as you
7  recall, I was terminated in April 2001, right?
8  This letter is dated -- to the best of your
9  knowledge, this letter is dated with
10  November 29th, 2000, right?
11       A.   I have no idea.
12       Q.   Okay. It was initiated on
13  November 29th, 2000, Anthony Bayad, because I
14  signed this letter. I used the open-door policy
15  complaining about the Cisco no-hire list.
16       A.   Can you give me a moment to read
17  this document.
18       Q.   You can read it to us if you want.
19  You're good in English. You can browse through
20  it pretty quick.
21       MR. FALBY: Why don't you just have
22  her read it to herself.
23       MR. BAYAD: Okay, no problem.
24  I want to read it for the court

Page 147

1  reporter, only three lines, because it's very
2  important. This letter was initiated during my
3  employment at Cisco when I came back from Europe,
4  North Africa and Dubai seeking opportunity
5  elsewhere for my career because I was spotted by
6  Anthony Savastano. I used the open-door policy,
7  and I wrote the following, a letter with the logo
8  and e-mail and over head letter, interoffice, and
9  I wrote the following to Mr. John Chamber and
10  Rick Justice. I stated "Subject: Employment
11  discrimination and retaliation by Anthony
12  Savastano." At that time Anthony Savastano was
13  director of finance. I wrote the following:
14  "Dear Mr. Chamber and Mr. Justice." The reason I
15  wrote to Mr. Chamber and Mr. Justice is because
16  Mr. Justice is responsible about overseas, about
17  sales overseas, is because he's worldwide, that's
18  why I did not write it to somebody else, to Nick
19  Adamo or to anybody else. I wrote it to John
20  Chambers, I will see you, according to the
21  open-door policy of Cisco, and I asked
22  Mr. Justice, as it states in the letter,
23  Exhibit 11 of the complaint. I state the
24  following: "I would like to bring to your

Page 148

1  attention that Anthony Savastano has
2  discriminated against me once again by placing my
3  name in the Cisco no-hire list, policy list on or
4  about November 3rd, 2000. I was offered an
5  opportunity with Cisco Group Middle East in
6  Africa -- France, Middle East and Africa and
7  France to become a system engineer for North
8  Africa region. Mr. Chandler and Mr. Justice, as
9  you already know, have spent a considerable time
10  being interviewed over the phone by my managers
11  of Cisco Europe before I was invited for
12  one-to-one interviews on and before Cisco Europe
13  decided to proceed with an expenditure over
14  $10,000 on my travel airfare and accommodation
15  and for the time and effort spent by Cisco
16  directors, managers, engineers and myself in the
17  last stage of this hiring selection process.
18       The three set of interviews were
19  very expensive as they were conducted in United
20  Arab Emirate Dubai, the second one in France,
21  Paris, and the third and the last interview in
22  England, London. The interviews went well. I
23  was offered a verbal offer by all manager."
24       Since I'm a resident of -- for the

Page 149

1  record, since I'm a resident in Massachusetts,
2  the law state if somebody provide me with oral
3  contract it's binding, just to let you know for
4  the future. It's good to know. Nobody knows
5  this. Also, to know, Miss Celia Harper, in
6  Massachusetts if an employee asks you to give him
7  his personnel record and you deny to give it to
8  me, it's against the law. Any resident in
9  Massachusetts has right to write to the employer,
10  like Cisco, as Anthony did, and ask you for my
11  personnel -- employment personnel record. It's
12  the law. It's not privileged, just to let you
13  know.
14       Let me keep reading. "The pick
15  was" -- I'm talking about the people that I met
16  overseas. I flew half the world. "The pick was
17  adjusted because of my strong technical
18  background and my ability to speak the Arabic,
19  English, French and North African dialect, and
20  it's good business decision for Cisco," and the
21  list goes on and on and on.
22       The reason I wrote this letter -- I
23  did not violate anybody's privacy or right. I
24  followed the business code of conduct set forth

**CELIA HARPER-GUERRA**
**January 19, 2007**

39 (Pages 150 to 153)

