## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ANTHONY BAYAD,                          )
                                        )
        Plaintiff ,                     )        **CIVIL ACTION**
                                        )
                                        )        **CASE NO. 05-11005PBS**
BUCE  BASTIAN; KATE DCAMP               )
LYNN FRASER;CELIA HARPER-GUERRA; )
RICK JUSTICE; CISCO SYSTEMS INC.        )
        Defendants,                     )

### SUPPLEMENT FILING OF SWORN DEPOSITION OF THE TWO MEN TONY SAVASTANO AND CARL WIESE BOTH MY MANAGERS AT LUCENT TECHNO LIES AND NOW CISCO SYSTEMS BOTH DISCRIMINATED AGAINST MY AT LUCENT TECHNOLOGIES AND NOW CISCO SYSTEMS

Anthony Bayad, I the plaintiff file this sworn deposition of Carl Wiese and Tony Savastano in support of history of discrimination is admissible and motive of discrimination is admissible and I the plaintiff will let this court to act Sua Ponte and decide what is going on here.  I the plaintiff is unemployed for about 10 years because of Savastano and Wiese lucent  Technologies and now Cisco Systems. I have nothing but to say that what they have done to me in Florida and they got away with it – will not going to happen here without I cause this case to go to the senate and I will make lot of people regret what they have done to me here in this litigation by playing with me and denying and denying all my motions without justification under the law and letting these attorneys playing with the systems and let not forget what is going on at the Justice Department. Fraud is not good because it is illegal. Please who ever is presiding use  the rain check for another case and easy stupid minority who does not know better. Thank you/

See Exhibits Attached hereto .

**Wherefore**, Plaintiff Anthony Bayad ("I") demands that this court: See Complaint

Docket # 1 page 36-37, the relief requested.

(a)     declare the defendants' conduct to be in violation of my rights;

(b)     enjoin defendants from engaging in such conduct in the future;

(c)     award me back pay and benefits (with interest) that have accrued to date;

(d)     award me front pay until normal retirement age as I am 39 years old;

(e)     award me compensatory damages of $ 10,000,000.000 or more for emotional distress, mental anguish, and loss of enjoyment of life and the disparate treatment, and discrimination and false imprisonment that I suffered at the hand of the defendants;

(f)     award me compensatory damages of $2, 000,000.000 for interfering with my Civil Rights, conspiring to restrict me from equal rights and benefits, and for defaming and destroying my life, and blocking me for working and conducting my business;

(g)     Award my damages of $3, 000,000.000 or more for defamation and damage to my business and my career and my health, my reputation, injury to my character and to my credit standing;

(h)     Award me punitive damages in the amount of $20, 000, 000. 000 or more;

(i)     Award me costs and legal fees;

(j)     Grant me such other relief as the court may deem just proper.

For the following count(s):

# PUNITIVE DAMAGES ( Published by Dla Piper Rudnick Gray Carry  'official web site)

- "The record are clear that federal race discrimination claims brought under Title 42 Section 1981 as well as claims brought under numerous state laws are not subject to **any limits,** A recent unpublished opinion in the Fourth Circuit Court of Appeals, *White v. BFI Waste Services, LLC* (No. 05-1804, 4th Cir. May 23, 2006), serves as a pointed, when the jury in *White* found that defendant BFI's supervisors subjected two African-American plaintiffs to a racially hostile work environment for over **ten years** and awarded the plaintiffs $4 million in punitive damages on top of $1.2 million in compensatory damages. And Several recent cases illustrate just how costly discrimination and harassment punitive damages can be; also In *Issa v. Roadway Package Sys.*, a California jury awarded two FedEx drivers $50 million in punitive damages after finding that a manager subjected the two drivers to ethnic harassment and ridicule during their two years of employment at FedEx (June 2, 2006). See In *Zubulake v. UBS Warburg*, a federal jury in New York awarded a single plaintiff over $20 million in punitive damages on her gender discrimination claims (April 6, 2005). . . . etc"

## 1.    COUNT I RACE  DISCRIMINATION

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.    Centennial   P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 2.    COUNT III CLASSIFICATION OF RACE – CISCO-NO-HIRE-LIST

Respectfully, Plaintiff request relief on Count III ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 3.    COUNT VI BREACH OF ORAL CONTACT AND CONTRACTUAL OF OBLIGATION

Respectfully, Plaintiff request relief on Count VI ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos   vs.   Centennial P.R.   Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

## 4.    COUNT VIII CONSPIRACY

Respectfully, Plaintiff request relief on Count VIII ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

5.        **COUNT IX FALSE IMPRISONMENT**

Respectfully, Plaintiff request relief on Count I ( Race Discrimination) record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

6.        **RETALIATION ( NOT MASSACHUSETTS LAW )**

Respectfully, Plaintiff request relief on Count ( Retaliation record contains direct evidence exist supporting such claim, is evidence that established the existence of discriminatory intend behind the employment decision without the inference or the presumption. see *Santiago-Ramos vs. Centennial P.R. Wireless Corp.*, 217 F. 3d 46, 56 ( 1st Cir.)

**As the court deems and proper or tier of fact or by jury . (See Docket Entry #1,  in support)**

## CERTIFICATION OF SERVICE

I, Anthony Bayad, certify that I caused this document to be served upon Attorney Bruce Falby, Dla Piper Rudnick Gray Cray Carry, 33 Arch Street, 26 th, Boston, MA 02110, First class - U.S. Mail on March 30, 2007.

**Respectfully submitted**

**Anthony Bayad**
**2 Magoun Avenue**
**Medford, MA 02155**

LAW OFFICES

## WALLACE, BAUMAN, LEGON, FODIMAN & SHANNON, P.A.

TODD R. LEGON

1200 BRICKELL AVENUE
SUITE 1720
MIAMI, FLORIDA 33131

TELEPHONE (305) 444-9991
FAX (305) 444-9937
E-MAIL
LAWFIRM@WALLACEBAUMAN.COM

January 7, 1999

*No. 04-10468PBS*

**Via Telefax and U.S. Mail**

David Sales, Esq.
Searcy, Denney, et al.
P.O. Box 3626
West Palm Beach, Florida 33402

Re:     *Bayad v. Lucent Technologies, et al.*
        U.S.D.C., S.D. Fla., Case No. 97-6671-Civ-Roettger
        Our File No.: 1520.109

Dear David:

Pursuant to your request, we have scheduled the deposition of Carl Wiese for Friday, January 29, 1998 in New Jersey. I am currently checking with my client to see if there is a room available in one of its facilities for the deposition. We will also need to confirm a time. I will let you know shortly.

Further, you had previously requested the depositions of both Patricia Russo and Henry Schacht. My secretary has advised me that you are *no longer* seeking these depositions. If this is not the case please let me know immediately.

Of course, should you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

WALLACE, BAUMAN, LEGON,
FODIMAN & SHANNON, P.A.

TODD R. LEGON

TRL/re
cc:    Charles H. Fash, Esq.
       Stephanie Alexander, Esq.
M:\TODD\LUCENT\BAYAD\LETTERS\ALEXANDE\ALEXANDE.J07



Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ANTHONY BAYAD,

     Plaintiff,

vs.      Case No.: 97-6671-C.V.-RCETTIGS
     Magistrate Seltzer

LUCENT TECHNOLOGIES, INC.,
LEWIS KASLOW, MIKE REED,
RONALD LAURINO, ANTHONY SAVASTANO,
and JOAN GROHE.

     Defendants.

SEE #04-10464PBS
(D.MASS)

DEPOSITION OF:    ANTHONY SAVASTANO

TAKEN:    Pursuant to Notice by
     Counsel for Plaintiff

PLACE:    Marriott Hotel
     Tampa International Airport
     Manatee Room
     Tampa, Florida

DATE:    June 24, 1998

TIME:    Began: 9:17 a.m.
     Ended: 1:04 p.m.

REPORTED BY:    KEVIN P. MIKUS, RPR, RMR
     Registered Merit Reporter
     Notary Public - State of Florida
     at Large

Page 2

APPEARANCES:

DAVID J. SALES, ESQUIRE
Searcy, Denney, Scarola,
Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33402

-and-

STEPHANIE ALEXANDER, ESQUIRE
2450 Hollywood Boulevard
Suite 702
Hollywood, Florida 33020
     Attorneys for Plaintiff

TODD R. LEGON, ESQUIRE
Wallace, Bauman, Legon, Fodiman & Shannon
2222 Ponce de Leon Boulevard
Suite 600
Coral Gables, Florida 33134
     Attorney for Defendants

I N D E X

Examination                Page

     By Mr. Sales      3

STIPULATION             170
DEPONENT SIGNATURE PAGE    171
CERTIFICATE OF OATH      172
CERTIFICATE OF REPORTER    173

E X H I B I T S

Plaintiff's Exhibit No. 3
Plaintiff's Exhibit No. 4
Plaintiff's Exhibit No. 6
Plaintiff's Exhibit No. 7
Plaintiff's Exhibit No. 8

(All Exhibits marked after completion of deposition)

(All Exhibits Attached)

Page 3

1    The Deponent herein,
2          ANTHONY SAVASTANO,
3    being first duly sworn to tell the truth, the
4    whole truth, and nothing but the truth, was
5    examined and testified as follows:
6          EXAMINATION
7 BY MR. SALES:
8    Q. What is your name, sir?
9    A. Anthony Savastano.
10    Q. And your date of birth?
11    A. 11-10-46.
12    Q. Are you from the New England area?
13    A. Yes.
14    Q. What part of the country are you from?
15    A. Massachusetts.
16    Q. Where were you born?
17    A. Lawrence, Massachusetts.
18    Q. Is that a Boston suburb?
19    A. It's about 30 miles north of Boston.
20    Q. And what is your date of birth?
21    A. 11-10-46.
22    Q. Do you know Anthony Bayad?
23    A. Yes.
24    Q. How is it that you know him?
25    A. He worked in the Tampa facility as a

Page 4

1 technical support engineer.
2    Q. That would be the Tampa facility of?
3    A. Of -- he worked at Lucent Technologies as a
4 technical support engineer.
5    Q. Did you come to know him personally upon his
6 arrival?
7    A. No.
8    Q. How many people were working there as of the
9 time he came on board, if you know?
10    A. I don't know when he came on board.
11    Q. What was your title there?
12    A. I don't know how many people were there when
13 he came on board.
14    Q. What was your title there at that time?
15    A. At the time he came on board in Largo, I was
16 a Director of Market Management in New Jersey.
17    Q. Okay. He was there before you were there?
18    A. Yes, he was.
19    Q. Okay. Who was the -- was the GM at the Largo
20 office at that time, the highest level person?
21    A. Robert Thomas.
22    Q. Would that have been the highest level person
23 in Largo at that time?
24    A. Yes, he was.
25    Q. And that's now what's apparently the

Case 1:05-cv-11005-WGY   Document 110-2   Filed 04/02/2007   Page 3 of 25

BAYAD V. LUCENT, ET AL.                    Condenselt!                    ANTHONY SAVASTANO

Page 5

1  St. Petersburg office?
2     A. Yes.
3     Q. When did you come to this area?
4     A. I -- I was in this location and was
5  transferred to New Jersey and returned to this location
6  January 19th, 1996.
7     Q. I'm sorry, you had been here and then left
8  and then came back?
9     A. Yes.
10    Q. And when was your departure?
11    A. My transfer was the middle of June of '95.
12    Q. And then you came back. Was that a requested
13  return to Florida?
14    A. Yes. Mr. Thomas resigned.
15    Q. And that created an opportunity effectively
16  for you to attempt to become General Manager?
17    A. I was requested to come back and take the
18  assignment. I was a D band General Manager in
19  New Jersey.
20    Q. That's a roughly equivalent position?
21    A. Yes, it was.
22    Q. In what field, in what application of the
23  company were you doing in New Jersey?
24    A. I was the Director of Market Management for
25  the data networking business, service business.

Page 6

1     Q. What is market management?
2     A. Putting together offers and programs that the
3  company will present to customers for purchase.
4     Q. All right. So you came back to Largo, then,
5  in 1996 in January, you said?
6     A. Yes, January 19th.
7     Q. And then Mr. -- was the birth of
8  Lucent Technologies already evident at the company
9  Largo offices at that time?
10    A. Yes.
11    Q. Yes?
12    A. Yes.
13    Q. You all were calling yourself Lucent by
14  then?
15    A. I don't -- I don't recall if that was a
16  general calling, but it was very apparent that there
17  was going to be a breakup of AT&T. I don't know if the
18  Lucent name was, at that point in time, even developed.
19    Q. Okay. What do you perceive as the birthday
20  of Lucent as it was evident at the Largo office?
21       MR. LEGON: Object to the form. You may
22  answer.
23    A. I think April of '96.
24    Q. How long was it before you returned to Largo
25  when you first became acquainted with the plaintiff in

Page 7

1  this case?
2     A. I would say probably within two weeks.
3     Q. Okay. What would your interaction with him
4  have been as of that time?
5     A. He came to visit me to talk about his
6  position and what he felt he could do to improve the
7  company and, basically, was looking for a promotion.
8     Q. And did he appear sincere in that regard?
9       MR. LEGON: Object to the form.
10    A. Yes, he did.
11    Q. Okay. Do you remember, in any greater
12  detail, the substance of that conversation?
13    A. He had told me that he was studying for the
14  BayNetwork certification, that he was working very
15  hard, and that he wanted to take on larger
16  responsibilities and higher levels of pay.
17    Q. Is that -- assuming it is sincere, is that
18  the kind of initiative that Lucent Technologies or
19  previously, I guess -- well, what was the Largo office
20  called before they called it Lucent?
21    A. It was the Data Networking Service Center.
22    Q. For?
23    A. For, at that point in time, it was Business
24  Communications Systems, BCS.
25    Q. Was it affiliated with any larger company

Page 8

1  such as a publicly traded company?
2     A. No. Then from -- BCS is a division of AT&T.
3     Q. Okay. The conversation you just described in
4  which Mr. Bayad expressed a desire to take on more
5  responsibility and, hopefully, greater pay, as well,
6  when did you say that that was after your arrival?
7     A. Within two weeks.
8     Q. Assuming that what he told you was sincere,
9  is that the kind of expression of initiative which is
10  prized by your employer?
11       MR. LEGON: Object to the form.
12    A. I thought it was very unusual, but I met with
13  Mr. Bayad and listened to his -- his scenario and,
14  basically, just took that into consideration.
15    Q. All right. What, if any, further contact did
16  you have with him after that?
17    A. Mr. Bayad and I had sessions on a regular
18  basis. And that was his, basically, either catching me
19  in the area of the facility or coming to my office and
20  going through, basically, his -- his feelings of
21  accomplishments that he had and his feelings that he
22  was better suited and worked harder than the other
23  people in the facility.
24    Q. Did you have any feelings as to the accuracy
25  or inaccuracy of those sentiments as he expressed them

Page 9

1  to you?
2      A. I think that Mr. Bayad overestimated his
3  skills to some degree and, basically, overemphasized
4  his superiority over some of the other people in the
5  facility, when he said that other people didn't work
6  hard.
7      Q. Do you recall him singling out any
8  individuals whom he claimed were not hard workers?
9      A. No. He made generic statements. I think
10 there was one -- one manager who he -- he had singled
11 out and made that statement about. The individual's
12 name was Fran Giordano.
13     Q. And did you have any reaction at the time
14 those sentiments were expressed to you as to the
15 inaccuracy or accuracy of them related to Mr. Giordano
16 specifically?
17     A. I, basically, counseled Mr. Bayad that
18 Mr. Giordano had a lot of years experience, did a very
19 good job within his organization and that he should
20 look to be more of a team player.
21     Q. Is it true that within two months of your
22 arrival that you recommended or approved a $1,000
23 off-cycle lump-sum bonus for both Mr. Anthony Bayad and
24 Mr. Amado Navas?
25     A. Yes.

Page 10

1      Q. Is it true that that was, apparently, for the
2  purpose of completing a Bay certification program?
3      A. No.
4      Q. I want to show you a memo from you, what
5  purports to be a memo from you to Barb Esson. Who is
6  Barb Esson?
7      A. She works -- she was working in HR in Denver.
8      Q. Is that a true and accurate copy of a memo
9  that you sent to her?
10     A. Yes.
11     Q. Let me read the first paragraph. "Per your
12 conversation with Rick Bailer this memo is to authorize
13 the issuance of two $1,000 off-cycle lump-sum bonus
14 checks for two Largo associates that have completed the
15 Bay certification program."
       A. That --
       Q. Excuse me. Did I read that accurately?
       A. Yes.
       Q. Is it just that the wording appears the way
that it is and that the Bay certification has nothing
to do with the bonuses that were authorized by you on
that date?
       A. The inaccuracy is they had not completed the
full Bay certification program at that point in time.
They had only completed the written exams. And it was

Page 11

1  common practice to award a lump sum cash bonus when an
2  individual completed a written portion of a
3  certification, whether that was Bay or Cisco. So, yes,
4  I did. And it was for the completion of the written
5  portion of the certification.
6      Q. All right. Was that a good thing?
7      A. Yes, it is.
8      Q. How many associates at -- at the Largo office
9  at that time, if you know, had Bay certification?
10     A. At this point in time?
11     Q. Yes, sir.
12     A. Two.
13     Q. Who were the two?
14     A. Mr. Navas and Mr. Bayad.
15     Q. Okay.
16     A. They were the first two to go through the Bay
17 certification.
18     Q. What is the benefit, in the context of the
19 business, if this is ever read to a jury, of Largo,
20 then Lucent Largo -- I should say the Employee Change
21 Notice that accompanies this says AT&T, but March
22 of '96 is at least -- that's a time when at least AT&T
23 is yielding to Lucent in terms of what people would
24 identify as the employer at that location; would you
25 agree with that statement?

Page 12

1      A. I -- no. I would think that the Lucent
2  became Lucent when the stock options and the formal
3  transition of the corporate breakup happened.
4      Q. Okay. Well, the reason I ask -- and I
5  haven't gone back to check the financial papers, which
6  is probably as good as everything else, but everybody
7  who has testified had a different idea of what that
8  birthday was, so --
9      A. Okay.
10     Q. -- it's not really important except to try
11 and pinpoint the documents because some say -- for
12 example, would you agree that the company continued to
13 use documents that might have said AT&T on them even
14 after the date on which you would conclude that the
15 breakup, to use your word, had concluded?
16     A. Yes.
17     Q. All right. Tell us, if you would, please,
18 what the benefit would have been to the Largo facility,
19 whoever the nominal employer was, of having an
20 associate with Bay certification in terms of the
21 overall business of AT&T, subsequently
22 Lucent Technologies.
23     A. I don't know if I could quantify that. The
24 certification is something that is on the service side
25 and I don't know that that -- that's something that's

6

5,

e of

Page 16

Page 17

1 attempt to get Bay certified without the input of the
2 company or its management?
3      A. Yes.
4      Q. Did that occur?
5         Let me give you an example.
6      A. Okay.
7      Q. Did people sometimes actually take any kind
8 of course of study prior to taking the exams on the
9 Internet?
10     A. We have a continuing program of training
11 where people go to Bay or we brought Bay classes into
12 the Largo facility.
13     Q. Would people have to sign up to take those
14 classes?
15     A. Yes. The classes are generally arranged for
16 the specific products. The managers make some
17 selections of individuals who they deem would be
18 capable and within their product support to be able to
19 attend that class.
20        And if there are other available seats, it's
21 left open for other selections or people who are
22 interested and want to take the program.
23     Q. Do you know Scott Boda?
24     A. Yes, I do.
25     Q. Was Scott Boda BayNetwork certified in 1996?

Page 18

1      A. Not to my knowledge.
2      Q. Did there come a time when he became
3 BayNetwork certified?
4      A. I don't know.
5      Q. Did there come a time when you were ever
6 advised that Mr. Scott Boda was going to attempt to
7 become BayNetwork certified?
8      A. I was told that Scott Boda was attempting --
9 basically, going to take the written exam.
10     Q. When were you told that, sir?
11     A. It was probably in the January time frame.
12     Q. Would that have been prior to the time that
13 Mr. Bayad was terminated?
14     A. No. It was after.
15     Q. You were told after that he had been trying
16 to prepare to take the exam?
17     A. No, that he was going to go -- go and pursue
18 the Bay certification.
19     Q. Who was it that told you that, sir?
20     A. Bruce Brewer.
21     Q. Is it your testimony that at no time prior to
22 Mr. Bayad's termination you had knowledge that Mr. Boda
23 was trying to become Bay certified?
24     MR. LEGON: Object to the form. You may
25 answer.