Page 150

1  by you and your team, Celia Harper, that correct?
2  Do I have a right to complain about
3  discrimination to my upper managers, including
4  but not limited to John Chamber and Rick Justice?
5  Do I have right to do that, or I probably have
6  violated something here. Do I have a right to
7  complain about this open-door policy?
8        Also, Miss Celia Harper, when you
9  finish this question, I'm going to ask you
10  another question, and that question need you to
11  help Mr. Bruce Falby because he keep stating some
12  stuff that is not fair, not true.
13        Miss, if I see myself discriminated
14  in this company, as you state earlier I do have
15  open policy for me to go to the upper management,
16  yes or no?
17     A.    We do have an open policy -- we do
18  have an open policy at Cisco Systems.
19     Q.    To complain about discrimination?
20  Let's not guess Cisco System policy and
21  procedure. Nobody will be terminated for raising
22  the issue of discrimination at Cisco or any
23  discrimination, gender, origin, religion, sexual
24  harassment. Anybody who felt uncomfortable, he

Page 151

1  goes and views the open policy at Cisco by
2  organization of human resources at Cisco and go
3  ahead and complain to upper management, yes or
4  no?
5     A.    The open policy is an opportunity
6  for any employee to be able to voice their
7  opinion about any subject that pertains to them
8  or the company.
9     Q.    In other words, what you're
10  stating, what you're stating, Miss Celia Harper,
11  for the record, you're telling me that I did not
12  do anything by going above a director of finance,
13  Mr. Anthony Savastano, who have discriminated
14  against me in three companies. The record is so
15  outrageous that the United States District Court
16  does not understand what happened here, because
17  nobody saw this discrimination case, not in
18  Florida, Lucent Technologies, move to INS,
19  International Network Services, and end up at
20  Cisco. Cisco has cleaned up their house right
21  now.
22     A.    I don't know any of that. I'm not
23  aware of any of that. I don't have any knowledge
24  of that.

Page 152

1     Q.    You don't have any knowledge, but
2  the complaint has knowledge. If you read -- if
3  you read Exhibit 4, it's Mr. Navara's
4  declaration, Mr. Nara's declaration, Mr. Navara's
5  affidavit in support in the case, in the case of
6  said Anthony Bayad versus Anthony Savastano. You
7  stated earlier that you knew Anthony Savastano.
8  You do, right?
9     A.    Yeah, I do know Anthony Savastano
10  as an employee of Cisco.
11     Q.    Well, let me ask you this.
12  Mr. Savastano was involved in three
13  discrimination lawsuits. Also, he was named in
14  the newspaper, in the Foreground Hotel. I have
15  it, and I gave it to Mr. Falby. He has it for
16  the record. High Tech Scandal. He stated fired
17  engineer accuse of racial bias. And in such
18  article you have Anthony Bayad and Anthony
19  Savastano. Now, Anthony Savastano has the answer
20  of discrimination. He discriminated against
21  Anthony Alsai, an employee that works for you
22  right now. He's in Egypt. We just found that he
23  is in Egypt. Also, he made, he filed a complaint
24  with the EEOC like I did, and sue Mr. Savastano

Page 153

1  that you know. Also, we filed, I filed myself a
2  Title VII which you mentioned earlier. That's
3  with the EEOC -- right? -- Equal Employment
4  Opportunity Commission, right?
5     A.    Correct.
6     Q.    Okay. In such organization, the
7  EOC, they have loss as Title VII.
8     A.    I was only answering your question
9  and verifying the EEOC. I am not aware of any
10  files or suits that have been claimed against who
11  you've just named.
12     Q.    Ms. Celia Harper, I don't want to
13  put you on the spot. Anybody that comes for a
14  deposition, they read Exhibit 4, and they see
15  Exhibit 4 that says in the United States District
16  Court, Southern District of Florida, Anthony
17  Bayad versus Lucent Technologies, Louis Caslow,
18  Mike Reed, Ronald Mohito, Anthony Savastano, and
19  John Gruen. Anthony Savastano, Case No.
20  976671CTV. Luther was the judge. In the United
21  States District Court, Southern District of
22  Florida. Savastano is an employee at Cisco. You
23  know him, right?
24     A.    I know him as an employee of Cisco.