Page 19

1      A. Would you repeat the question?
2      Q. I'll re-ask it.
3         Did you ever, prior to January 23rd, 1997,
4 through any means, learn that Mr. Boda was seeking to
5 become BayNetwork certified?
6      MR. LEGON: Object to the form. You may
7 answer.
8      A. No.
9      Q. Did you have any further contact -- well, let
10 me ask you this: The document that I have shown you,
11 we talked about it as a thousand dollar off-cycle
12 lump-sum bonus.
13     A. Uh-huh.
14     Q. Your instruction actually was that the checks
15 should be grossed up to provide a net amount of
16 $1,000.
17     A. Yes.
18     Q. If I understand that, you were asking the
19 company -- you were -- you were actually awarding a
20 bonus in terms of a taxable amount that would have been
21 higher than $1,000?
22     A. Yes.
23     Q. You were asking that the bonus be awarded in
24 an amount so that once taxes were accounted for, the
25 net bonus to the associates would have been $1,000?

Page 20

1      A. Yes.
2      Q. And that was consistent with the practice for
3 others that achieved Bay certification?
4      A. Yes.
5      Q. Prior to January 23rd of 1997, can you recall
6 having similarly awarded or requested an award of a net
7 bonus amount of $1,000 to any other associate for
8 achieving BayNetwork certification?
9      A. I -- I -- I don't know by name, but if that
10 was presented to me by the Operations Managers of the
11 groups, I would have signed them.
12     Q. You're in the financial end of the Largo
13 office now; is that right?
14     A. Yes.
15     Q. Is that the kind of thing, as a person
16 involved in the financial end, that would come to your
17 attention now?
18     A. No.
19     Q. To the extent that it involves payroll or any
20 other matters, that would be, perhaps, brought only to
21 the attention of persons below you at this point; is
22 that correct?
23     A. That normally would stay in the Operations
24 area.
25     Q. Operations is in charge of payroll?

Page 21

1    A. No. Meaning that the Operations Manager and
2  the manager of the facility, they would have the
3  approval authority to -- to make that recommendation
4  and have that disbursed.
5    Q. What was Bruce Brewer? What was his position
6  in January of 1997?
7    A. He was the Operations Manager of the Cisco
8  product support.
9    Q. Could you explain where on the organizational
10 chart, if you thought of it vertically, where his name
11 would lie in relationship to you and some other folks?
12 Could you do that for me? I know they might not have
13 been in direct supervision line.
14   A. At the time in January I wasn't the
15 General Manager of the facility.
16   Q. Well, let's say prior to January 20th.
17   A. He reported directly -- I supported him
18 directly.
19   Q. Okay. He was your direct supervisee?
20   A. Yes.
21   Q. Okay. Or whatever language is at this
22 particular company.
23       That would have placed him in a position
24 superior to Mr. Navas.
25       MR. LEGON: Object to the form.

Page 22

1    A. No.
2    Q. It would have been equivalent?
3    A. Yes.
4    Q. Would that have placed him in a position
5  superior to Mr. Bayad?
6        MR. LEGON: Object to the form.
7    Q. Although they were not in a direct
8  hierarchial line?
9    A. Yes.
10       MR. LEGON: Object to the form.
11   Q. I'm sorry?
12   A. Yes.
13   Q. Are you known -- your full name is Anthony;
14 is that right?
15   A. Yes.
16   Q. Are you known by any other shortened versions
17 of that name?
18   A. Tony.
19   Q. Are there any others?
20   A. Not that I know of.
21   Q. Ones that you support; that is to say if
22 people call you Tony, that's agreeable to you?
23   A. Yes.
24   Q. Assuming they shouldn't be using your last
25 name; is that correct?

Page 23

1    A. Yes.
2    Q. Now, having had an opportunity to review --
3  you told me that when Mr. Bayad spoke to you the first
4  time telling you that he was seeking additional
5  compensation and the like, he told you he was
6  attempting to get Bay certified?
7    A. Yes.
8    Q. And I think you told us that you thought that
9  that was sometime in April. Having had --
10   A. No.
11   Q. No?
12   A. That was, basically, in the January time
13 frame.
14   Q. Okay. So, in any event, would it be fair to
15 say that it was most certainly sometime before the
16 timing of the memo attached to the front page of
17 Exhibit 3?
18   A. Yes.
19       MR. SALES: I don't think this is actually --
20   we're going to make this Exhibit 3 to his depo
21   only, okay? All the other ones you can put
22   separately, but this one is -- do you understand
23   what I'm saying?
24       MR. LEGON: Could we do this more confusing?
25       MR. SALES: No. That's why the transcripts

Page 24

1    are separate.
2        MR. LEGON: This is horribly confusing, but
3    it's your show, sir.
4        MR. SALES: You've got a college degree. I
5    know you can handle it.
6    Q. What, if any, additional contact did you have
7  with Mr. Bayad following that first meeting that you
8  can speak more specifically about?
9        You told me about repeated contacts with him
10 on an ongoing basis. Do you remember any in
11 particular?
12   A. No, not that weren't pretty much, I mean, in
13 that -- in that vein.
14       I had -- are you talking about just the whole
15 span of the time frame that I was responsible for the
16 facility or -- that's a broad question.
17   Q. Well, I'm asking you -- you told me that you
18 remember periodic meetings where he would get in touch
19 with you or you would get in touch with him?
20   A. Yeah. So I can -- I can relate to a -- a
21 meeting that I had with Mr. Bayad at the -- probably in
22 the May -- May type of time frame, where Mr. Bayad
23 approached me and told me that he had a number of
24 personal problems; that his fiancee, who had come to
25 Tampa Bay -- the Tampa Bay area with him, had not been

Page 25

1 able to find employment. She was very unhappy because
2 all of her relatives and family were back in the Miami
3 area and wanted to move back to the Miami area. I took
4 that under advisement.
5        I had another session with Mr. Bayad about a
6 week later and told him that he could return to the
7 Miami area and work virtual, but that the company had
8 paid for his relocation from that area up to Tampa and
9 had paid him and that if he wanted to do that, then he
10 could take his computer, we would pay his telephone
11 bill and he would have to incur that cost himself.
12        And within 24 hours, Mr. Bayad promptly
13 gathered his items in his office and his laptop,
14 et cetera, and headed back to the area of Miami.
15    Q. At that time did Lucent have any facilities
16 in South Florida?
17    A. Yes, they had sales facilities.
18    Q. Where was that?
19    A. I believe those facilities were in
20 Pompano Beach.
21    Q. At that time did Lucent have any plans to
22 develop any offices to support staff in
23 South Florida?
24    A. No.
25    Q. Who -- if there was a customer of Lucent that

Page 26

1 was in Fort Lauderdale or Miami, what would be the
2 regional office back in early 1996, that would have
3 supported that customer?
4        MR. LEGON: Object to the form.
5    A. That would have depended on the type of
6 customer it was. If it was a large customer, being a
7 customer that was -- and we have our customers
8 categorized by customers who are large and customers
9 who are small. And I'm not -- the division of that is,
10 basically, on the size of the -- the account, based on
11 phone lines and other things of that nature.
12        That -- the large customer office is out of
13 Miami and the small customer office was out of
14 Fort Lauderdale.
15    Q. Did they have the support staff in addition
16 to sales staff in Fort Lauderdale?
17    A. The company has service engineers, field
18 technicians all across the country, not necessarily
19 assigned to offices, but who work out of the offices or
20 work virtually in a specific territory.
21    Q. Did there come a time when the company
22 decided to create a support staff which would be
23 resident in Fort Lauderdale?
24    A. The Fort Lauderdale office came up as a
25 request by Mr. Bayad and Mr. Navas to look to establish

Page 27

1 an office in that area so that we would have a better
2 opportunity to recruit some talent in that area. And
3 the basis for that was we had been trying to do some
4 recruiting in the Tampa Bay area and were not meeting
5 with a great deal of success.
6        They had come to my office and proposed
7 setting that office -- an office up in that area
8 because Cisco and Bay and IBM and a number of companies
9 were down in that area that would promote and provide a
10 more generous opportunity of recruiting employees.
11    Q. Did you think that was a good idea or a bad
12 idea?
13    A. I thought that was a -- an interesting idea.
14 And I authorized Mr. Navas to run some employment ads
15 and to see if we were able to attract some talent.
16    Q. Did this occur before or after Mr. -- you
17 had given Mr. Bayad leave to return to South Florida to
18 remain virtual?
19    A. It occurred about four months after.
20    Q. Okay. And what was the -- when was it that
21 Mr. Bayad asked to -- or you granted him leave, if you
22 will, to work virtual out of the -- out of
23 South Florida?
24    A. It was in the May time frame.
25    Q. Do you remember are there any -- if there is

Page 28

1 anything in any -- in the form of any kind of document
2 which memorializes the event that you've just described
3 with respect to Mr. Bayad's request to go virtual and
4 return to South Florida?
5    A. I don't know if there is any documents.
6    Q. Do you remember -- well, when was it that
7 Mr. Bayad and Mr. Navas came to you with the idea of
8 changing the presence of the Fort Lauderdale office to
9 include a resident support staff?
10    A. There -- there wasn't a Fort Lauderdale
11 office.
12    Q. Okay.
13    A. So this was the creation of a support staff
14 there.
15    Q. I thought you told me there was sales people
16 in Fort Lauderdale. That was Pompano?
17    A. Sales people.
18    Q. Okay. So this was a completely -- to be a
19 completely separate facility?
20    A. Yes.
21    Q. When was it that they came to you with the
22 idea of doing that?
23    A. It was probably in the September time frame.
24    Q. Is that the kind of thing, which given your
25 position as General Manager in 1996, you would have

Page 29

1 been authorized to do without gaining the consent or
2 approval of anyone above your position?
3    A. Yes.
4    Q. And do you know if there are any documents or
5 other written materials that memorialize the genesis of
6 what became a Fort Lauderdale office?
7    A. Well, I guess the only -- the only documents
8 may be the fact that we, at that point in time, ran
9 some ads in the Miami or the local papers.
10   Q. What I mean is, "Amado, thanks for talking to
11 me. You have my permission to get an office space in
12 Fort Lauderdale, run the ads, put people on payroll,"
13 and the like?
14      MR. LEGON: Object to the form of the
15 question.
16   A. No.
17   Q. Is there any such memo?
18      MR. LEGON: Object to the form of the
19 question.
20   A. No. The -- the authorization was to run the
21 ad and to look at the potential opportunity to
22 recruit. That was the initial approval that they
23 received.
24   Q. Did they subsequently get approval to do
25 anything besides run employment ads?

Page 30

1    A. They -- they did interview a number of
2 people. They gave me very, very favorable reports to
3 what they felt the potential for recruiting in that
4 area was. And I, basically, had the Corporate Real
5 Estate Department linked with them so that they could
6 pursue looking for office space.
7    Q. Do you know if there are any documents which
8 represent communications between yourself and the
9 corporate Real Estate Department which convey the
10 instruction that you just described?
11   A. I would have to -- I don't know.
12   Q. Do you know if there are any documents going
13 to or from you and Mr. Navas or you and Mr. Bayad which
14 would represent permission, if you will, to go to the
15 next step of getting office space?
16   A. There is a release that I signed for the
17 company that authorized the review of several pieces of
18 real estate and then a final lease that I find for the
19 real estate.
20   Q. At that time once that you had authorized
21 corporate level activity in terms of searching for an
22 office space -- is that what we're talking about?
23   A. Uh-huh.
24   Q. Yes?
25   A. Yes.

Page 31

1    Q. What was your vision for what it was that
2 Mr. Navas was going to do?
3    A. Set up a small technical support group to do
4 configurations and design interfacing with the sales
5 organization.
6    Q. Is that what Mr. Bayad was, basically, doing
7 in the field already?
8    A. Mr. Bayad was a technical support engineer
9 working on, basically, maintenance troubles or
10 installation problems.
11      Mr. Bayad did not do design or configuration
12 prior to this.
13   Q. Okay. Was he qualified to do that?
14   A. Yes.
15   Q. Was Mr. Navas qualified to do that kind of
16 work?
17   A. Yes.
18   Q. Was it your intention to have Mr. Navas
19 actually relocate to South Florida, as well?
20   A. No.
21   Q. He was just going to be the boss of the
22 people that got hired there?
23   A. Yes.
24   Q. Coach, sorry.
25   A. Yes, he was the coach.

Page 32

1    Q. How many people did you authorize them to
2 interview?
3    A. To interview?
4    Q. Uh-huh.
5    A. There was no limit to the number of people
6 they could have interviewed.
7    Q. How many people did you authorize them to
8 hire?
9    A. I -- I don't know the exact number at this
10 point in time.
11   Q. Isn't -- is the -- are you familiar with a --
12 a process whereby the company would -- and I -- and I
13 have forgotten the -- the human resource type
14 expression, where a company -- let me ask you this: In
15 order to hire new people as to -- as opposed to merely
16 replacing people within Lucent Technologies back in
17 1996, were there any procedural requirements that would
18 have to be followed according to company policy?
19   A. Yes.
20   Q. What were they?
21   A. You had to open up a requisition and then go
22 through a screening process, recommend a candidate and
23 then have a final screening done by the company and
24 then an offer letter was sent out to the individual
25 which offered the job and a start date.

| Page 33 | Page 35 |
|---|---|
| 1 Q. I'm talking about -- and maybe that covers | 1 people have included necessary support personnel like |
| 2 it -- a situation where you're not merely hiring | 2 receptionists or secretaries or whatever was being |
| 3 someone new for an existing position, but actually | 3 thought about at that time? |
| 4 creating new positions. | 4   A. No, not necessarily. |
| 5   A. Yeah. | 5   Q. All right. Was that something that would |
| 6   Q. Is that the same procedure? | 6 have come later? |
| 7   A. Yes. | 7   A. Not necessarily. |
| 8   Q. All right. And were those procedures adhered | 8   Q. It might not have been necessary at all? |
| 9 to in this case? | 9   A. Right. |
| 10   A. Yes. | 10   Q. Okay. Did there ever come a time when |
| 11   Q. Who would have been required to authorize the | 11 additional authorizations were made for support |
| 12 creation of new positions? | 12 personnel to the support personnel, if you understand |
| 13       Could you have done that without anyone | 13 what I mean? |
| 14 else's approval? | 14   A. Not that I'm aware of. |
| 15   A. Yes. | 15   Q. All right. You did not, then, make any such |
| 16   Q. And did you do that in writing? | 16 authorizations? |
| 17   A. I -- I -- I assume I -- I signed off on those | 17   A. No. |
| 18 papers, yes. | 18   Q. What happened next in terms of the opening of |
| 19   Q. And how many positions did you authorize to | 19 the Fort Lauderdale -- I assume -- well, I assume |
| 20 be created? | 20 Corporate Real Estate found a location? |
| 21   A. I don't know. | 21   A. Corporate Real Estate reviewed and contracted |
| 22   Q. The reason I'm asking you if it had to be in | 22 for a location, yes. |
| 23 writing, that would be the best evidence of how many | 23   Q. You had nothing to do with that? |
| 24 you authorized -- | 24   A. No. |
| 25       MR. LEGON: Object to the form. | 25   Q. All right. Did you have anything to do with |

| Page 34 | Page 36 |
|---|---|
| 1   Q. -- is that correct? | 1 specifying the amount of square footage or space that |
| 2       MR. LEGON: Object to the form. | 2 would have been appropriate for the facility |
| 3   A. Yes, but I don't know how many I authorized | 3 contemplated? |
| 4 two years ago. | 4   A. No. |
| 5   Q. Okay. Do you know if it was more than 20? | 5   Q. Do you know how it would have been determined |
| 6   A. No, it was not. | 6 by Corporate Real Estate that that -- what amount of |
| 7   Q. Do you know if it was more than 10? | 7 space was necessary? |
| 8   A. No, it was not. | 8   A. It would have been a -- a forecast of the |
| 9   Q. Do you know if it was more than five? | 9 number of people. |
| 10   A. That's -- that's probably more in line with | 10   Q. All right. |
| 11 what my expectation would have been. | 11   A. There's a standard type of square footage |
| 12   Q. Somewhere between five and 10 persons? | 12 that the corporation applies. |
| 13   A. Yes. | 13   Q. So many people per square foot? |
| 14   Q. All right. And what were, generally | 14   A. Yeah. |
| 15 speaking, the qualifications or the -- of the persons | 15   Q. Per person? |
| 16 that were being authorized to be hired? What were they | 16   A. As a -- as a norm. And the -- there also |
| 17 expected to be, I should say? | 17 would be a consideration of what was available and what |
| 18   A. There are standard job descriptions for | 18 the market price was and that might change the amount |
| 19 technical support engineers and they would fall into a | 19 of square footage or some of the decision based on the |
| 20 request for those specific job categories. | 20 terms and conditions that might be available in the |
| 21   Q. What happened next with respect to the effort | 21 area. |
| 22 that you had authorized to open the Fort Lauderdale | 22   Q. Have you ever seen the analysis of the -- |
| 23 office? | 23 that was performed by Corporate Real Estate with |
| 24       Before I do that, would those people have | 24 respect to the needs that would be required? |
| 25 included -- would the authorization of five to 10 | 25       MR. LEGON: Object to the form. You may |

Page 37

1   answer.
2   A. I don't know that there was an extensive
3   analysis. I did sign a real estate lease.
4   Q. Okay. If I understand your testimony,
5   however, you had no real input as to the space that was
6   developed by the real estate folks?
7       MR. LEGON: Object to the form.
8   A. I -- I just reviewed the -- the lease from
9   the standpoint of what the projected head count that we
10  had looked at was and what the dollar value of the
11  lease was.
12  Q. All right. What happened -- I'm sorry. Go
13  ahead, sir.
14  A. No.
15  Q. What happened next with respect to the
16  establishment of a presence in Fort Lauderdale of the
17  type we've been discussing?
18  A. The lease was signed. The office was opened
19  up. People were hired in terms of offers.
20  Q. We're talking about engineers and technical
21  people only?
22  A. Yes.
23  Q. Okay. And what else?
24  A. And we began to divert configuration work
25  down to that office from -- from other groups that were

Page 38

1   in the Largo facility at the time.
2   Q. Where would the configuration customers have
3   been primarily who were requiring that type of work?
4   What was their geographic location?
5   A. Anywhere in the United States.
6   Q. Was there ever any request made -- well, let
7   me ask you this: Did the office space that was
8   provided, was it like a turnkey operation, do you know,
9   meaning that there were chairs and phones and other
10  office type equipment or -- that need to be acquired?
11  A. That needed to be acquired.
12  Q. Who would have been the person responsible
13  for authorizing the acquisition of such things as
14  chairs and desks and the like?
15  A. That is done within the thrust of the
16  Corporate Real Estate.
17  Q. And would the same be true with respect to
18  the obtaining of other supplies like office supplies
19  and the like?
20  A. No. Office supplies are ordered through a --
21  a vendor that the company uses that bills the company
22  directly.
23  Q. Do employees of the company have permission,
24  generally speaking, to incur office supply expense
25  through some vendor other than the authorized vendor?

Page 39

1       MR. LEGON: Object to the form. You may
2   answer.
3   A. It depends on the specific supply and the
4   specific need.
5   Q. Have you ever been told of anyone buying
6   office supplies at Eckerd Drug Store?
7   A. No, I haven't. That one has -- does not ring
8   any bell of familiarity.
9   Q. Can you conceive of any circumstances where
10  an associate at Lucent Technologies would be
11  appropriate in charging office supplies at Eckerd Drug
12  Store?
13      MR. LEGON: Object to the form. You may
14  answer.
15  A. There are situations where a person who is
16  servicing a customer requires something and he should
17  be empowered to do what is necessary to support that
18  effort.
19  Q. What if the person's in Clearwater or in
20  Largo on a workday? Can you think of circumstances
21  where an associate would be appropriate in charging
22  office supplies at company expense at Eckerd's?
23      MR. LEGON: Object to the form. You may
24  answer.
25  A. I guess I would have to understand what they

Page 40

1   bought and what circumstances were immediately involved
2   and --
3   Q. If it was ever told to you by an associate
4   that he or she had charged office supplies at company
5   expense using a Corporate American Express Card issued
6   in conjunction with the company at an Eckerd Drug
7   Store, would you want to know more about that?
8       MR. LEGON: Object to the form. You may
9   answer.
10  A. I would want to know what was purchased and
11  under what circumstances.
12  Q. What I'm asking you is if that were brought
13  to your attention, is that something that you would
14  request no more information about?
15      MR. LEGON: Object to the form. You may
16  answer.
17  A. I believe I would.
18  Q. If it were brought to your attention that
19  someone had purchased merchandise at Eckerd Drug Store
20  which was described on a credit card invoice as being
21  pharmaceuticals, et cetera, would you, without knowing
22  more, want to know the circumstances surrounding that
23  purchase?
24      MR. LEGON: Object to the form. You may
25  answer it.