# CELIA HARPER-GUERRA
## January 19, 2007

40 (Pages 154 to 157)

Page 154

1    Q.    Exactly, and you know Exhibit 3
2    doesn't lie. If we go right now, if you and I --
3    I'll give it to you right now. If you want me to
4    send you -- if you want me to go to the docket
5    entry and tell you that I filed a motion similar,
6    discrimination that is admissible, and the
7    honorable court has provided that, has said yes,
8    it is admissible. Now, what I'm telling you is
9    you have a guy that has a history of
10   discrimination, and he discriminated against me.
11          Also, I want to ask you, did you
12   want to know why I flew around the world for a
13   job overseas, knowing my family are in America
14   and I love my country America. I do not care
15   about other countries. I care about this country
16   because I live here. Ask yourself why I am
17   scared and flying around the world looking for a
18   job at Cisco, calling my buddies at Cisco to hook
19   me up. Do you know why? Because exhibit -- I'll
20   tell you, Miss, why. First you need to review
21   Exhibit 4, that states what Savastano has done to
22   me. Also, you have to go to Exhibit 5, and
23   Savastano directed others, coerced to call me son
24   nigger, lying culprit. Also, Exhibit 6 is a

Page 155

1    police report. He abused me, tortured me.
2    That's why I'm like this right now. That's
3    Exhibit 6.
4          Now going to Exhibit 7, and this
5    they call a knockout respectfully. They call it
6    a knockout in this discrimination lawsuit.
7    Mr. Savastano, the person that you know, in
8    Exhibit 7 he stated to me -- on January 24th,
9    1997, he said to me, Mr. Anthony Bayad, with the
10   company title Lucent Technologies, Mr. Savastano
11   said the following to me: "Dear, Anthony Bayad,
12   I have reviewed the information for the security
13   investigation regarding the purchase of two
14   airline tickets from Morocco to Miami." You know
15   what that means? He found out that I'm Moroccan.
16   Because my name is Anthony, anybody who can't see
17   me thinks I'm Italian. So when he found out I'm
18   Moroccan, you know what he said in his letter,
19   "This is a serious violation of the Lucent
20   Technologies code of conduct." By being
21   Moroccan, by using his authority as a finance
22   director and a VP at Lucent, as he is right now
23   at Cisco, he's a vice president of finance, he
24   stated to me, "misusing the corporate American

Page 156

1    Express card for personal expenses, you are
2    fired," he said. "This is to notify you that
3    your employment is terminated immediately as a
4    result of your violation of Lucent Technologies
5    code of conduct." The credit card has my name,
6    but that's another story, that's no problem.
7          Now, moving back to Exhibit No. 8.
8    Okay, Exhibit 8, also in this lawsuit is a
9    knockout. It's an awful letter. Remember he
10   fired me from Cisco, Miss Celia Harper. And
11   Exhibit 8 of the complaint is an awful letter,
12   dated July 21st, 1997. And if we go back -- I'm
13   sorry. If you go back to Exhibit 7, the date of
14   that is January 24th. How many months between
15   January 24th and July 21st, how many months?
16   A.    Six.
17   Q.    Okay. I have not worked for six
18   months. I was involved in discrimination lawsuit
19   and I was in hospital by Mr. Anthony Savastano
20   and Carl Wiese, the VPs of this company, this
21   wonderful company Cisco, and I got a letter.
22   Nobody can sue anybody in this industry and find
23   a job in six months, nobody. You know it. I
24   know it. I found a job. Guess what. On

Page 157

1    July 30th, 1997, I was terminated.
2          Now, let's go back to Exhibit 8,
3    the offer letter from International Network
4    Services. Another company gave me an offer
5    letter, gave me an opportunity, and it was dated
6    July 21st, 1997, and my job is to start
7    July 30th, 1997. I was terminated on my first
8    day by Anthony Savastano. And I have an e-mail,
9    and that's Exhibit 8, about his personal
10   secretary doing the same thing as Lynn Fraser has
11   done, discriminating against me, giving me bad
12   references.
13         Now, Ms. Celia Harper, I'm going to
14   ask you last question. When you hire somebody in
15   your organization, first you look at liability
16   right? Make sure they're not criminal, right?
17   Yes?
18   A.    We verify --
19   Q.    I have the package here that you
20   guys went through with me when you hired me.
21   First what you do you fill out an application.
22   First if the interview go well with the hired
23   manager, if he likes you, he calls you guys to
24   set up -- to tell you give Anthony an offer