Page 41

1  A. Yes.
2  Q. Can you conceive of any circumstances under
3  which it would be appropriate for an associate at
4  Lucent Technologies to charge something described as
5  pharmaceuticals without knowing more, using a Corporate
6  American Express Card --
7       MR. LEGON: Object to the form.
8  Q. -- without prior authorization of
9  management?
10      MR. LEGON: Object to the form.
11 A. I -- I don't know. I mean, there -- I don't
12 know what context you're taking it in. I don't know
13 what you're really looking at or driving to.
14 Q. I'm not driving anywhere. I'm just asking
15 you if you -- if it were brought to your attention, for
16 example, that an associate of Lucent Technologies had
17 used his Corporate American Express Card to charge
18 something described on a credit card invoice as
19 pharmaceutical, et cetera, at an Eckerd Drug Store in
20 Palm Harbor, Florida, would you want to know about
21 that?
22      MR. LEGON: Object to the form. Asked and
23 answered. You're asking for speculation. You may
24 answer.
25 A. I -- if I saw an expense coming in as

Page 42

1  pharmaceuticals, I would want to know what it was.
2  Q. And if you saw that, would you make inquiry
3  of it?
4       MR. LEGON: Object to the form. You may
5  answer.
6  A. Yes.
7  Q. Back in the time that you were
8  General Manager of the Largo facility, who would have
9  been the person who would have reviewed the invoices
10 from American Express charge cards as they came into
11 the office?
12      MR. LEGON: Object to the form. You may
13 answer.
14 A. American Express statements do not come to
15 our office. An individual is given a credit card for
16 the benefit of procuring or covering expenses incurred
17 in company business. And the only thing that is
18 brought to a manager are the receipts attached to
19 specific expense reports.
20 Q. And the manager either approves them or not?
21 A. Yes.
22 Q. Are there circumstances under which, despite
23 that method of approval, which you just described for
24 me, someone at a corporate level will flag expenses as
25 they come across their desk?

Page 43

1  A. I don't know. I have not had experience with
2  that.
3  Q. Do you know what the company's procedures
4  were in November and December of 1996 for the review of
5  credit card statements and invoices as opposed to
6  expense forms filled out by associates as they came to
7  some corporate office somewhere?
8  A. I do not know what procedures are used for
9  corporate American Express or other cards that go to
10 other offices.
11 Q. If you were ever told that a sales associate
12 had apparently incurred an expense of $535 for sporting
13 goods at an outfit known as Sun Coast Golf in
14 Clearwater, Florida, if that were told to you, is that
15 something you would want to know more about?
16      MR. LEGON: Object to the form.
17 A. Yes.
18 Q. Using an American Express Card?
19      MR. LEGON: Object to the form.
20 A. If it was a Corporate American Express Card,
21 yes.
22 Q. Have you ever heard that anyone in the Largo
23 office has done that?
24 A. No.
25 Q. Have you ever heard that anyone in the Largo

Page 44

1  office incurred expenses at Eckerd Drug Store on a
2  Corporate American Express Card for an item which is
3  described as pharmaceutical, et cetera?
4  A. No.
5  Q. Have you ever heard that anyone out of the
6  Largo office had incurred personal charges on a company
7  American Express Card at Eckerd Drug Store in
8  Clearwater, Florida, for something known as health
9  personal care items?
10 A. Well, let me go back in one vein. If we have
11 meetings that isn't to say that one of the associates
12 wouldn't go to an Eckerd Drug Store and get sodas or
13 something for the meetings and charge it on an
14 American Express Card to support refreshments for a --
15 a company meeting. So, you know, seeing something at
16 a -- a Winn Dixie or an Eckerd is -- is possible.
17 Q. Okay.
18 A. And that is in strict support of a business
19 function.
20 Q. In order for that to be verified, would it be
21 your testimony that at a minimum that person should
22 still submit an expense report?
23      MR. LEGON: Object to the form. You may
24 answer.
25 A. The only way that that expense would be

Page 45

1 cleared from an American Express Card is through filing
2 an expense report where the company would take the
3 portion of that expense that's on the expense report
4 and disburse it to American Express to cover the
5 charge.
6    Q. Is there a particular form that's used in
7 that regard?
8        MR. LEGON: Object to the form.
9    A. Expense report.
10    Q. Is it different for the American Express Card
11 purchases than it is for cash purchases, out-of-pocket
12 purchases?
13    A. An expense report has an indicator of whether
14 it's an AmEx charge or money you paid by other means,
15 your own -- your own credit card or cash.
16    Q. Has the same form been in continuous
17 existence over the last several years?
18        MR. LEGON: Object to the form.
19    A. I don't know.
20    Q. Does the form have a name or number other
21 than "Expense Report" with which you are familiar?
22    A. I don't know the name or number.
23    Q. In the procedure that you described whereby
24 expenses would be approved in office, if, for example,
25 an associate had incurred an expense using a Corporate

Page 46

1 American Express Card and sought to turn in an expense
2 report, would it be turned in to that person's coach?
3    A. Yes.
4    Q. And would it require any verification beyond
5 the coach in order for it to get company approval?
6    A. No.
7    Q. In other words, is there any procedure
8 whereby there is a second level of approval beyond the
9 most proximate coach to an individual associate?
10    A. If it was an extremely large dollar value,
11 then potentially that could be.
12    Q. Do you know if the processes or procedures
13 that you've described are set forth in writing or
14 anywhere, the approval of expenses?
15    A. There are company policies that cover expense
16 reports and disbursement.
17    Q. Other than issues involving Mr. Bayad and
18 perhaps others employed in Fort Lauderdale in January
19 of 1997, let's say, has it ever come to your attention,
20 while at Lucent or any predecessor employer, that
21 someone had made or -- or was -- or had possibly made
22 an inappropriate charge on a company credit card?
23        MR. LEGON: Object to the form.
24    A. Yes.
25    Q. How did that reach your attention in the

Page 47

1 prior times where that occurred?
2    A. A check had been sent to the corporation
3 against American Express and we were notified that an
4 individual was making payments against a credit card
5 balance.
6    Q. And was there -- is there any other way that
7 that's ever occurred?
8    A. That is the only way that I -- I have had
9 experience with it.
10    Q. Is that the method through which the -- the
11 company became aware of Mr. Bayad's charging airline
12 tickets on Royal Air Morocco?
13    A. Yes.
14    Q. And how was that brought to your attention?
15    A. The finance manager for the facility notified
16 me that she had been contacted by Corporate Travel
17 Department.
18    Q. In the past, prior to the time you became --
19 well, prior to the time that Mr. Bayad was terminated,
20 it would appear by your testimony that similar events
21 had occurred in the past. Is that a correct
22 statement?
23        MR. LEGON: Object to the form.
24    Q. I.e., that you became aware of a personal
25 payment of American Express charges incurred by an

Page 48

1 associate using a Corporate Card.
2    A. Yes.
3    Q. On how many prior occasions had that occurred
4 in your work life at Lucent or any predecessor entity
5 while at a management level?
6    A. One.
7    Q. What was the other occasion?
8    A. An individual had charged personal expenses
9 while on vacation.
10        We notified the corporate security
11 department. They reviewed the situation and the
12 employee was terminated.
13    Q. Is it your understanding that that is the
14 company's policy -- that is to say termination -- for
15 personal charge use of the Corporate American Express
16 Card without prior authorization of management?
17    A. In the situations that I have been involved
18 in, yes.
19    Q. Can you perceive of any situation without
20 prior approval of a manager, where it would be
21 appropriate for a sales associate to charge as much as
22 $500 worth of custom made golf clubs using a Corporate
23 American Express Card?
24        MR. LEGON: Object to the form. You may
25 answer.

**BAYAD V. LUCENT, ET AL.**    CondenseIt!™    **ANTHONY SAVASTANO**

Page 49

1    A. It doesn't seem like a -- a reasonable
2    situation.
3    Q. Can you think of any circumstances under
4    which that would be excusable with respect to the
5    conduct of that particular associate?
6        MR. LEGON: Object to the form. You may
7    answer.
8    A. No.
9    Q. Have you ever been told about any sales --
10   excuse me, any associate at the Largo facility charging
11   as much as $600 worth of Polo clothing merchandise
12   without prior approval on a company American Express
13   Card at the Dillard's in Clearwater, Florida?
14   A. I'm aware of a circumstance and I have not
15   been directly involved.
16   Q. What is the circumstance about which you are
17   aware?
18   A. That Mike Reed was involved in.
19   Q. Other than hearing about it from your
20   attorneys, how was it that you became aware of that?
21   And when I say other than from your attorney, I'm not
22   suggesting that he told you --
23       MR. LEGON: Thank you.
24   Q. -- but if you learned about it only from your
25   lawyers, then there's some question about whether or

Page 50

1    not you should discuss that with me.
2        Did you learn about it from someone other
3    than your lawyers?
4    A. No.
5    Q. All right. Without telling me the context --
6    all right.
7        What is your understanding of what it was
8    that Mr. Reed did, without telling me what your lawyer
9    told you?
10       MR. LEGON: I'm going to object. I'll just
11       ask you -- are you saying the only way you know
12       this is through communications with your counsel
13       about Mike Reed and the Polo?
14       THE DEPONENT: And I had heard rumors, but I
15       had no idea of the value or what the circumstance
16       is.
17   Q. All right. Well, don't tell me what your
18   lawyer told you.
19   A. Okay.
20   Q. Tell me what the rumors were that you heard
21   at any time, other than speaking to your lawyer about
22   these matters.
23   A. I heard that -- that -- and I heard that from
24   Lew, that he had a situation he was working with
25   respect to Mike Reed's relocation.

Page 51

1    Q. Was that conversation that you had with
2    Lew Kaslow?
3    A. I believe so.
4    Q. Was that prior to this past Monday?
5    A. Yes.
6    Q. Okay. In other words, you talked to him
7    about Mike Reed's purchase of Polo clothing merchandise
8    sometime prior to Monday, January 22nd, 1992?
9    A. Yes.
10   Q. All right. When was it that you had that
11   discussion?
12   A. I don't remember. It was in the past.
13   Q. Was it subsequent to Mr. Bayad's
14   termination?
15   A. Yes.
16   Q. Tell me what you remember Mr. Kaslow having
17   told you about that situation.
18   A. That he had a -- an issue he was working on
19   Mike Reed's relocation.
20   Q. Well, what else did he say?
21   A. That it had to do with purchasing some
22   damage -- replacement for some damaged clothes.
23   Q. Did he say anything else?
24   A. No.
25   Q. Did you ask any questions about it?

Page 52

1    A. No.
2    Q. Well, how did you know it was Polo
3    merchandise?
4    A. I didn't. You said it.
5    Q. Okay. What other rumor, if any, had you
6    heard about that?
7    A. None.
8    Q. I think the record will show that the word
9    was rumors. Was the rumors the one discussion that you
10   had one-on-one with Mr. Kaslow?
11   A. Yes.
12   Q. Had you ever heard of any other rumors about
13   Mike Reed's charges, possibly, of personal merchandise
14   using a company American Express Card?
15   A. No.
16   Q. Did Mr. Kaslow indicate to you any sentiment
17   he had -- well, did he tell you what Mr. Reed's version
18   of the events were about how it was that he came to
19   charge clothing on a Corporate Card?
20   A. No.
21   Q. Were you curious to find out about that?
22   A. No.
23   Q. Has it ever occurred in your life, either
24   with Lucent or any predecessor company, including AT&T
25   and its affiliates, that you had, for some reason, made

**THE REPORTERS GROUP, INC.**    Page 49 - Page 52

Page 53

1 a charge of a personal item using a Corporate American
2 Express Card?
3    A. No.
4    Q. It never happened one time?
5    A. No.
6    Q. Even inadvertently?
7    A. No.
8    Q. How long have you been with AT&T and its
9 affiliated companies?
10    A. Since 1989.
11    Q. How long have you had a Corporate American
12 Express Card other corporate sponsored credit card?
13    A. I -- I don't know the exact date.
14    Q. Do your personal expenses have to be approved
15 by your coach as a GM, when you were GM?
16    A. Yes, they do.
17    Q. Before getting sidetracked on the fascinating
18 story of Mr. Reed's Polo shirts -- company, I can't
19 help myself -- before getting sidetracked we were
20 talking about the establishment of the Fort Lauderdale
21 office and you were telling me about the hiring and the
22 establishment of that facility.
23        And where we left off was I had asked you
24 whether or not how it would be that office equipment
25 and the like would be supplied to that facility and you

Page 54

1 told me, generally speaking, that would have been
2 handled by Corporate Real Estate.
3        Do you recall that testimony?
4    A. Yes.
5        MR. LEGON: Object to the form. You may
6 answer.
7    Q. Do you recall that testimony?
8    A. Yes.
9    Q. Did I accurately state in summary form what
10 we were talking about?
11        MR. LEGON: Object to the form.
12    A. Yes.
13    Q. Yes?
14    A. Yes.
15    Q. Who would have been the person to deal with
16 Corporate Real Estate in terms of attempting to meet
17 the logistical needs of the Fort Lauderdale office from
18 an equipment point of view and -- and furniture point
19 of view and the like?
20    A. Mr. Navas.
21    Q. All right. Would he have had to seek any
22 higher approval, other than himself, for purposes of
23 doing such things as getting chairs, desks and the
24 like?
25    A. Yes.

Page 55

1    Q. And how would that approval have been
2 secured?
3    A. Through a purchase requisition.
4    Q. And do you know if such purchase requisitions
5 were, in fact, done?
6    A. No, I don't.
7    Q. Did you consider the -- the establishment of
8 the Fort Lauderdale office to be important?
9        MR. LEGON: Object to the form.
10    A. The establishment of that office was a test,
11 if you would.
12    Q. Well, is it still there?
13    A. No, it is not.
14    Q. And what happened? Why not?
15    A. I believe that -- I wasn't involved in the
16 decision, so why -- why it was ultimately taken and
17 closed, I am not aware of.
18    Q. You told me -- you were about to say, "I
19 believe". What is your belief with respect to the
20 closing of that office?
21    A. I would be speculating and I don't think that
22 that's --
23    Q. Well, have you heard any rumors about why
24 that office was closed?
25    A. No, I haven't discussed that with the

Page 56

1 either sales or service organization.
2    Q. I didn't ask you if you discussed it. I
3 asked you if you had heard any rumors about that
4 similar to the rumors you told me you heard about
5 Mr. Reed buying clothing at the company fisc?
6        MR. LEGON: Objection to the form. You may
7 answer.
8    Q. Excuse me, on the company fisc?
9        MR. LEGON: Object to the form.
10    A. No.
11    Q. Let me show you, this is Exhibit 4 to this
12 transcript only, which purports to be a letter from
13 Larry Clarkson to Mr. Akers.
14        Do you know Mr. Clarkson?
15    A. No, I do not.
16    Q. Can you identify him as the General Manager
17 of San Antonio or SBD San Antonio?
18    A. No. I do not know Mr. Clarkson and have
19 never met him.
20    Q. Prior to January 17th, 1997, did this letter
21 ever come to your attention?
22    A. Yes, it did.
23    Q. How was it that came to your attention?
24    A. It was sent to me by Mr. Akers.
25    Q. Okay. And who was he in reference to you?

Page 57

1    A. He was my superior.

2    Q. He was your immediate coach or some level
3 higher than that?

4    A. My immediate coach.

5    Q. What was the purpose, if you know, of him
6 sending you this letter?

7    A. Making me aware that he had received a letter
8 from Mr. Clarkson.

9    Q. What was your response when you received the
10 letter, if any?

11    A. I'm trying to think if I had a discussion
12 directly with Mr. -- Mr. Bayad and I don't recall.

13    Q. Did you have any trouble communicating with
14 Mr. Bayad?

15    A. No.

16    Q. Did you detect a noticeable accent in his
17 speech?

18    A. Yes, he had an accent.

19    Q. The comments that you made a few moments ago,
20 notwithstanding about your request that he become or
21 try to become a team player, was he, prior to
22 January 23rd, 1997, appropriate in his treatment of you
23 personally?

24    MR. LEGON: Object to the form.

25    A. I never had any problems with Mr. Bayad in

Page 58

1 terms of --

2    Q. Personality?

3    A. -- his treatment of me, yes.

4    Q. There were no personality conflicts?

5    A. No.

6    Q. Did you have any impression of him one way or
7 the other whether you liked him or disliked him?

8    MR. LEGON: Object to the form.

9    A. No, I didn't have a problem with Mr. Bayad.

10    Q. Would you agree that the letter of
11 Mr. Clarkson who shared the same title as you,
12 General Manager, is a letter of substantial praise of
13 Mr. Navas and Mr. Bayad?

14    MR. LEGON: Object to the form. You may
15 answer.

16    A. It is a -- letter of -- recognizing that
17 they had provided support and had been a value to the
18 sales team.

19    Q. Anthony Bayad -- well, "Amado Navas and
20 Anthony Bayad," second sentence, "know what it takes to
21 support customers who are creating new WANs and who
22 need support for existing WANs using our product line.
23 Anthony went beyond the normal call of duty to work
24 after hours over several evenings to complete a network
25 installation for Play by Play out of San Antonio,

Page 59

1 Texas."

2    Is that the kind of conduct by a company
3 employee which the company should have prized in July
4 of 1996?

5    MR. LEGON: Object to the form.

6    A. Yes.

7    Q. And did you prize that kind of conduct, as
8 exemplified by Mr. Bayad, described to you by a fellow
9 General Manager on or about that date?

10    MR. LEGON: Object to the form.

11    A. Yes.

12    Q. Would you -- well, that's good enough for
13 that.

14    That's Exhibit 4 to your deposition.

15    Do you recall that shortly -- that
16 contemporaneous with the letter of Mr. Clarkson of
17 January 3rd, 1996, that you authorized a $5,000
18 increase in salary, it appears, for Mr. Navas and
19 Mr. Bayad and some others with respect to their
20 completion of BayNetwork's Internet working
21 certification?

22    A. Yes.

23    Q. Was the completion of that certification
24 process by Mr. Bayad and Mr. Navas the kind of activity
25 or conduct which the company prized in July of 1996?

Page 60

1    A. Yes.

2    MR. LEGON: Object to the form.

3    Q. Do you recall having told Mr. Akers, who was
4 your boss, apparently --

5    A. Yes.

6    Q. -- that that achievement is a significant
7 achievement that brings prestige and stature to the
8 technical support staff of the company?

9    I'm showing you the memo now that I was
10 referring to. It's the first full paragraph.

11    MR. LEGON: So the record is clear it's Bates
12 number L 000098.

13    A. Yes, that's mine.

14    Q. Meaning that, in fact, achievement of
15 Internet working certification on either Bay's or Cisco
16 is an achievement that brings prestige and stature to
17 Lucent; correct?

18    A. Does it say Lucent or the center?

19    Q. Lucent's technical support staff.

20    A. Okay.

21    Q. Was that -- do you differentiate between the
22 two somehow?

23    A. Yes, you could, from the standpoint of the
24 credibility of the staff versus what it really means to
25 the business.

Page 61

1    Q. Well, would you agree with me that Mr. -- on
2    Mr. Bayad's part, as reflected in Exhibit 4, that his
3    efforts, along with those of Mr. Navas, resulted in a
4    $100,000 increase in sales revenue to the country -- to
5    the company in addition to a $30,000 service increase
6    in revenue?
7        MR. LEGON: Object to the form. You may
8    answer.
9        A. That's what the -- that's what the letter
10   says.
11       Q. Well, you believe it was true, don't you?
12       MR. LEGON: Object to the form.
13       A. That's what the letter says. I -- I don't
14   know. I wasn't part of the sales situation nor
15   involved with that customer directly.
16       Q. Do you have any reason to believe that
17   Mr. Clarkson would have lied to you about the financial
18   impact of the efforts of Mr. Navas and Mr. Bayad on or
19   about July 3rd, 1996?
20       MR. LEGON: Object to the form. You may
21   answer.
22       A. No.
23       Q. Do you not believe that what he was saying
24   was true for some reason that you have not shared with
25   me?

Page 62

1        A. No.
2        Q. Now, if you could explain to me how it could
3    be that something could bring prestige to the company's
4    technical support staff, but how that would not bring
5    prestige and stature to the company yourself? Could
6    you do that because I didn't understand your
7    testimony?
8        MR. LEGON: Object to the form. You may
9    answer.
10       A. The -- the fact of the skill level that you
11   attain in your staff is a credibility to the -- the
12   organization and the location, but as in this case, I
13   mean, Mr. Clarkson didn't say that based on the fact
14   that Mr. Navas and Mr. Bayad were certified technical
15   support engineers, that he got $100,000 more of
16   orders. He said that they treated the customer well.
17       Q. What I'm trying to get at, sir, is to see if
18   your comments of July 2nd, just the day before, to
19   Mr. Akers, if that refreshes your recollection at all
20   to tell me why it was that the company encouraged, by
21   increasing the salary of an associate by as much as
22   seven or eight percent in the case of Mr. Bayad --
23       A. Uh-huh.
24       Q. -- why was it that the company thought that
25   that was a good thing? What was the prestige and

Page 63

1    stature that was brought to the technical staff?
2        MR. LEGON: Object to the form. You may
3    answer.
4        A. Recognition that they had gone through the
5    certification exam.
6        Q. And that -- and that's it?
7        A. Yes.
8        Q. Okay. It didn't do anything, from your
9    perspective, to improve the capacity of the company or
10   the company's business?
11       A. That -- that cannot be quantified.
12       Q. Well, I didn't ask you if you could quantify
13   it as a financial amount in dollar terms.
14       A. Uh-huh.
15       Q. I asked you if you could tell me in words or
16   gestures of how it might have improved the business of
17   the company.
18       MR. LEGON: Object to the form.
19   Argumentative.
20       A. I -- I don't see that I could answer that
21   question. If you say you can't quantify and I can't
22   quantify, then how could I -- how could I give you
23   an -- an impression or speculation?
24       Q. Does the company usually pay people more than
25   they're worth?