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI

CELIA HARPER-GUERRA
January 19, 2007

41 (Pages 158 to 161)

**Page 158**

1 letter, right?.
2     A.    The process that -- if the
3 candidate --
4     Q.    Miss Celia Harper, we are almost
5 finished. Please help me. And you're not,
6 you're not -- whoever is listening here, you're
7 not to blame here. You are to blame for sticking
8 you with the Cisco no-hire list as the admin, and
9 you cannot say no because you get fired. I don't
10 know what's your background. I don't care. But
11 I can tell you Cisco no-hire list does exist, and
12 you know it and I know it, and Mr. Savastano put
13 my name, because all the evidence is in support
14 of Cisco no-hire list, you know, this Lynn Fraser
15 and everything.
16         Now my question is, I want you for
17 the last moment of this deposition to go step by
18 step with me. I have the record with me. When
19 somebody first enter, first apply for job either
20 he goes through the HR personnel direct, send a
21 resume through the system which you, one of you
22 guys at human resources or probably Savastano
23 sent me an e-mail stating to me identify your
24 race and gender before you're hired. In other

**Page 159**

1 words, he was laughing at me. He thought it was
2 a joke.
3         But anyhow, my question now to you
4 is a real question. When somebody file an
5 application and it goes through the system, you
6 have a, you have like a recruiter internally,
7 right?
8     A.    We do have recruiters internally.
9     Q.    Yes. Those recruiters they go over
10 the resume. Probably -- I don't want the
11 details, yes or no. Probably call the applicant
12 or they refer the application to the hiring
13 manager, yes or no?
14     A.    The recruiter will screen the
15 applicant.
16     Q.    The Recruiter reviews it. And if
17 he decided this guy has talent, then he forward
18 it to the right hiring manager that needs that
19 talent, yes?
20     A.    Let me share the process with you.
21 The applicant comes through the system.
22     Q.    Yes.
23     A.    The system acknowledges that
24 they've received the application and/or the

**Page 160**

1 resume. It gets forwarded to the recruiter. The
2 recruiter then screens the applicant and forwards
3 on to the hiring manager.
4     Q.    Yes.
5     A.    And the hiring manager and a select
6 group of team members will interview the
7 candidate.
8     Q.    And in mine I was interviewed by
9 seven people. I was very impressed by Cisco.
10 They screened me left and right as you know.
11 Very talented. From other group and my group
12 which is very good. Then they give me a offer
13 letter, right?
14     A.    I don't know. I don't know if they
15 gave you an offer letter. I don't know the steps
16 of the process that you went through. I can't
17 verify that.
18     Q.    They gave me a offer letter, right?
19 When they gave me a offer letter -- right? -- I
20 want to ask you a question. Before that offer
21 letter has been initiated to any applicant, me or
22 anybody. I just don't want to put you in any
23 spot, and I swear to God I'm not trying to trick
24 you. I just want to know the process. Any

**Page 161**

1 applicant before he gets the offer letter, you
2 have a process in place with the hiring, what
3 they call hiring -- there's another organization
4 that do hiring. What's the name that do the --
5     A.    The process in the place is the
6 Hire Right Company that does the background
7 verification. So they actually verify the
8 applicant's employment.
9     Q.    That's what I want to ask you, yes.
10     A.    They verify --
11     Q.    Thank you. Yes, that's correct.
12 They go through everything. You five years
13 resident. They check your background against
14 your driver's license. They check your driver's
15 license if you have a moving violation. They
16 check everything. Also they check your district.
17 If I live in Tampa, for example, like Anthony
18 Savastano, they will go to court, and they will
19 find out if there is something about the court.
20 Is that correct, yes or not?
21     A.    I don't know.
22     Q.    Well, they do. I have it here.
23 Now, my question to you, who hired these two
24 guys, Carl Wiese, Anthony Savastano knowing