Page 64

1        MR. LEGON: Object to the form.
2        A. I really couldn't answer that question.
3        Q. Well, would you agree that the company has
4    the ability to obtain services of associates in
5    competing with other employers on a market basis?
6        A. Yes.
7        Q. Does the company go to substantial efforts to
8    find out what is the appropriate salary to compete in
9    the marketplace with other employers?
10       A. Yes.
11       Q. Would you agree that if the company, through
12   you, gave someone a $5,000 raise, that they thought it
13   was worth at least $5,000 to the company?
14       MR. LEGON: Object to the form.
15       A. Yes.
16       Q. Do you recall that approximately a month
17   after the document that we were just talking about --
18   by the way, the way we had this produced to us was that
19   Exhibit 4, which I showed you was actually a composite
20   exhibit with an additional page identified as Employee
21   Change Notice, Employee Change Notice Request, Standard
22   Delegation of Authority, and the memo which you have
23   been reading from dated July 2nd, 1996, from you to
24   Mr. Akers and we would, therefore, make that composite
25   Exhibit 4 to your deposition, consisting of one, two,

Page 65

1 three, four, five, pages.
2     MR. LEGON: Just so the record is clear, the
3 witness was not shown the entire exhibit while he
4 was questioned.
5     MR. SALES: Okay.
6     Q. Why don't you take a look at that,
7 Mr. Savastano, and tell me if those corporate forms
8 that are now included in the exhibit change any of the
9 testimony that you have given me about that document?
10     MR. LEGON: Object to the form. You may
11 answer.
12     Q. Have you had an opportunity to review now all
13 of Composite Exhibit 4?
14     A. Yes.
15     Q. Are there any changes which are necessary to
16 your testimony, having reviewed those documents?
17     MR. LEGON: Object to the form. You may
18 answer.
19     A. No.
20     Q. Let me show you what's been previously marked
21 as Exhibit 6 to your deposition, which is an Employee
22 Change Notice request and a memo attached to it dated
23 August 8, 1996, from you to Mr. Akers, again your boss
24 and Vice President. Is that correct?
25     A. Yes.

Page 66

1     MR. LEGON: Object to the form. You may
2 answer.
3     A. Yes.
4     Q. Is the second page of Exhibit 6, Bates 100,
5 in fact, a memo from you to Mr. Akers?
6     A. Yes.
7     Q. Was it true that the increase that was being
8 requested at that time, apparently from Mr. Bayad, in
9 the amount of $2,000, taking his salary to $73,000, was
10 necessary to bring his salary to a fair market level?
11     A. This documentation shows an increase from
12 $73,000 to $82,000.
13     Q. I'm sorry. I misspoke.
14         Using that number, do you need me to repeat
15 the question?
16     A. No. We -- we made -- that decision was made
17 and I -- I wrote the attached document as an
18 adjustment to -- to bring Mr. Bayad to what we felt the
19 market value was.
20     Q. Of his services?
21     A. Of his services, yes.
22     Q. And, apparently, Mr. Navas', as well?
23     A. Yes.
24     Q. What is an SMI increase?
25     A. I'm -- I'm not sure I know what that acronym

Page 67

1 SMI means.
2     Q. Okay. What does the phrase "off-cycle" refer
3 to?
4     A. It means it is not part of an annual review
5 process.
6     Q. Would it be fair to say that this document
7 reflects that the two gentlemen referenced were getting
8 a raise before their time?
9     A. Yes.
10     Q. Meaning they weren't up yet for an annual
11 review?
12     A. Yes.
13     Q. Did you honestly believe, on August 8, 1996,
14 that the two gentlemen identified had "exceptional
15 skills" for Lucent Technologies?
16     A. Yes.
17     Q. Did you actually believe on the date
18 indicated that they were "instrumental in the closing
19 of the two largest BayNetworks deals at USAA and
20 Wellspring"?
21     A. Yes.
22     Q. Tell me about those deals, sir.
23         What do you mean when you say they were the
24 two largest BayNetworks deals?
25     MR. LEGON: Object to the form. You may

Page 68

1 answer.
2     A. They were the two largest sales contracts we
3 had signed up to that point in time.
4     Q. With reference to that specific product line
5 or technology?
6     A. Yes. To that specific product line.
7     Q. How much money was involved in those two
8 deals?
9     MR. LEGON: Object to the form. You may
10 answer.
11     A. I -- I don't recall at this time.
12     Q. Do you remember what the USAA reference is?
13 Is that a company?
14     A. That is an insurance company.
15     Q. Do you remember what Wellspring was referring
16 to?
17     A. Wellspring is -- Wellspring is a company here
18 in Florida.
19     Q. And is it your testimony that at this time
20 you do not remember the revenue impact on the company
21 of those two deals?
22     MR. LEGON: Object to the form.
23     A. Yes.
24     Q. Is it your testimony at this time that you do
25 not remember the service revenue impact of those two

Page 69

1 deals on the company?
2        MR. LEGON: Object to the form.
3     A. Yes.
4     Q. The next sentence says, "The expertise they
5 demonstrated during the sales presentations and
6 customer meetings in both cases were key factors in
7 these customer decision" -- it should be decisions --
8 "to buy from BCS."
9        Was that a true statement on or about the
10 date that you made that statement?
11    A. Yes.
12    Q. How was it that you were advised or apprised
13 of the expertise that they demonstrated in sales
14 presentations and customer meetings?
15    A. Through feedback that they gave me and
16 feedback I got from the sales support team that they
17 were working with.
18    Q. How is it that you learned that their efforts
19 were key factors in the decision by the referenced
20 customers to buy from your company?
21    A. The sales support team wanted to keep them
22 engaged through the sales process because of their --
23 their knowledge of the Bay product lines.
24    Q. Who, at that time, in the Largo office, had
25 similar levels of knowledge with respect to the Bay

Page 70

1 product line who could have fulfilled the
2 responsibilities that Mr. Navas and Mr. Bayad
3 apparently fulfilled in closing and assisting to close
4 the deals at USAA and Wellspring?
5     A. Mr. Bayad and Mr. Navas were the two most
6 senior people that we had in technical support in the
7 Bay product lines.
8     Q. The question I asked you was who else could
9 have done what they did, if you know, with respect to
10 the activities that are described in Exhibit 6?
11    A. At that point in time those were the only two
12 employees that we had with that senior knowledge.
13    Q. Is that the same as saying that they were the
14 only two persons who could have performed those
15 services at that time?
16       MR. LEGON: Object to the form. You may
17    answer.
18    A. That's a difficult question. They were --
19 they were here, so we used them. If they were not
20 here, then the company would have gone and obtained
21 some other resource.
22    Q. Or --
23    A. From Bay or from an outside firm.
24    Q. Or possibly not been able to close those
25 deals?

Page 71

1        MR. LEGON: Object to the form. You may
2     answer.
3     A. I think that's speculation to say that the
4 deals would not have been closed.
5     Q. Is it equally speculative to say we would
6 have found somebody else from some other place?
7        MR. LEGON: Object to the form. You may
8     answer.
9     A. I guess you could take it on both sides.
10    Q. That's right. That's why the lawyers tell
11 the clients not to speculate, because you get a
12 speculation right back at you.
13    A. Uh-huh.
14    Q. Let's look at Exhibit 7. And what I want you
15 to refer to is the second page of Exhibit 7 to your
16 deposition dated October 23rd, 1996, with a carbon copy
17 to you from Mr. Navas to Ms. Suarez.
18       Did you, in fact, receive a copy of this?
19    A. Yes.
20    Q. Did Mr. Navas, at the time, have the
21 authority to generate the award of a $1,500 amount to
22 Mr. Bayad for efforts on his behalf that are described
23 in that document?
24    A. No. I mean, the recommendations have to be
25 approved by one -- one level higher.

Page 72

1     Q. All right. Is this, in effect, an effort to
2 get Mr. Bayad approved for a bump in that amount?
3        MR. LEGON: Object to the form.
4     A. Yes.
5     Q. And that's why you're a carbon copy
6 recipient, apparently?
7     A. Yes.
8     Q. And did you, in fact, make that approval?
9     A. Yes.
10    Q. Prior to making the approval, did you review
11 the content of the memo dated 10-23-96, contained in
12 Exhibit 7 to your deposition?
13    A. Yes.
14    Q. All right. Did you take the statements of
15 Mr. Navas with respect to the impact on the company of
16 Mr. Bayad's services at face value; meaning, did you
17 believe what he was saying in the memo?
18    A. Yes.
19    Q. Did you have any independent corroboration of
20 the information that was contained therein?
21    A. No.
22    Q. Do you question whether or not the efforts of
23 Mr. Bayad that are described in the memo actually
24 generated $300,000 in maintenance revenue for the
25 company?

Page 73

1    A. I took Mr. Navas' memo as the truth.
2    Q. And, apparently, when he wrote this memo to
3  Ms. Suarez, if you look at the last sentence, he had
4  already spoken to you; is that correct?
5    A. Yes.
6    Q. And you had, in fact, given prior approval
7  before the generation of this memo for the --
8    A. Yes.
9    Q. -- bonus described therein?
10    A. Yes.
11    Q. What is executive escalation?
12    A. Is that in this document?
13    Q. Yes, sir. I'll read you the paragraph for
14  context.
15    A. Uh-huh.
16    Q. The first paragraph talks about accounts that
17  the company was having problems with. The second
18  paragraph begins, "One of such accounts is Silberline
19  Manufacturing Corporation. This account was having a
20  performance problem with the Bay routers that was
21  dragged six months by the former employee. He even had
22  BayNetworks Technical Response involved, they were also
23  unable to pinpoint the problem. The account was then
24  put in an executive escalation to Pat Russo. Plus the
25  customer was threatening with return of the equipment

Page 74

1  and legal action."
2      Did you see that, sir?
3    A. Uh-huh.
4    Q. Prior to the date of memo, were you aware of
5  the problems that were described with respect to the
6  particular customer, Silberline Manufacturing?
7    A. Yes, I knew that we were working the
8  customer.
9    Q. Were you -- were you aware that they were
10  threatening legal action as a result of performance
11  problems with the equipment and services supplied?
12    A. No.
13    Q. Who is the former employee that's described
14  there, do you know?
15    A. I -- I don't -- I don't know who he was
16  referring to.
17    Q. Okay. The -- the way we got started on this
18  was to ask you what executive escalation --
19    A. I think Mr. Navas meant that that was
20  referred to Pat Russo, who was the President of BCS at
21  the time.
22    Q. In the context of your business as it existed
23  in 1996, a serious response internally?
24      MR. LEGON: Object to the form.
25    A. That's an escalation that's moved well up

Page 75

1  into the company.
2    Q. Is that a bad thing is what I'm asking you?
3      MR. LEGON: Object to the form.
4    A. Not necessarily. I -- I think that -- when I
5  say "not necessarily," some -- some customers work
6  through a chain of events. Other customers start at
7  the top and work down. So I -- I don't know where
8  Silberline fit within that at this point in time,
9  but --
10    Q. Did you take Mr. -- well, escalation, if I
11  understand your -- your testimony, then, refers to
12  the -- the height on the org chart to which a problem
13  has gotten or developed?
14    A. Well, the escalation comes out of a normal
15  process that has been raised because of the time span
16  it has taken to resolve the problem. And escalation is
17  generally reviewed as going from one step to the higher
18  step to the higher step in terms of increasing the
19  levels of communication at higher levels in the
20  organization based on the duration of time.
21      So that's -- that's what an escalation is
22  within the service business.
23    Q. Well, from the perspective of -- from the
24  perspective of a General Manager, who is ultimately
25  responsible, I guess, Ms. Russo -- Mr. Akers is

Page 76

1  responsible to Ms. Russo; is that the way it worked at
2  that time?
3    A. At that time Mr. Akers was responsible to
4  Mr. Bearden, who was responsible to Ms. Russo.
5    Q. And her title was what again?
6    A. President of Business Communications Systems.
7    Q. Which, by that time, we're clearly in the
8  Lucent era; correct?
9    A. Yes.
10    Q. With what frequency did Ms. Russo get
11  involved in the day-to-day service operation of your
12  business in terms of communicating directly with
13  customers?
14      MR. LEGON: Object to the form.
15    Q. In 1996?
16    A. Infrequently.
17    Q. What I'm getting at is do you know whether or
18  not escalation to the point of Ms. Russo, with respect
19  to customer complaints, including, apparently, threat
20  of legal action, was a serious matter?
21    A. It's -- it's a matter that requires attention
22  and sensitivity. Someone may call Ms. Russo's office.
23  Her office would call us, we might call the customer
24  and resolve it in 20 seconds.. I mean, it's -- it's a
25  matter of what the circumstances around that escalation

Page 77

1  are.
2    Q. All right.
3    A. But in any case it's -- it's the same as
4  escalating to any point in a -- in a company. If
5  someone went to the partner of your law firm, you would
6  be very, very sensitive about making sure the issue
7  that was brought to him was clarified --
8    Q. That's the way --
9    A. -- and resolved.
10   Q. -- that's the way they usually do it. They
11 go right, I call it "ratting me out to my daddy," is
12 what I call it.
13   A. Well, I mean, the issue is, you know, taking
14 it to a degree that you apply the right level of
15 communication and effort to resolve it.
16   Q. All right. In this --
17   A. Having an escalation go to Pat Russo is not a
18 good thing.
19   Q. Okay, that's what I was getting at. In this
20 case, after having read this portion of Exhibit 7 and
21 any other portion you care to look at, can you agree
22 that resolution of the problem required in the field
23 work on behalf of -- of an individual, in this case
24 Mr. Bayad?
25   A. Could you come back to me? I lost you in

Page 78

1  the --
2    Q. In this particular case, apparently the
3  matter wasn't resolved by a telephone call.
4    A. No. Someone had -- someone had to fix the
5  problem.
6    Q. And that was done by Mr. Bayad?
7    A. Yes.
8    Q. All right. Can you give me that one back?
9      Do you want to take a little break?
10   A. It's up to you.
11   Q. No, it's not, actually. I -- I'll keep
12 going, if you like.
13   A. Yeah.
14   Q. I want to return to the Fort Lauderdale
15 office and I would like you to tell me if, in fact, the
16 personnel which was approved to be hired was, in fact,
17 hired. You told me about interviews, approvals.
18   A. Yeah, they were hired.
19   Q. How many people were hired? You told me
20 about five to 10, somewhere in that area?
21   A. Yeah. I'm not sure of the exact number,
22 no.
23   Q. What was the general type of job description
24 that would have been appropriate to those persons who
25 were hired for Fort Lauderdale?

Page 79

1    A. Technical support engineers or support
2  technical -- technical support personnel.
3    Q. You told me that you did not know why it was
4  that the Fort Lauderdale office was closed.
5      Do you -- prior to the closing of the
6  Fort Lauderdale office, did you have personal knowledge
7  of how things were going in the Fort Lauderdale office
8  before you ceased to become General Manager at the
9  Largo facility?
10   A. Yes.
11   Q. And what is your knowledge or understanding
12 about that?
13   A. I visited the office, I believe it was the --
14 the end of the first week of January or the beginning
15 of the second week of January.
16   Q. 1997?
17   A. 1997.
18   Q. How long had it been up and running at that
19 time?
20   A. About I -- I believe seven to eight weeks.
21   Q. What -- describe the facility for me.
22   A. It was a -- what do you mean "describe"?
23 What do you mean?
24   Q. Is it an office building?
25   A. It's an office building.

Page 80

1    Q. A suite in an office building?
2    A. Yes.
3    Q. Do they have furniture?
4    A. Yes.
5    Q. Did they have any support staff of the type
6  we spoke about previously, any secretaries,
7  receptionists, anybody to answer the phone?
8    A. There was no secretary or receptionist the
9  day I went there.
10   Q. Okay. And was that the one and only time
11 that you visited the facility?
12   A. Yes, it was.
13   Q. What was the occasion that you did that? Why
14 did you do that?
15   A. I wanted to visit the facility and see
16 what -- meet some of the people and, basically, spend
17 some time finding out what they were about and what
18 type of problems they had and what they were doing.
19   Q. Had you had any reports as to the function of
20 the Fort Lauderdale office prior to the time of your
21 visit, how it was going, how they were dealing with
22 customers, anything like that?
23   A. Yes.
24   Q. What were the reports that you had had up to
25 that time?

Page 81

1   A. That it was very disorganized. Records and
2 things were being lost. That scheduling wasn't
3 occurring and that there were a lot of -- a lot of
4 problems in terms of the operation.
5   Q. Who had been providing those reports?
6   A. I had gotten a number of calls from field
7 sales people.
8   Q. Those are Lucent employees?
9   A. Lucent employees, as well as installations
10 that were scheduled and when we got to the
11 installations, the configurations weren't complete.
12   Q. And when you say we got to them, you mean
13 when it came time for them to be done, they weren't
14 complete?
15   A. No. Meaning, when the material arrived
16 on-site and the technicians were ready to go to the
17 site, we take configurations and download them and
18 those were to be done at the Fort Lauderdale facility.
19 When it got to the point that someone went to pull
20 configuration, they were incomplete.
21   Q. Who was the person at the Fort Lauderdale
22 office that was responsible for the scheduling of -- of
23 service or installation appointments?
24   A. Anthony Bayad.
25   Q. And how -- he was supposed to actually have a

Page 82

1 schedule and a calendar and dispatch people, if you
2 will?
3   A. No.
4   Q. How was that supposed to be handled?
5   A. His responsibility was as a technical lead to
6 provide technical support and work flow at that
7 facility.
8   Q. What was your general direction or
9 instruction to Mr. Bayad and Mr. Navas prior to your
10 visit to the facility in January about how to run
11 things? What did you tell them?
12   A. Mr. Bayad was -- Mr. Bayad was a technical
13 lead at that facility and Mr. Navas was the Operations
14 Manager responsible for that facility and for that
15 product line.
16   Q. Were they doing, from your perspective, a
17 good job, a bad job? How -- how were -- how were they
18 doing as of the time you visited the facility?
19   A. When I visited the facility it was not -- it
20 was not operating appropriately and it was below
21 standard.
22   Q. Did you attribute that to them or to
23 something within their control, beyond their control?
24 I'm trying to get some sense of where your -- what your
25 perspective was as to where, for lack of a better

Page 83

1 expression, the claim laid in -- in that regard.
2     MR. LEGON: Object to the form. You may
3 answer.
4   A. The -- I had discussion with Mr. Bayad and
5 Mr. -- and Mr. Navas regarding the -- the work flow,
6 organization, basic things of who was working on what
7 and who was providing support when -- when people were
8 working on specific configurations.
9     There was lab equipment and so forth that was
10 required for training and for replication of a network
11 that was, you know, installed and just sitting off to
12 the side. And in talking to the people a lot of
13 disorganization from the standpoint of the work flow.
14   Q. Did anyone at that office -- Mr. Bayad,
15 Mr. Navas or anyone else -- give you any sense of what
16 kinds of demands were being placed upon them either by
17 customers or by the company at that time?
18   A. I had had a couple of conversations with --
19 one with Mr. Navas and also with Mr. Bayad with respect
20 to a heavy workload and a lot of issues they had with
21 respect to being able to complete the job.
22   Q. Did they indicate to you that they thought
23 that the workload was, in fact, heavy?
24   A. Yes, they did.
25   Q. Did they indicate to you whether or not they

Page 84

1 thought they could meet the demands, whether they were
2 being placed upon them by customers or the company?
3   A. The discussions we had came in -- in line
4 with the amount of workload. We had fewer people
5 working on this prior to it going to Fort Lauderdale,
6 and better results.
7   Q. In terms of what?
8   A. In terms of the scheduling and the completion
9 of configurations.
10   Q. Well, were there -- was there more customer
11 support and installation activity as of the time
12 Fort Lauderdale opened, or less or the same?
13   A. The business was growing, but the -- the
14 amount of growth would not have created the type of
15 situation or -- or acceleration of workload that they
16 were talking about.
17   Q. Did they ask for more support?
18   A. No. There was never any request for more
19 people.
20   Q. Did they ask for anything else over and above
21 what they had?
22   A. More money.
23   Q. For?
24   A. Each other.
25   Q. For themselves?