# CELIA HARPER-GUERRA
## January 19, 2007

42 (Pages 162 to 165)

### Page 162

1  they're on a newspaper, knowing they have three
2  lawsuits pending against him that was in Florida,
3  and we don't want to talk about their result. I
4  mean, I'm going to put you on the spot here, and
5  then we're going to finish this deposition. If
6  somebody has a long wrap sheet of discrimination
7  and he's a racist, would you hire him or would
8  you not hire him? I would not hire him because
9  he broke the law. Would you hire him? Anthony
10 Savastano, Carl Wiese, why are they working right
11 now? Why do they have you on the phone right now
12 stretching like this, why, why? If it wasn't
13 Tony Savastano and Carl Wiese, I would never be
14 on this Cisco no-hire list. Yes or no, miss?
15     A.   I don't understand your question.
16 Restate it, please.
17     Q.   I would like to ask you why did you
18 hire, your organization hire two guys from a
19 loser company. With all respect to anybody
20 listening, I call Lucent Technologies losers, and
21 I predicted their downfall, and they beat me up
22 because I'm a Moroccan.
23          When Spanish, Arabs and female are
24 suing Anthony Savastano and Carl Wiese, and the

### Page 163

1  record speaks for itself, in Tampa and in Fort
2  Lauderdale, why did you hire these people knowing
3  it is public traded company, Miss. If this goes
4  to public right now -- you are an officer of the
5  company. If somebody right now take this
6  deposition and give it to CNBC which I'm not
7  going to do. I don't care about anybody. I'm
8  just fighting for my rights.
9          Now, two Cisco senior VPs have a
10 long sheet of discrimination. They are racists,
11 and they're representing the company. And
12 knowing if they get promoted to senior vice
13 president, they're going to be publicly on the
14 Internet. And guess what, what happen to CNBC
15 when they talk to him, what are they going to
16 tell Mr. Savastano? Do you have a problem with
17 arrest Arabs? Do you have a problem with
18 Spanish? Do you have a problem with Puerto
19 Ricans? He discriminated against a beautiful
20 woman called Joanna Lopez who is Puerto Rican.
21 You know that, right? To cover up my
22 discrimination because he told my lawyer that
23 Anthony's discrimination lawsuit is too costly
24 because we taught him a lesson. Why did you hire

### Page 164

1  this guy. He doesn't have a future. He cannot
2  be hired or promoted like senior vice president
3  George O'Mara or Nick Adamo. He can't.
4          As HR I want you to tell me why you
5  have two people that have discriminated against
6  all races, not just Arabs, Spanish, Puerto Rican,
7  and black. I don't know about black, but
8  probably. Probably, I don't know. But I know
9  they discriminate against Arabs, North Africans
10 and Puerto Ricans and Hispanics and Southern
11 Spanish. Why, Miss, why did they get promoted
12 and hired, why?
13          You are human resources, you have
14 to, you have to, you have to answer this question
15 because you know him and you are HR. It is your
16 duty to answer this question, because one person
17 said do not hire Anthony Bayad, and you did not
18 hire me, and I showed you that I was qualified,
19 but I never discriminated against anybody. I do
20 not have any criminal record. I did not, I did
21 not hurt anybody. My people are the American
22 people. I did not, Miss. I did not, I did not
23 participate with any criminal organization. I'm
24 a topnotch engineer. I can go to the telephone

### Page 165

1  pole. I can hack into any phone in the world,
2  any company because I'm very well trained, and I
3  don't do this because I'm an American, a patriot.
4  I love my country.
5          Why do you hire these two people,
6  Carl Wiese and Anthony Savastano, why? If you
7  don't want to answer this question, I don't know
8  what to tell you. Because if you do hire
9  somebody, and you also see it yourself with
10 somebody, you become also that person. That's
11 what it is, Miss. Now tell me why, Miss, before
12 we can cut this and go home.
13     A.   So I'm not aware -- I can't answer
14 that question because I don't know the answer to
15 it, that's why. I can only tell you that they
16 went through the same process as any other
17 applicant as we would expect. So they went
18 through the screening of the resumes, went
19 through the interview process, and they went
20 through the background process.
21     Q.   And why John Chamber and Rick
22 Justice -- when Anthony used the open-door policy
23 and blew the whistle on him, Anthony Savastano
24 told them that he has a race problem with Spanish