Page 85

1    A. Yes.
2    Q. Because of the time commitment they were
3  making and how hard they were working?
4    A. Yes.
5       MR. LEGON: Object to the form.
6    A. Yes. The -- the issue of their value and
7  what they were worth so it wasn't an issue of, "How do
8  we get the job done?" It was, "Give me more."
9    Q. What was the date, as best you can remember,
10 that you were there in January?
11      MR. LEGON: Object to the form.
12   A. I would have to go back and look at it, but
13 it was -- I believe within probably by the 10th of the
14 month or something like that.
15   Q. The 10th of January?
16   A. Yes.
17   Q. Did you keep your calendar or appointment
18 book for the month of January?
19   A. I -- I would have in my files a record of the
20 trip in terms of an expense report, et cetera.
21   Q. Because you, undoubtedly, went by airplane?
22   A. Yes.
23   Q. And there would -- if there were any trips to
24 Fort Lauderdale -- Fort Lauderdale Airport?
25   A. Uh-huh.

Page 86

1    Q. Yes.
2    A. I flew into Fort Lauderdale.
3    Q. If there are any expense reports for a trip
4  to Fort Lauderdale in January, it would have to relate
5  to that particular visit, because you don't recall
6  going there at any other time?
7    A. I didn't go there for any other reason.
8    Q. Even up to and including January 31st, let's
9  say, of '97?
10   A. I never -- it was the only trip that I made
11 to Fort Lauderdale.
12   Q. Even since?
13   A. Even since. I have passed through Miami
14 Airport, but I haven't gone to Fort Lauderdale.
15      MR. LEGON: Condolences.
16      THE DEPONENT: Connecting flight.
17   Q. When Mr. Bayad told you that he wanted -- I
18 don't remember who initiated the conversation, but in
19 the discussion where he indicated to you that he wanted
20 to -- that he was agreeable to going virtual at a -- at
21 a remote location, did he discuss with you any other
22 problems that he felt he was encountering as an
23 employee of Lucent Technologies?
24   A. Are you referring to him asking to leave the
25 Tampa Bay area and go back to Fort Lauderdale in the

Page 87

1  May time frame?
2    Q. You told me that he said that he wanted to be
3  with his girlfriend or whatever.
4    A. Well, the statement was he told me his
5  fiancee --
6    Q. I remember that. You don't have to repeat.
7  Over and above that --
8    A. No, he did not request anything else.
9    Q. -- over and above that, did he tell you about
10 any personal problems that he might have been
11 encountering with respect to the staff at Largo?
12   A. No.
13   Q. Did he tell you about any personality
14 conflicts he felt might exist with the staff at Largo?
15   A. His statements to me in the conversations
16 were all in tune with how hard he was working and he
17 was working much harder than everyone else.
18   Q. Well, I'm asking more about interpersonal
19 conflicts over and above those things that you've
20 already told me.
21      I think you have told me about them.
22   A. No.
23   Q. Have you received any reports from any other
24 associates or up the chain of command prior to the time
25 that Mr. Bayad actually left Largo to go to

Page 88

1  Fort Lauderdale, about problems that any other
2  associate was having with him?
3    A. No.
4    Q. How -- how would you describe overall,
5  from -- from the perspective of the technical support
6  staff, at least, how was the atmosphere, the working
7  atmosphere, at Largo in the middle of 1997 -- excuse
8  me, 1996?
9    A. It was a very active time frame. It was a
10 new product line, the Bay product line. There was
11 additions of new staff. And at that point in time I
12 had made Mr. Navas a temporary Operations Manager and,
13 finally, he was made the Operations Manager, I believe,
14 in August, so he was taking responsibility for that
15 organization. So there was some changes that he was
16 making in moving his leadership into that
17 organization.
18   Q. Well, did that create problems or conflicts?
19   A. No, not -- not to -- not to any degree. I
20 mean, I -- I gave Amado some -- some counseling on how
21 to make the changes in terms of how to work with the
22 organization in terms of setting the schedules up and
23 things of that nature. He ran two shifts, et cetera.
24      MR. SALES: Why don't we take a five minute
25 break?

BAYAD V. LUCENT, ET AL.    Condenseit!    ANTHONY SAVASTANO

Page 89

1   THE DEPONENT: Okay.
2      (A short break was held).
3 BY MR. SALES:
4      Q. Mr. Savastano, prior to the time that you
5 visited the Fort Lauderdale office, which you described
6 for me as taking place sometime in early January, 1994,
7 were you ever made aware that Mr. Navas and/or
8 Mr. Bayad had been communicating with senior management
9 of the company with respect to the operation of Largo
10 and its territory?
11     A. Yes.
12     Q. How was it that you became aware of such
13 contacts?
14     A. I was made aware, in the middle of December,
15 it was December 13th, that there was a communication
16 that had gone to Ms. Russo.
17     Q. Did you see the actual communication?
18     A. I do not believe I saw the actual
19 communication. I don't remember that.
20     Q. At that time?
21     A. I had not, no.
22     Q. You saw it subsequently?
23     A. I don't know if I saw it subsequently. I
24 don't remember it.
25     Q. How was it that that was brought to your --

Page 90

1 well, how do you remember that it was December 13th,
2 first of all?
3      A. I was in the process of moving.
4      Q. From -- you mean houses?
5      A. Yes.
6      Q. That was your move date?
7      A. Yes. And I got a call that --
8      Q. That was from Ms. Grohe?
9      A. I got a call from -- from -- I don't
10 remember, but I wound up talking to Ms. Russo's
11 executive assistant in New Jersey.
12     Q. Mr. --
13     A. And I'm not sure of --
14     Q. Mr. Denault?
15     A. Yes.
16     Q. All right. If you were moving personal
17 residences, would that have been considered a vacation
18 day?
19     A. It was a company excused day, yes.
20     Q. The reason I ask is that Ms. Grohe testified
21 yesterday with respect to speaking on Mr. Denault that
22 you were not at work and you were on vacation that day
23 and she called you and said call Denault or something
24 like that.
25     A. That may have --

Page 91

1      MR. LEGON: Object to the form.
2      A. Okay.
3      Q. And that's just to take a shortcut to set the
4 scene. Do you know if, in fact, that's the way it
5 occurred?
6      A. It may -- I got a message to call Denault. I
7 can't remember if I talked to Joan in that situation,
8 but I got a message to call Mr. Denault.
9      Q. When you were made General Manager, you told
10 me previously that was -- that was on return from
11 New Jersey?
12     A. Yes.
13     Q. But that it was not really a lateral -- it
14 was not really a promotion because you were a GM up
15 North?
16     A. It's the same -- the same salary band, yeah.
17     Q. It's just better to live in Florida than
18 New Jersey?
19     MR. LEGON: Object to the form.
20     A. It's a matter of --
21     Q. Preference?
22     A. A matter of preference.
23     Q. Anyway, you wanted to be here, right?
24     A. I guess that's --
25     Q. Well, let me put it this way: Were you

Page 92

1 ordered to come and take the job in Florida?
2      A. No.
3      Q. Was it given to you as an option?
4      A. Yes.
5      Q. All right. How long had you been a
6 General Manager level person in New Jersey prior to
7 your return to Florida?
8      A. I had been working in that capacity since the
9 middle of -- probably the June/July time frame of '95.
10     Q. Prior to your hearing on December 13th, 1996,
11 about the need to call Ms. Russo or Mr. Denault, had
12 you ever been made to believe that your position as
13 General Manager in Largo was anything but 100 percent
14 secure?
15     A. I had no -- no problems with my level of
16 security in my job.
17     Q. Well, that isn't what I asked you exactly.
18     A. Well, repeat the question.
19     Q. And it's probably because I used words that
20 were not appropriate to the circumstances.
21        Do you, just like the associates, the -- the
22 lowliest of the low and the highest of the high, get
23 reviewed periodically?
24     MR. LEGON: Object to the form. You may
25 answer.

**THE REPORTERS GROUP, INC.**                    Page 89 - Page 92

Page 93

1    A  Yes, I do.
2    Q  Prior to December 13th, 1996, were you made
3  aware of, generally speaking, the results of reviews
4  that had been made about you up to that point in time?
5    A  No.  My -- my performance review was not
6  until the beginning of '97; the March time frame of
7  '97.
8    Q  Is it an annual for a GM?
9    A  Yes.
10    Q  All right.  Prior -- what I'm saying is
11  the -- had you had any reason to believe that there
12  were any -- there was any -- there had been any
13  complaints about your performance in any way prior to
14  December 13th, 1996?
15    A  No.
16    Q  Had you consistently, for practical purposes,
17  been a well reviewed employee at all times prior to
18  December of 1996?
19        MR. LEGON:  Object to the form.
20    A  Yes.
21    Q  All right.  To return to my earlier question,
22  then, prior to December 13th, 1996, did you have any
23  reason to believe that there was the perception by
24  management senior to you that your performance was
25  anything less than at least adequate?

Page 94

1    A  No.
2    Q  All right.  Did you, in fact, call
3  Mr. Denault on December 13th, 1996?
4    A  Yes.
5    Q  Tell me first if you can remember what
6  specifically you were told about the call from
7  Mr. Denault or Ms. Russo's office prior to returning
8  that call.
9    A  What I was told?
10    Q  Yeah.  Whoever --
11    A  Before?
12    Q  Somebody called you and said, "Call Denault,"
13  right?
14    A  Yeah.
15    Q  What did that person say, whoever it was?
16    A  I don't -- I don't recall.
17    Q  Do you recall if it was described to you as a
18  matter of some urgency?
19    A  In any vein having a request to call the
20  President of the company's office, you know, brings up
21  some level of urgency.
22    Q  Okay.  So tell me what was said between you
23  and Mr. Denault when that call was made.
24    A  I had a discussion with Mr. Denault regarding
25  communication that had come to Ms. Russo and that they

Page 95

1  were going to be reviewing that and wanted to make me
2  aware of it.
3    Q  Did he tell you what the communication was
4  that had been transmitted to Ms. Russo?
5    A  I think he said that he had a letter from an
6  employee.
7    Q  Did he identify the employee or employees?
8    A  It was Mr. Navas.
9    Q  And do you remember if you were told in any
10  greater detail with respect to what Mr. Navas was
11  saying in that letter?
12    A  No, I don't believe he gave me any detail on
13  that other than that they had that and that I should
14  just continue to conduct my business and they would be
15  working to review that.
16    Q  So they said, we got a letter from Mr. Navas
17  about you --
18    A  Uh-huh.
19    Q  -- we're not telling you what it says, but
20  we're going to review you and just go about your
21  business --
22    A  We made an assumption --
23        MR. LEGON:  Let him finish his question.
24    Q  I'm sorry, sir.  What were -- I interrupted
25  you.  What were you going to say?

Page 96

1    A  You made an assumption that he was told it
2  was about me.
3    Q  You were not even told that the letter
4  concerned you?
5    A  I was told that the letter concerned the
6  facility and I was involved in the letter.
7    Q  Were you told whether it was a favorable
8  letter or an unfavorable letter?
9        MR. LEGON:  Object to the form.
10    A  He said it had -- the letter concerned the
11  facility and the operation of the facility and did not
12  go into what the real issue was.
13    Q  Were you told how much time had elapsed
14  between the time the communication was received by
15  Ms. Russo's office and the time of the call, January --
16  December 13th?
17    A  No.
18    Q  Are you -- have you told me every single
19  thing that you can recall being told about -- by
20  Mr. Denault about the communication?
21    A  Yes, I have.
22    Q  Have you told --
23    A  I was in the middle of a move.  I was on a
24  cell phone with a mover going back and forth.  I had
25  told Mr. Denault that.  And he gave me some highlights,

Page 97

1 as I recall, and told me to take care of what I had to
2 do with moving and my family.
3    Q. All right. Well, were there any other
4 highlights, as you have described them now, that you
5 have not yet told me about?
6    A. Not that I recall.
7    Q. Were there, in fact, highlights that you
8 don't recall?
9       MR. LEGON: Object to the form.
10   A. If I don't recall them, how could I specify
11 them?
12   Q. I'm just trying to put it in context.
13      You told me that you perceived it to be a
14 matter of some urgency -- those are my words; I
15 realize they're not yours -- because it was a call
16 from the President? Is that an accurate
17 statement?
18   A. Yeah.
19   Q. And you returned the call from the
20 President's assistant; correct?
21   A. Yeah.
22   Q. And all the information that you got is what
23 you've told me after returning that call?
24   A. Well, you know, the -- the context of the
25 call was to make me aware that they had a letter,

Page 98

1 whatever, and to ask me what I knew about it, is my
2 recollection. And I -- I did not have any knowledge of
3 it and did not know what the specific information
4 within it was, so I couldn't offer a lot of value to
5 Mr. Denault in this.
6    Q. Were you told that Mr. Navas and Mr. Bayad
7 were seeking a meeting with senior management to
8 discuss the operation of the Largo office?
9       MR. LEGON: Object to the form.
10   A. I don't know if that was mentioned.
11   Q. Were you told -- do you know who
12 Henry Schacht is?
13   A. Yes, I do.
14   Q. Who was he in December -- on December 13th of
15 1996?
16   A. He was the CEO of Lucent Technologies.
17   Q. That would be even Ms. Russo's boss?
18   A. Yes.
19   Q. Were you told whether or not at that time, in
20 fact, Mr. Navas and Mr. Bayad had contacted
21 Mr. Schacht?
22   A. I don't recall.
23   Q. Did you subsequently learn that they had been
24 in touch with Mr. Schacht, as well?
25   A. Yes.

Page 99

1    Q. How was it that you learned that?
2    A. In subsequent communication.
3    Q. All right. After you got yourself moved and
4 returned to work, did you have any further information
5 about the communication or communications from
6 Mr. Bayad and Mr. Navas to senior management?
7    A. I was not involved. They -- and I -- and I
8 assume that since there may have been an implication of
9 me in that -- in that communication that that was going
10 to be reviewed and handled by senior management. And
11 I -- at that point in time I was in a situation where I
12 was going to be moving to another position and I
13 assumed that they would handle what they needed to --
14 to do in terms of reviewing the situation and making
15 whatever decisions they had to make.
16   Q. Did you know, as of December 13th, 1996, you
17 were going to be moving into another position?
18   A. No.
19   Q. When did you first become aware that you
20 would be moving into another position?
21   A. In the beginning of January time frame.
22   Q. Were you asked to move into another position
23 or was that your idea?
24   A. That was my option.
25   Q. I didn't ask you if it was your option.

Page 100

1    A. Uh-huh.
2    Q. I said do you know if you were asked to do
3 that, whether you were given some other option or not,
4 I guess, is a different way of qualifying it.
5       MR. LEGON: Object.
6    Q. Let me rephrase the question.
7       Tell me about the circumstances under which
8 you were given the option of moving to a new position.
9    A. They -- there was a reorganization of certain
10 areas of the service business and the Largo facility
11 was being consolidated with three other groups into
12 what is -- was going to be NetCare. And Carl Wiese was
13 going to be the General Manager of the enterprise
14 section, which the Largo facility was a part of.
15      So I had the option of staying in the
16 Tampa -- in the Largo General Manager's position
17 reporting in to Mr. Wiese or taking a position as the
18 controller of the NetCare organization. And I opted
19 for the controller of the NetCare organization.
20   Q. What was the date on which this option was
21 provided to you?
22   A. I don't know off the top of my head.
23   Q. Was it sometime prior -- well, where was it
24 in reference to the time you went to Fort Lauderdale to
25 look at the Fort Lauderdale facility?

Page 101

1  A. It was after that.
2  Q. Where was it in reference to the time in
3  which Mr. Kaslow became the General Manager on
4  January 21st?
5  A. It was prior to that.
6  Q. All right. So somewhere in the first three
7  weeks of January?
8  A. Yes.
9  Q. Do you know if it was in the first week?
10  A. No, it was not in the first week.
11  Q. Do you know if it was in the second week?
12  A. Yes. It had to be in the second week because
13  there was a time frame that Mr. Kaslow had to be
14  offered the position.
15  Q. Now, you described this as an option that was
16  presented to you. Was that presented to you by
17  Mr. Wiese?
18  A. Yes.
19  Q. How many people, as of January 21st -- you
20  became controller?
21  A. Yes.
22  Q. Controller of what division?
23  A. NetCare.
24  Q. How many people are directly under your
25  supervision in that capacity?

Page 102

1  A. I was working that position stand alone.
2  Alone.
3  Q. Well, do you have a staff?
4  A. At that time, no.
5  Q. Do you have a staff now?
6  A. Yes.
7  Q. How many people are in your staff now?
8  A. Two.
9  Q. You and someone else or you and two others?
10  A. Me and two others.
11  Q. So you're the boss of two people right now?
12  A. Yes.
13  Q. Coach of two people?
14  A. Yes.
15  Q. Prior to January 21st, 1997, how many people
16  were under your direct supervision?
17  A. In the Largo facility?
18  Q. Right.
19  A. Over 200.
20  Q. Did you consider that understanding that it
21  was -- I assume by your testimony there was no change
22  in pay as a result of your changing positions following
23  the choice of option two, as it were?
24  A. Yes.
25  Q. All right. And your testimony is that you

Page 103

1  considered the position to be an equivalent one within
2  the company?
3  A. Yes.
4  Q. Were you happy about making that change once
5  the change was offered to you as a choice?
6  A. Yes.
7  Q. And you did not, in fact, want to remain
8  General Manager of the Largo facility?
9  A. No.
10  Q. How would you compare, from the purposes of
11  a -- well, did you -- do you consider yourself to be
12  what I would say -- call euphemistically as midlevel
13  management?
14  A. Yes.
15  MR. LEGON: Object to the form.
16  Q. Do you all have -- is there any kind of
17  organization of midlevel managers within
18  Lucent Technologies?
19  A. I don't -- I don't understand the question.
20  Q. Well, do you have meetings where you go to
21  with people that are from a certain level of -- of
22  management up to General Manager?
23  Let me put it a different way.
24  You had been a General Manager within an AT&T
25  affiliated company for how long?

Page 104

1  A. Since mid-1995.
2  Q. And would you also characterize
3  General Manager of a facility like Largo to be that of
4  midlevel management?
5  A. Yes.
6  Q. Within Lucent -- let me ask you this: Are
7  the titles that are being used presently by
8  Lucent Technologies similar to those that would have
9  been used in the AT&T and Paradyne days, GM.
10  controller?
11  A. Yes.
12  Q. Did the position of controller, doing what
13  you do now, even exist prior to the time it was created
14  for your choice?
15  A. Yes.
16  Q. Who was the controller before then?
17  A. The -- the controller of the customer service
18  organization prior to this '96 transition was me. I
19  was the controller of the customer service organization
20  prior to the transition into BCS and I left to go to
21  New Jersey.
22  Q. Okay.
23  A. Jeff Akers had support from a controller in
24  New Jersey who -- who was a D band type of controller
25  who supported the sales and service operation.

1 When NetCare was spun off as a separate
2 entity and a separate group, having that financial
3 support was reasonable.
4      Q. All right. So do I understand correctly that
5 the job function that you have is -- now is essentially
6 the same as that that you had prior to returning to
7 New Jersey in '95, is it?
8      A. Yes.
9      Q. All right.
10     A. You know, I guess my -- my point is
11 whether -- whether there is one person doing a job and
12 they have two people reporting to them or whether that
13 person has 200 people reporting to him doesn't make a
14 difference in my mind or -- or I believe in the
15 company's mind as to what their level ought to be or to
16 what their value ought to be.
17     Q. I'm not disputing that. Let me ask you this
18 question: What is your perception of the prestige that
19 is associated with the position of General Manager at a
20 facility like Largo, now St. Pete, in comparison to
21 that of controller, which you had before you became a
22 General Manager?
23        MR. LEGON: Object to the form. You may
24 answer.
25     A. I -- I believe that they're compatible levels

1 in different disciplines.
2      Q. Why was that you didn't want to be a
3 General Manager anymore?
4      A. Based on the -- the consolidation of NetCare
5 and the type of background and opportunity for helping
6 structure the financial structure of that new business,
7 I felt that that would be a -- a challenge I would like
8 to get involved with.
9      Q. Did you have any relationship with Mr. Wiese
10 before that option was presented to you?
11        MR. LEGON: Object to the form.
12     A. I worked with Carl Wiese over the period of
13 1996.
14     Q. Do you know what his personal feeling was
15 about the status of the Largo office as of the time
16 that you were presented with the option to become
17 controller?
18     A. No.
19     Q. Were you familiar with a VIP survey that was
20 conducted among -- conducted with participation of
21 associate level personnel sometime in mid to late 1996?
22     A. No.
23     Q. Do you know what a VIP survey is?
24     A. Yes.
25     Q. What is it?