**CELIA HARPER-GUERRA**
**January 19, 2007**

43 (Pages 166 to 169)

Page 166

1  and women and Arabs, Moroccan. And I told them
2  that, and I called Mr. Rick Justice over the
3  phone. I spoke to him directly.
4      A.    I don't know anything that you're
5  saying about them to be true, so.
6      Q.    Yeah, they have a race problem.
7      A.    I'm not aware of that. I don't
8  know any of that to be truthful.
9      Q.    No problem. On November 29th,
10  2000, when somebody tells you that somebody is
11  racist and has a long sheet, a record of
12  discrimination?
13      A.    I'm not aware of that to be
14  truthful.
15      Q.    Okay, okay. Somebody sues you,
16  you're not racist. People just wake up in the
17  morning and go sue people. You wouldn't have
18  deposition today. The Honorable Patti B. Sarris
19  work through this case because it's the law.
20      A.    You can sue people, but it does not
21  mean that they are guilty. You can sue people
22  for anything. It doesn't mean that they are
23  criminals in that aspect.
24      Q.    I'm not incriminating anybody. I'm

Page 167

1  not saying they are criminals. I'm sorry.
2      A.    But you're stating that they're
3  racist, and you're stating that they're dis --
4      Q.    Just for the record --
5      A.    I'm not aware of that, but that
6  doesn't make them --
7      Q.    I'm stating to you that they are,
8  that they have a history of discrimination and
9  they have a pattern of discrimination and they
10  are in violation of Title VII Section 704 and 703
11  which state clearly if anybody violate complaint
12  with the EOC at any time -- they don't specify
13  the time limit, no time limitation -- that person
14  is automatic in a protected activity. Mr. Falby
15  can explain that to you.
16          Now, when somebody use open-door
17  policy and state to you that, help me, this guy
18  has a problem with me, doesn't like my race, why
19  does he get promoted and I get fired six months
20  later? And why after one year I apply for a job
21  I get denied by Lynn Fraser in support of the
22  Cisco no-hire list.
23          And at the end, Miss, let me tell
24  you something, you want to answer this or not.

Page 168

1  Ask your attorney Bruce Falby why did he provide
2  the Cisco no-hire list under oath and he did not
3  provide the electronics copy, and I proved that
4  to you the electronics copy, this one that I gave
5  you, it has more people, that's why he don't want
6  to give it to me.
7          Now, Miss, God bless you. Thank
8  you for your help. If you have any questions,
9  please ask me. And thank you for your patience,
10  and I'm sorry, I apologize to you for putting you
11  through this, and it's not personal. It's just
12  I'm fighting for my rights and my survival
13  because I try to find jobs, move on, become an
14  engineer. I'm highly educated. I cannot work.
15  And if I cannot work, I have to go to court. And
16  I do not like to go to court because it affects
17  my health and my future and my kids. If I have
18  kids in the future, they're going to be looked at
19  like their father, Anthony Bayad, sue people, his
20  kids also sue people, and I don't, and now I'm
21  almost 40 years old. You have kids, and I don't.
22  You have future, I don't. You have savings, I
23  don't. Thank you, Miss.
24          Mr. Falby, I still need you to give

Page 169

1  me the electronics copy of your declaration.
2          MR. FALBY: The witness has done
3  her best to answer your questions. Do you have
4  any more questions of the witness?
5          MR. BAYAD: No. Thank you very
6  much.
7          MR. FALBY: Then let's terminate
8  the deposition. Thank you.
9          (Deposition concluded at 4:30 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# CELIA HARPER-GUERRA
# January 19, 2007

44 (Pages 170 to 173)