1      A. It's a survey of the associates on levels of
2 satisfaction and perceptions of the company.
3      Q. Were you aware in 1996, during the period of
4 your General Managership of the Largo office that there
5 was a VIP survey conducted?
6      A. Yes, there was.
7      Q. Would you have participated in that?
8      A. Yes.
9      Q. In other words, you fill out your own boxes
10 and forms?
11     A. Uh-huh.
12     Q. Yes?
13     A. Yes.
14     Q. When was it conducted?
15     A. I don't know the -- the time frame.
16     Q. Was it your understanding that typically the
17 General Manager of a facility such as here in Largo or
18 where you were in New Jersey would not be provided with
19 the results of that survey?
20     A. I was not the manager of that facility, nor
21 was I responsible for putting together the plans,
22 et cetera, that follow up a survey.
23     Q. That wasn't what I asked you.
24     A. Okay.
25     Q. Did you not get it, for some reason?

1      A. I did not get it.
2      Q. But you knew that one had been done?
3      A. Yes.
4      Q. Were you curious to know, as the
5 General Manager of as many as 250 people, how people
6 thought about working for you?
7        MR. LEGON: Object to the form.
8      A. I had other objectives and other challenges
9 that I was moving on to and the responsibility for that
10 facility was now Mr. Kaslow's and Mr. Wiese's.
11     Q. Has anyone ever told you what the overall
12 level of associate level satisfaction was during your
13 stewardship over the Largo office?
14        MR. LEGON: Object to the form. You may
15 answer.
16     A. I did not have a discussion with anyone
17 regarding the survey.
18     Q. Did Mr. Wiese ever tell you directly how he
19 felt about the Largo facility at any time prior to the
20 point in which you decided for option two; that is to
21 say become a controller in your present job?
22     A. No.
23     Q. Do you know if the reorganizational plan that
24 you described which led to the creation of your present
25 job title was documented somewhere? In other words,

Page 109

1 were you shown that in memo form or was it just
2 explained to you?
3     A. The reorganization effort started in the
4 middle of December of '95.
5     Q. Were you --
6     A. Excuse me, '96.
7     Q. Did you participate in that reorganization
8 effort?
9     A. Yes.
10    Q. What was the first date on which you believe
11 that reorganizational effort was underway?
12    A. It was -- the time frame that it was
13 announced in terms of its approval was, I believe,
14 sometime in the middle -- middle to late part of
15 December and we had a kick off meeting in Denver.
16    Q. Do you know when it was that there was a
17 posting for an unidentified position as General Manager
18 within the company's electronic job posting system?
19        And when I say unidentified, I mean it
20 says -- and we have it here -- GM, but it doesn't
21 identify the location.
22        Have you ever seen that document?
23    A. No.
24    Q. Do you know when that was put out?
25    A. No.

Page 110

1     Q. If I were to tell you that the electronic
2 posting for that position was on December 19th, 1996,
3 would that be consistent with the understanding that
4 you had about the reorganizational efforts as you just
5 described them?
6        MR. LEGON: Object to the form. You may
7 answer.
8     A. I don't know.
9     Q. Well, what was the date which you said the
10 reorganizational effort would have been complete?
11    A. The meeting in Denver was sometime in that
12 time frame.
13    Q. And you participated in that?
14    A. Yes.
15    Q. Did you know at that time that effectively
16 the company was already looking for another
17 General Manager?
18        MR. LEGON: Object to the form. You may
19 answer.
20    A. No.
21    Q. Did Mr. Kaslow attend the meeting?
22    A. No.
23    Q. Who was at the meeting that you described?
24    A. The -- the meeting was called by Mr. Akers.
25 Carl Wiese was at the meeting. And -- and at that

Page 111

1 point we were kicking that off and it was -- at that
2 point we became aware that Carl was the individual that
3 Jeff had selected to head the enterprise piece of the
4 business, which was the data and video and network
5 management piece of which the Largo facility was one
6 piece of that.
7        There were two new groups that were -- were
8 being incorporated into NetCare. One was call center
9 consulting and the other one was call center
10 outsourcing. And Rob Melich headed the consulting
11 group and Denzel Samuels the outsourcing group, and
12 they were there.
13        Tom Prachak was there, who was going to be
14 working in Market Management. There were a couple of
15 other people who were there who were part of the Data
16 Networking and Market Management organization who were
17 there for the planning. That was Pete Avioli -- I
18 can't think of the other fellow's name.
19        And there were Jeff's two staff managers,
20 Nancy Kitely and Rosemary Dowd. And there were a
21 couple of other individuals that Jeff brought in on a
22 consulting basis.
23    Q. Over how many days did this meeting take
24 place?
25    A. It was Saturday and Sunday.

Page 112

1     Q. And you believe that it was sometime around
2 the December 19th time frame?
3     A. Yes.
4     Q. Do you know how much advance notice of that
5 meeting that you had prior to attending it?
6     A. It was, you know, something that came out on
7 the beginning to the middle of that week.
8     Q. So it was scheduled on fairly short notice?
9     A. Yes.
10    Q. Considering the number of people that you
11 named, which was at least a dozen, by my count?
12    A. Yeah.
13    Q. Did you know in advance what it was you were
14 going to be talking about?
15    A. We were going to be talking about the NetCare
16 organization network.
17        (A short break was held).
18 BY MR. SALES:
19    Q. All right, sir. December of '96 you told me
20 that you were moving on the 13th. That would have been
21 a Friday; is that correct?
22    A. Uh-huh, yeah.
23    Q. And you told me that the meeting that you
24 were attending was on the 21st and the 22nd, which
25 would have been over a weekend?

Page 113

1    A. Yeah.
2    Q. Yes?
3    A. To the best of my knowledge, I think that
4  would be it.
5    Q. And your belief is that that meeting was
6  scheduled sometime during that same week, including
7  Monday the 16th through Friday the 20th?
8    A. Uh-huh.
9    Q. Yes?
10    A. Yes.
11    Q. So you had as little as five days notice of
12  the meeting being assembled?
13    A. Yes.
14    Q. Do you have any reason to believe that the
15  meeting was assembled -- excuse me, that the meeting
16  was planned in advance of that week from the 16th to
17  the 20th, but you had not somehow heard about it yet?
18  Or, alternatively, is it your impression that all of
19  those people were gathered during that week time frame?
20    A. That was my impression.
21    Q. Did you ever come to believe or form any
22  opinion that something about the communication that had
23  been received by Ms. Russo or perhaps by Mr. Schacht
24  had anything to do with that meeting taking place in
25  the roughly proximate time frame?

Page 114

1    A. No.
2    Q. Have you been told, in fact, by anyone that
3  that was not so, that it -- that the two events had
4  nothing to do with each other?
5    A. No.
6    Q. You just believe that? In other words, there
7  is nothing you have seen or heard to form that belief,
8  it's just your belief; is that correct?
9        MR. LEGON: Object to the form. You may
10    answer.
11    Q. Let me give you an example.
12    A. Yeah.
13    Q. Mr. Schacht never called you and said, "This
14  meeting is because of that letter I got from your
15  associates" --
16        MR. LEGON: Object to the form.
17    Q. -- right?
18    A. Yes.
19    Q. And nobody else ever said anything like that,
20  right?
21    A. Right.
22    Q. And you never saw anything else like that in
23  writing?
24    A. Right.
25    Q. Did anyone conversely say -- did anyone say

Page 115

1  the opposite to you, that it either was or was not
2  related in any way to the matters that you learned
3  about on the date of your move, December 13th, 1996?
4    A. No.
5    Q. Subsequent to December 13th, 1996, but prior
6  to the termination of Mr. Bayad -- well, prior to
7  January 17th, 1997, what, if any, additional
8  information did you receive about other contacts by
9  Mr. Navas or Mr. Bayad to senior company management?
10    A. I -- I believe I found out subsequent that --
11  to the December 13th, that the letter or the --
12  whatever document it was, was sent to Henry Schacht and
13  at that point I was not given any further communication
14  on it.
15    Q. At any time prior to January 17th, 1997, did
16  you obtain or receive any information concerning the
17  content of any communication by Mr. Bayad or Mr. Navas
18  to senior management?
19    A. No.
20    Q. Have you, at any time after January 17th,
21  1997, did you ever see copies of any such
22  communications in writing?
23    A. No.
24    Q. How did you feel, prior to January 17th,
25  1997, about Mr. Navas and Mr. Bayad contacting senior

Page 116

1  management about the operation of the Largo office?
2    A. I -- I thought that they did not use
3  the proper method of going to -- to work the
4  problem, if they had a problem, or to -- to,
5  basically, talk to me and work with me, since they
6  had a regular opportunity and voiced their concerns
7  for what they wanted in terms of resources or money,
8  et cetera.
9    Q. Did you express that to them prior to January
10  17th, 1997?
11    A. No, I did not.
12    Q. Why not?
13    A. Because the matter was being handled by
14  Pat Russo's office.
15    Q. Well, did Ms. Russo or anyone else in senior
16  management tell you that you were not to discuss the
17  matter further with anyone?
18    A. They told me that they were going to handle
19  it.
20    Q. Do you know subsequently, subsequent to
21  December 13th, 1996, that is, what, if any, contact,
22  additional contact, there was between senior management
23  and your associates?
24    A. No, I do not.
25        (A short break was held).

Page 117

BY MR. SALES:

2   Q. Mr. Savastano, is it -- just to leave this
3   area, is it your testimony that you can recall -- you
4   cannot recall, prior to December -- excuse me,
5   January 17th, 1997, seeing any documents which
6   contained a discussion of any kind concerning the
7   communications by Mr. Bayad or Mr. Navas to senior
8   management?
9       A. Yes.
10      Q. Is it your testimony -- I didn't ask you
11  whether or not you had spoken to anyone else about
12  that. Had you spoken to anyone else about that between
13  12-13 and 1-17?
14      A. As I said, the only person that I -- I talked
15  to on a subsequent basis was Pat Russo's EA and that
16  was, I think, to let me know that it was Henry Schacht
17  that -- that the document went to and that they were
18  handling it.
19      Q. And, again, they shared nothing with you
20  about it?
21      A. No.
22      Q. Do you know why they would have told you that
23  something is being handled, but would not have told you
24  what it was that was being handled?
25      A. Well, I don't -- I don't think it's uncommon

Page 118

1   when an item goes to a level of management a few levels
2   above that they review things in an independent way
3   and -- and take advisement of that review that they
4   do.
5       Q. Did Lucent policy, at that time, permit
6   communication about company business matters outside
7   the chain of command?
8       MR. LEGON: Object to the form.
9       A. I don't know what you mean.
10      Q. You told me your personal feeling at the time
11  was that you would have preferred if Navas and Bayad
12  came to you directly.
13      Do you remember that?
14      A. Yes.
15      Q. What I'm asking you is if they did, in fact,
16  communicate with senior management, was there something
17  within company policy or procedure that would have
18  prohibited that type of conduct?
19      A. No.
20      Q. Did the company have, at that time, what is
21  known as an open door policy?
22      A. Yes.
23      Q. And what was your understanding of that
24  policy?
25      A. That any associate had access to anyone in

Page 119

1   the company.
2       Q. And that would include, if appropriate,
3   communication with senior management, apparently?
4       A. Yes.
5       Q. Other than the one additional discussion that
6   you had with Mr. Denault about advising you that the
7   communication from Mr. Bayad and Navas had gone to
8   Mr. Schacht, is it your testimony that you spoke, prior
9   to January 17th, 1997, with no other person about those
10  matters?
11      A. No.
12      Q. Not even your wife?
13      A. No, I did not speak to anyone about this. If
14  I talked to my wife, it was only in -- in -- in respect
15  to the fact that it had happened.
16      Q. Did you feel that your unit, or the Largo
17  office, rather, was under some kind of investigation as
18  of that time?
19      A. No.
20      Q. Well, what did you think it was? What was in
21  your mind as to what you thought senior management was
22  doing, since they didn't tell you what it was that they
23  were looking into?
24      MR. LEGON: Object to the form.
25      A. I thought that they would probably talk to

Page 120

1   Mr. Navas, try to understand what his issue was, and
2   then respond to him.
3       Q. But about what, you did not know?
4       A. No.
5       Q. In Ms. Grohe's deposition yesterday, she, at
6   my urging, I will acknowledge, described herself as the
7   right-hand woman to the General Manager of the Largo
8   facility.
9       Would you agree with that description, that
10  euphemistic description of her role at that office?
11      MR. LEGON: Object to the form.
12      A. I -- I guess I couldn't comment on that. I
13  mean, I don't know how you describe the right-hand --
14  right arm of -- of someone.
15      Q. All right. What was her role in relationship
16  to you at Largo before your electing option two and
17  becoming the controller?
18      A. She was the Staff Manager.
19      Q. Did she have daily regular contact with you?
20      A. Her office was across the -- right across
21  from mine.
22      Q. Do you know -- did you -- did you have, at
23  that time, an administrative assistant?
24      A. I have an administrator who in some cases is
25  called the secretary, but I have an administrator.

Page 121

1    Q. You did at that time?
2    A. Yes.
3    Q. Do you have one now?
4    A. Yes.
5    Q. Would you have told Ms. Grohe about anything
6    that you had heard from Mr. Denault between the time of
7    December 13th and January 17th?
8        And I ask you that because she obviously knew
9    about the call.
10   A. I may have told her that I returned the call
11   to Jack and that there was a -- an issue with the
12   center.
13   Q. Prior to December 23rd, 1997, did you, or
14   anyone else at the Lucent Largo offices, to your
15   knowledge, ever request that Mr. Bayad come there to
16   discuss business matters with you or other Lucent
17   personnel?
18   A. Would you repeat the question?
19   Q. Do you remember the date of what I'll refer
20   to as the fountain incident, that was January 23rd.  Do
21   you remember that?
22       MR. LEGON: Object to the form.
23   A. Yes.
24   Q. Prior to that time, but subsequent to
25   December 13th, 1997 -- '96, December 13th, 1996, did

Page 122

1    you ever request that Mr. Bayad come to Largo to speak
2    to him?
3    A. I did not.
4    Q. Do you know if anybody else did?
5    A. No, I do not.
6    Q. At the meeting that you described with the
7    dozen or so persons, perhaps it was more involving the
8    reorganization, did anyone there ask you what was going
9    on in reference to what you had found out about, albeit
10   to a limited extent, on December 13th, 1996.
11   A. No.
12   Q. Did anybody say to you "Tony, what's
13   happening in Largo," anything like that?
14       MR. LEGON: Object to the form.  You may
15   answer.
16   A. No. The meeting was to discuss, basically,
17   kicking off -- a new organization. It was a very,
18   very tight schedule. We were working in groups with
19   consultants and different business teams, so that
20   wasn't an area that was discussed.
21   Q. When was it first brought to your attention
22   that Anthony Bayad had appeared, according to company
23   records, to have misused his American Express Card?
24   A. I received that information right around the
25   time of my trip to Fort Lauderdale. As I said, the --

Page 123

1    Carolyn Myrbach, who is the finance manager, had been
2    notified by the corporate travel office.
3    Q. Do you know when it was that she had received
4    that notification?
5    A. I don't know the exact date, no.
6    Q. Given the one other similar experience that
7    you had do you know how many time -- how much time
8    would you expect to have elapsed between the time in
9    which a payment was received by American Express from a
10   sales -- from an associate and the time in which
11   notification would be made from a corporate level to an
12   office like yours at Largo?
13   A. I did not look at the -- the date of the
14   payment in either instance.
15   Q. Do you know if -- referencing your visit to
16   the Largo office now, having heard you say that the
17   matters were roughly contemporaneous, if, in fact, you
18   received that communication about the American Express
19   charges before or after you went to Fort Lauderdale?
20   A. I don't remember.
21   Q. It could have been before, it could have been
22   after?
23       MR. LEGON: Object to the form.
24   Q. Is that what you're saying?
25       MR. LEGON: Object to the form.  You may

Page 124

1    answer.
2    A. I don't remember.
3    Q. Well, do you believe it was on the same day?
4    A. I don't know.
5    Q. Could it have been on the same day?
6    A. It -- if I don't know, it could have been on
7    the same day, I guess.
8    Q. Is it likely that you received that
9    information prior to the time that Corporate Security
10   was notified with respect to the activity on
11   Mr. Bayad's Corporate Card?
12   A. Yes.
13   Q. Did you instruct someone from your office to
14   notify Corporate Security as to the claim of an
15   inappropriate charge being made?
16   A. Yes.
17   Q. As of that time did you have any information
18   as to whether or not Mr. Bayad had discussed the charge
19   involved with anyone from Largo?
20   A. Could you repeat the question?
21   Q. Do you know if, prior to the time
22   Corporate Security was notified, whether or not
23   Mr. Bayad had discussed the charge, the
24   American Express Card charge, with anyone from the
25   Largo office?

Page 125

1  A. To my knowledge, he discussed that with no
2 one.
3  Q. Okay. Is that -- is there some basis for
4 your statement in that regard?
5  A. It was never brought to my attention and it
6 was never discussed with me.
7  Q. Okay. In other words, you're unaware of any
8 such contact, if there was any?
9  MR. LEGON: Object to the form. You may
10 answer.
11  A. Yes.
12  Q. Who was it that you told to contact the
13 Corporate Security office?
14  A. I believe Joan Grohe.
15  Q. Was there, at that time, to your knowledge,
16 any written policy or procedure with respect to how to
17 handle allegations or claims that associates or other
18 personnel had misused company property, including a
19 corporate charge card?
20  A. I can't say that I'm aware of that.
21  Q. How did you know that Corporate Security
22 should be contacted?
23  A. Well, I'm not an investigator. I would not
24 have the -- the knowledge nor the access to be able to
25 do the inquiry properly, so we had asked

Page 126

1 Corporate Security.
2  Q. Did anyone actually show you the offending --
3 allegedly offending charges as represented on some kind
4 of American Express document?
5  MR. LEGON: Object to the form.
6  A. Yes, I saw a copy of the tickets.
7  Q. Who showed you those?
8  A. Care Lynn Myrbach.
9  Q. And she, again, was who?
10  A. Finance Manager.
11  Q. And did you -- were you able, by the
12 description, to identify the type of charge that was
13 involved?
14  A. Airline tickets.
15  Q. Were you able to identify, by reading the
16 reference in the American Express document, the
17 specific airline involved?
18  Let me see if this refreshes your
19 recollection.
20  Do you recall having seen that the reference
21 is Royal Air Moroc, New York, or something of that
22 type?
23  A. I -- I don't recall the airline, but I know
24 the tickets were originated -- the --
25  Q. The travel?

Page 127

1  A. -- the travel was from Morocco.
2  Q. Did you know who the persons were for whom
3 those tickets were purchased?
4  A. No, I did not, other than that they were
5 the -- the same name as Anthony Bayad.
6  Q. From that did you conclude that they were his
7 relatives?
8  A. I -- I concluded, yes, I can say that.
9  Q. Did you associate Air Moroc, as identified in
10 the American Express charge records, with the
11 company -- excuse me, with the nation state known as
12 Morocco?
13  MR. LEGON: Object to the form. You may
14 answer.
15  A. I -- I -- I assumed that the tickets were
16 from Morocco.
17  Q. As of the time these matters were first
18 presented to you; is that correct?
19  You presumed that on the date you first saw
20 the charge information; correct?
21  A. Yes.
22  Q. And what happened next with respect to any
23 involvement that you had in terms of the investigation
24 that was conducted by Corporate Security?
25  A. We notified Corporate Security.

Page 128

1  Q. Who is "we," sir?
2  A. Let me say I didn't. Joan Grohe notified
3 Corporate Security.
4  Q. How did she know to do that, sir?
5  A. I instructed her to.
6  Q. All right. And then what happened?
7  A. They -- they pursued the matter. And at that
8 point in time I was transitioning to the controllership
9 position with two other entities that I was supporting
10 in Denver and Lew Kaslow assumed the interface with the
11 Security Department.
12  Q. When you say he assumed the interface, what
13 do you mean, sir?
14  A. Meaning that when there were questions or
15 when Security was in the facility, they were dealing
16 with Lew.
17  Q. Prior to January 23rd, 1997, did you have any
18 contact whatsoever with Corporate Security?
19  A. I was interviewed by Mr. Laurino.
20  Q. Did that happen on the 23rd?
21  A. No. That happened before the 23rd.
22  Q. Where was it when you were interviewed?
23  A. It was in the Largo facility. And he asked
24 me to just give him my involvement and understanding of
25 how this happened.

Page 129

1    Q. Well, other than what you've told me, did you
2 have any additional information?
3    A. No.
4    Q. Did you share with him any information that
5 you had become aware of about contacts by Mr. Bayad or
6 Mr. Navas of senior management at that time?
7    A. I may have told him that there was a review
8 being done by Ms. Russo.
9    Q. In conjunction with the investigated
10 individual's contact with senior management?
11    A. Yes.
12    Q. In other words, you told Mr. --
13    A. Well, wait a second.
14    Q. I'm sorry. Go ahead, sir.
15    A. I mean at this point my understanding was
16 that the inquiry had come from Mr. Navas.
17    Q. You were unaware, at that time, that
18 Mr. Bayad had any involvement?
19    A. That's right.
20    Q. Well, why would you, in the course of an
21 investigation of Mr. Bayad, tell a security officer
22 from a -- from corporate security what had happened
23 with respect to the limited information you obtained
24 from Mr. Denault?
25    Why would you tell him about that?

Page 130

1    A. Because it was in the group.
2    Q. In the group, what does that mean?
3    A. In the -- in the BayNetworks organization.
4    Q. Well, Mr. -- was Mr. Laurino there to
5 investigate you or the organization?
6    A. I wanted to make sure that if he was
7 reviewing items and there were other people in his
8 organization that were making any other type of
9 inquiries, that they were aware.
10    Q. I see. Were you concerned, in fact, at that
11 time, that someone from Corporate Security might have
12 been conducting investigation of the office other than
13 the charge card use by Mr. Bayad?
14    A. No.
15    Q. Well, what was then -- can you be more
16 precise, then, in explaining your purpose of telling
17 Mr. Laurino something which you told me, if I
18 understand your testimony, you did not even tell, in a
19 substantial way, your wife?
20        MR. LEGON: Object to the form of the
21    question.
22    A. Because I thought he might have a need to
23 know that.
24    Q. But why would you think that, sir?
25        MR. LEGON: Object to the form.

Page 131

1    A. Because I wanted him to be aware that there
2 may be another inquiry or review going on.
3    Q. Did you have any particular concern which
4 caused you to have that sentiment?
5    A. No.
6    Q. Did you have any particular objective which
7 you wanted to obtain -- attain in providing him with
8 that limited information?
9    A. No.
10    Q. It occurred to you and you told him; is that
11 a fair statement?
12        MR. LEGON: Object to the form.
13    A. Yes.
14    Q. And you don't have anymore reason than what
15 you've told me?
16        MR. LEGON: Object to the form.
17    Q. Is that correct?
18    A. Yes.
19    Q. I had asked you if you were aware of any
20 corporate level policy, whether -- that might have been
21 in writing with respect to how to conduct or trigger an
22 investigation of a matter such as Mr. Bayad's alleged
23 misuse of a credit card, and I believe your answer was
24 you're not aware if there is any written policy.
25        MR. LEGON: Object to the form.

Page 132

1    Q. Is that correct?
2    A. I -- no. I did not look for a policy book on
3 the specific issue. When that occurs, I took it as a
4 serious infraction and wanted to have it reviewed
5 properly.
6    Q. Did you consider whether or not you might
7 speak to Mr. Bayad personally or have someone else in
8 the organization speak to him personally prior to
9 contacting security?
10    A. No.
11    Q. Why not?
12    A. Because we had a tangible charge that was --
13 we had -- we could see and it needed to be reviewed.
14    Q. Did you speak to Mr. Navas about that matter
15 before you contacted corporate security?
16    A. No.
17    Q. At any time, prior to Mr. Bayad's
18 termination, did you speak to Mr. Navas about the
19 investigation of Mr. Bayad?
20    A. No.
21    Q. Did you, up until and including the time of
22 Mr. Navas's termination, speak to him about that
23 matter?
24    A. No.
25    Q. What information -- well, let me ask you

Page 133

1 this: Did you have sufficient information, as of the
2 time Corporate Security was contacted to including, in
3 fact, that Mr. Bayad had incurred a charge on his
4 American Express Card and made a partial payment?
5      A. Yes.
6      Q. What additional information did you believe
7 would be obtained as a result of a Security
8 investigation?
9      A. My thought process is that that's -- that was
10 the function of the security and the -- that
11 organization in the company.
12     Q. Did you have the power to fire Mr. Bayad on
13 January 17th, 1997?
14     A. On January 17th?
15     Q. Yeah. As the GM still, did you have the
16 power to fire him, if you chose to do so?
17     A. Yes.
18     Q. Did you consider doing it at that point in
19 time before security even got involved?
20     A. No.
21     Q. Why not?
22     A. Because I wanted a review done before we took
23 any action.
24     Q. You told me a few moments ago that the matter
25 was handled once security became involved by Mr. Kaslow

Page 134

1 in terms of the interface with the Largo office?
2      A. Yeah.
3      Q. Who fired Mr. Bayad?
4      A. I wrote the letter.
5      Q. Why?
6      A. Mr. Kaslow was in transit back to Denver.
7      Q. Mr. Kaslow, and I may be mischaracterizing
8 this -- I don't think I am. We can tease it out, if
9 necessary -- well, let's do it this way:
10        Did you attend a meeting with Mr. Kaslow on
11 the date after the fountain incident?
12        MR. LEGON: Object to the form.
13     A. I don't remember.
14     Q. Do you recall -- don't tell me anything that
15 any lawyer told you or you told a lawyer, but do you
16 recall being in a meeting with Mr. Kaslow shortly after
17 the fountain incident wherein a -- an in-house
18 counsel -- an in-house attorney was contacted by the
19 two of you?
20     A. Yes.
21     Q. Do you recall that, in fact, that meeting was
22 the day after the fountain incident?
23        MR. LEGON: Object to the form.
24     A. Yes.
25     Q. Had Mr. Bayad been terminated prior to that

Page 135

1 time?
2      A. No.
3      Q. In the discussion that you had with
4 Mr. Kaslow before the lawyer was called, did you
5 discuss with him who would, in fact, write the
6 termination letter?
7      A. I -- I believe -- we -- we had some
8 discussion and, based upon the fact that he was heading
9 to the airport, I told him that I would -- I would put
10 the -- the letter together.
11     Q. Your memory is that Mr. Kaslow actually left
12 town on the 24th, that same day?
13     A. Yes.
14     Q. And was not there long enough, apparently,
15 even to sign a letter terminating someone?
16     A. No. He was leaving immediately after we had
17 the -- the discussion with the attorney.
18     Q. And that is your understanding as to why you
19 signed the termination letter as opposed to Mr. Kaslow,
20 simply because he was going out of town?
21     A. Yes.
22     Q. There is no other reason, that you can
23 recall?
24     A. No.
25     Q. Do you recall Mr. Kaslow saying something to

Page 136

1 the effect that the event that led to the termination
2 had occurred under your watch and he was demanding that
3 you sign the termination letter?
4        MR. LEGON: Object to the form.
5      A. No, I don't remember that.
6      Q. Did that not occur?
7      A. I don't remember that.
8      Q. Well, this is a kind of a lawyer question and
9 I apologize. Does that mean that that did not occur or
10 something similar to that?
11        MR. LEGON: Object to the form. Asked and
12 answered.
13     A. It means I don't recall that.
14     Q. All right. Do you deny that Mr. Kaslow said
15 something to that effect in his discussion?
16        MR. LEGON: Object to the form.
17     A. I don't recall that.
18     Q. So the answer is, no, you do not deny it?
19        MR. LEGON: Objection to the form. Asked and
20 answered four times.
21     Q. Some people, you have to understand, after
22 the Oliver North hearings, everybody uses the
23 expression "I don't recall," differently and I don't
24 mean to appear to be difficult. .But what I'm asking
25 you really is a yes or no question, okay?

Page 137

1 Is the answer, "I am saying that never
2 occurred." which is why I said, do you deny that, or is
3 it merely that you do not remember, one way or the
4 other?
5 Before I ask the question, do you understand
6 the difference between those two types of statements,
7 sir?
8 MR. LEGON: I object to the instruction that
9 you tried to give, but you can answer the question
10 any way you want. You don't have to say yes or
11 no. Subject to that, ask your question.
12 Q. Do you understand the difference between the
13 statement by a person such as yourself X, Y, Z never
14 happened and, I don't know if X, Y, Z ever happened?
15 A. I gave you an honest answer. I don't
16 remember.
17 Q. Is that the same, for my education, as saying
18 I don't know if it happened?
19 MR. LEGON: Object to the form. Asked and
20 answered.
21 A. I don't know if that happened.
22 Q. Prior to the -- what else was discussed prior
23 to calling the lawyer -- well, let me ask you this:
24 You had time to call the lawyer, apparently, before
25 Mr. Kaslow flew out of town; is that correct?

Page 138

1 A. Yes.
2 Q. Do you remember, without telling me anything
3 that was said to the lawyer or vice versa, how long you
4 spoke to the lawyer for?
5 A. It was a short conversation.
6 Q. What, if anything, else do you recall about
7 the decision surrounding the termination letter?
8 A. The decision was made to -- to go ahead with
9 the termination, and Lew was leaving town and I told
10 him I would take care of putting the letter together.
11 Q. At any time, up until and including the
12 present day, with the exception of counsel, have you
13 ever discussed the matters relating to Mr. Bayad's
14 termination with any person in the company?
15 A. No.
16 Q. You have never discussed it with Ms. Grohe?
17 A. Other than items that she was involved in
18 with the investigation and going back through
19 supporting any request that Mr. Laurino had, no.
20 Q. Did you have an opinion, prior to the date of
21 the fountain incident, as to whether or not Mr. Bayad
22 ought to be terminated for misuse of his
23 American Express Card?
24 MR. LEGON: Object to the form. You may
25 answer.

Page 139

1 A. I reserved my judgment until we got a -- a
2 full review of the matter.
3 Q. What additional information were you waiting
4 for to make that decision?
5 A. Finalization of the information and
6 finalization of Mr. Laurino's discussion with
7 Mr. Bayad.
8 Q. If I understand your testimony, you had not
9 yet made up your mind?
10 A. That's right.
11 Q. What factors would have been important to you
12 in considering whether or not Mr. Bayad should be
13 terminated?
14 What information might have been important?
15 A. Something that negated the transaction that
16 was there.
17 Q. Meaning somehow showing that that -- it never
18 happened, basically?
19 A. Yes.
20 Q. What was your estimate as to the probability
21 that that would occur, given the providing by
22 American Express of specific documents showing the
23 transaction had, in fact, occurred?
24 MR. LEGON: Object to the form of the
25 question. You may answer.

Page 140

1 A. Very low.
2 Q. Zero?
3 A. Very low. I -- I don't -- I don't think zero
4 is right, but it's, you know, based on having the
5 tickets and him making the payment, it appeared that it
6 was an overt act.
7 Q. Is it your testimony that prior to January
8 17th, 1997, you had no knowledge whatsoever of any
9 contact by Mr. Bayad of senior management with respect
10 to the Largo office?
11 MR. LEGON: Object to the form. Asked and
12 answered about 20 times.
13 A. My understanding was that it was Mr. Navas
14 who had initiated the -- the communication.
15 Q. Well, understanding was initiated, I'm not
16 sure I -- I -- I -- I'm not sure if that's a direct
17 response to the question. I'm not quarreling with
18 you. I just want to know, to leave this area, if you
19 can confirm for me that you had no knowledge of any
20 participation by Mr. Bayad in those efforts prior to
21 that time.
22 MR. LEGON: Object to the form. You can
23 answer yet again.
24 A. What was communicated to me was that
25 Mr. Navas had originated the inquiry.

Page 141

1   Q. And, therefore, you had no knowledge of any
2 participation by Mr. Bayad?
3   A. Not directly.
4   Q. Well, did you have any indirectly? That's
5 what I'm getting at, sir.
6   A. No.
7   Q. Did you have a belief that that might have
8 occurred?
9   A. I knew that they were very close and so I --
10 I -- I guess internally I felt that there was that
11 possibility.
12   Q. You suspected that is a possibility?
13   A. Yes.
14   Q. Were you involved in the discussions to try
15 and secure Mr. Bayad's attendance -- well, before I do
16 that, I -- I believe you did indicate that you
17 participated in a separate meeting with Mr. Laurino and
18 others on the 23rd, prior to the fountain incident; is
19 that correct?
20   A. Yes.
21   Q. Have you reviewed the Security files of
22 Mr. Laurino in that regard?
23   A. I believe I saw a one page letter that
24 Mr. Laurino had written to the file.
25   Q. To the extent it might have referenced any

Page 142

1 involvement on your part, did it accurately set forth
2 the involvement?
3   A. I guess I would want to take a look at that
4 again before I answered the question.
5   Q. I'm referring to an entry into a log,
6 actually, that says, "Met with Grohe, Kaslow,
7 Savastano. Stated that Bayad refusing to come to
8 office from Fort Lauderdale."
9   Do you recall that occurring?
10   A. We were back and forth during the day because
11 I needed to -- he wanted -- he wanted me at the meeting
12 for the initial start of the meeting and Mr. Bayad
13 was --
14   Q. Who is the "he"? I'm sorry.
15   A. Mr. Laurino wanted me at the -- at the
16 beginning of -- of the meeting. And we were having
17 some difficulty ascertaining whether Mr. Bayad was
18 going to be on time or whether he was going to show
19 up. So there was some communication back and forth
20 with respect to time frames.
21   Q. Did you have -- given what you have told me
22 previously about your estimates of the likely outcome
23 of a Security investigation, did you have any
24 discussion with anyone, prior to January 23rd of 1997,
25 about Mr. Bayad's future with the company?

Page 143

1   A. Not that I remember.
2   Q. Do you know how it would be that persons, if
3 there are such persons in the company, forecasted,
4 prior to Mr. Bayad termination, that he was going to,
5 in fact, be terminated?
6   A. No, I don't know.
7   Q. Do you recall, similar to the rumors that you
8 described previously, being the beneficiary -- excuse
9 me, being the hearer of any rumors concerning
10 Mr. Bayad's future with the company?
11   A. No.
12   Q. Do you recall Ms. Grohe ever coming to you
13 and asking, sometime prior to January 17th, 1997, any
14 questions about your future with the company?
15   A. No.
16   Q. Do you recall Ms. Grohe coming to you and
17 asking you about rumors that she had heard that you
18 might be removed as General Manager of Largo?
19   A. No.
20   Q. Is it possible that you had such discussions
21 with her and do not recall them?
22   MR. LEGON: Object to the form of the
23 question.
24   A. Yes.
25   Q. Were you aware of any rumors, prior to

Page 144

1 January 17th, 1997, that you might be removed as
2 General Manager of Largo?
3   MR. LEGON: Object to the form of the
4 question.
5   A. No.
6   Q. You heard no such rumor?
7   MR. LEGON: Object to the form.
8   A. No.
9   Q. You were going to tell me what transpired
10 during the period of your involvement in the meeting
11 prior to Mr. Bayad's arrival at Largo.
12   Do you recall that?
13   A. Mr. Bayad arrived at the facility --
14   Q. No, prior.
15   A. Prior?
16   Q. We're still on the prior.
17   Do you recall any further discussion
18 involving Mr. Kaslow, Mr. Savastano and Ms. Grohe with
19 Laurino before Mr. Bayad actually came?
20   A. Just the timing and -- and what time frame we
21 had to be available.
22   Q. You were, if I understand your
23 testimony, you were sort of in and out of these
24 discussions?
25   A. Yes.

Page 145

1 Q. Because from your perspective, Mr. Kaslow was
2 in charge at that point?
3 A. Yes.
4 Q. All right. Were you -- were you involved any
5 further once Mr. Bayad got to Largo?
6 A. When Mr. Bayad got to Largo, we were convened
7 in a conference room on the second floor. Ms. Grohe
8 brought Mr. Bayad up to the conference room.
9 Mr. Laurino was introduced. Mr. Laurino put in front
10 of Mr. Bayad the -- the issues of the American Express
11 Card and some -- some -- some issues that they were
12 investigating.
13 Q. This is in your presence?
14 A. Yes.
15 Q. And who all was present when this was done?
16 A. Lew Kaslow and myself and Ron Laurino.
17 Q. Okay.
18 A. And at that point in time Mr. Laurino
19 dismissed us from the room and we left.
20 Q. What -- did that conference room have a name
21 where other Largo personnel could easily identify it?
22 A. 200.
23 Q. Was it an interior room or an exterior room,
24 meaning did it have or not have windows?
25 A. It had a window, yes.

Page 146

1 Q. And what was the size of that room?
2 A. It's probably 10 by 20.
3 Q. Okay. And from that point forward, did you
4 hear or see anything further with respect to the
5 matters that followed thereafter?
6 Before I -- before I -- before you answer
7 that, can I just back up a little bit?
8 In your presence, if I understand your
9 testimony, the issue of the charges and the
10 American Express Card were specifically raised while
11 Ms. Grohe and Mr. Kaslow were also there?
12 A. Ms. Grohe was not there.
13 Q. Okay.
14 A. She left the room after she brought
15 Mr. Kaslow -- Mr. Bayad upstairs.
16 Q. All right. But the issues were described at
17 that time by Mr. Laurino?
18 A. Well, I guess my recollection is the -- the
19 context of him investigating was introduced and then we
20 left.
21 Q. Was he shown any documents in your present?
22 A. I don't recall.
23 Q. You said something else about other matters
24 were also discussed at that time. Do you recall what
25 the other matters were?

Page 147

1 A. I -- I don't recall the context that I used
2 that.
3 Q. Was there anything discussed, other than the
4 American Express charges, in your presence before you
5 and Mr. Kaslow left the room?
6 A. No.
7 Q. All right. What, if anything, did you see or
8 hear next about Mr. Bayad?
9 A. I went back to my office, which is about
10 three or four offices off to the left away from the
11 conference room, and I heard a -- a yell in the -- it
12 echoed in the building. And I came out of my office.
13 And I heard some -- some movement downstairs. I looked
14 and ran down the stairs.
15 When I got to the bottom of the stairs
16 Mr. Bayad was in the fountain being held by
17 Mr. Lukosavich, which was a maintenance person at the
18 facility and Mr. Laurino came up from behind me and
19 told me that Mr. Bayad had jumped into the fountain.
20 Q. What did you see next?
21 A. Well, at that point in time Mr. Lukosavich
22 was holding Mr. Bayad, sitting on the wall of the
23 fountain, holding Mr. Bayad in the fountain as he was
24 sort of lying on his side.
25 There were a number of employees and

Page 148

1 associates who were, you know, starting to gather, so I
2 moved off and tried to provide some crowd control, get
3 people out of the lobby.
4 At that point in time, I believe they called
5 911. And I spent some time trying to move some people
6 away from the area. Then I think it was with Ms. Grohe
7 we thought that Mr. Hamdi Elsiah had driven Mr. Bayad
8 from the airport and come up from Fort Lauderdale with
9 him. So we come out to the parking lot and found
10 Mr. Hamdi sleeping in his car in the parking lot.
11 Q. Who is the "we"?
12 A. Ms. Grohe and I.
13 Q. You went and retrieved Mr. Hamdi with her?
14 A. Yes.
15 Q. Okay.
16 A. And we brought him inside because we thought
17 he might be able to help with the situation. And the
18 paramedics came. They talked to Mr. Bayad. And he got
19 up and walked out of the fountain and he brought him
20 over and they were with him. I don't know what they
21 were doing. And a few minutes later they brought him
22 over to the paramedics' vehicle. And after that point
23 in time I didn't see Mr. Bayad again.
24 Q. Because he was taken away in an ambulance?
25 A. Yes.

Page 149

1     Q. Other than the point in time where you went
2 to find Mr. Hamdi -- what's his last name?
3     MS. ALEXANDER: Elsiah.
4     Q. -- Elsiah, were you in a position -- from the
5 time you first observed Mr. Bayad in the fountain up
6 until the time that Mr. Bayad was taken away by
7 ambulance and except for the time in which you went to
8 look for Mr. Hamdi, were you continuously in an area
9 where you could observe what was going on?
10     A. Yes, pretty much I was -- I was in the lobby
11 and in the -- the entryways.
12     Q. Was Ms. Grohe, during that same time frame,
13 in the general area, as well?
14     A. Yes.
15     Q. Was Mr. Kaslow in -- at that same time frame,
16 in the general area, as well?
17     A. Yes.
18     Q. Was Mr. Laurino in that same time frame, in
19 the general area, as well?
20     A. Yes.
21     Q. At any time did any of those individuals or
22 anyone else, for that matter, ever express to Mr. Bayad
23 that he had been terminated?
24     A. No.
25     Q. Were you in a position where if that had

Page 150

1 occurred you would have been able to observe it?
2     A. Not necessarily.
3     Q. Excluding for the moment the time that you
4 went to see Mr. Hamdi?
5     A. No. I mean I was around different parts.
6 The foyer area is a pretty good size, and I was in and
7 out of some of the entryways to get -- to get people
8 away from the front of the building and get people away
9 from the area completely.
10     Q. You were in crowd control, sort of --
11     A. Yes.
12     Q. -- for lack of a better expression.
13     A. Yes.
14     Q. Did you observe, at any time, Mr. Bayad being
15 asked to return company property, including, perhaps,
16 business cards and a pager and the like?
17     A. I was in the area trying to keep people away
18 from the paramedics when that request was made.
19     Q. Could you see?
20     A. No, I didn't see.
21     Q. Did you see who made the request?
22     A. No. I -- I know that Mr. Laurino and
23 Mr. Kaslow had discussed it as I was passing by them.
24     Q. All right. But you didn't see that actually
25 transpire?

Page 151

1     A. No.
2     Q. What was your feeling about what was going on
3 as you saw these events unfolding?
4     MR. LEGON: Object to the form.
5     A. An unfortunate situation.
6     Q. Did you think, with the -- with the benefit
7 of hindsight, that the effort to -- given what you have
8 told us about the likely outcome of the security
9 investigation, did you think that there was, in
10 hindsight, a valuable purpose for the investigation
11 that had been conducted?
12     A. I -- I think that the decision to make
13 security get -- get Security involved was an
14 appropriate decision.
15     Q. And would you do it any differently, given
16 what you know with the benefit of hindsight?
17     MR. LEGON: Object to the form.
18     A. I -- I don't think that's a question that's
19 answerable.
20     Q. Well --
21     A. Given -- given hindsight.
22     Q. Well, I am asking you and I'll explain to
23 you --
24     A. That's all supposition.
25     Q. Well, there is -- there is a claim in this

Page 152

1 case for punitive damages and one of the things in a
2 punitive damage claim that's relevant is how does the
3 party who is being -- against whom punitive damages are
4 being sought, what is the position that they take
5 knowing what occurred subsequently.
6     And I am asking you, as a defendant in this
7 case, if -- with the benefit of hindsight, knowing what
8 you know now, you would have at least attempted to see
9 things done differently?
10     MR. LEGON: I'm going to object to the form
11     and the recitation of the statement of law, which
12     I think is inaccurate. Subject to that, you can
13     answer that question, if you can.
14     A. I don't -- I don't know how to answer that
15 question.
16     Q. Okay, sir. Did Mr. -- were you ever able to
17 hear Mr. Bayad speaking any words which were
18 intelligible to you from the time you heard the yell to
19 the time he was carted away?
20     MR. LEGON: Object to the form. You may
21     answer.
22     Q. Until the time he was taken away. Excuse
23 me.
24     A. Yes.
25     Q. Where was he when you heard him saying

Page 153

1 something which you understood?
2    A. In the fountain.
3    Q. What did he say?
4    A. I'm just trying to think of the words. I --
5 I don't recall the -- the words, but it -- it was
6 something like, "What am I going to do?"
7    Q. Anything else?
8    A. No.
9    Q. Up to and including the time that Mr. Bayad
10 was taken away by ambulance, can you recall him having
11 said anything else?
12    A. No.
13    Q. At any time did you observe Mr. Bayad engage
14 in activity which you understood or took to be in the
15 nature of a threat or an assault against any person?
16    A. No.
17    Q. Did you actually see Mr. Bayad attempt to do
18 harm to himself?
19    A. No.
20    Q. Did persons tell you that they had seen
21 Mr. Bayad either take action against himself or against
22 others which appeared to be -- let me rephrase the
23 question.
24    Did anyone tell you that they had observed
25 Mr. Bayad take any action that seemed to be -- put

Page 154

1 others in danger?
2    A. No.
3    Q. Did anyone tell you that they had observed
4 Mr. Bayad take action which seemed to put himself in
5 danger?
6    A. Well, I guess lying in the fountain seemed to
7 be not a -- a thing that would be in his own best
8 interest or -- or reasonable action.
9    Q. Regardless of whether it was reasonable or
10 not, let me ask you this: Do you know why he went in
11 the fountain?
12    A. No, I don't.
13    Q. Did you see him attempt to drown himself, for
14 example?
15    A. Well, I did see someone holding his head up.
16    Q. All right. Well, you told me that person was
17 sitting on the side of the fountain?
18    A. Yeah.
19    Q. And Mr. Bayad was in the water?
20    A. Lying down on his side.
21    Q. It's been -- it was described for us
22 yesterday or the day before as like cradling.
23    Is that what you saw, as well?
24    MR. LEGON: Object to the form.
25    A. He was holding his head, in my opinion.

Page 155

1    Q. Well, did you see someone trying to pull him
2 out of the fountain in an effort to rescue him, if you
3 will?
4    MR. LEGON: Object to the form.
5    A. He would not move and that's why
6 Mr. Lukosavich went to a sitting position.
7    Q. Well, I'm trying to depict, based on your
8 words and observations, if you can tell it for me, if
9 you noticed some resistance, for example, Mr. Bayad
10 trying to take his head away from Mr. Lukosavich so
11 that he could drown himself.
12    Did you see anything like that?
13    A. No.
14    Q. Has anyone ever told you what Mr. Bayad's
15 version of the events are in terms of why he jumped in
16 the fountain?
17    A. I -- I -- I was -- I guess from the suit and
18 so forth that the --
19    MR. LEGON: Well, let me caution the witness
20 not to reveal the contents of any communications
21 you might have had with me or Mr. Fash or any
22 attorney subject to this dispute. If it did, you
23 may not reveal any such discussions.
24    A. I have no idea why he went in the fountain.
25    Q. You read the Complaint, right?

Page 156

1    A. Yes.
2    Q. That's a communication from Ms. Alexander,
3 not your lawyer. She wrote the Complaint, okay?
4    A. All right.
5    Q. Can you accept my representation in that
6 regard? Your lawyer didn't sue you, I swear.
7    The question to you is, do you have, other
8 than that Complaint, to make it easy, any understanding
9 of Mr. Bayad's version of the events as to why he
10 jumped in the fountain?
11    You don't even have to look at it because I'm
12 just asking you if, other than that, you know anything
13 about it.
14    MR. LEGON: That you did not learn from
15 counsel.
16    A. No.
17    Q. When Mr. Bayad got to Largo that day before
18 the interview began, how did he appear?
19    A. He appeared a bit nervous.
20    Q. Was there anything else about his behavior
21 that seemed unusual to you?
22    A. No.
23    Q. When Mr. Laurino, in his -- in your presence,
24 told him that he was there to talk about the
25 American Express Card, as has previously been

Page 157

1 discussed, what, if anything, did he do or say while
2 still in your presence?
3    A. At the time he was sitting at the head of the
4 table and he explained it and Anthony was sitting down
5 looking at it and we were excused. I don't remember
6 anything that was said.
7    Q. All right. I asked you previously if you can
8 recall Mr. Bayad ever discussing with you any concerns
9 that he had about -- I think I used the word
10 atmosphere, of the Largo office. Do you recall that?
11    A. Yeah.
12    Q. Did anyone, at any time, ever bring to your
13 attention any discussion about concerns they might have
14 had about what I will refer to as atmospheric issues
15 relating to ethnicity and diversity prior to your
16 ceasing to be General Manager of the facility?
17    A. No.
18    Q. Is it your testimony that in the year,
19 roughly, that you were GM, that that was never a
20 subject of discussion with you?
21    A. No.
22    Q. And I include in that not just Mr. Bayad, but
23 others who might have -- who might identify themselves
24 as members of an ethnic group.
25    A. Not to my recollection.

Page 158

1    Q. Did you know a Mr. Letzi?
2    A. Yes.
3    Q. Did Mr. Letzi ever complain to you about
4 Mr. Bayad or Mr. Navas?
5    A. I had a discussion with Mr. Letzi about
6 bringing an escalation of a customer problem to
7 Mr. Bayad examine Mr. Bayad not responding.
8    Q. Okay. Is that the end of it?
9    A. Yes. And he gave me his -- his thoughts and
10 concerns on the matter.
11    Q. Did it get resolved?
12    A. Yes, it did, but not in -- not in the time
13 frame that I would have liked it or Mr. Letzi would
14 have liked it.
15    Q. Did you ever tell anybody at Largo that they
16 ought to play together like good children?
17       MR. LEGON: Object to the form.
18    A. Not that I recall.
19    Q. Are those words that you would have used?
20    A. No.
21    Q. Do you view the -- do you view the concept of
22 team play and working together as a team as being
23 equivalent to a parent telling their children to play
24 together well?
25    A. No.

Page 159

1    Q. What is your reaction to the perspective
2 taken by a company employee that the concept of team
3 play is that of being told to play together like good
4 children?
5       MR. LEGON: Object to the form. You may
6    answer.
7    A. I don't -- I don't -- I don't understand it.
8    Q. Have you ever heard that expression before?
9    A. No.
10    Q. Or an expression similar to that?
11    A. No.
12    Q. Does it appear to be -- to you to be a
13 helpful reaction to the concept of team play as
14 expressed by a supervisor?
15       MR. LEGON: Object to the form. You may
16    answer.
17    A. No.
18    Q. Did Mr. Watts ever speak to you about
19 Mr. Bayad?
20    A. The discussions I had with Mr. Watts were
21 with respect to Mr. Bayad sharing technical expertise
22 with him.
23       The -- the discussions that I -- I'm aware of
24 with Mr. Watts was the fact that when Mr. Watts, as a
25 technical support engineer, had a question or a problem

Page 160

1 to do with Bay and went to Anthony Bayad, Mr. Bayad
2 would not share the analysis or the diagnostics with
3 him so that he might learn.
4    Q. He was keeping his expertise to himself?
5    A. Yes.
6    Q. All right. Was that a subject of counsel --
7    A. Yes.
8    Q. -- with Mr. Bayad?
9    A. Yes.
10    Q. Anything else?
11    A. No.
12    Q. Mr. Bond, did he ever complain about
13 Mr. Bayad?
14    A. Not to my recollection.
15    Q. Did Mr. Pleasant ever do so?
16    A. Not to my recollection.
17    Q. Did Mr. Hadler ever do so?
18    A. Not to my recollection.
19    Q. Do you remember all of the gentlemen that I
20 just identified --
21    A. Yes.
22    Q. -- Letzi, Watts, Bond, Pleasant, Hadler?
23    A. Yes.
24    Q. To your knowledge, did any of them ever
25 resign or ask for a transfer as a result of interaction

Page 161

1 that they had with Mr. Bayad?

2    A. That -- we had a couple of people, and I

3 don't know out of that list that you had, that because

4 of the lack of team effort on the part of Anthony and

5 Amado's -- Mr. Navas' lack of -- of leadership in -- in

6 melding a better working unit, had discussed their --

7 the fact that they may want an opportunity in another

8 group within the Largo facility.

9    Q. Do you know what a mercenary is?

10    MR. LEGON: Object to the form. You may

11 answer.

12    A. Yes.

13    Q. What is your understanding of that word?

14    MR. LEGON: Object to the form. You may

15 answer.

16    A. It's a person who is hired to do a specific

17 job.

18    Q. Someone who is known to be expendable?

19    MR. LEGON: Object to the form. You may

20 answer.

21    A. I don't know that that is what I would

22 consider a mercenary as opposed to someone who is hired

23 to do a -- a specific job that the individual doesn't

24 want to do.

25    Q. Have you ever used the term mercenary to

Page 162

1 describe any of your employees at Largo?

2    A. Not that I'm aware of.

3    Q. Have you ever told anyone that your intent

4 with respect to Mr. Bayad was to use him as a mercenary

5 for a year or so and then fire him?

6    MR. LEGON: Object to the form. You may

7 answer.

8    A. Not that I remember.

9    Q. Well, similar to what I said previously, do

10 you deny ever having said that?

11    A. I don't recall saying that.

12    Q. I don't want to go through what we did

13 again --

14    A. Okay.

15    Q. -- but would you tell me whether or not you

16 deny ever having told anyone that?

17    MR. LEGON: Object to the form. Asked and

18 answered. You can try and answer yet again.

19    A. I -- I don't recall saying that or using

20 those words with respect to Mr. Bayad.

21    Q. Did you ever use words to that effect, with

22 respect to Mr. Bayad, that you intended to use him for

23 a year and then fire him?

24    MR. LEGON: Object to the form. You may

25 answer.

Page 163

1    A. No, I don't recall saying that.

2    Q. Is it -- is it, no, or that you don't

3 recall?

4    A. No.

5    MR. LEGON: Object to the form.

6    Q. Did you ever tell anyone that Mr. Bayad was

7 overly motivated?

8    A. No.

9    Q. Did you ever tell Mr. -- anyone that

10 Mr. Bayad was too much of a go-getter or words to that

11 effect?

12    A. No.

13    Q. Did you ever tell Mr. Bayad that he would

14 obtain promotion to a B band manager for his efforts

15 associated with the Fort Lauderdale office?

16    A. No.

17    Q. Do you recall having seen an electronic mail

18 message purported to be authored by Mike Reed

19 containing ethnically offensive language?

20    MR. LEGON: Object to the form. You may

21 answer.

22    A. I saw the e-mail message.

23    Q. When did you first see that?

24    A. The morning that it was sent.

25    Q. Were you copied on it electronically?

Page 164

1    A. No. My administrator received a copy of it.

2    Q. Who is that?

3    A. Debbie Garcia.

4    Q. Is that your current administrator or the one

5 when you were GM?

6    A. The one when I -- the -- she was my

7 administrator when I was in that position.

8    Q. All right. So she was no longer your

9 administrator --

10    A. No, she is still my administrator.

11    Q. Okay. She moved over with you?

12    A. Yes.

13    Q. How did she get it, do you know?

14    A. She was an administrator that supported that

15 group prior to taking the position with me.

16    And apparently they sent this out in sort of

17 a -- a group mailing I.D. and she was still included as

18 part of the group in that list.

19    Q. Do you agree generally that whoever the

20 author of the e-mail that we are referring to, which is

21 Exhibit 20 to the prior depositions, whoever the author

22 of that was, if discovered and detected, they should be

23 immediately fired without reservation whatsoever?

24    MR. LEGON: Object to the form. You may

25 answer.

Page 165

1   A. Yes.
2   Q. Do you agree that it would never be
3   appropriate in any work environment to refer to any
4   person using a six letter word that starts with N? Do
5   you know the word that I'm referring to, sir?
6        MR. LEGON: Just show him the document.
7   Q. N-i-g are the first three letters.
8   A. Yes, I -- I agree with you. That's
9   absolutely wrong.
10  Q. Do you agree that it would never be
11  appropriate in the context of a -- a business such as
12  Lucent Technologies to refer it a person employed there
13  as a dirty Arab?
14  A. Yes.
15  Q. Do you agree that it would never be
16  appropriate, in the context of a work environment such
17  as Lucent, to refer to a person of Hispanic descent as
18  a spick?
19  A. Yes.
20       MR. LEGON: Is that less offensive than the N
21  word? You can say that?
22  Q. Would you agree that it would never be
23  appropriate, in the context of a work environment such
24  as Lucent, to tell someone known to be from the
25  Middle East or of Arabic descent when asking them to do

Page 166

1   something expeditiously to tell them to take a flying
2   carpet?
3        MR. LEGON: Object to the form. You may
4        answer.
5   A. I think I would have to understand the
6   circumstance and the context of the discussion,
7   et cetera, before I could make a decision on that.
8   Q. The context and discussion would be as
9   follows: Someone wants an Arab American employee to
10  come to be interviewed by security personnel and that
11  person is resisting coming because they are concerned
12  about what's going to happen at that interview. The
13  manager of that person, that associate, in reference to
14  trying to get them there expeditiously says or is
15  overheard to say, "I don't care if he has to take a
16  flying carpet. I want him here now." That would be
17  the circumstance.
18       MR. LEGON: Object.
19  Q. Given that circumstance, sir, can you ever
20  conceive of -- can you tell me whether or not language
21  such as that would be appropriate?
22       MR. LEGON: I object to the form of the
23  question. You may answer.
24  A. I'm concerned with it.
25  Q. You don't think that that's an appropriate

Page 167

1   : use of the English language in reference to an Arab
2   American associate?
3        MR. LEGON: Object to the form of the
4        question.
5   Q. I'll rephrase the question.
6        Do you think that language could ever be
7   appropriate in the context of speaking about an Arab
8   American associate by a manager?
9        MR. LEGON: I object to the form of the
10  question. You may answer.
11  A. Yes.
12  Q. When would it be appropriate?
13  A. I don't know. When you say when would it be
14  appropriate, I -- rephrase the question. Maybe I --
15  Q. You asked me to put the matter in context.
16  A. Yeah.
17  Q. When I did so, did you understand the
18  specific context that I was referring to?
19       MR. LEGON: Object to the form of the
20  question.
21  A. Yes.
22  Q. Do you know the person who spoke those
23  words?
24  A. Yes.
25  Q. Do you know what the circumstances were when

Page 168

1   he spoke those words?
2   A. Yes.
3   Q. All right. Do you believe that when he did
4   that he was acting appropriately in reference to a
5   person of Arab American descent?
6        MR. LEGON: Object to the form.
7   A. And I answered I would have concerns about
8   that.
9   Q. Did Mr. Bayad ever request that he be
10  transferred to sales to you?
11  A. No. He discussed an issue with me where he
12  was working on one of the -- one of the accounts that
13  he received the bonus on because he was supporting
14  them, Wellspring or whatever, and brought up the fact
15  of how much the sales people made and, basically,
16  engaged me in a discussion of paying him more.
17  Q. Okay. And that was the extent of it?
18  A. Yes, it was.
19  Q. Did anyone at senior management ever speak to
20  you about the matters leading up to Mr. Bayad's
21  termination?
22  A. No.
23  Q. See if you can tell me whether or not
24  Exhibit 8 to your deposition appears to be what it is,
25  which is a summary of your business experience at some

Page 169

1 point in your career.

2    A. Yes.

3    Q. Is that, in fact, what it is?

4    A. Yes.

5    Q. Would that have been -- that would have been

6 prior to the birth of Lucent Technologies; correct?

7    A. Yes.

8    Q. And when you were described here as Director

9 of Business Planning, were you in Largo?

10    A. Yes.

11    Q. That's before you were promoted and made GM

12 in New Jersey?

13    A. Right.

14    Q. Do you have a Master's degree in business

15 administration?

16    A. No.

17    Q. Have you ever represented to any employer

18 that you have a Master's degree in business

19 administration?

20    A. No. I -- I specifically put on my resume

21 that it's an M.B.A., evening courses.

22    Q. I'm speaking other than Exhibit 8. Have you

23 ever represented to anyone at AT&T or any affiliated

24 company that you are the holder of a Master's degree in

25 business administration?

Page 170

1        MR. LEGON: Object to the form. You may

2    answer.

3    A. No.

4        MR. SALES: No more questions.

5        MR. LEGON: We will read. If he orders it I

6    will take a copy with a disk and a mini

7    transcript.

8            * * * * * *

9        THEREUPON, THE DEPOSITION WAS CONCLUDED AT

10 1:04 P.M.

11            * * * * * *

12            STIPULATION

13        It was thereupon stipulated and agreed by and

14 between counsel present for the respective parties and

15 the deponent that the reading and signing of this

16 deposition by the deponent is not waived.

17

18

19

20

21

22

23

24

25

Page 171

1            SIGNATURE PAGE FOR DEPONENT

2

3 ANTHONY BAYAD,

4        Plaintiff,
                        Case No.: 97-6671-C.V.-ROETTGER
5 vs.                    Magistrate Seltzer

6 LUCENT TECHNOLOGIES, INC.,
  LEWIS KASLOW, MIKE REED,
7 RONALD LAURINO, ANTHONY SAVASTANO,
  and JOAN GROHE,
8
        Defendants.
9 _____/

10
        I have read the foregoing transcription of my
11 deposition pages 3 through 170, and hereby subscribe to
   the foregoing deposition, said subscription to include
12 any corrections and/or amendments hereto.

13

14        _____
          ANTHONY SAVASTANO
15

16        WITNESS my hand and official seal, this _____
   day of _____, 1998.
17

18

19        _____
          Notary Public
20        State of Florida at Large

21        My Commission Expires: _____
          Personally Known _____
22        Produced Identification _____
          Type: _____
23

24

25

Page 172

1            CERTIFICATE OF OATH

2
   STATE OF FLORIDA
3 COUNTY OF HILLSBOROUGH

4

5

6

7        I, the undersigned authority certify that

8 ANTHONY SAVASTANO personally appeared before me and was

9 duly sworn by me.

10

11        WITNESS my hand and official seal, this 28th

12 day of June, 1998.

13

14        KEVIN P. MIKUS, RPR, RMR

15            Notary Public - State of Florida

16

17

18

19

20

21

22

23

24

25

Page 173

```
 1              CERTIFICATE OF REPORTER
 2
    STATE OF FLORIDA
 3  COUNTY OF HILLSBOROUGH
 4
 5
 6        I, KEVIN P. MIKUS, Registered Merit Reporter,
 7  certify that I was authorized to and did
 8  stenographically report the foregoing deposition; and
 9  that the transcript is a true record of the testimony
10  given by the witness.
11        I further certify that I am not a relative,
12  employee, attorney, or counsel of the parties, nor am I
13  a relative or employee of any of the parties' attorney
14  or counsel connected with the action, nor am I
15  financially interested in the action.
16        DATED this 28th day of June, 1998.
17
18         KEVIN P MIKUS, RPR, RMR
19
20
21
22
23
24
25
```