Page 170

1        C E R T I F I C A T E
2        I, Maryellen Coughlin, a Registered
3   Professional Reporter and Notary Public of the
4   State of Massachusetts, do hereby certify that
5   the foregoing is a true and accurate transcript
6   of my stenographic notes of the deposition of
7   Celia Harper-Guerra, who appeared before me,
8   satisfactorily identified themself, and was by
9   me duly sworn, taken at the place and on the
10  date hereinbefore set forth.
11        I further certify that I am neither
12  attorney nor counsel for, nor related to or
13  employed by any of the parties to the action in
14  which this deposition was taken, and further
15  that I am not a relative or employee of any
16  attorney or counsel employed in this case, nor
17  am I financially interested in this action.
18        THE FOREGOING CERTIFICATION OF THIS
19  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20  THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21  CONTROL AND/OR DIRECTION OF THE CERTIFYING
22  REPORTER.
23
24        MARYELLEN COUGHLIN, RPR

Page 171

1        UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3        C.A. NO. 05-11005-PBS
4
5   * * * * * * * * * * * * * * * * * *
6   ANTHONY BAYAD,              *
7        Plaintiff          *
8   vs.                          *
9   BRUCE BASTIAN; KATE DCAMP; LYNN   *
10  FRASER; CELIA HARPER-GUERRA; RICK *
11  JUSTICE; CISCO SYSTEMS, INC.    *
12        Defendants          *
13                              *
14  * * * * * * * * * * * * * * * * * *
15
16        I, Celia Harper-Guerra, do hereby
17  certify, under the pains and penalties of
18  perjury, that the foregoing testimony is true
19  and accurate, to the best of my knowledge and
20  belief.
21        WITNESS MY HAND THIS ____ day of
22  _____, 2007.
23
24        Celia Harper-Guerra

Page 172

1        CORRECTION SHEET
2   DEPONENT: Celia Harper-Guerra
3   CASE: Anthony Bayad vs. Bruce Bastian, et al
4   DATE TAKEN: 1-19-07
5   *********************************************
6   PAGE / LINE / CHANGE OR CORRECTION AND REASON
7        /    /
8        /    /
9        /    /
10       /    /
11       /    /
12       /    /
13       /    /
14       /    /
15       /    /
16       /    /
17       /    /
18       /    /
19       /    /
20       /    /
21       /    /
22       /    /
23       /    /
24

Page 173

1   Today's Date:    February 2, 2007
2   To:         Bruce Falby, Esq.
3   Copied to:     Anthony Bayad, Esq.
4   From:       Maryellen Coughlin, CRR/RPR
5   Deposition of:  Celia Harper-Guerra
6   Taken:      January 19, 2007
7   Action:     Bayad vs. Bruce Bastian, et al
8
9        Enclosed is a copy of Ms. Harper
10  -Guerra's deposition.
11        Please have Ms. Harper-Guerra sign the
12  enclosed signature page. If there are any
13  errors, please have her mark the page, line, and
14  error on the enclosed correction sheet. She
15  should not mark the transcript itself. This
16  addendum should be forwarded to all interested
17  parties.
18        Thank you for your cooperation in this
19  matter.
20
21
22
23
24

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**CELIA HARPER-GUERRA**
**January 19, 2007**

Page 171

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                  C.A. NO. 05-11005-PBS

4

5    * * * * * * * * * * * * * * * * * *

6    ANTHONY BAYAD,                        *

7              Plaintiff                   *

8    vs.                                   *

9    BRUCE BASTIAN; KATE DCAMP; LYNN       *

10   FRASER; CELIA HARPER-GUERRA; RICK     *

11   JUSTICE; CISCO SYSTEMS, INC.          *

12             Defendants                  *

13                                         *

14   * * * * * * * * * * * * * * * * * *

15

16          I, Celia Harper-Guerra, do hereby

17   certify, under the pains and penalties of

18   perjury, that the foregoing testimony is true

19   and accurate, to the best of my knowledge and

20   belief.

21          WITNESS MY HAND THIS _28_ day of

22   _Feb____, 2007.

23

24                        Celia Harper-Guerra

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI